1   Joseph J. Tabacco, Jr. (75484)
    Christopher T. Heffelfinger (118058)
2   Jennifer S. Abrams (178203)
    BERMAN DeVALERIO PEASE
3     TABACCO BURT & PUCILLO
    425 California Street, Suite 2025
4   San Francisco, California 94104-2205
    Telephone: (415) 433-3200
5   Facsimile: (415) 433-6382

6   Liaison Counsel for Lead Plaintiff
    Connecticut Retirement Plans and Trust Funds
7
    Jonathan M. Plasse
8   Barbara J. Hart
    Louis Gottlieb
9   Lisa Buckser-Schulz
    David J. Goldsmith
10  GOODKIND LABATON RUDOFF
      & SUCHAROW LLP
11  100 Park Avenue
    New York, New York 10017-5563
12  Telephone: (212) 907-0700
    Facsimile: (212) 818-0477
13
    Lead Counsel for Lead Plaintiff Connecticut
14  Retirement Plans and Trust Funds

15
                  **UNITED STATES DISTRICT COURT**
16
                 **NORTHERN DISTRICT OF CALIFORNIA**
17
                         **OAKLAND DIVISION**
18  _____
                                    )
19                                  )   Master File No. C-02-1486 CW
    IN RE JDS UNIPHASE CORPORATION  )
20  SECURITIES LITIGATION           )   CLASS ACTION
                                    )   ─────────────
21  _____)
                                    )   **FIRST AMENDED CONSOLIDATED**
22  THIS DOCUMENT RELATES TO:       )   **COMPLAINT FOR VIOLATION OF THE**
           ALL ACTIONS             )   **FEDERAL SECURITIES LAWS**
23                                  )
                                    )   Jury Trial Demanded
24  _____)   ──────────────────

25         Lead Plaintiff, by its undersigned attorneys, for its complaint, alleges the following

26  upon personal knowledge as to itself and its own acts, and upon information and belief as to all

27  other matters, based upon the investigation made by and through its attorneys, which

28  investigation included, among other things, a review of the public documents and press

1 | releases of JDS Uniphase Corporation, reports by the media and securities analysts about the
2 | Company, consultation with experts, and interviews with more than 50 former employees of
3 | JDS at JDS facilities throughout the United States with detailed knowledge of the Company's
4 | operations.

5 | **SUMMARY AND OVERVIEW**

6 |      1.      This is a securities class action on behalf of all persons and entities (the "Class")
7 | who purchased or otherwise acquired the securities of JDS Uniphase Corporation ("JDS" or the
8 | "Company") between July 27, 1999 and July 26, 2001, inclusive  (the "Class Period"), against
9 | JDS and certain of its officers and directors and its controlling shareholder for violations of the
10 | Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the
11 | "Securities Act").   The individual Defendants named herein, along with more than a dozen
12 | other officers and directors of JDS, engaged in massive insider trading of unprecedented
13 | proportions while in possession of undisclosed material adverse information, collectively
14 | disposing of more than $3.2 billion worth of JDS securities during the Class Period.

15 |      2.      The Class Period incorporates two separate and distinct time periods that are
16 | presented here as Subclasses.   The first Subclass consists of all persons and entities who
17 | purchased or otherwise acquired JDS securities from July 27, 2000 to July 26, 2001 ("Subclass
18 | Period A").   The second Subclass consists of all persons and entities who purchased or
19 | otherwise acquired JDS securities from July 27, 1999 to July 26, 2000 ("Subclass Period B").

20 |      3.      JDS is a provider of advanced fiber optic components and modules that are sold
21 | to telecommunications and cable television system providers worldwide.  During most of the
22 | 1990s, JDS experienced great demand for its products which translated into strong financial
23 | results, and led it to be named by *The Wall Street Journal* as one of the top ten stocks of the
24 | 1990s.

25 |      4.      Defendants' strategy during the Class Period was to grow the Company through
26 | a series of acquisitions of other companies (including its suppliers and competitors) that JDS
27 | would acquire for stock rather than cash.  Obviously, the higher the price of JDS stock, the
28 | fewer the number of shares JDS would have to issue for each acquisition.  This was especially

1    significant to JDS's officers and directors because they owned a substantial number of shares

2    of JDS common stock and did not want to see the value of their securities diluted by the

3    issuance of too many new shares.  Thus, it was imperative that JDS **appear** to be a Company

4    that was experiencing very strong demand for its products, such that it would keep reporting

5    earnings growth quarter after quarter.

6        5.        JDS appeared to do just that and, during the Class Period, JDS made the

7    following acquisitions with its common stock:

8            (a)     November 1999 – JDS acquired EPITAXX for $400 million worth of

9    JDS common stock.

10           (b)     February 2000 – JDS acquired Optical Coating Laboratory, Inc.

11   ("OCLI") for 1.856 shares of JDS common stock for each share of OCLI in a deal valued at

12   $2.7 billion.

13           (c)     April 2000 – JDS acquired Cronos Integrated Microsystems, Inc. for

14   6,251,247 shares of JDS stock in a deal worth $750 million.

15           (d)     June 2000 – JDS acquired E-TEK Dynamics, Inc. ("E-TEK") for 1.1

16   shares of JDS stock for each share of E-TEK in a deal worth $17.5 billion.

17           (e)     February 2001 – JDS acquired SDL, Inc. ("SDL") for 3.8 shares of JDS

18   stock for each share of SDL in a deal valued at $41 billion.

19       6.        Contrary to Defendants' unqualifiedly bullish statements concerning the

20   seemingly endless demand for the Company's products, customer demand began to slow

21   dramatically in the Spring of 2000 and had reached crisis proportions by June-July 2000.  As a

22   result of the reduced demand, JDS was accumulating excess inventory by the summer of 2000

23   that Defendants knew the Company would not be able to sell and would therefore become

24   worthless and have to be written off.

25       7.        Instead of disclosing that information to the public, JDS officers and directors

26   engaged in an unprecedented feast of insider selling beginning on July 31, 2000, disposing of

27

28

1   17 million shares of their JDS common stock for proceeds of $1.9 billion dollars.[1]

2      8.      Then, on July 26, 2001, JDS announced enormous inventory write-downs of

3   $270 million for the quarter ending June 30, 2001 as a result of the reduced demand and

4   inflated inventory that Defendants knew about no later than the fourth quarter of the fiscal year

5   ending June 30, 2000 ("Fiscal 2000"), when JDS's reported that its inventories balance was

6   $375.4 million.  JDS also announced on July 26, 2001 that as a result of reduced demand,

7   earnings per share for the fiscal year ending June 30, 2001 ("Fiscal 2001") would be far less

8   than the Company had been representing and that it would incur a loss of $0.15 per share in

9   Fiscal 2002.  On this news, JDS's common stock, which traded as high as $146.32 per share

10  during the Class Period, dropped to as low as $7.90 per share.

11                          **JURISDICTION AND VENUE**

12     9.      This action arises under Sections 11, 12(a)(2), and 15 of the Securities Act, 15

13  U.S.C. § 77k, 77*l*(a)(2), and 77*o,* and Sections 10(b), 14(a), 20(a) and 20A of the Exchange

14  Act, 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and 78tA and Rules 10b-5 and 14a-9 promulgated

15  thereunder, 17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9.

16     10.     This Court has subject-matter jurisdiction over this action pursuant to Section

17  22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa,

18  and 28 U.S.C. §§ 1331 and 1367.

19     11.     Venue is proper in this District pursuant to Section 22 of the Securities Act,

20  Section 27 of the Exchange Act, and 28 U.S.C. § 1391.  Many of the false and misleading

21  statements were made in or issued from this District.

22     12.     The Company's corporate headquarters are in San Jose, California where the

23  day-to-day operations of the Company are directed and managed.

24                          **THE PARTIES**

25     13.     Lead Plaintiff Connecticut Retirement Plans and Trust Funds ("Lead Plaintiff")

26  purchased JDS securities as described in the certification attached as Exhibit A and was

27  damaged thereby.

28
---
[1] All share and price information has been adjusted for stock splits.

14.      The Plaintiffs referred to in Exhibit B also purchased or otherwise acquired the securities of JDS during the Class Period.

15.      Defendant JDS Uniphase Corporation resulted from a merger of equals between Uniphase Corporation and JDS FITEL Inc. on June 30, 1999.  JDS is a provider of advanced fiber optic components and modules that are sold to telecommunications and cable television system providers worldwide.  These providers are commonly referred to as OEMs and include, *inter alia*, Lucent, Nortel, Alcatel, and CIENA.  The Company's components and modules are the basic building blocks for fiber optic networks and perform both optical-only (passive) and optoelectronic (active) functions within these networks.  The products include semiconductor lasers, high-speed external modulators, transmitters, amplifiers, couplers, multiplexers, circulators, tunable filters, optical switches and isolators for fiberoptic applications.   The Company's stock trades actively in an efficient market on the NASDAQ National Market System.

16.      Defendant Jozef Straus ("Straus"):

(a)      Defendant Straus was, during the Class Period, the Company's Co-Chairman of the Board and, since May 2000, has been Chief Executive Officer of the Company.  Straus founded JDS Fitel in 1981 and served as its President and CEO from 1993 until the merger with Uniphase.

(b)      Defendant Straus signed numerous materially false statements filed with the Securities and Exchange Commission ("SEC"), including registration statements related to the OCLI, E-TEK and SDL acquisitions and JDS's Form 10-K for Fiscal 2000.

(c)      Defendant Straus reviewed and approved press releases issued by JDS during the Class Period.

(d)      Defendant Straus also made numerous additional false and misleading statements about JDS on conference calls with analysts and to the news media that were incorporated into analyst reports and news stories.

(e)      During the Class Period, while in possession of undisclosed adverse information about JDS, **Straus sold 2,558,488 shares -- or 99.97% -- of his JDS stock for**

1    proceeds of $179 million.  Moreover, Straus sold 1,468,044 of those shares in August 2000,

2    for proceeds of $172.9 million.

3         17.      Defendant Kevin Kalkhoven ("Kalkhoven"):

4              (a)      Defendant Kalkhoven was the Company's Chief Executive Officer from

5    June 1999 to May 2000.  Kalkhoven joined Uniphase Corporation in 1992 as President and

6    CEO.

7              (b)      Defendant Kalkhoven signed materially false statements filed with the

8    SEC, including JDS's registration statements related to the OCLI and E-TEK mergers.

9              (c)      Defendant Kalkhoven reviewed and approved press releases issued by

10   JDS during Subclass Period B until his retirement in May 2000.  Following his retirement,

11   Kalkhoven continued to have access to and continued to receive material nonpublic

12   information about JDS, including information about sales and demand for the Company's

13   products.

14             (d)      Defendant Kalkhoven also made numerous additional false and

15   misleading statements about JDS on conference calls with analysts and to the news media that

16   were incorporated into analyst reports and news stories.

17             (e)      During the Class Period, while in possession of undisclosed adverse

18   information about JDS, **Kalkhoven sold 3,561,204 shares -- or 76.6% -- of his JDS stock for**

19   **proceeds of $246.4 million.  Moreover, Kalkhoven sold 1,312,500 of those shares between**

20   **July 31 and August 31, 2000 for $158.7 million.**

21        18.      Defendant Anthony R. Muller ("Muller"):

22             (a)      Defendant Muller was Chief Financial Officer, Executive Vice President

23   and Secretary of the Company during the Class Period.

24             (b)      Defendant Muller signed numerous materially false statements filed with

25   the SEC, including JDS's registration statements related to the OCLI, E-TEK and SDL

26   mergers, JDS's Form 10-K for Fiscal 2000 and each of the Form 10-Qs filed by JDS during the

27   Class Period.

28             (c)      Defendant Muller reviewed and approved press releases issued by JDS

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    6

1    during the Class Period.

2           (d)    Defendant Muller also made numerous additional false and misleading

3    statements about JDS on conference calls with analysts and to the news media that were

4    incorporated into analyst reports and news stories.

5           (e)    During the Class Period, while in possession of undisclosed adverse

6    information about JDS, **Muller sold 1,055,000 shares -- or 39.5% -- of his JDS stock for**

7    **proceeds of $62.3 million.  Muller sold 355,000 shares between July 31 and August 31,**

8    **2000 for $42.2 million.**

9    19.    Defendant Charles J. Abbe ("Abbe"):

10          (a)    Abbe  was President and Chief Operating Officer of JDS from May 18,

11   2000 through June 12, 2001.

12          (b)    Defendant Abbe reviewed and approved press releases issued by JDS

13   during the Class Period.

14          (c)    Defendant Abbe made numerous false and misleading statements about

15   JDS on conference calls with analysts and to the news media that were incorporated into

16   analyst reports and news stories.

17          (d)    During the Class Period, while in possession of undisclosed adverse

18   information about JDS, **Abbe sold 490,000 shares -- or 87.8% -- of his JDS stock for**

19   **proceeds of $45.8 million.  Abbe sold 150,000 JDS shares between July 31 and August 31,**

20   **2000, for $17.6 million**.

21   20.    The individuals named as Defendants in ¶¶ 16 - 19 above are referred to herein

22   as the "Individual Defendants."  The Individual Defendants, because of their positions with the

23   Company, possessed the power and authority to control the contents of JDS quarterly reports,

24   press releases and presentations made to securities analysts, money and portfolio managers,

25   and institutional investors, i.e., the market.  Each Individual Defendant was provided with

26   copies of the Company's reports and press releases, alleged herein to be misleading, prior to or

27   shortly after their issuance, and had the ability and opportunity to prevent their issuance or

28   cause them to be corrected.  Moreover, each Individual Defendant had access to JDS's Oracle

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT          7

1   database system which tracked JDS's customer orders and inventory levels company-wide.

2   21.      Because of their positions and access to material non-public information, each

3   of the Individual Defendants knew that demand for the Company's products was declining

4   dramatically and that excess inventory was accumulating as a result.  They also knew the

5   adverse facts specified herein had not been disclosed to and were being concealed from the

6   public, and that the positive representations which were being made were materially false and

7   misleading.

8   22.      Defendant The Furukawa Electric Co., Ltd., through its wholly owned

9   subsidiaries FES Holding, Inc. and FEJ Sales, Inc. (collectively referred to herein as

10  "Furukawa"), was the largest shareholder of JDS, owning approximately 27% of the

11  Company's stock at the beginning of the Class Period.   During the Class Period, while in

12  possession of material adverse information about weakening demand for JDS's products and

13  rising levels of excess inventory, **Furukawa sold (or delivered to a dealer) 17,864,000**

14  **shares of its JDS stock for which it received proceeds of $2.1 billion.   These sales**

15  **represented 99.3% of JDS shares held by Furukawa that were registered and available**

16  **for sale.**

17                          **CLASS ACTION ALLEGATIONS**

18  23.      Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and

19  (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who

20  purchased or otherwise acquired JDS publicly traded securities between July 27, 2000 through

21  July 26, 2001 ("Subclass A") and all persons and entities who purchased or otherwise acquired

22  JDS publicly traded securities between July 27, 1999 through July 26, 2000 ("Subclass B").

23  Lead Plaintiff also asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act and

24  Section 14 of the Exchange Act on behalf of the following three subclasses: (i) the "OCLI

25  Subclass," consisting of all persons and entities who exchanged OCLI common stock for JDS

26  common stock pursuant to the OCLI Registration Statement (defined below); (ii) the "E-TEK

27  Subclass," consisting of all persons and entities who exchanged E-TEK common stock for JDS

28  common stock pursuant to the E-TEK Registration Statement (defined below); and (iii) the

"SDL Subclass" consisting of all persons and entities who exchanged SDL common stock for JDS common stock pursuant to the SDL Registration Statement (defined below).  Excluded from the Class and the Subclasses are: the Defendants herein; members of the families of each of the Individual Defendants; any parent, subsidiary, affiliate, partner, officer, executive or director of any Defendant; any entity in which any such excluded person has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

24.     The members of the Class and Subclasses are so numerous that joinder of all members is impracticable.  While the exact number of Class and Subclass members is unknown to Lead Plaintiff at the present time and can only be ascertained from books and records maintained by JDS and/or its agents, Lead Plaintiff believes that Class and Subclass members number in the thousands.  As of August 23, 2001, the Company had 1,324,211,931 shares of common stock issued and outstanding which, at all relevant times, actively traded on the NASDAQ National Market System, an efficient market.  During the Class Period, JDS was followed and reported on by analysts at numerous securities firms, including Credit Suisse First Boston, CIBC World Markets, Lehman Brothers, SG Cowen, ABN AMRO, and JP Morgan.

25.     Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions solely affecting individual members of the Class and Subclasses.  Among the questions of law and fact common to the Class and Subclasses are:

(a)     Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein in connection with claims asserted under the Exchange Act;

(c)     Whether the documents, reports, filings, releases, and statements disseminated to the Class and Subclasses by Defendants during the Class Period

1  misrepresented material facts about the business prospects, performance, and financial
2  condition of JDS;

3        (d)     With respect to the OCLI, E-TEK and SDL Registration Statements,
4  whether Defendants acted negligently in misrepresenting material facts;

5        (e)     Whether Defendants acted knowingly or with deliberate recklessness in
6  misrepresenting material facts herein in connection with the fraud based claims;

7        (f)     Whether the market price of JDS securities during the Class Period was
8  artificially inflated due to the misrepresentations complained of herein; and

9        (g)     Whether Lead Plaintiff and the other members of the Class and
10  Subclasses have sustained damages and, if so, the appropriate measure thereof.

11      26.     Lead Plaintiff will fairly and adequately represent and protect the interests of
12  the members of the Class and Subclasses.  Lead Plaintiff has retained competent counsel
13  experienced in class and securities litigation and intends to prosecute this action vigorously.
14  Lead Plaintiff is a member of the Class and does not have interests antagonistic to, or in
15  conflict with, the other members of the Class.

16      27.     Lead Plaintiff's claims are typical of the claims of the members of the Class and
17  Subclasses.  Lead Plaintiff and members of the Class and Subclasses purchased or otherwise
18  acquired JDS securities during the Class Period at artificially inflated prices and have sustained
19  damages arising out of the wrongful course of conduct alleged herein.

20      28.     A class action is superior to other available methods for the fair and efficient
21  adjudication of this controversy.  Since the damages suffered by individual Class members
22  may be relatively small, the expense and burden of individual litigation make it virtually
23  impossible for the Class members individually to seek redress for the wrongful conduct
24  alleged.  Lead Plaintiff knows of no difficulty that will be encountered in the management of
25  this litigation that would preclude its maintenance as a class action.

26

27

28

**SUBCLASS PERIOD A**
**(JULY 27, 2000 - JULY 26, 2001)**

**THE FRAUDULENT SCHEME**

29.    In the late 1990s and 2000, JDS portrayed itself as a company experiencing explosive growth with such strong demand for its products that the only possible impediment to JDS's continued success was its capacity limitations (which the Company stated it was addressing).    While JDS had historically experienced solid demand for its fiber optic components and modules, by the Spring of 2000 it became obvious at all levels of the Company that demand had softened and that the Company had only one or two more quarters to continue to impress the market with its successes.

30.    Indeed, Defendants learned by no later than the Spring of 2000 that demand for its products was waning and demand in fact had declined dramatically by June or July 2000. However, despite the fact that JDS's customers were reducing and even canceling orders during that time frame, Defendants continued to report strong sales (partially as a result of orders it had received earlier and intentionally deferred delivery of into later quarters) and to publicly maintain that demand remained so robust that there was no end in sight to JDS's explosive revenue and earnings growth.  In fact, Defendants even guided analysts to project higher and higher sales and earnings.  JDS also consistently maintained that although it had some very big customers such as Lucent and Nortel, it was not overly dependent on those customers as the Company was developing a broad customer base.

31.    At the same time that Defendants were feeding the market with unqualifiedly positive statements about JDS's outlook, **the Individual Defendants and other Company insiders unloaded millions of shares of JDS common stock (constituting most or all of their JDS holdings) on an unsuspecting market, netting more than $3.2 billion in proceeds, $1.6 billion of that between July 31, 2000 and August 31, 2000**, immediately following the release of the Company's impressive Fiscal 2000 results and Defendants' representations -- despite knowledge to the contrary -- that there was no end in sight to the ever-growing demand for the Company's products.

32.     The internal news at JDS worsened throughout the remainder of calendar year 2000 as customers began pushing out their orders and refusing and/or delaying deliveries of JDS products.  As a result, excess inventories (products for which JDS had no firm orders) at JDS grew to such high levels that Defendants knew they could not possibly convert that inventory into sales and such inventory was therefore obsolete.  JDS reacted to the reduced demand for its products by embarking on cost-cutting strategies such as eliminating shifts, reducing or eliminating overtime and firing temporary workers.  Notwithstanding the internal measures that JDS was taking to deal with reduced demand and excess inventory, Defendants continued to paint an overly optimistic picture for the public through the end of 2000, even going so far as to emphatically reject the suggestion that demand was decreasing and that inventory was building, and encouraged analysts to raise their estimates when Defendants knew that those estimates could not possibly be achieved based on its current business conditions.

Demand for JDS Products Declined Significantly Beginning in the Spring of 2000

33.     By no later than the Spring of 2000, signs of reduced customer demand were apparent to all levels of employees at JDS corporate offices and manufacturing plants throughout the country including three of JDS's five biggest plants in the United States.

34.     For instance, a former senior financial analyst at JDS's San Jose, California headquarters, confirmed that order cancellations in the San Jose plant -- the Company's largest plant in the United States -- began in earnest in the Spring of 2000.  The financial analyst further stated that by mid-2000, orders from major customers such as Nortel, Cienna, Alcatel and ONI Systems began to dry up.

35.     Likewise, a former Senior Manufacturing Engineer in San Jose, California stated that during that same time period, employees at JDS became aware that "demand had come to a halt." An Opto-Mechanical Engineer in San Jose also reported that demand decreased between the Spring and early Summer of 2000. In addition, an Account Manager in San Jose confirmed that by late Spring 2000, there was widespread delaying of orders for JDS products by both large and small customers.

36.     As described by a former Materials Planner in Bloomfield, Connecticut (one of JDS's five largest plants in the United States), work orders "decreased drastically in or around April 2000 and into 2001." The Materials Planner added that "it got to the point where there was so much down time" that the planner began "concocting training topics for work cell members, simply to keep them appropriately busy."

37.     According to a former Logistics Analyst at a JDS plant in West Trenton, New Jersey (one of JDS's top five plants in the United States), at or around the same time, Lucent and Nortel -- the Company's two biggest customers -- declined to take delivery on orders they had agreed upon, leaving the Trenton facility with approximately $40 million in excess inventory.

38.     As described by a former Senior Technician in Columbus, Ohio, by the Spring and Summer of 2000, JDS had lost a significant amount of sales from Lucent, one of its two biggest customers. According to the former employee, it was common knowledge within the Company that sales at the Columbus plant plunged around mid-2000.

39.     By mid-2000, a clear pattern of reduced demand had developed. As the Former Logistics Analyst in West Trenton put it, "no firm orders were coming in." According to that former employee, "visibility" was not high, meaning that by mid-2000, JDS officials could not say with a high degree of confidence that firm orders would be coming in with regularity.

40.     A former senior electro/mechanical inspector at JDS in San Jose asserted that the problem of customers canceling contracts developed in mid-2000, which caused inventory to rise.

41.     In or around July 2000, a Senior Quality Engineer in San Jose noted that customers were canceling orders and sending back inventory that they could not sell to their own clients.

42.     The slowdown in demand was so pervasive by mid 2000 that Defendants were forced to institute cost-cutting measures at plants across the country. For example, according to a Production Team Leader, by mid to late-2000, no overtime was authorized and temporary staff was fired at the Company's plant in Windsor, Connecticut.

43.     Similarly, a production worker in Bloomfield, Connecticut (one of the Company's five biggest plants in the United States), reported that overtime in Bloomfield was brought to a halt in the Spring of 2000 and an Engineering Technician in that same plant conceded that a two-shift operation at the plant was reduced to one shift in mid to late 2000.

44.     Further, according to a Senior Programmer Analyst in Santa Clara, California, by the late Spring or early Summer of 2000, the Santa Clara plant was running only five days a week (down from seven), almost everyone had their hours reduced and overtime was no longer available at that time.

Excess Inventory Begins to Build at JDS in 2000 as a Result of Reduced Demand

45.     Like any company engaged in manufacturing, inventory management was critical to JDS's success.  According to a former San Jose Account Manager, because JDS's products were manufactured specifically to a customer's unique specifications, if JDS produced more product than customers actually needed, those products could not be sold to others. The rapidly changing technology requirements in the fiber optics field complicated matters because a customer that used one type of product last month might need an enhanced version of that product next month.  Moreover, many of the customer purchase contracts for JDS products did not contain non-cancellation provisions.  Thus, a customer was free to refuse delivery or even return product to JDS without penalty.   As a result, if the Company's inventory exceeded customer demand, that excess inventory would quickly become worthless and would eventually have to be destroyed.  As noted in a January 31, 2001 *Motley Fool* article, "[t]he products that JDS sells can change rapidly.  The longer JDS' inventory sits on its shelves, the greater the risk that there will be spoilage.  That's wasted money."

46.     According to four former JDS employees, in order to keep tight controls over inventory levels at JDS plants throughout the world, JDS tracked its inventory on a computerized system designed by Oracle. **The Oracle system provided current information on inventory levels, customer orders and shipments.   The information on the Oracle system was available company-wide and was available to each of the Individual Defendants.**

47.     In the Spring of 2000, with customer orders beginning to dwindle, JDS's inventory began to rise and such rise was reflected on the Oracle system.  According to a former Production Team Leader in Windsor, Connecticut, by April 2000 JDS was overproducing product despite the fact that orders from virtually all JDS clients had dwindled.

48.     Further, as noted above, in or around April 2000, Lucent and Nortel refused to take delivery on prior orders, leaving the Trenton facility with approximately $40 million in excess inventory.

49.     Similarly, according to a former Senior Technician in Columbus, Ohio, by the Spring and Summer of 2000, the JDS fiber optics plant in Columbus, Ohio was producing a lot of products but not actually shipping products to customers.

50.      A former cost accountant at JDS in San Jose, who was in charge of inventory confirmed a large build-up of inventory at JDS in 2000, which accumulated as a result of mass cancellations by Nortel and other companies.  According to the accountant, the inventory buildup was out of proportion with the demand for product, and there was a much higher accumulation of both raw material and finished product than there were confirmed orders. Ultimately, in March 2001, a great deal of the finished product was destroyed as obsolete.

51.     Further, a former materials supervisor at JDS in San Jose, whose job responsibilities included supervising six stockrooms and an offsite storage facility, also confirmed that there was a buildup of a "huge amount" of excess material throughout 2000. The massive buildup of inventory, which far exceeded demand, consisted of finished product as well as raw material, mostly raw fiber used in fiber optics.  For example, the list of solid, firm orders for products at the San Jose plant on the Oracle database system was 50-60% below the quantity of material ordered from JDS's raw material products suppliers.  All six stockrooms were full of inventory by June 2000, and offsite storage areas were used for storing additional inventory.  The stockrooms and storage area combined amounted to approximately 11,000 square feet of storage, and by May or June 2000, there was enough raw material and finished fiber optic components to keep the facility running at capacity for an entire year. Moreover, in the offsite storage facility alone, there were fifty pallets of finished products that

1   no customer had ordered.  This excess inventory was ultimately destroyed in March 2001 as

2   obsolete.

3           <u>JDS Secretly Lowered Sales Forecasts During 2000</u>

4       52.      A former account manager at JDS in San Jose, California, whose

5   responsibilities included submitting a periodic revenue forecast for the clients the manager

6   dealt with, stated that it became obvious that the Fiscal 2000 forecasts that were being prepared

7   throughout the Company were overly optimistic.  Consequently, throughout the latter half of

8   2000, the former account manager revised his internal sales forecasts downward.  These

9   downward revisions were not communicated to the investing public.

10       53.      As described below, despite all of the foregoing adverse information about

11   reduced demand and rising excess inventory levels, during the Class Period Defendants

12   represented exactly the opposite -- that demand was increasing and there was no problem with

13   the Company's inventory levels.

14                 **DEFENDANTS' FALSE AND MISLEADING**

15              **STATEMENTS DURING SUBCLASS PERIOD A**

16   JDS Misrepresents that Demand for Its Products is Strong Despite
<u>Pervasive Evidence to the Contrary, Including a Buildup of Excess Inventory</u>

17           <u>Fiscal 2000 Fourth Quarter</u>

18       54.      On July 26, 2000, JDS announced its fourth quarter fiscal 2000 ("4Q 00")

19   results in a release which stated in part:

20                  JDS Uniphase Corporation today reported sales for its fourth quarter
               ended June 30, 2000 of $524 million and pro forma net income of

21                  $114 million or $0.14 per diluted share.  Sales for the year ended June
               30, 2000 were $1.43 billion.

22

23                      Sales for the quarter were 33% above net sales of $395 million
               for the quarter ended March 31, 2000 and 173% above pro forma

24                  combined sales of $192 million for the quarter ended June 30, 1999.
               Sales for the year ended June 30, 2000 of $1.43 billion were 143%

25                  above pro forma sales for the comparable prior year period.

26       55.      Subsequent to the release of its 4Q 00 results, on July 26, 2000, JDS held a

27   conference call for securities analysts, money and portfolio managers, institutional investors,

28   brokers and stock traders to discuss the Company's business and its prospects.  During the call,

    [C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT             16

Defendants Straus, Muller and Abbe made presentations and answered questions.  During the call – and in follow-up conversations with participants – they directly disseminated important information to the market by stating:

- All product segments were strong, particularly new product introductions from recently acquired E-TEK.

- Demand for the Company's 10 Gbps components was extremely strong, though demand was strong across all product lines.

- The Company was successfully expanding its customer base to diminish its reliance on its major customers such as Nortel and Lucent.

- The Company's sales growth would exceed 50% over the coming year.

56.     Following the conference call, on July 27, 2000, securities analysts issued reports on JDS, which were based on, and repeated statements disseminated by Defendants, including on the quarterly conference call as follows:

- Credit Suisse First Boston:

    JDS's results once again outpaced both our top and bottom line forecasts.  **The demand for optical components and modules continues to exceed available supply** as carriers aggressively transition from voice centric network architectures to next generation optically based networks to support the current and anticipated massive capacity requirements.  (Emphasis added).

- ABN AMRO:

    JDS Uniphase reported another record quarter. . . .  **Demand remains strong** as the company is nearly booked for the entire September quarter, with a record backlog of $931 million . . . .  As a result, we estimate revenue will grow 18 - 19% sequentially for 1Q and over 90% in FY01.  The company's biggest bottleneck remains the capacity, as it appears to be production limited for the near term. (Emphasis added).

57.     The above-referenced statements by the Individual Defendants on the July 26, 2000 conference call as reported in the foregoing analyst reports were false or misleading when issued. The true but concealed facts were:

    (a)     As detailed above at ¶¶ 33 - 41, demand for JDS products had dropped

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    17

1   off dramatically by July 2000 as fewer and fewer orders were coming in, some orders were

2   cancelled and customers were declining to take delivery of products they had previously

3   ordered;

4         (b)    As detailed above at ¶¶ 42 - 44, by no later than the Spring and Summer

5   of 2000, and in response to reduced demand, JDS was implementing cost savings measures

6   such as reducing shifts, eliminating overtime and reducing production days at its

7   manufacturing plants; and

8         (c)    The Company's reported sales growth was not reflective of the current

9   demand for the Company's products because, as described below at ¶¶ 103 - 106, a significant

10  portion of revenues recognized by JDS during the quarter were from shipments on orders from

11  earlier periods which the Individual Defendants intentionally pushed back into later periods to

12  create the false impression that demand was continuing to grow.

13  58.    As detailed below, in the weeks following the release of the Company's 4Q 00

14  results, the Individual Defendants and other high ranking JDS insiders engaged in insider

15  selling of unprecedented proportions.  Indeed, of the $3.2 billion of JDS common stock sold by

16  company insiders during the Class Period, more than $1.6 of that  was sold between July 31,

17  2000 and August 31, 2000 when the closing price of JDS common stock ranged between

18  $112.62 and $125.12.

19  59.    On September 1, 2000, JDS filed a Form 8-K with the SEC which contained the

20  Company's Fiscal 2000 financial statements (the "September 1, 2000 8-K").  The financial

21  statements included the results previously announced by JDS in its July 26, 2000 press release

22  and reported that JDS's inventories balance at June 30, 2000 was $375.4 million -- an increase

23  of  $94.7 million over its inventories balance at March 31, 2000.  The September 1, 2000 8-K

24  attributed the 34% increase in inventories to the "ongoing increases in demand for nearly all of

25  our component and module products."

26  60.    The September 1, 2000 8-K was false and misleading.  As detailed above at

27  ¶¶ 45 - 51, as a result of declining demand, excess inventory at JDS had begun to rise in the

28  Spring of 2000 and, indeed, by June 2000 there was a full year's worth of excess inventory at

the Company's headquarters in San Jose that was ultimately destroyed in March 2001 as obsolete. Consequently, JDS's inventories balance as reported in its Fiscal 2000 financial statements was overstated in violation of generally accepted accounting principles ("GAAP") as described below and a substantial amount of that inventory was written off in the fourth quarter of Fiscal 2001.  Under GAAP, and according to the Company's own policy as described below, the excess inventory should have been written off in the quarter in which its market price fell below cost (i.e., the quarter ending June 2000).

61.     On September 28, 2000, JDS filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2000 ("Fiscal 2000 10-K").  The Fiscal 2000 10-K incorporated by reference the financial statements filed with the SEC in the September 1, 2000 8-K.  The Fiscal 2000 10-K was signed by Defendants Straus and Muller.

62.     The Fiscal 2000 10-K was false and misleading for the same reasons that the September 1, 2000 8-K was false and misleading as described in ¶ 60.

Fiscal 2001 First Quarter

63.     On October 10, 2000, Lucent, one of JDS's two biggest customers, announced in a press release that it was experiencing a slow down in its optical networking business.

64.     On October 25, 2000, Nortel reported its results for the quarter ending September 30, 2000 and noted that it was experiencing a downturn in its optical networking equipment division -- the division which made Nortel one of JDS's two largest customers. Concerned that Nortel's business woes might mean trouble for JDS, investors drove down the price of JDS common stock 21%, to $75.

65.     On October 26, 2000, JDS announced its fiscal 2001 first quarter ("1Q 01") results in a release which stated in part:

> JDS Uniphase Corporation today reported sales for its first quarter ended September 30, 2000 of $786 million and pro forma net income of $177 million or $0.18 per diluted share.
>
> Sales for the quarter were 23% above pro forma combined sales of $641 million for the quarter ended June 30, 2000 and 171% above pro forma combined sales of $290 million for the quarter ended September 30, 1999.

66.     Subsequent to the release of its 1Q 01 results, on October 26, 2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and its prospects.  During the call, Straus, Muller and Abbe made presentations and answered questions.  During the call – and in follow-up conversations with participants – they directly disseminated important information to the market by stating:

- The Company was increasing its revenue guidance going forward.

- JDS was seeing strong growth from many systems suppliers such that it was not dependent on growth from only Nortel and Lucent.

- Visibility was strong as JDS had 80 engineers who monitored customers and their respective inventory levels.

- The Company did not see any demand slowdown or inventory buildup and JDS still remained capacity constrained.

- Demand was strong and would lead to even better than previously forecasted results through Fiscal 2001.

67.     As described in a November 1, 2000 *Motley Fool* article recounting the conference call "[i]t's rare that I've listened to any conference call in which I've heard so many comments from management about how good things went in the past quarter and how good they expect business to be in the future."

68.     Following the conference call, on October 27, 2000, securities analysts issued reports on JDS, which were based on, and repeated statements disseminated by Defendants, including on the quarterly conference call as follows:

- JP Morgan:

     **The company is seeing tremendous growth from many systems suppliers, not just Nortel, Alcatel, and Lucent** - which combined to be slightly lower than the company's overall growth rate in the quarter.  JDS is benefiting from a diversified customer base, a broad product offering, and the continued supply and demand gap that exists for optical components.  The positive results at JDS are consistent with strong results across the board this quarter for both optical components and related comm. IC companies.  **Key to helping**

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT            20

**calm fears is management's increased guidance for revenue growth into 2Q/01 and the remainder of fiscal 2001** (ended in June). Previous guidance called for 90% revenue growth in 2001, which was raised to 115-120%, a range which we believe may still be conservative.

Important points from the call:

* Strong Customer Relationships and Markets- Management provided greater insight on the call regarding how its 80 sales engineers worldwide keep constant tabs on customers and their inventory levels. **In particular, JDS management emphasized that it has seen 1) no systematic inventory builds at its customers, 2) no double booking, 3) no change in order size beyond general increases with demand, and 4) no stretching of delivery schedules**. Lead times have also not changed for the company as demand continues to keep pace with JDS's output growth. The metro market is beginning to be a stronger one for the company consistent with commentary on Nortel's call. . . .  (Emphasis added).

• CIBC World Markets Corp.:

**Management, through extensive customer discussions, indicated that [they] do not see any demand slowdown, inventory buildup or shortening lead times for its optical components and subsystems.** While some skeptics will remain, management has not seen any change in spending forecasts from customers.

*       *       *

We are raising our revenue forecast in FY2001 to $3.9 billion, up from our previous $3.3 billion estimate, after CFO Tony Muller guided for 115%-120% year/year growth. Based on the 50.3% gross margin, our FY2001 EPS estimate moves to $0.80 from $0.68.  (Emphasis added).

• Credit Suisse First Boston:

Despite the negative results delivered by Nortel and Lucent in the September quarter which shook the optical systems and component industry, JDS delivered another outstanding quarter based upon all financial metrics. The company beat our top line estimate by approximately 5% and outpaced our $0.16 earnings per share estimate by $0.02. More importantly, **the tone of the conference call was extremely upbeat reflecting strong demand for the company's broad array of both active and passive components and modules. JDS management was emphatic that there was no systematic component/module overbuild occurring or significant component/module inventory increases with customers**. In

addition, management indicated JDS has not experienced double ordering from customers and that order sizes have not changed in a negative fashion.  (Emphasis added).

- SG Cowen Securities:

    Importantly, management's tone was very confident on last night's conference call and its outlook was very bullish.  **On the call, management was emphatic that they are not seeing any downshift in demand for optical systems or components.**  In addition, the company indicated that it saw no evidence of "a systemic build-up of inventories" among its customers, no delay in the delivery times of existing orders and no evidence of double ordering among the carriers. **The company backed its argument by pointing out that it is in constant contact with its customers in order to maintain a good understanding of their short and long-term component requirements.**  While the question remains as to how carrier spending will trend next year, JDS remains firm in its belief that demand for optical networking systems and components will remain very strong for the foreseeable future.

    Despite concerns to the contrary, JDSU's business with Lucent and Nortel remained relatively intact.  (Emphasis added).

- William Blair & Co.:

    Realizing the concerns among investors, management indicated that it is seeing no evidence of inventory buildup at customers, no evidence of double bookings, no change in the size of orders placed by customers, and no evidence that scheduled delivery dates are being extended.  **Most importantly, demand remains very strong**. (Emphasis added).

- Robertson Stephens:

    With regards to inventory, JDS Uniphase addressed concerns about inventory building at the system level.  **JDS Uniphase remained firm that it is not seeing any inventory build-up of its product at its customers.**  In support of this metric, JDS Uniphase mentioned that lead times for its products have remained flat for the last two quarters. . . (Emphasis added).

    69.    An October 27, 2000 *Wall Street Journal* article about JDS's first quarter 2001 results repeated similar positive sentiments about demand for JDS's products, stating that JDS:

    sought to calm nervous investors with strong fiscal first-quarter results and equally bullish statements about its outlook for fiber-optics communications gear.

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    22

Just two days after Nortel Networks Corp. stunned financial markets by reporting slower sales of fiber-optics equipment, JDS officials said they see no letup in the fevered demand for JDS components, which are used by Nortel and others.  "**We had a great quarter," JDS Chief Executive Jozef Straus told Wall Street analysts at the start of a conference call.  "Our outlook and guidance for the next quarter and year are equally strong."**

Repeatedly and at great length, JDS executives went out of their way to ease fears that JDS wouldn't be able to meet targets for explosive growth**.  President Charles J. "Jay" Abbe said the company had extensively surveyed its customers and found no indication of growing inventories, phantom orders or slowing forecasts.  "We cannot see and do not find meaningful evidence of an industry slowdown," Mr. Abbe said.**

The bullish comments, and JDS's better-than-expected results, seemed to have their intended effect.  JDS shares rose sharply during after-hours trading to $82.44 each, after climbing $3.44 to $74.44 each at 4 p.m. in Nasdaq Stock Market trading.  In all, the stock recovered nearly half the $24 it had surrendered Wednesday.  JDS was the most actively traded issue on Nasdaq yesterday. . . .

Mr. Abbe said demand for JDS's amplifiers, filters and other products continues to outstrip the company's manufacturing capacity, meaning slowdowns of some customers' orders are being offset by demand from others.

**Chief Financial Officer Anthony Muller urged analysts to increase their revenue and earnings estimates for JDS in its current fiscal year, which ends June 30.**  Mr. Muller said JDS expects to earn 80 cents a share this year, almost 15% more than the 70-cent consensus estimate of analysts surveyed by First Call/Thomson Financial.

JDS now expects sales to more than double this year, revising its growth projection to 115% to 120% from a 90% estimate in July, Mr. Muller said. . . .

There were no hints of an industry slowdown elsewhere in JDS's financial statements.  Inventories grew only 5% from the previous quarter, much slower than sales.  And accounts receivable kept pace with sales, suggesting that JDS's customers weren't hoarding equipment or having trouble paying their bills. . . .

It still isn't clear why JDS's sales to Nortel grew so much more quickly than Nortel's sales of optical gear to its own customers.  Analysts suggested that Nortel products most affected by the slowdown may be those that don't use a lot of parts from JDS.

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                   23

**Analysts said the JDS executives convinced them there is no industrywide slowdown.**  (Emphasis added).

70.      The above referenced statements and the Individual Defendants on the October 26, 2000 conference call as reported in the foregoing analyst reports and in the October 27, 2000 *Wall Street Journal* were false or misleading when issued.  The true but concealed facts were:

(a)      As detailed above at ¶¶ 33 - 41, demand for JDS products had dropped off dramatically by July 2000 as fewer and fewer orders were coming in, some orders were cancelled and customers were declining to take delivery of products they had previously ordered;

(b)      As detailed above at ¶¶ 42 - 44, by no later than the Spring and Summer of 2000 JDS was implementing cost savings measures such as reducing shifts, eliminating overtime and reducing production days at its manufacturing plants;

(c)      The downturn in Lucent's and Nortel's businesses as described above at ¶¶ 63 - 64, was beginning to result in significantly reduced sales by JDS; and

(d)      As described below at ¶¶ 103 - 106, the Company's reported sales growth was not reflective of the current demand for the Company's products as a significant portion of revenues recognized by JDS during the quarter were from shipments on orders from earlier periods which the Individual Defendants intentionally pushed back into later periods.

71.      On or about November 13, 2000, JDS filed a Form 10-Q with the SEC which contained its financial statements for the fiscal 2001 first quarter ("1Q 01 10-Q") and was signed by Defendant Muller.  The 1Q 01 10-Q reiterated the Company's results as announced in its October 26, 2000 press release and also represented that its inventories at September 30, 2000 were $394.5 million.

72.      The 1Q 01 10-Q was false and misleading.   As detailed above at ¶¶ 45 - 51, excess inventory at JDS had begun to rise in the Spring of 2000 and, indeed, by June 2000 there was a year's worth of excess inventory at the Company's headquarters in San Jose that was ultimately destroyed in March 2001 as obsolete.  Consequently JDS's inventories balance

1   as reported in its 1Q 01 10-Q was overstated in violation of GAAP and a substantial amount of

2   that inventory was ultimately written off at the end of the Class Period. Under GAAP, and

3   according to the Company's own policy as described below, the excess inventory should have

4   been written off starting in June 2000 and each successive quarter as excess inventory

5   continued to build.

6       Fiscal 2001 Second Quarter

7       73.     On January 25, 2001, JDS announced its Fiscal 2001 second quarter ("2Q 01")

8   results in a press release which stated in part:

9           JDS Uniphase Corporation today reported sales for its second
            quarter ended December 30, 2000 of $925 million and pro forma net
10          income of $208 million or $0.21 per diluted share.

11          Sales for the quarter were 18% above pro forma combined
12          sales of $786 million for the quarter ended September 30, 2000 and
            161% above pro forma combined sales of $354 million for the quarter
13          ended December 31, 1999. . . .

14      74.     In addition to reporting JDS's historical results, the January 25, 2001 press

15  release also contained the first acknowledgement from the Company that demand for its

16  products and its prospects were not as positive as had been portrayed:

17          JDS Uniphase expects sales in the March quarter to be 7% to 10%
            above sales for the quarter ended December 30, 2000.  This change in
18          guidance from previous periods reflects uncertain carrier capital
            spending prospects, customer inventory adjustments, and a somewhat
19          lower level of near-term sales visibility than the Company has
            experienced in recent periods.  The Company anticipates sales for its
20          fiscal year ending June 30, 2001 to be in the range of previously
            announced guidance of 115% to 120% above pro forma combined
21          sales for the fiscal year ended June 30, 2000, recognizing that it could
            be at the low end of that range. . . .  The Company expects pro forma
22          earnings per share in its third quarter to be approximately equal to or
            slightly above the December quarter and to be approximately $0.82 for
23          the fiscal year ending June 30, 2001.
24

25      75.     Notwithstanding that the Company had finally alluded to the fact that visibility

26  was not as good as Defendants had primed the market to believe, Defendants continued to

27  downplay the effect that this would have on JDS's future results as illustrated by an article in

28  *The Wall Street Journal* on January 26, 2001 which stated in part:

1

2

3

**Despite the more conservative outlook, JDS executives were generally bullish in a conference call with Wall Street analysts.** "We have had a great quarter, and we look to the future with considerable optimism," said Chief Executive Officer Jozef Straus."

4

5

6

7

President Charles J. Abbe said the lower growth forecast primarily reflected efforts by JDS's customers to reduce inventories of fiber-optic parts.  Both Nortel Networks Corp. and Lucent Technologies Inc., JDS's two biggest customers have recently announced plans to trim inventories as their own sales of fiber-optic gear slow.  (Emphasis added).

8   76.    As referred to in the January 26, 2001 *Wall Street Journal* article, subsequent to

9   the release of its 2Q 01 results, JDS held a conference call on January 25, 2001 for securities

10  analysts, money and portfolio managers, institutional investors, brokers and stock traders to

11  discuss the Company's business and its prospects.  During the call, Straus, Muller and Abbe

12  made presentations and answered questions.  During the call - and in follow-up conversations

13  with participants - they directly disseminated important information to the market by stating:

14  15
- The Company was seeing strong growth in demand for optical components which was continuing unabated.

16  17
- The Company was improving its operating efficiencies which would lead to increased earnings in Fiscal 200l and Fiscal 2002.

18  19
- The Company had several new products to be launched which would help JDS sustain its 35%-40% growth rate.

20  77.    Following the conference call, on January 26, 2001, securities analysts issued

21  reports on JDS, which were based on and repeated information provided by JDS management

22  on the conference call and in follow-up conversations as follow:

23
- J.P. Morgan:

24

25

26

27

28

The company remains comfortable with its outlook for 115-120% revenue growth through the end of the year, cautioning that it could be at the low end of this range, with 7-10% expected sales expansion into the next quarter (we were originally looking for 13%). We believe JDS's outlook confirmed that it is not immune to short-term inventory corrections by its customers but continues to be a defining force in the optical components industry and we do not expect this to change anytime soon.

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    26

*     *     *

Management indicated that the underlying growth in optical components has continued "unabated" with exception to a limited group of products and customers.

• SG Cowen Securities:

Last evening, JDSU reported strong Q2:F01 results, beating the $0.19 cent Street consensus estimate by $0.02 cents and reporting revenue of $925 MM which was in-line with consensus.  This compares with our estimate of $0.19 cents on $916 MM in sales.  **Clearly, the focus on last night's call was not on the previous quarter's results, but on the company's outlook.  And based on what we could have heard, we were relieved.**  Management fine-tuned its guidance on the March quarter down very modestly relative to our estimate, and its tone on the conference call [was] cautiously optimistic.

*     *     *

As many suspected, management was somewhat cautious in its guidance on the March quarter.  But in our view, the change in guidance was exceptionally mild considering the recent deterioration in industry fundamentals.  Specifically, the company indicated that it expects to book roughly $1B in sales (up 7-10% Q/Q) in the March quarter, which is about $25 MM below our previous in-line revenue estimate.  We've fine-tuned our forecast accordingly.  Frankly, we were relieved with this outlook in light of Corning's comments earlier in the day, that its photonics sales were expected to be flat on a sequential basis in the March quarter.  JDSU's management indicated that it was comfortable with the current $0.21 First Call consensus EPS estimate for the March quarter, and raised guidance for the fiscal year by a penny to $0.82 per share.  Given the slower than expected growth in the March quarter, the company indicated that revenue would probably come in toward the low end of the range of 115-120% Y/Y growth for the year.  (Emphasis added).

• Credit Suisse First Boston:

**The tone of the conference call was upbeat reflecting the strong long-term growth fundamentals driving demand across the company's broad array of both active and passive components and modules.**

*     *     *

Moreover, we believe the fact that management has revised guidance to reflect customer inventory adjustments combined with the

1    imminent closure of the SDLI transaction outlined above will serve as
2    positive catalysts for the stock.  Reiterate BUY.  (Emphasis added).

3    • CIBC World Markets:

4        We are reiterating our Strong Buy rating on JDS Uniphase after
5    the company reported strong 2Q01 results slightly ahead of
     expectations and delivered an outlook statement that should assuage
6    most investors concerns.  JDSU's diverse product portfolio and
     customer breadth is allowing it to nicely cycle through near-term
7    softness in telecom equipment.

8                        *        *        *

9        Management maintained an optimistic outlook for the March
     quarter, but offered prudently tempered guidance of 7 - 10% sequential
10   revenue growth, or just below our 11% estimate but likely in-line with
     "whisper" estimates.  Book-to-bill was nicely positive giving some
11   visibility. . . .

12       78.     Each of the above referenced statements made by Defendants on the January 25,

13   2001 conference call as reported in the January 26, 2001 analyst reports and *The Wall Street*

14   *Journal* article was false or misleading when issued.  The true but concealed facts were:

15       (a)     As detailed above at ¶¶ 33 - 41, demand for JDS products had dropped

16   off dramatically by July 2000 as fewer and fewer orders were coming in, some orders were

17   cancelled and customers were declining to take delivery of products they had previously

18   ordered;

19       (b)     As detailed above at ¶¶ 42 - 44, by no later than the Spring and Summer

20   of 2000 JDS was implementing cost savings measures such as reducing shifts, eliminating

21   overtime and reducing production days at its manufacturing plants;

22       (c)     Defendants knew that the downturn in Lucent's and Nortel's businesses,

23   as described at ¶¶ 63-64, was already resulting in significantly reduced sales by JDS; and

24       (d)     As detailed below at ¶¶ 103 - 106, the Company's reported sales growth

25   was not reflective of the current demand for the Company's products as a significant portion of

26   revenues recognized by JDS during the quarter were from shipments on orders from earlier

27   periods which the Individual Defendants intentionally pushed back into later periods.

28

1

<u>JDS Admits That Business Is Slowing, But Continues to Conceal the Full Story</u>

2       79.      On February 12, 2001, JDS and SDL announced that their respective

3   stockholders approved the merger at special meetings.  **Immediately following the special**

4   **meetings**, JDS held a conference call for securities analysts, money and portfolio managers,

5   institutional investors, brokers and stock traders, at which time the Company provided **new**

6   **and reduced guidance** for the combined companies.  The analysts wrote the following about

7   the conference call:

8           •  First Union Securities:

9           *       Last night, JDSU provided new guidance for the business
            model arising from the closing  of the merger with SDLI and reduced
10          visibility since the company reported earnings.

11          *       Guidance was lowered for JDSU and SDLI. . .

12          *       Clearly, it is not pleasant to be hit with an additional estimate
            reduction only three weeks after a similar action on JDSUs most recent
13          quarterly earnings call.  The company provided no hard information to
            explain the reduced visibility, only that the outlook had mildly
14          deteriorated in recent weeks.  This move serves to undermine our
15          confidence. . . .

16          •  SG Cowen Securities:

17          [T]he company took this opportunity to lower its guidance on the
            current quarter as well as fiscal 2001.  The company also provided
18          preliminary guidance on 2002, which was well below the current
            Street's consensus of $1.12 in EPS on $5.72 billion in sales.  In our
19          view, this change in the company's guidance was surprisingly weak,
            particularly in light of the fact that it just provided fresh guidance a
20          couple of weeks ago when the company reported its fiscal 2Q:F01
            numbers in late January.  This change in the numbers, together with
21          the change in management's tone, was sobering to say the least.
22
23                              *       *       *

24          [I]n our view, the major issues with these numbers is the lower
            revenue guidance.  It's clear from this guidance that the growth
25          outlook at both JDSU and SDLI has worsened significantly!

26          JDSU's business environment is characterized by low visibility,
            weakening demand and, we believe, falling prices.  **The factors**
27          **impacting JDSU's business have not changed all that much since**
            **we last heard from the company, only the guidance has!**  (Emphasis
28

1   added).

2   80.      The JDS/SDL merger was completed on February 13, 2001.  Each outstanding

3   share of SDL common stock was exchanged for 3.8 shares of JDS common stock, for a total of

4   334 million shares of JDS stock valued at $41 billion.

5   81.      Also on February 13, 2001 -- the day after JDS and SDL shareholders approved

6   the merger -- JDS issued a press release informing investors that JDS had unexpectedly

7   lowered its guidance for the third quarter of Fiscal 2001 and reduced its EPS estimates for the

8   full year from $0.82 to $0.74, stating:

9         The Company expects sales in the quarter ending March 31 to be at or
          slightly above $1 billion with earnings per share of $0.17. . . .   In
10        addition, this guidance reflects continued uncertainty in carrier capital
          spending prospects and customer inventory adjustments as well as a
11        lower level of near-term sales visibility than the Company has
          experienced in recent periods.  The Company anticipates sales for its
12        fiscal year ending June 30, 2001 to be $3.9 billion with earnings per
          share of $0.74.
13

14   82.      JDS filed its Form 10-Q for 2Q 01 with the SEC on February 13, 2001 ("2Q 01

15   10-Q"), which was signed by Defendant Muller.  The 2Q 01 10-Q repeated the results for 2Q

16   01 announced in the Company's January 25, 2001 press release and represented that JDS's

17   inventories balance at December 30, 2000 was $493.9 million -- a 25% increase over the

18   balance at the end of the previous quarter.

19   83.      JDS's inventories balance as represented in the 2Q 01 10-Q was false and

20   misleading when issued.  Indeed, as detailed above at ¶¶ 45 - 51, excess inventory at JDS had

21   begun to rise in the Spring of 2000 and, indeed, by June 2000 there was a year's worth of

22   excess inventory at the Company's headquarters in San Jose that was ultimately destroyed in

23   March 2001 as obsolete.  At the end of the Class Period, a substantial amount of inventory that

24   was on the books as of December 30, 2000 was ultimately written off.  Under GAAP, and

25   according to the Company's own policy as described below, the excess inventory should have

26   been written off in the quarter in which its market price fell below cost (i.e., the quarter ending

27   June 2000 and each successive quarter in which inventory continued to build).

28   84.      On February 27, 2001, JDS issued a press release announcing that it would be

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    30

1   reducing its global workforce by approximately 3,000 people.  Despite that news, JDS stated in

2   the press release that "it remains confident about its long-term leadership position in the

3   industry and believes that its ongoing prospects remain very positive."

4       85.   On March 6, 2001, the Company filed a Form 8-K with the SEC in which it

5   revised its guidance for future periods downward for the third time in little over a month, as

6   follows:

> [JDS] expects sales in its third quarter ending March 31, 2001
> to be approximately $925 million with pro forma earnings per share of
> approximately $0.14.  Fourth quarter guidance (for the quarter ending
> June 30, 2001) now is for sales and pro forma earnings per share to be
> approximately at the same levels as the third quarter or slightly above
> those levels.  [JDS] has not provided guidance for the fiscal year
> ending June 30, 2002.  JDS's revised guidance, which is lower than
> guidance previously provided for the periods, reflects continued
> uncertainty in carrier capital spending prospects and customer
> inventory adjustments as well as a lower level of near-term sales
> visibility than [JDS] has experienced in recent periods.

13      86.   None of JDS's three earnings warnings between January 25, 2001 and March 6,

14  2001 gave any indication that the Company was carrying excess obsolete inventory as a result

15  of reduced demand, or that JDS would have to write off more than a quarter of a billion dollars

16  of inventory it was then carrying on its books and which should have been written off in prior

17  quarters.

18  Fiscal 2001 Third Quarter

19      87.   On April 24, 2001, JDS announced its Fiscal 2001 third quarter ("3Q 01")

20  results as well as a new "Global Realignment" program being implemented by the Company to

21  deal with the declining demand.  The press release stated in pertinent part:

> JDS Uniphase Corporation today reported sales for its third
> quarter ended March 31 2001 of $920 million and pro forma net
> income of $160 million or $0.14 per diluted share.  The Company also
> announced a Global Realignment Program.

> *       *       *

> The Global Realignment Program is intended to align the
> Company's resources and operations into a global structure that is
> competitive now and positions the Company to remain competitive in
> the future.  This program includes a number of actions by the
> Company to reduce costs and expenses and align manufacturing

capacity with customer demand.  The Company will close several operations, vacate 25 buildings at operations to be closed, as well as at continuing operations, and reduce employment by approximately 5,000 people or 20% of current levels.  These actions are being taken in response to current business conditions in a market the Company continues to believe will experience substantial growth over the longer term.  The Company believes these changes will position JDS well in the current business environment and prepare it for future growth with increasingly competitive new product offerings and long-term cost structure.

*     *     *

Sales for the third quarter ended March 31, 2001 were 1% below sales of $925 million for the quarter ended December 30, 2000 and 90% above pro forma combined sales of $485 million for the quarter ended March 31, 2000.  Sales for the nine months ended March 31, 2001 of $2.6 billion were 133% above pro forma combined sales for the comparable prior year nine-month period. . . .

*     *     *

The Company is evaluating the carrying value of certain long-lived assets, consisting primarily of $56.2 billion of goodwill recorded on its balance sheet at March 31, 2001.  Pursuant to accounting rules, the majority of the goodwill was recorded based on stock prices at the time merger agreements were executed and announced.  The Company's policy is to assess enterprise level goodwill if the market capitalization of the Company is less than its net assets.  Goodwill will be reduced to the extent that net assets are greater than market capitalization.  At March 31, 2001, the value of the Company's net assets, including unamortized goodwill exceeded the Company's market capitalization by approximately $40 billion.

The Company anticipates sales and pro forma earnings per share for its fourth quarter ending June 30, 2001 will be approximately $700 million and $0.05, respectively. . . .  The Company has limited visibility as to sales in future periods, and is not currently providing sales guidance for fiscal 2002.

88.     On May 10, 2001, JDS filed its Form 10-Q for 3Q 01 with the SEC ("3Q 01 10-Q"), which was signed by Defendant Muller.  The 3Q 01 10-Q repeated the results for 2Q 01 announced in the Company's April 24, 2001 press release and represented that JDS's inventories balance at March 31, 2001 was $672.9 million, a 36% increase over the inventories

1   reported on JDS's balance sheet at the end of the prior quarter.

2       89.     JDS's inventories balance as represented in the 3Q 01 10-Q was false and

3   misleading when issued.  Indeed, as detailed above at ¶¶ 45 - 51, inventory at JDS had begun

4   to rise in the Spring of 2000 and by June 2000 there was a year's worth of excess inventory at

5   the Company's headquarters in San Jose that was ultimately destroyed in March 2001 as

6   obsolete.  At the end of the Class Period, approximately $270 million of inventory that was on

7   the books as of March 31, 2001 was written off.   Under GAAP, and according to the

8   Company's own policy as described below, the excess inventory should have been written off

9   beginning in June 2000 and each quarter thereafter as the excess inventory continued to build.

10      90.     On June 12, 2001, JDS announced the retirement of Charles Abbe as President

11  and Chief Operating Officer and the appointment of Gregory Dougherty as Executive Vice

12  President and Chief Operating Officer.

13      91.     On June 14, 2001, JDS issued a press release once again revising its outlook and

14  acknowledging for the first time the fact that its inventories balance was overstated due to

15  declining demand.  The release stated in part:

16          The Company anticipates sales for its fourth quarter ending
            June 30, 2001 will be approximately $600 million as compared to
17          earlier guidance of $700 million.  This revised outlook reflects
            continued weakness in telecommunications carrier spending and
18          inventory reductions by the Company's system provider customers.

19          JDS Uniphase anticipates sales of $450 million for its first
20          quarter of fiscal 2002 ending September 29, 2001.  The Company is
            carefully reviewing its expense structure in connection with the
21          preparation of its fiscal 2002 operating plan to determine the changes,
            including additional charges under the Company's previously
22          announced Global Realignment Plan, required to respond to this
            revised sales forecast.  The Company is not providing guidance for
23          later periods at this time.

24          **The lowered sales forecast will cause the Company to**
25          **record inventory write-downs in its fourth quarter ending June 30,**
            **2001.  The Company reserves inventory amounts for specific**
26          **components and modules with on hand balances in excess of six**
            **months' supply, and the lowered forecast will require an increase**
27          **in excess inventory reserves of $225 to $250 million.**  The inventory
            write-downs are expected to result in a fourth quarter pro forma loss of

28

1   $0.06 to $0.08 per share after exclusion of merger & acquisition
    related charges and charges resulting from the Company's Global
2   Realignment Program.  Absent the inventory write-downs, the
    Company anticipates such pro forma results would be profitable.
3   (Emphasis added).

4

5   92.     The Company's stock declined to $12.44 on this news.

6       The Full Extent of the Bad News is Finally Disclosed

7       93.     Finally, on July 26, 2001, JDS issued a press release in which it announced its

8   fourth quarter Fiscal 2001 ("4Q 01") results and revealed that its 4Q 01 sales were 35% below

9   its 3Q 01 sales.  In addition to the dismal 4Q 01 results, the Company also announced large

10  write-downs of inventory and goodwill as follows:

11          In addition to charges associated with the Global Realignment
            Program, the Company incurred charges of approximately $270
12          million for the write-down of excess inventory in the fourth quarter
            related to its lowered sales forecasts.  All of the foregoing amounts are
13          greater than estimates previously announced because of further
            reductions in sales forecasts.
14

15                              *       *       *

16          As announced in April, the Company has evaluated the
            carrying value of certain long-lived assets and acquired equity
17          investments, consisting primarily of goodwill and the Company's
            investment in ADVA.  Pursuant to Generally Accepted Accounting
18          Principles (GAAP), the majority of the goodwill was recorded based
            on stock prices at the time merger agreements were executed and
19          announced.  The Company's policy is to assess enterprise level
            goodwill if the market capitalization of the Company is less than its
20          net assets with goodwill being reduced to the extent net assets are
            greater than market capitalization.
21

22          Downturns in telecommunications equipment and financial
            markets have created unique circumstances with regard to the
23          assessment of long-lived assets, and the Company sought the counsel
            of the Staff of the Securities and Exchange Commission on the
24          interpretation of GAAP with regard to this matter.  The Company has
            had communications with the Staff of the SEC, and will amend its
25          Quarterly Report on Form 10-Q for the quarter ended March 31, 2001
            to reduce the carrying value of goodwill by $38.7 billion for that
26          quarter.  In addition, the Company has recorded a $6.1 billion
            reduction of goodwill for the quarter ended June 30, 2001 following
27          further declines in its market capitalization.  Finally, approximately
28

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    34

$300 million in certain amounts paid to SDL executives in connection with the acquisition which were previously recorded as acquisition costs in the quarter ended March 31, 2001 have been reclassified as a one-time charge for that period and the Company also recorded a $715 million charge for that period to write down the value of its equity investment in ADVA.  Because of the significant industry downturn the Company is in the process of performing a review of its long-lived assets in accordance with GAAP, and this review may result in further charges being recorded for the fourth quarter of fiscal 2001 based on the value of such assets.

94.     The amount of JDS's inventory write off was staggering.  The $270 million write-down represented 72%, 68%, 55% and 40% of the Company's stated inventory balances at FY 00, 1Q 01, 2Q 01 and 3Q 01, respectively.

95.     On this news, JDS's stock dropped to $8.55 per share.

96.     On July 27, 2001, *The Wall Street Journal* noted:

The magnitude and speed of JDS's fall are breathtaking.  A year ago, it was scrambling to increase its manufacturing capacity of lasers, amplifiers and filters fourfold, as it struggled to keep up with orders from communications-gear makers.  Now, JDS has far more buildings, equipment and people than it needs.  In addition to the layoffs, JDS said it is vacating about two million square feet of office and factory space, roughly 30% of its space before the downturn, and selling its three airplanes.  JDS will shutter 25 buildings in nine cities around the world.

97.     On July 28, the *San Jose Mercury News* summed up the situation by stating: "JDS said Thursday that it lost $51 billion in the 12 months that ended June 30 – the worst full-year loss in U.S. history – including a huge write-off related to past acquisitions and the dramatic decline in its stock price."

### SUBCLASS PERIOD B
### (JULY 27, 1999 - JULY 26, 2000)

### THE FRAUDULENT SCHEME

98.     In the one-year period leading up to the business downturn in Subclass Period B, JDS apparently did experience impressive growth through strong demand for its products. However, even while JDS reported results that were in line with analyst estimates for sales and earnings quarter after quarter, as described below, there were red flags signaling that danger

1    lay ahead as early as July 1999.

2        JDS's Customers Were Forced To Order More Than They Actually Needed

3        99.        Even as JDS performed well in Fiscal 1999 and the first quarters of Fiscal 2000,

4    Defendants knew that forecasted demand was not as robust as it seemed.  At JDS, forecasts for

5    each successive period were based on the orders received in prior periods.  For example, if

6    Nortel ordered 100,000 units of an item in 1Q 99, JDS might forecast that they would order

7    120,000 units in 2Q 99.  The problem was that, in reality, the 100,000 unit order in 1Q 99 was

8    not reflective of Nortel's true demand but an inflated order that came as a direct response to

9    JDS's dishonest sales tactics.

10        100.        As described by a former JDS sales manager, the "sales program" at JDS

11   revolved around the acronym "FUD": Fear, Uncertainty and Desperation.  JDS sales people

12   were specifically instructed to create FUD in their customers:  **Fear** that capacity constraints at

13   JDS would mean that the customer would not be able to have their entire order filled,

14   **Uncertainty** about whether they would be able to meet their own customers' demand if they

15   could not get enough JDS product, and **Desperation** that would lead them to over order JDS

16   products in the hope that if they ordered 100,000 units, they would get the 50,000 units they

17   really needed.

18        101.        JDS customers were told that they need not worry about over-ordering since

19   there were no non-cancellation provisions in their purchase contracts.  Thus, they were free to

20   return any unwanted product to JDS at any time.

21        102.        As a result of "FUD" and the absence of non-cancellation provisions, the orders

22   on JDS's books were not indicative of true demand and forecasted demand for the future was

23   known to be artificially inflated.

24        JDS Manipulated the Timing of its Sales to Create the Impression of Growing Demand

25        103.        From the beginning of Subclass Period B until the Spring of 2000, JDS was the

26   beneficiary of strong demand for its products.  Demand translates into orders, orders translate

27   into sales, and sales translate into revenues upon shipment of the product to the customer.  The

28   positive trends in all of those indicators drove the price of JDS stock up dramatically from

     [C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    36

1   $20.66 on July 27, 1999 to as high as $121.88 in April 2000.  However, realizing that the

2   seemingly insatiable appetite for its products would not last forever, the Individual Defendants

3   sought to protect themselves from a downturn in business by intentionally delaying delivery on

4   orders received during Subclass Period B so that it could demonstrate sales growth in the future

5   even as orders started to dry up.

6        104.     Indeed, according to a former cost accountant in Horsham, Pennsylvania (one of

7   JDS's five largest facilities in the United States), it was a "common practice" throughout JDS

8   to hold back the delivery of products and therefore defer recording the sales of those products

9   until "the fiscal quarter that was the most advantageous to the Company."  This practice

10   occurred in two situations:  (1) when the sales quota for a given quarter had been achieved; and

11   (2) when a sales quota for a given quarter at a given plant could not realistically be achieved,

12   and the sales could be used to "jump start" the following quarter.

13        105.     According to the cost accountant, "the Chief Operating Officer in Corporate

14   approved and encouraged this policy."  The former employee would often get a call from the

15   COO, or one of the COO's assistants, towards the end of a fiscal quarter, and the COO would

16   ask whether the facility would be meeting its sales goals for the fiscal quarter.  If the goal had

17   already been achieved, or if, conversely, the goal had no chance of being achieved, the COO

18   would direct the former employee to hold off on delivery of product until the subsequent

19   quarter so that sales would be counted for the subsequent quarter.

20        106.     Moreover, a former manufacturing engineer at JDS in Trenton, New Jersey,

21   confirmed that there appears to have been a deliberate attempt to delay delivery on components

22   or modules to a subsequent quarter in order to make the numbers for that subsequent quarter

23   look better.

24                    **DEFENDANTS' FALSE AND MISLEADING**
                    **STATEMENTS DURING SUBCLASS PERIOD B**
25
    JDS Falsely Represented During Subclass Period B that
26   Its Current Success Would Continue and Get Even Stronger in the Future

27        107.     On July 26, 1999, after the market closed, JDS issued a press release

28   announcing its results for the fourth quarter and fiscal year ended June 30, 1999 ("FY99").

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    37

1    According to the press release, JDS reported pro forma sales of $191.6 million and pro forma

2    net income of $41.7 million for the quarter, and $587.9 million in sales and $124.9 million in

3    net income for the year ended June 30, 1999.

4        108.        On July 27, 1999, subsequent to the release of its FY99 results, JDS held a

5    conference call for securities analysts, money and portfolio managers, institutional investors,

6    brokers and stock traders to discuss the Company's business and its prospects.   The call was

7    described as "upbeat" by at least two securities analysts.   During the call, Defendants

8    Kalkhoven and Muller made presentations and answered questions.   During the call -- and in

9    follow-up conversations with participants -- they directly disseminated important information

10   to the market by stating that:

11           • The Company was experiencing strong demand for its products.

12           • The Company had strong visibility into future results.

13       109.        Securities analysts issued reports on JDS on July 27, 1999, which were based on

14   and repeated information provided by JDS management on the conference call and in follow-

15   up conversations as follow:

16           • Cruttenden Roth:

17               The combined company [JDS/Uniphase] reported strong
         results.   Visibility remains strong. . . .
18

19           • F A C/Equities:

20               JDS Uniphase reported 4Q00 results last night after the close
         followed by an upbeat conference call:
21

22               -- Market outlook is strong:  Demand from terrestrial long-
         haul and submarine markets continues to be strong and shows no sign
23       of abating. . . .

24       110.        Defendants' statements on the July 27, 1999 conference call as reported in the

25   July 27, 1999 analyst reports were false and misleading when issued.   The true but concealed

26   facts were:

27           (a)      As described above at ¶¶ 103 - 106, Demand was not as strong as

28   represented as JDS used deceptive sales tactics to encourage customers to place orders for

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    38

1   more than they needed in order to ensure delivery of an adequate amount of product; and

2           (b)    JDS was intentionally pushing orders into subsequent quarters in order

3   to create the false impression that demand was continuing to grow with each successive

4   quarter.

5       111.    On August 4, 1999, JDS completed a public offering of 9,250,000 shares of JDS

6   common stock at a split-adjusted price of $20.65 per share, of which 7,034,308 shares were

7   sold by the Company and 2,215,692 shares were sold by certain stockholders of JDS, including

8   Defendants Kalkhoven, Straus and Muller.

9       112.    On October 28, 1999, JDS announced its results for the first quarter of fiscal

10  2000 ("1Q 00") in a press release which stated that JDS had pro forma sales of $113 million

11  and pro forma net income of $51 million during the quarter.

12      113.    On October 29, 1999, subsequent to the release of its 1Q 00 results, JDS held a

13  conference call for securities analysts, money and portfolio managers, institutional investors,

14  brokers and stock traders to discuss the Company's business and its prospects.  During the call,

15  Kalkhoven and Muller made presentations and answered questions.  During the call -- and in

16  follow-up conversations with participants -- they directly disseminated important information

17  to the market by stating:

18      • JDS's outstanding results were due to robust demand across the total

19          product range.

20      • JDS would double or triple manufacturing capacity over the next year,

21          which it was doing because of its outstanding visibility of future sales

22          growth.

23      114.    Securities analysts issued reports on JDS on October 29, 1999, which were

24  based on, and repeated statements disseminated by Defendants, including on the quarterly

25  conference call.  These reports stated in part:

26      • Credit Suisse First Boston:

27          FQ1: 00 highlights include a 20% sequential sales growth
            profile that outpaced our 14% forecast; Mgmt focused on
28          implementing at least a 2x-3x across the board increase in mfg.

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    39

capacity during the next 12 months; Underscores outstanding top line
visibility and the potential for additional upside sales and EPS
surprises.

115.    Defendants' statements on the October 29, 1999 conference call as reported in the October 29, 1999 analyst reports were false or misleading when issued.  The true but concealed facts were:

(a)    Demand was not as strong as represented as JDS manipulated its customers into placing orders for more than they needed in order to ensure delivery of an adequate amount of product.  Thus, JDS's revenue growth was not based on true demand for its product and any forecasts based upon already inflated demand figures were known to be unrealistic; and

(b)    JDS was intentionally pushing orders into subsequent quarters in order to create the false impression that demand was continuing to grow with each successive quarter.

116.    On November 4, 1999, JDS announced it would acquire OCLI in a stock transaction valued at 0.928 JDS shares for each OCLI share, or $2.8 billion.  JDS and OCLI had been engaged in a strategic alliance since 1997, under which OCLI contributed its expertise in optical thin film technology and products for certain applications and JDS contributed its expertise in the design, manufacture and marketing of these products.  At the time the acquisition was announced, JDS was OCLI's largest customer.

117.    On December 30, 1999, JDS common stock split in a two-for-one stock split.

118.    On January 17, 2000, JDS announced the signing of a definitive agreement to merge with E-TEK, a supplier of optical components and component packaging.

119.    On January 26, 2000, JDS issued a press release announcing its results for the second quarter of fiscal 2000 ("2Q 00"), in which it disclosed that it achieved sales of $282 million and pro forma net income of $66 million in the quarter.  Sales were 119% above pro forma sales of $129 million in the quarter ended December 31, 1998 and 22% higher than net sales of $230 million in the quarter ended September 30, 2000.

120.     On January 26, 2000, subsequent to the release of its 2Q 00 results, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and its prospects.  During the call, Kalkhoven and Muller made presentations and answered questions.  During the call -- and in follow-up conversations with participants -- they directly disseminated important information to the market by stating:

- Demand for JDS's products was strong.

- Visibility remained strong.

- The Company's sales growth would exceed 50% over the coming year.

121.     The following day, on January 27, 2000, securities analysts issued reports on JDS, which were based on, and repeated statements disseminated by Defendants, including on the quarterly conference call.  The reports stated in part:

- J.P. Morgan:

     The big themes on the call were as expected, capacity expansion, packaging of components, and building the company's operational infrastructure.  **The company remains very bullish about its market opportunities** and we continue to believe that JDS Uniphase is the clear leader in the high growth optical components space.  Capacity expansion seems to be coming along even faster than expected and the recently closed acquisitions of EPITAXX and SIFAM are seeing strong growth.  (Emphasis added).

- Cruttenden Roth:

     JDSU had another strong quarter and **the visibility remains strong.**  The company's biggest challenge continues to be the capacity situation.  JDSU announced that it plans to increase capacity by two-to-three fold in 2000.  Assuming the capacity situation is properly addressed, the company is on track to break the $1 billion barrier this fiscal year.  (Emphasis added).

122.     Defendants' statements on the January 26, 2000 conference call as reported in the January 27, 2000 analyst reports were false and misleading when issued.  The true but concealed facts were:

     (a)     As detailed above at ¶¶ 99 - 102, demand was not as strong as represented, because customers were placing orders for more than they needed in order to

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT          41

1   ensure delivery of an adequate amount of product.  Thus, JDS's revenue growth was not based

2   on true demand for its product and any forecasts based upon already inflated demand figures

3   were known to be unrealistic; and

4            (b)    As described above at ¶¶ 103 - 106, JDS was intentionally pushing

5   orders into subsequent quarters in order to create the false impression that demand was

6   continuing to grow with each successive quarter.

7   123.    On February 4, 2000, JDS completed the acquisition of OCLI for 54 million

8   shares of JDS stock valued at $2.7 billion.

9   124.    On March 3, 2000, CIBC Oppenheimer issued a report on the fiber optic

10  industry which stated in part "[y]esterday, we grabbed a minute with JDS Uniphase (JDSU –

11  Strong Buy) CEO Kevin Kalkhoven at his San Diego headquarters for fear we would have

12  trouble tracking him down in the bustle of next week's [Optical Fiber Communications]

13  conference.  Our one take-away – business as usual (i.e. extremely strong demand for core

14  optical component products and continued struggle to meet demand)."

15  125.    Defendant Kevin Kalkhoven's statements to CIBC Oppenheimer, as reported in

16  the March 3, 2000 CIBC Oppenheimer report were false and misleading because, as detailed

17  above at ¶¶ 99 - 102, demand was not as strong as represented and JDS knew customers were

18  placing orders for more than they needed in order to ensure delivery of an adequate amount of

19  product.  Thus JDS's revenue growth was not based on true demand for its product and any

20  forecasts based upon already inflated demand figures were known to be unrealistic.

21  126.    On March 10, 2000, JDS completed another two-for-one stock split.

22  127.    On April 25, 2000, JDS announced its fiscal 2000 third quarter ("3Q 00")

23  results in a press release which stated in part:

24          JDS Uniphase Corporation today reported sales for its third
        quarter ended March 31, 2000 of $394.6 million, and pro forma net
25      income of $85.8 million or $0.11 per diluted share.  Sales for the nine
        months ended March 31, 2000 were $906.4 million.
26

27          Sales for the quarter were 40% higher than net sales of $281.7
        million for the quarter ended December 31, 1999 and 155% above pro
28      forma combined sales of $154.9 million for the quarter ended March

31, 1999.  Sales for the nine months ended March 31, 2000 of $906.4 million were 129% above pro forma sales for the comparable prior year period. . . .

128.     Subsequent to the release of its 3Q 00 results on April 25, 2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and its prospects.  During the call, Kalkhoven and Muller made presentations and answered questions.  During the call, and in follow-up conversations with participants, they directly disseminated important information to the market by stating:

- The Company saw no sign of a slowdown in demand, and saw it expanding for the next several years.

- Sales to Nortel and Lucent were strong and the Company was also seeing strong sales from new players.

- Revenue was expected to grow 75% in Fiscal 2001.

129.     On April 26, 2000, the day after the conference call, securities analysts issued reports on JDS, which were based on and repeated statements disseminated by Defendants, including on the quarterly conference call, as follows:

- SG Cowen Securities:

     NO SIGNS OF SLOWDOWN, GUIDANCE RAISED-The recent market activity and the constant question regarding a potential "bandwidth glut" keep many of us focused on the sustainability of the optical phenomenon, which the company addressed last night. Basically, **there is no slowdown in sight . . . .  With demand looking very strong** from all key end-markets, major customers and confirmed by competitors and the prospect of broadband access technologies ramping significantly starting now and metro DWDM to hit in 2001 in a big way, it's hard to see supply catching up anytime soon. (Emphasis added).

- J.P. Morgan:

     **Management spent a good deal of time talking about the very healthy demand environment and why they expect to see equal if not accelerated demand over the next couple of years**.  The point that was made was a good one.  The growth in optical components demand somewhat parallels that of bandwidth.  As

channel counts increase and modulation speeds increase, the need for more and better components follows suit.  (Emphasis added).

- Prudential Securities:

JDS remains in a very strong position in an enormously strong market.  **On the call, management reiterated its belief that the remarkable strength in demand for optical components is likely to remain steady for the next several years**.  (Emphasis added).

- Robertson Stephens:

**In terms of demand, JDS Uniphase indicated that it continues to see strength coming from across the board**, with the majority of its revenues still coming from the long-haul end market, including the submarine market.  (Emphasis added).

- Warburg Dillon Read:

Lucent at 22% of sales was up 22% sequentially and Nortel at 16% of sales was up 22% sequentially.  These two were the only 10% customers in the quarter, but management noted that **demand is strong from all fronts and some of the newer players in particular.** (Emphasis added).

130.    Defendants' statements on the April 25, 2000 conference call as reported in the April 26, 2000 analyst reports, were false or misleading when issued.  The true but concealed facts were:

(a)    As detailed above at ¶¶ 33 - 38, by the Spring of 2000 JDS was seeing clear signs of reduced demand for its products company-wide including loss of business, order cancellations, and refusals of customers to take delivery;

(b)    As detailed above at ¶¶ 42 - 43, JDS was implementing cost savings measures such as reducing shifts and eliminating overtime as far back as April or May 2000;

(c)    As described above at ¶¶ 47 - 49, Inventory levels were starting to rise in the Spring of 2000 as a result of reduced demand;

(d)    Defendants were seeing signs that two of its largest customers, Lucent and Nortel, would significantly reduce their purchases of JDS products as evidenced the fact that, as detailed above at ¶ 37, both of those customers in March or April 2000 declined to take delivery on orders they had previously agreed upon, leaving the Trenton facility with

1    approximately $40 million in excess inventory; and

2              (e)    As described above at ¶¶ 103 - 106, the Company's reported sales

3    growth was not reflective of the current demand for the Company's products because a

4    significant portion of revenues recognized by JDS during the quarter were from shipments on

5    orders from earlier periods which the Individual Defendants intentionally pushed back into

6    later periods.

7         131.    On June 22, 2000, the U.S. Department of Justice cleared the merger with E-

8    TEK with the condition that E-TEK give up the right of first refusal to purchase thin film filter

9    output from four of its vendors.  E-TEK shareholders subsequently approved the merger on

10   June 28, 2000. The merger was completed on June 30, 2000 for 150.1 million shares of JDS

11   stock, for a total purchase price of $17.5 billion.

12        132.    On July 10, 2000, JDS announced that it agreed to merge with SDL, a fiber

13   optic communications company, in a transaction valued at approximately $41 billion.  The

14   merger agreement provided for the exchange of 3.8 shares of JDS common stock for each

15   share of SDL.

16        133.    On July 19, 2000, it was announced that JDS stock would be added to the S&P

17   500 index after the close of trading on July 26, 2000.  JDS's addition to the S&P 500 index was

18   a positive development for the Company it guaranteed an avalanche of buy orders from

19   managers of the many S&P 500 index funds, all of whom would be required to add JDS

20   common stock to their portfolios.  Indeed, following the announcement of JDS's inclusion in

21   the index, the price of JDS common stock increased 20% to $128.12.

22        134.    On July 20, 2000, an article in the M2 Presswire noted that "the news [on JDS]

23   keeps getting better and better and the recent stock price of both JDS Uniphase and SDL is a

24   good indicator that things are going very well."

25        135.    As detailed above, a year later, the foregoing statements were proven false and,

26   on July 26, 2001, JDS shares were trading at under $10.

27

28

**JDS' FINANCIAL STATEMENTS VIOLATED GAAP**

136.     Defendants caused the Company to violate GAAP and SEC rules by failing to record required write-downs of its inventory at June 30, 2000, September 30, 2000, December 30, 2000 and March 31, 2001.

137.     As detailed above, JDS overstated the value of its inventory in Form 10-Qs and a 10-K filed with the SEC.  The Form 10-Qs represented the following:

> The financial information at [Quarter end] and for the [period then ended] is unaudited, but includes all adjustments (consisting only of normal recurring adjustments) that the Company considers necessary for a fair presentation of the financial information set forth herein, in accordance with generally accepted accounting principles for interim financial information, the instructions to Form 10-Q and Article 10 of Regulation S-X.

138.     This statement was false and misleading as to the financial information reported in the Form 10-Qs, because such financial information was not prepared in conformity with GAAP.

139.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

140.     GAAP, as set forth in Accounting Research Bulletin No. 43, Chapter 4, requires that inventory be stated at cost or market, whichever is lower.  When there is evidence that the market value is less than cost, inventory is to be written down to market and a corresponding loss recognized in the income statement.  The reduction in general demand for JDS' merchandise, the downward revision of internal sales forecasts, customers canceling and returning orders, the buildup of excess inventories for which JDS had no firm orders, and the

1    rapidly changing technology in the fiber optic marketplace all evidenced that the market value

2    of JDS' inventory was less than cost.

3        141.    Moreover, JDS stated that its policy was to write off inventory in excess of six

4    months' of supply.  However, by no later than June 2000, JDS already had more than a one

5    year supply of inventory at its headquarters in San Jose due to reduced demand.  At the end of

6    Fiscal 2000 and during Fiscal 2001, JDS was accumulating excess inventory due to reduced

7    demand. Nevertheless, Defendants failed to record adequate and timely inventory reserves

8    until, in the fourth quarter of fiscal 2001, JDS belatedly recorded an inventory write-down for

9    excess inventory of $270 million (approximately 40% of the amount of inventory on its books

10   as of March 31, 2001).

11       142.    Due to these accounting improprieties, the Company presented its financial

12   results and statements in a manner which violated GAAP, including the following fundamental

13   accounting principles:

14           (a)    The principle that interim financial reporting should be based upon the

15   same accounting principles and practices used to prepare annual financial statements was

16   violated (APB No. 28, ¶ 10);

17           (b)    The principle that financial reporting should provide information that is

18   useful to present and potential investors and creditors and other users in making rational

19   investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1,

20   ¶ 34);

21           (c)    The principle that financial reporting should provide information about

22   the economic resources of an enterprise, the claims to those resources, and effects of

23   transactions, events and circumstances that change resources and claims to those resources was

24   violated (FASB Statement of Concepts No. 1, ¶ 140);

25           (d)    The principle that financial reporting should provide information about

26   how management of an enterprise has discharged its stewardship responsibility to owners

27   (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent

28   that management offers securities of the enterprise to the public, it voluntarily accepts wider

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT                    47

1   responsibilities for accountability to prospective investors and to the public in general (FASB

2   Statement of Concepts No. 1, ¶ 50);

3           (e)   The principle that financial reporting should provide information about

4   an enterprise's financial performance during a period was violated.  Investors and creditors

5   often use information about the past to help in assessing the prospects of an enterprise.  Thus,

6   although investment and credit decisions reflect investors' expectations about future enterprise

7   performance, those expectations are commonly based at least partly on evaluations of past

8   enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

9           (f)   The principle that financial reporting should be reliable in that it

10  represents what it purports to represent was violated.  That information should be reliable as

11  well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2,

12  ¶¶ 58-59);

13          (g)   The principle of completeness, which means that nothing is left out of

14  the information that may be necessary to ensure that it validly represents underlying events and

15  conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

16          (h)   The principle that conservatism be used as a prudent reaction to

17  uncertainty to try to ensure that uncertainties and risks inherent in business situations are

18  adequately considered was violated.  The best way to avoid injury to investors is to try to

19  ensure that what is reported represents what it purports to represent (FASB Statement of

20  Concepts No. 2, ¶¶ 95, 97).

21  143.   Further, the undisclosed adverse information concealed by Defendants during

22  the Class Period is the type of information which, because of SEC regulations, regulations of

23  the national stock exchanges and customary business practice, is expected by investors and

24  securities analysts to be disclosed and is known by corporate officials and their legal and

25  financial advisors to be the type of information which is expected to be and must be disclosed.

26  **JDS INSIDERS ENGAGE IN MASSIVE INSIDER SELLING**

27  144.   The Individual Defendants named herein (all of whom were senior officers and

28  directors of the Company), as well as other senior officers and directors and the Company's

1   largest shareholder, took advantage of the inflation in the market price of JDS common stock,

2   selling or disposing of 33.2 million shares of their JDS stock in an unusual and suspicious

3   manner for proceeds of $3.2 billion. All of these individuals were in possession of undisclosed

4   adverse information about JDS, including information regarding a major reduction in demand

5   for the Company's products beginning no later than March or April 2000 that became

6   pervasive by June and July 2000.

7       145.        After becoming aware of the declining demand that ultimately would turn into

8   reduced sales and revenues, as well as the rising levels of excess inventory, the Individual

9   Defendants scrambled to sell all, or most, of their JDS stock during a relatively brief portion of

10  the Class Period.    In fact, of the 33.2 million shares sold or otherwise disposed of by the

11  Individual Defendants during the Class Period, 14.7 million shares were sold in the month

12  between July 31, 2000 and August 31, 2000 alone, for proceeds of more than $1.6 billion.  The

13  Individual Defendants' sales during the Class Period were as follows:

| Defendant | Date | Shares | Price | Proceeds | % Sold |
|-----------|------|--------|-------|----------|--------|
| Abbe | 2/18/00 | 40,000 | $ 104.31 | $ 4,172,400 | |
| | 2/18/00 | 120,000 | $ 104.22 | $ 12,506,400 | |
| | 2/22/00 | 80,000 | $ 106.22 | $ 8,497,600 | |
| | **8/1/00** | **50,000** | **$ 117.15** | **$ 5,857,500** | |
| | **8/11/00** | **100,000** | **$ 117.10** | **$ 11,710,000** | |
| | 2/26/01 | 50,000 | $ 32.91 | $ 1,645,500 | |
| | 2/27/01 | 25,000 | $ 29.62 | $ 740,500 | |
| | 2/28/01 | 25,000 | $ 27.34 | $ 683,500 | |
| | | 490,000 | | $ 45,813,400 | 87.8% |
| Kalkhoven | 8/2/99 | 1,200,000 | $ 19.93 | $ 23,916,000 | |
| | 11/8/99 | 128,000 | $ 48.50 | $ 6,208,000 | |
| | 11/8/99 | 140,000 | $ 47.85 | $ 6,699,000 | |
| | 11/9/99 | 14,000 | $ 47.50 | $ 665,000 | |
| | 11/9/99 | 144,704 | $ 46.93 | $ 6,790,959 | |
| | 11/10/99 | 122,000 | $ 46.79 | $ 5,708,380 | |
| | 11/23/99 | 50,000 | $ 60.67 | $ 3,033,500 | |
| | 11/30/99 | 40,000 | $ 59.82 | $ 2,392,800 | |
| | 5/22/00 | 100,000 | $ 83.80 | $ 8,380,000 | |
| | 5/22/00 | 130,000 | $ 77.65 | $ 10,094,500 | |
| | 5/24/00 | 180,000 | $ 76.68 | $ 13,802,400 | |
| | **7/31/00** | **250,000** | **$ 117.00** | **$ 29,250,000** | |
| | **7/31/00** | **250,000** | **$ 119.50** | **$ 29,875,000** | |

| Defendant | Date | Shares | Price | | Proceeds | % Sold |
|---|---|---|---|---|---|---|
| | **8/4/00** | **62,500** | **$ 119.68** | **$** | **7,480,000** | |
| | **8/7/00** | **100,000** | **$ 119.81** | **$** | **11,981,000** | |
| | **8/21/00** | **110,000** | **$ 125.00** | **$** | **13,750,000** | |
| | **8/22/00** | **100,000** | **$ 125.10** | **$** | **12,510,000** | |
| | **8/22/00** | **140,000** | **$ 124.63** | **$** | **17,448,200** | |
| | **8/31/00** | **100,000** | **$ 124.22** | **$** | **12,422,000** | |
| | **8/31/00** | **200,000** | **$ 120.03** | **$** | **24,006,000** | |
| | | 3,561,204 | | $ | 246,412,739 | 76.6% |
| Muller | 8/2/99 | 16,000 | $  19.93 | $ | 318,880 | |
| | 8/2/99 | 70,000 | $  19.93 | $ | 1,395,100 | |
| | 8/2/99 | 434,000 | $  19.93 | $ | 8,649,620 | |
| | 11/8/99 | 40,000 | $  48.75 | $ | 1,950,000 | |
| | 11/12/99 | 80,000 | $  48.78 | $ | 3,902,400 | |
| | 11/19/99 | 40,000 | $  54.79 | $ | 2,191,600 | |
| | 5/22/00 | 10,000 | $  82.63 | $ | 826,300 | |
| | 5/30/00 | 10,000 | $  84.19 | $ | 841,900 | |
| | **7/31/00** | **35,000** | **$ 117.41** | **$** | **4,109,350** | |
| | **8/1/00** | **20,000** | **$ 117.23** | **$** | **2,344,600** | |
| | **8/2/00** | **20,000** | **$ 117.00** | **$** | **2,340,000** | |
| | **8/4/00** | **2,500** | **$ 120.00** | **$** | **300,000** | |
| | **8/4/00** | **5,000** | **$ 118.00** | **$** | **590,000** | |
| | **8/4/00** | **5,000** | **$ 118.23** | **$** | **591,150** | |
| | **8/4/00** | **5,000** | **$ 118.50** | **$** | **592,500** | |
| | **8/7/00** | **37,500** | **$ 120.00** | **$** | **4,500,000** | |
| | **8/8/00** | **25,000** | **$ 122.00** | **$** | **3,050,000** | |
| | **8/11/00** | **50,000** | **$ 117.08** | **$** | **5,854,000** | |
| | **8/11/00** | **50,000** | **$ 119.94** | **$** | **5,997,000** | |
| | **8/14/00** | **25,000** | **$ 119.24** | **$** | **2,981,000** | |
| | **8/14/00** | **25,000** | **$ 119.74** | **$** | **2,993,500** | |
| | **8/15/00** | **50,000** | **$ 119.94** | **$** | **5,997,000** | |
| | | 1,055,000 | | $ | 62,315,900 | 39.5% |
| Straus | 8/2/99 | 1,200,000 | $  19.93 | $ | 23,916,000 | |
| | 11/8/99 | 26,700 | $  47.71 | $ | 1,273,857 | |
| | 11/8/99 | 52,944 | $  47.71 | $ | 2,525,958 | |
| | **8/1/00** | **16,020** | **$ 117.00** | **$** | **1,874,340** | |
| | **8/1/00** | **95,352** | **$ 117.00** | **$** | **11,156,184** | |
| | **8/1/00** | **156,000** | **$ 117.06** | **$** | **18,261,360** | |
| | **8/1/00** | **394,000** | **$ 117.00** | **$** | **46,098,000** | |
| | **8/1/00** | **396,672** | **$ 117.00** | **$** | **46,410,624** | |
| | **8/4/00** | **4,500** | **$ 117.69** | **$** | **529,605** | |
| | **8/4/00** | **5,200** | **$ 118.00** | **$** | **613,600** | |
| | **8/7/00** | **25,000** | **$ 118.13** | **$** | **2,953,250** | |
| | **8/7/00** | **34,100** | **$ 118.02** | **$** | **4,024,482** | |
| | **8/7/00** | **35,000** | **$ 118.06** | **$** | **4,132,100** | |
| | **8/7/00** | **96,200** | **$ 118.00** | **$** | **11,351,600** | |

| Defendant | Date | Shares | Price | | Proceeds | % Sold |
|-----------|------|--------|-------|---|----------|--------|
| | 8/8/00 | 210,000 | $ 121.19 | $ | 25,449,900 | |
| | 2/1/01 | 25,424 | $ 55.49 | $ | 1,410,778 | |
| | 2/1/01 | 74,576 | $ 55.49 | $ | 4,138,222 | |
| | 3/6/01 | 800 | $ 30.06 | $ | 24,048 | |
| | 3/6/01 | 20,000 | $ 30.00 | $ | 600,000 | |
| | | 2,868,488 | | $ | 206,743,908 | 99.9% |
| **Totals** | | **7,974,692** | | | **561,285,947** | |

146.     In addition to the foregoing insider sales by the Individual Defendants, JDS's largest shareholder, Defendant Furukawa, which owned approximately 27% of the Company's outstanding shares of common stock at the beginning of the Class Period, sold or disposed of 17,864,000 shares of its JDS stock for which it received proceeds of $2.1 billion.  **This represented 99.3% of the JDS shares it held that were registered and available for sale. Moreover, Furukawa sold 8,779,000 shares on August 31, 2000 for proceeds of $933.2 million**, after it was well known within the Company that demand for JDS's products had declined dramatically and would soon translate into declining sales and earnings.

147.     At least 10 other high ranking JDS insiders also sold substantial portions of their JDS stock during the Class Period, with the lion's share being disposed of between July 31 and August 31, 2000, as detailed below:

(a)     Zita M. Cobb was, during the Class Period, Executive Vice President, Strategy and Business Development of JDS.  During that time, Cobb sold a total of 1,573,956 shares of her JDS stock for proceeds of $100.1 million.  **This represented 99.8% of her holdings in JDS during the Class Period.  Cobb sold 652,788 of those shares during the period between July 31 and August 31, 2000, for proceeds of $76.5 million.**

(b)     Bruce D. Day was, during the Class Period, a director for the Company. During that time, Day sold a total of 112,000 shares of his JDS stock for proceeds of $10.4 million.  **This represented 100% of his holdings in JDS during the Class Period. Moreover, Day sold 80,000 shares in August 2000, for proceeds of $9.7 million.**

(c)     Harry Deffebach was, during the Class Period, an officer for the

Company.  During that time, Deffebach sold a total of 80,000 shares of JDS common stock -- or **99.8% of his total holdings** -- for proceeds of $9.5 million.  **He sold 100% of those shares on August 31, 2000.**

(d)     Robert E. Enos was, during the Class Period, a director for the Company.  During that time, Enos sold a total of 40,000 shares of JDS stock for proceeds of $4.2 million, representing **100% of his total holdings**.  **Enos sold 20,000 of those shares in August 2000 for $2.5 million.**

(e)     Joseph Ip was, during the Class Period, Senior Vice President of the Company.  During that time, Ip sold a total of 1,338,540 shares of his JDS stock for proceeds of $104 million.  **This represented 99.9% of his holdings in JDS during the Class Period. Moreover, Ip sold 657,108 shares in August 2000 for proceeds of $80.6 million.**

(f)     Fred Leonberger was, during the Class Period, the Company's Senior Vice President and Chief Technology Officer.  During that time, Leonberger sold a total of 337,500 shares of his JDS stock for proceeds of $37.1 million.  **This represented 82.7% of his holdings in JDS during the Class Period.  Leonberger sold 140,000 shares during August 2000 for proceeds totaling $15.2 million.**

(g)     John A. Macnaughton was, during the Class Period, a director for the Company.  During that time, Macnaughton sold a total of 45,000 shares of his JDS stock for proceeds of $4.6 million.  **This represented 100% of his holdings in JDS during the Class Period.  Macnaughton sold 31,272 of those shares in August 2000 for proceeds of $3.8 million.**

(h)     Danny E. Pettit was, until September 2000, Executive Vice President, European Operations of JDS.  During that time, Pettit sold a total of 3,016,124 shares of his JDS stock for proceeds of $226.3 million.  **This represented 98.4% of his holdings in JDS during the Class Period.  Pettit sold 832,000 of those shares during August 2000 for $100.2 million.**  His shares sold during the Class Period are extremely high compared to his sales of only 25,242 shares during the two years prior to the beginning of the Class Period.

(i)     Michael C. Phillips was, during the Class Period, Senior Vice President,

Business Development of the Company.  During that time, Phillips sold a total of 670,000 shares of his JDS stock for proceeds of $32.7 million.  **This represented 97.4% of his holdings in JDS during the Class Period.  Moreover, Phillips sold 150,000 shares between July 31 and August 7, 2000 for $17.7 million.**

(j)   Casimir Skrzypczak ("Skrzypczak") was, during the Class Period, a director of JDS.  During that time, Skrzypczak sold a total of 105,180 shares of his JDS stock for proceeds of $8.4 million.  **This represented 93.1% of his holdings in JDS during the Class Period.  Of those sales, 25,000 shares were sold in August 2000 for proceeds of $3.1 million.**

148.   The non-defendant insiders' sales are depicted in the following chart:

| Insider | Date | Shares | Price | Proceeds | % Sold |
|---------|------|--------|-------|----------|--------|
| Cobb | 8/2/99 | 75,032 | $ 19.93 | $ 1,495,388 | |
| | 8/2/99 | 179,416 | $ 19.93 | $ 3,575,761 | |
| | 8/2/99 | 219,688 | $ 19.93 | $ 4,378,382 | |
| | 8/2/99 | 277,864 | $ 19.93 | $ 5,537,830 | |
| | 11/15/99 | 16,020 | $ 49.11 | $ 786,742 | |
| | 11/15/99 | 32,348 | $ 49.11 | $ 1,588,610 | |
| | **7/31/00** | **40,000** | **$ 118.13** | **$ 4,725,200** | |
| | **7/31/00** | **100,000** | **$ 118.06** | **$ 11,806,000** | |
| | **7/31/00** | **252,788** | **$ 118.00** | **$ 29,828,984** | |
| | **8/3/00** | **49,300** | **$ 116.13** | **$ 5,725,209** | |
| | **8/3/00** | **210,700** | **$ 116.00** | **$ 24,441,200** | |
| | 2/1/01 | 100,000 | $ 55.49 | $ 5,549,000 | |
| | 3/6/01 | 352 | $ 30.06 | $ 10,581 | |
| | 3/6/01 | 448 | $ 30.06 | $ 13,467 | |
| | 3/6/01 | 20,000 | $ 30.00 | $ 600,000 | |
| | | 1,573,956 | | $ 100,062,353 | 99.8% |
| Day | 8/2/99 | 32,000 | $ 19.94 | $ 637,920 | |
| | **8/9/00** | **40,000** | **$ 119.88** | **$ 4,795,200** | |
| | **8/9/00** | **40,000** | **$ 123.06** | **$ 4,922,400** | |
| | | 112,000 | | $ 10,355,520 | 100% |
| Deffebach | **8/31/00** | **80,000** | **$ 118.70** | **$ 9,496,000** | 99.8% |
| Enos | 5/30/00 | 20,000 | $ 85.00 | $ 1,700,000 | |
| | **8/21/00** | **20,000** | **$ 125.00** | **$ 2,500,000** | |
| | | 40,000 | | $ 4,200,000 | 100% |

| Insider | Date | Shares | Price | Proceeds | % Sold |
|---------|------|--------|-------|----------|--------|
| Furukawa | 6/20/00 | 7,700,000 | $ 125.00 | $ 962,500,000 | |
| | **8/31/00** | **1,874,180** | **$ 104.91** | **$ 196,620,224** | |
| | **8/31/00** | **6,904,820** | **$ 106.67** | **$ 736,537,149** | |
| | 10/12/00 | 1,385,000 | $ 133.93 | $ 185,493,050 | |
| | | 17,864,000 | | $ 2,081,150,423 | 99.3%[2] |
| Ip | 8/2/99 | 192,096 | $ 19.93 | $ 3,828,473 | |
| | 8/2/99 | 230,672 | $ 23.50 | $ 5,420,792 | |
| | 11/9/99 | 232,660 | $ 46.65 | $ 10,853,589 | |
| | 2/1/00 | 372 | $ 101.97 | $ 37,933 | |
| | 2/28/00 | 25,632 | $ 125.87 | $ 3,226,300 | |
| | **8/10/00** | **17,208** | **$ 120.50** | **$ 2,073,564** | |
| | **8/11/00** | **40,000** | **$ 119.02** | **$ 4,760,800** | |
| | **8/11/00** | **96,624** | **$ 119.02** | **$ 11,500,188** | |
| | **8/11/00** | **103,276** | **$ 119.02** | **$ 12,291,910** | |
| | **8/24/00** | **400,000** | **$ 125.00** | **$ 50,000,000** | |
| | | 1,338,540 | | $ 103,993,549 | 99.9% |
| Leonberger | 2/25/00 | 47,136 | $ 129.25 | $ 6,092,328 | |
| | 2/25/00 | 102,864 | $ 129.25 | $ 13,295,172 | |
| | 5/25/00 | 10,000 | $ 85.00 | $ 850,000 | |
| | 5/30/00 | 10,000 | $ 84.83 | $ 848,300 | |
| | **8/4/00** | **2,500** | **$ 120.00** | **$ 300,000** | |
| | **8/7/00** | **17,500** | **$ 120.00** | **$ 2,100,000** | |
| | **8/18/00** | **20,000** | **$ 122.50** | **$ 2,450,000** | |
| | **8/21/00** | **20,000** | **$ 125.00** | **$ 2,500,000** | |
| | **8/30/00** | **20,000** | **$ 120.88** | **$ 2,417,600** | |
| | **8/31/00** | **40,000** | **$ 120.08** | **$ 4,803,200** | |
| | 2/26/01 | 20,000 | $ 32.50 | $ 650,000 | |
| | 2/28/01 | 15,000 | $ 28.35 | $ 425,250 | |
| | 3/6/01 | 12,500 | $ 30.00 | $ 375,000 | |
| | | 337,500 | | $ 37,106,850 | 82.7% |
| Macnaughton | **8/9/00** | **31,272** | **$ 121.00** | **$ 3,783,912** | |
| | 11/28/00 | 13,728 | $ 63.13 | $ 866,649 | |
| | | 45,000 | | $ 4,650,561 | 100% |
| Pettit | 8/2/99 | 2,132 | $ 23.05 | $ 49,143 | |
| | 8/2/99 | 80,000 | $ 19.93 | $ 1,594,400 | |
| | 8/2/99 | 294,016 | $ 19.93 | $ 5,859,739 | |
| | 8/2/99 | 385,984 | $ 19.93 | $ 7,692,661 | |
| | 11/8/99 | 800,000 | $ 47.96 | $ 38,368,000 | |
| | 2/1/00 | 1,992 | $ 101.97 | $ 203,130 | |
| | 2/4/00 | 20,000 | $ 110.12 | $ 2,202,400 | |

---

[2] Percentage of shares registered and available for sale.

| Insider | Date | Shares | Price | Proceeds | % Sold |
|---|---|---|---|---|---|
| | 2/4/00 | 200,000 | $ 109.52 | $ 21,904,000 | |
| | 2/23/00 | 200,000 | $ 111.12 | $ 22,224,000 | |
| | 2/28/00 | 200,000 | $ 129.75 | $ 25,950,000 | |
| | **8/9/00** | **100,000** | **$ 122.64** | **$ 12,264,000** | |
| | **8/14/00** | **34,000** | **$ 119.47** | **$ 4,061,980** | |
| | **8/14/00** | **40,000** | **$ 119.47** | **$ 4,778,800** | |
| | **8/14/00** | **50,000** | **$ 119.47** | **$ 5,973,500** | |
| | **8/14/00** | **76,000** | **$ 119.47** | **$ 9,079,720** | |
| | **8/14/00** | **200,000** | **$ 119.24** | **$ 23,848,000** | |
| | **8/17/00** | **200,000** | **$ 119.98** | **$ 23,996,000** | |
| | **8/18/00** | **22,744** | **$ 123.03** | **$ 2,798,194** | |
| | **8/18/00** | **32,000** | **$ 122.88** | **$ 3,932,160** | |
| | **8/18/00** | **77,256** | **$ 123.03** | **$ 9,504,806** | |
| | | 3,016,124 | | $ 226,284,633 | 98.4% |
| Phillips | 8/9/99 | 200,000 | $ 21.35 | $ 4,270,000 | |
| | 8/13/99 | 200,000 | $ 21.92 | $ 4,384,000 | |
| | 11/9/99 | 100,000 | $ 46.98 | $ 4,698,000 | |
| | 5/24/00 | 10,000 | $ 81.00 | $ 810,000 | |
| | 5/25/00 | 10,000 | $ 84.25 | $ 842,500 | |
| | **7/31/00** | **50,000** | **$ 116.18** | **$ 5,809,000** | |
| | **8/4/00** | **65,000** | **$ 118.81** | **$ 7,722,650** | |
| | **8/7/00** | **35,000** | **$ 118.49** | **$ 4,147,150** | |
| | | 670,000 | | $ 32,683,300 | 97.4% |
| Skrzypczak | 8/2/99 | 60,000 | $ 19.94 | $ 1,196,100 | |
| | 5/30/00 | 15,000 | $ 90.25 | $ 1,353,750 | |
| | **8/9/00** | **25,000** | **$ 122.31** | **$ 3,057,750** | |
| | 11/29/00 | 30,000 | $ 57.15 | $ 1,714,500 | |
| | 12/14/00 | 10,000 | $ 64.31 | $ 643,100 | |
| | 1/3/01 | 130 | $ 39.93 | $ 5,191 | |
| | 1/4/01 | 50 | $ 50.12 | $ 2,506 | |
| | 1/16/01 | 10,000 | $ 50.50 | $ 505,000 | |
| | | 150,180 | | $ 8,477,897 | 93.1% |
| **Totals** | | **25,227,300** | | **2,618,461,086** | |

## FIRST CLAIM FOR RELIEF

**For Violations of § 11 of the Securities Act**
**(On Behalf of the OCLI Subclass**
**Against Defendants JDS, Kalkhoven, Straus and Muller)**

149.     This Count is brought pursuant to Section 11 of the Securities Act on behalf of

the OCLI Subclass.

150.     This Count does not incorporate, and expressly excludes, any allegations based on fraud or deliberate recklessness.

151.     On December 8, 1999, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with OCLI (the "OCLI Registration Statement").  The OCLI Registration Statement was signed by Defendants Kalkhoven, Straus and Muller.  The OCLI Registration Statement contained a Proxy Statement-Prospectus which detailed the terms of the merger (the "OCLI Proxy-Prospectus").  According to the OCLI Proxy-Prospectus, the primary reason for the proposed merger was the allegedly strong demand in the fiber optic industry:

> The current demand for increased capacity in fiber optic telecommunications networks, which is largely the result of increased requirements for information transfer due to Internet usage, has caused the complexity and performance requirements of fiber optic network systems to substantially increase and the product life cycles for these network systems to decrease.  OEM system suppliers are under pressure from their customers to provide higher capacity and more complex systems in shorter time periods.  These same pressures apply at all levels of their system, including the component and module levels.  Given these factors, OCLI and JDS Uniphase believe there is **increasing demand** for products designed, manufactured and distributed by merchant suppliers.
>
> In this market environment, OCLI and JDS Uniphase believe that both companies will be able to serve their respective customers more effectively with OCLI as part of the JDS Uniphase family of companies. . . .  (Emphasis added).

152.     On December 22, 1999, JDS filed an amended Registration Statement on Form S-4 for the OCLI merger (the "Amended OCLI Registration Statement"), which contained an amended Proxy Statement-Prospectus (the "Amended OCLI Proxy-Prospectus").  The Amended OCLI Proxy-Prospectus contained the same statements concerning demand as the original OCLI Proxy-Prospectus and was signed by the same Defendants.

153.     The OCLI Registration Statement and Amended OCLI Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and failed to adequately disclose material facts as described

1   above.  Specifically, the statements regarding "increasing demand" were false and misleading.

2   The truth was that demand was not as strong as represented and JDS knew that customers were

3   placing orders for more than they needed in order to ensure delivery of an adequate amount of

4   product.

5   154.      JDS was the registrant of the OCLI Registration Statement and Amended

6   Registration Statement.

7   155.      JDS was the issuer of the securities exchanged in connection with the OCLI

8   merger.  As issuer of the registered securities, JDS is strictly liable to the OCLI Subclass for

9   the material misstatements and omissions contained in the OCLI Registration Statement and

10  Amended OCLI Registration Statement.

11  156.      The Defendants named in this count, and each of them, issued, caused to be

12  issued, and participated in the issuance of materially false written statements to the investing

13  public which were contained in the OCLI Registration Statement and Amended OCLI

14  Registration Statement, which statements misstated or failed to disclose, among other things,

15  the facts referenced above.

16  157.      The Defendants named in this count owed a duty to make a reasonable

17  investigation of the statements contained in the OCLI Registration Statement and Amended

18  OCLI Registration Statement at the time they became effective, and to reasonably assure that

19  those statements were true and that there was no omission of material facts required to be

20  stated in order to make the statements contained therein correct.

21  158.      The Individual Defendants, and each of them, signed the OCLI Registration

22  Statement and Amended OCLI Registration Statement and were responsible for the content

23  and dissemination of the OCLI Registration Statement and Amended OCLI Registration

24  Statement in connection with the JDS common stock registered and exchanged for shares of

25  OCLI common stock upon consummation of the OCLI merger, and caused such filing to be

26  made with the SEC.

27  159.      The Individual Defendants who signed the OCLI Registration Statement and

28  Amended OCLI Registration Statement failed to make a reasonable investigation or possess

1    reasonable grounds for the belief that the statements contained in those Registration Statements

2    and which they signed were true and correct and did not omit any material fact.  Each of the

3    Individual Defendants who signed the OCLI Registration Statement and Amended OCLI

4    Registration Statement failed to exercise reasonable care in ensuring the accuracy and

5    completeness of those Registration Statements.

6        160.        As a direct and proximate result of Defendants' acts and omissions in violation

7    of the Securities Act, the value of the securities exchanged by JDS for shares of OCLI was

8    artificially inflated.  Consequently, the number of JDS shares received by shareholders of

9    OCLI was less than it otherwise should have been and the OCLI Subclass suffered substantial

10   damages in connection with their exchange of OCLI shares for shares of JDS common stock.

11       161.        By reason of the conduct alleged herein, the Defendants named in this count

12   violated and/or controlled a person who violated Section 11 of the Securities Act.

13       162.        At the times they acquired JDS common stock, the OCLI Subclass was without

14   knowledge of the facts concerning the false statements or omissions alleged herein.  Less than

15   one year has elapsed from the time that the OCLI Subclass discovered or reasonably could

16   have discovered the facts upon which this Count is based to the time this action was filed.  Less

17   than three years have elapsed from the time that the securities upon which this Count is

18   brought were *bona fide* offered to the public to the time that this action was commenced.

19                          **SECOND CLAIM FOR RELIEF**

20                      **For Violations of § 11 of the Securities Act**
                        **(On Behalf of the E-TEK Subclass**
21           **Against Defendants JDS, Kalkhoven, Straus and Muller)**

22       163.        This Count is brought pursuant to Section 11 of the Securities Act on behalf of

23   the E-TEK Subclass.

24       164.        This Count does not incorporate, and expressly excludes, any allegations based

25   on fraud or deliberate recklessness.

26       165.        On February 11, 2000, JDS filed a Registration Statement on Form S-4 with the

27   SEC with respect to the registration of shares of JDS common stock to be used in the

28   Company's merger with E-TEK (the "E-TEK Registration Statement").   The E-TEK

1   Registration Statement was signed by Defendants Kalkhoven, Straus and Muller.  The E-TEK

2   Registration Statement contained a Proxy Statement-Prospectus which detailed the terms of the

3   merger (the "E-TEK Proxy-Prospectus").   According to the E-TEK Proxy-Prospectus, the

4   primary reason for the proposed merger was the allegedly strong demand in the fiber optic

5   industry:

6                E-TEK and JDS Uniphase are proposing to merge in response to
             **unprecedented growth in the telecommunications industry and**
7            **demand for the fiber optic networks that are enabling such**
             **growth**. . . .  The component and module manufacturers have not been
8            able to meet these demands of the systems manufacturers to date, and
             this imbalance is hampering the growth of optical networking and
9            deployment of these advanced telecommunications networks.  **E-TEK**
             **and JDS Uniphase believe that the merger will allow the**
10           **companies to better respond to these needs of the**
             **telecommunications industry and the demands of their customers**,
11           thereby better enabling more widespread deployment of optical
             networks and advancement of these networks to increase bandwidth to
12           the levels sought by the marketplace. (Emphasis added).

13

14      166.      JDS filed amendments to the E-TEK Registration Statement on May 23, 2000

15   and May 31, 2000 (the "Amended E-TEK Registration Statements"), which were signed by

16   Defendants Straus and Muller.  The Amended E-TEK Registration Statements contained a

17   Proxy Statement-Prospectus (the "Amended E-TEK Proxy-Prospectuses") which repeated the

18   statements in the original E-TEK Registration Statement that the proposed merger was in

19   response to "unprecedented growth in the telecommunications industry and demand for the

20   fiber optic networks that are enabling such growth."

21      167.      E-TEK shareholders approved the transaction at a special stockholders meeting

22   on June 28, 2000.

23      168.      The E-TEK Registration Statement and Amended E-TEK Registration

24   Statements contained untrue statements of material fact, omitted to state other facts necessary

25   to make the statements made not misleading, and failed to adequately disclose material facts as

26   described above.   Specifically, the statements regarding strong demand were false and

27   misleading.  The true but concealed facts were:

28            (a)      As detailed above at ¶¶ 99 - 102, demand was not as strong as

1    represented and JDS knew that customers were placing orders for more than they needed in

2    order to ensure delivery of an adequate amount of product;

3    (b)    As detailed above at ¶¶33 - 38 by Spring 2000, there was no longer

4    "unprecedented demand" but JDS and the Individual Defendants named herein were seeing

5    clear signs of reduced demand for its products company-wide including loss of business, order

6    cancellations, and refusals of customers to take delivery;

7    (c)    As detailed above at ¶¶ 42 - 44, JDS was implementing cost savings

8    measures such as reducing shifts and eliminating overtime as far back as April or May of 2000;

9    (d)    As detailed above at ¶¶ 45 - 51, inventory levels were starting to rise in

10    the Spring of 2000 as a result of reduced demand; and

11    (e)    Defendants were seeing signs that two of its largest customers, Lucent

12    and Nortel, would significantly reduce their purchases of JDS products as evidenced by the fact

13    that, as described above in ¶ 37, both of those customers in March or April 2000 declined to

14    take delivery on orders they had agreed previously agreed upon, leaving the Trenton facility

15    with approximately $40 million in excess inventory.

16    169.    JDS was the registrant of the E-TEK Registration Statement and Amended

17    Registration Statements.

18    170.    JDS was the issuer of the securities exchanged in connection with the E-TEK

19    merger.  As issuer of the registered securities, JDS is strictly liable to the E-TEK Subclass for

20    the material misstatements and omissions contained in the E-TEK Registration Statement and

21    Amended E-TEK Registration Statements.

22    171.    The Defendants named in this Count, and each of them, issued, caused to be

23    issued, and participated in the issuance of materially false written statements to the investing

24    public which were contained in the E-TEK Registration Statement and Amended E-TEK

25    Registration Statements, which statements misstated or failed to disclose, among other things,

26    the facts referenced above.

27    172.    The Defendants named in this Count owed the E-TEK Subclass the duty to

28    make a reasonable investigation of the statements contained in the E-TEK Registration

1   Statement and Amended E-TEK Registration Statements at the time they became effective, and

2   to reasonably assure that those statements were true and that there was no omission of material

3   facts required to be stated in order to make the statements contained therein correct.

4         173.      The Individual Defendants named herein, and each of them, signed the E-TEK

5   Registration Statement and Amended E-TEK Registration Statements and were responsible for

6   the content and dissemination of the E-TEK Registration Statement and Amended E-TEK

7   Registration Statements in connection with the JDS common stock registered and exchanged

8   for shares of E-TEK common stock upon consummation of the E-TEK merger, and caused

9   such filing to be made with the SEC.

10         174.      The Individual Defendants who signed the E-TEK Registration Statement and

11   Amended E-TEK Registration Statements failed to make a reasonable investigation or possess

12   reasonable grounds for the belief that the statements contained in those Registration Statements

13   and which signed were true and correct and did not omit any material fact.  Each of the

14   Individual Defendants who signed the E-TEK Registration Statement and Amended E-TEK

15   Registration Statements failed to exercise reasonable care in ensuring the accuracy and

16   completeness of those Registration Statements.

17         175.      As a direct and proximate result of Defendants' acts and omissions in violation

18   of the Securities Act, the value of the securities exchanged by JDS for shares of E-TEK was

19   artificially inflated and consequently the number of JDS shares received by shareholders of E-

20   TEK was less than it otherwise should have been.  The E-TEK Subclass suffered substantial

21   damages in connection with their exchange of E-TEK shares for shares of JDS common stock.

22         176.      By reason of the conduct alleged herein, Defendants named in this Count

23   violated and/or controlled a person who violated Section 11 of the Securities Act.

24         177.      At the times they acquired JDS common stock, the E-TEK Subclass was

25   without knowledge of the facts concerning the false statements or omissions alleged herein.

26   Less than one year has elapsed from the time that the E-TEK Subclass discovered or

27   reasonably could have discovered the facts upon which this count is based to the time this

28   action was filed.  Less than three years have elapsed from the time that the securities upon

1  which this count is brought were *bona fide* offered to the public to the time that this action was

2  commenced.

3  **THIRD CLAIM FOR RELIEF**

4  **For Violations of § 11 of the Securities Act**
**(On Behalf of the SDL Subclass**
5  **Against Defendants JDS, Straus and Muller)**

6     178.       This Count is brought pursuant to Section 11 of the Securities Act on behalf of

7  the SDL Subclass.

8     179.       This Count does not incorporate, and expressly excludes, any allegations based

9  on fraud or deliberate recklessness.

10    180.       On September 7, 2000, JDS filed a Registration Statement on Form S-4 with the

11  SEC with respect to the registration of shares of JDS common stock to be used in the

12  Company's merger with SDL (the "SDL Registration Statement"). The SDL Registration

13  Statement was signed by Defendants Straus and Muller.  The SDL Registration Statement

14  contained a Proxy Statement-Prospectus which detailed the terms of the merger (the "SDL

15  Proxy-Prospectus").   The SDL Proxy-Prospectus incorporated by reference the September 1,

16  2000 8-K which contained JDS's Fiscal 2000 financial statements.   In addition, the SDL

17  Proxy-Prospectus also included selected data from those financial statements, including the

18  balance sheet which represented that JDS's inventories balance at June 30, 2000 was $375.4

19  million.  As with the E-TEK merger, JDS once again cited strong demand as the impetus for its

20  merger with SDL:

21         SDL and JDS Uniphase are proposing to merge in response to
       unprecedented growth in the telecommunications industry and demand
22     for the fiber optic networks that are enabling such growth. Due to the
       rapid increase in demand for applications such as Internet access,
23     email and electronic commerce, telecommunications service providers
       have rapidly accelerated the deployment and bandwidth capacity of
24     fiber optic systems in their networks. . . .

25         SDL and JDS Uniphase believe that the merger will enable the
26     combined company to compete more effectively in a rapidly changing
       and expanding environment.  The merger will enable the combined
27     company to satisfy its customers' demands for increased output, lower
28     prices, integrated modules and the depth and breadth of engineering

1
2
3
4
5
6
7
8

resources required to support new systems designs.  SDL and JDS Uniphase believe that the combined company will be better equipped to compete with the in-house optical component and advanced module manufacturing capabilities of the major, vertically integrated systems suppliers, which, due to their size and resources, enjoy market advantages over organizations such as SDL and JDS Uniphase.  In addition, by being able to offer a broader range of components and to supply integrated modules to new and emerging systems suppliers, SDL and JDS Uniphase also believe that the combined company will enable these suppliers to grow more rapidly, and thereby increase the number of potential customers and the level of demand for their products.

9    181.    On November 17, 2000, JDS filed an amendment to the SDL Registration

10  Statement with the SEC (the "Amended SDL Registration Statement").  The Amended SDL

11  Registration Statement was signed by Defendants Straus and Muller.  The Amended SDL

12  Registration Statement contained the same rationale for the merger as the original SDL

13  Registration Statement and incorporated by reference JDS's 1Q 01 10-Q.

14    182.    SDL shareholders approved the merger on February 12, 2001.

15    183.    Immediately following the February 12, 2001 stockholder meeting, JDS

16  announced a downward revision of its revenue and earnings guidance as a result of lower

17  visibility and customer inventory adjustments.

18    184.    The SDL Registration Statement and Amended SDL Registration Statement

19  contained untrue statements of material fact, omitted to state other facts necessary to make the

20  statements made not misleading, and failed to adequately disclose material facts as described

21  above.  Specifically, the statements regarding strong demand were false and misleading.  The

22  true but concealed facts were:

23      (a)    As detailed above at ¶¶ 33 - 41, demand for JDS products had dropped

24  off dramatically by July 2000 as fewer and fewer orders were coming in, some orders were

25  cancelled and customers were declining to take delivery of products they had previously

26  ordered;

27      (b)    As detailed above at ¶¶ 42 - 44, by no later than the Spring and Summer

28  of 2000 JDS was implementing cost savings measures such as reducing shifts, eliminating

1  overtime and reducing production days at its manufacturing plants;

2           (c)    The downturn in Lucent's and Nortel's businesses, as described above at

3  ¶¶ 63 - 64, was beginning to result in significantly reduced sales by JDS;

4           (d)    The inventories balance reported and incorporated in the SDL

5  Registration Statements was false and misleading and violated GAAP.  As detailed above at

6  ¶¶ 45 - 51, as a result of declining demand, excess inventory at JDS had begun to rise in the

7  Spring of 2000 and by June 2000 there was a full year's worth of excess inventory at the

8  Company's headquarters in San Jose that was ultimately destroyed in March 2001 as obsolete.

9  Under GAAP, and according to the Company's own policy as described above, the excess

10  inventory should have been written off in the quarter in which its market price fell below cost

11  (i.e., beginning in June 2000); and

12           (e)    As disclosed immediately after the shareholder vote, at the time of the

13  vote that the Company was experiencing lower sales visibility and customer inventory levels

14  had risen.

15  185.    JDS was the registrant of the SDL Registration Statement and Amended

16  Registration Statement.

17  186.    JDS was the issuer of the securities exchanged in connection with the SDL

18  merger.  As issuer of the registered securities, JDS is strictly liable to the SDL Subclass for the

19  material misstatements and omissions contained in the SDL Registration Statement and

20  Amended SDL Registration Statement.

21  187.    The Defendants named in this Count, and each of them, issued, caused to be

22  issued, and participated in the issuance of materially false written statements to the investing

23  public which were contained in the SDL Registration Statement and Amended SDL

24  Registration Statement, which statements misstated or failed to disclose, among other things,

25  the facts referenced above.

26  188.    The Defendants named in this Count owed the SDL Subclass the duty to make a

27  reasonable investigation of the statements contained in the SDL Registration Statement and

28  Amended SDL Registration Statement at the time they became effective, and to reasonably

1  assure that those statements were true and that there was no omission of material facts required

2  to be stated in order to make the statements contained therein correct.

3       189.      The Individual Defendants, and each of them, signed the SDL Registration

4  Statement and Amended SDL Registration Statement and were responsible for the content and

5  dissemination of the SDL Registration Statement and Amended SDL Registration Statement in

6  connection with the JDS common stock registered and exchanged for shares of SDL common

7  stock upon consummation of the SDL merger, and caused such filing to be made with the SEC.

8       190.      The Individual Defendants who signed the SDL Registration Statement and

9  Amended SDL Registration Statement failed to make a reasonable investigation or possess

10  reasonable grounds for the belief that the statements contained in those Registration Statements

11  and which they signed were true and correct and did not omit any material fact.  Each of the

12  Individual Defendants who signed the SDL Registration Statement and Amended SDL

13  Registration Statement failed to exercise reasonable care in ensuring the accuracy and

14  completeness of those Registration Statements.

15       191.      As a direct and proximate result of Defendants' acts and omissions in violation

16  of the Securities Act, the value of the securities exchanged by JDS for shares of SDL was

17  artificially inflated and consequently the number of JDS shares received by shareholders of

18  SDL was less than it otherwise should have been.   The SDL Subclass suffered substantial

19  damages in connection with their exchange of SDL shares for shares of JDS common stock.

20       192.      By reason of the conduct alleged herein, Defendants named in this Count

21  violated and/or controlled a person who violated Section 11 of the Securities Act.

22       193.      At the times they acquired JDS common stock, the SDL Subclass was without

23  knowledge of the facts concerning the false statements or omissions alleged herein.  Less than

24  one year has elapsed from the time that the SDL Subclass discovered or reasonably could have

25  discovered the facts upon which this count is based to the time that the Complaint was filed.

26  Less than three years have elapsed from the time that the securities upon which this Count is

27  brought were *bona fide* offered to the public to the time that this action was commenced.

28

**FOURTH CLAIM FOR RELIEF**

**For Violations of § 12(a)(2) of the Securities Act**
**(On Behalf of the OCLI Subclass Against Defendant JDS)**

194.     Lead Plaintiff incorporates ¶¶ 149 - 162 by reference as if fully set forth herein.

195.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the OCLI Subclass.

196.     By means of the OCLI Proxy-Prospectus and Amended OCLI Proxy-Prospectus, OCLI shareholders exchanged their shares of OCLI common stock for shares of JDS common stock.

197.     The OCLI Proxy-Prospectus and Amended OCLI Proxy-Prospectus contained untrue statements of material facts, and concealed and failed to disclose material facts, as detailed above at ¶ 153.   JDS owed the OCLI Subclass the duty to make a reasonable investigation of the statements contained in the OCLI Proxy-Prospectus and Amended OCLI Proxy-Prospectus at the time they became effective, and to reasonably assure that those statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein correct.

198.     The OCLI Subclass did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the OCLI Proxy-Prospectus and Amended OCLI Proxy-Prospectus at the time they acquired JDS common stock.

199.     By reason of the conduct alleged herein, JDS violated Section 12(a)(2) of the Securities Act.   As a direct and proximate result of such violations, the members of the OCLI Subclass sustained substantial damages in connection with their acquisition of JDS common stock.   Accordingly, the OCLI Subclass has the right to rescind and recover the consideration (or like value) paid for their shares, and hereby tender their shares to the Defendants, or to the extent they have sold their shares, seek damages to the extent permitted by law.

**FIFTH CLAIM FOR RELIEF**
**For Violations of § 12(a)(2) of the Securities Act**
**(On Behalf of the E-TEK Subclass Against Defendant JDS)**

200.     Lead Plaintiff incorporates ¶¶ 163 - 177 by reference as if fully set forth herein.

201.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the E-TEK Subclass.

202.     By means of the E-TEK Proxy-Prospectus and Amended E-TEK Proxy-Prospectuses, E-TEK shareholders exchanged their shares of E-TEK common stock for shares of JDS common stock.

203.     The E-TEK Proxy-Prospectus and Amended E-TEK Proxy-Prospectuses contained untrue statements of material facts, and concealed and failed to disclose material facts, as detailed above at ¶ 168.     JDS owed the E-TEK Subclass the duty to make a reasonable investigation of the statements contained in the E-TEK Proxy-Prospectus and Amended E-TEK Proxy-Prospectuses at the time they became effective, and to reasonably assure that those statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein correct.

204.     The E-TEK Subclass did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the E-TEK Proxy-Prospectus and Amended E-TEK Proxy-Prospectuses at the time they acquired JDS common stock.

205.     By reason of the conduct alleged herein, JDS violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, the members of the E-TEK Subclass sustained substantial damages in connection with their acquisition of JDS common stock.  Accordingly, the E-TEK Subclass has the right to rescind and recover the consideration (or like value) paid for their shares, and hereby tender their shares to the Defendants, or to the extent they have sold their shares, seek damages to the extent permitted by law.

**SIXTH CLAIM FOR RELIEF**

**For Violations of § 12(a)(2) of the Securities Act**
**(On Behalf of the SDL Subclass Against Defendant JDS)**

206.        Lead Plaintiff incorporates ¶¶ 178 - 193 by reference as if fully set forth herein.

207.        This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the SDL Subclass.

208.        By means of the SDL Proxy-Prospectus and Amended SDL Proxy-Prospectus, SDL shareholders exchanged their shares of SDL common stock for shares of JDS common stock.

209.        The SDL Proxy-Prospectus and Amended SDL Proxy-Prospectus contained untrue statements of material facts, and concealed and failed to disclose material facts, as detailed above at ¶ 184.   JDS owed the SDL Subclass the duty to make a reasonable investigation of the statements contained in the SDL Proxy-Prospectus and Amended SDL Proxy-Prospectus at the time they became effective, and to reasonably assure that those statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein correct.

210.        The SDL Subclass did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the SDL Proxy-Prospectus and Amended SDL Proxy-Prospectus at the time they acquired JDS common stock.

211.        By reason of the conduct alleged herein, JDS violated Section 12(a)(2) of the Securities Act.   As a direct and proximate result of such violations, the members of the SDL Subclass sustained substantial damages in connection with their acquisition of JDS common stock.   Accordingly, the SDL Subclass has the right to rescind and recover the consideration (or like value) paid for their shares, and hereby tender their shares to the Defendants, or to the extent they have sold their shares, seek damages to the extent permitted by law.

**SEVENTH CLAIM FOR RELIEF**

**For Violations of § 15 of the Securities Act**
**(On Behalf of the OCLI Subclass**
**Against Defendants Kalkhoven, Straus and Muller)**

212.    Lead Plaintiff incorporates ¶¶ 149 - 162 by reference as if fully set forth herein.

213.    This Count is brought pursuant to Section 15 of the Securities Act on behalf of the OCLI Subclass.

214.    Each of Kalkhoven, Straus and Muller, by reason of his JDS stock ownership and management position and his signature on and participation in the preparation and dissemination of the OCLI Registration Statement and OCLI Proxy-Prospectuses, was a controlling person of JDS and had the power and influence, and exercised such power and influence, to cause JDS to engage in the violations of law complained of herein.

215.    None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the OCLI Registration Statements and Proxy-Prospectuses were true and devoid of any omissions of material fact.   Therefore, by reason of their positions of control over the Company, as alleged herein, each of the Individual Defendants named herein are liable jointly and severally with and to the same extent that JDS is liable to the OCLI Subclass as a result of the wrongful conduct alleged herein.

**EIGHTH CLAIM FOR RELIEF**

**For Violations of § 15 of the Securities Act**
**(On Behalf of the E-TEK Subclass**
**Against Defendants Kalkhoven, Straus and Muller)**

216.    Lead Plaintiff incorporates ¶¶ 163 - 177 by reference as if fully set forth herein.

217.    This Count is brought pursuant to Section 15 of the Securities Act on behalf of the E-TEK Subclass.

218.    Each of Kalkhoven, Straus and Muller, by reason of his JDS stock ownership and management position and his signature on and participation in the preparation and dissemination of the E-TEK Registration Statement and Proxy-Prospectuses, was a controlling person of JDS and had the power and influence, and exercised such power and influence, to

1  cause JDS to engage in the violations of law complained of herein.

2        219.     None of the Individual Defendants named herein made a reasonable

3  investigation or possessed reasonable grounds for the belief that the statements contained in the

4  E-TEK Registration Statements and Proxy-Prospectuses were true and devoid of any omissions

5  of material fact.  Therefore, by reason of their positions of control over the Company, as

6  alleged herein, each of the Individual Defendants named herein are liable jointly and severally

7  with and to the same extent that JDS is liable to E-TEK Sub-Class as a result of the wrongful

8  conduct alleged herein.

9  **NINTH CLAIM FOR RELIEF**

10 **For Violations of § 15 of the Securities Act**<br>**(On Behalf of the SDL Subclass**

11 **Against Defendants Straus and Muller)**

12       220.     Lead Plaintiff incorporates ¶¶ 178 - 193 by reference as if fully set forth herein.

13       221.     This Count is brought pursuant to Section 15 of the Securities Act on behalf of

14 the SDL Subclass.

15       222.     Each of Straus and Muller, by reason of his JDS stock ownership and

16 management position and his signature on and participation in the preparation and

17 dissemination of the SDL Registration Statement and Proxy-Prospectuses, was a controlling

18 person of JDS and had the power and influence, and exercised such power and influence, to

19 cause JDS to engage in the violations of law complained of herein.

20       223.     None of the Individual Defendants named herein made a reasonable

21 investigation or possessed reasonable grounds for the belief that the statements contained in the

22 SDL Registration Statements and Proxy-Prospectuses were true and devoid of any omissions

23 of material fact.  Therefore, by reason of their positions of control over the Company, as

24 alleged herein, each of the Individual Defendants named herein are liable jointly and severally

25 with and to the same extent that JDS is liable to SDL Sub-Class as a result of the wrongful

26 conduct alleged herein.

27

28

**TENTH CLAIM FOR RELIEF**

**For Violations of § 10(b) of the Exchange Act and Rule 10b-5**
**(On Behalf of Subclass A Against Defendants JDS, Straus, Muller and Abbe)**

224.     Lead Plaintiff incorporates ¶¶ 1 - 223 by reference as if fully set forth herein.

225.     This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Subclass A.

226.     During Subclass Period A, Defendants JDS, Straus, Muller and Abbe and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout Subclass Period A, did: (i) deceive the investing public, including the Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JDS securities; (iii) cause the Lead Plaintiff and other members of Subclass A to purchase JDS securities at inflated prices; and (iv) enable JDS insiders to unload more than $1.8 billion of Company common stock at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

227.     Defendants JDS, Straus, Muller and Abbe, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to purposely misrepresent that demand for the Company's products was strong and conceal the fact a substantial portion of the inventory it was carrying on its books was worthless, which operated as a fraud and deceit upon the purchasers of JDS securities during Subclass Period A.

228.     As alleged herein, the Individual Defendants acted with scienter in that they knew or were deliberately reckless in not knowing that: (i) JDS's 2000 10-K, 1Q 01 10-Q, 2Q 01 10-Q, 3Q01 10-Q, and September 1, 2000 8-K; (ii) July 26, 2000, October 26, 2000, and January 25, 2001 analyst conference calls and meetings; and (iii) the SDL Registration Statement and SDL Proxy-Prospectuses were materially false and misleading as detailed above; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.  By virtue of their receipt of information

1  reflecting the true facts regarding JDS and their failure to take steps to rectify the situation, the

2  Individual Defendants named in this Count participated in the fraudulent scheme alleged

3  herein.

4  229.      The Individual Defendants acted with scienter in that, as described above, they

5  knew and/or recklessly disregarded the false and misleading nature of the information that they

6  caused to be disseminated to the investing public.

7  (a)      As detailed above, the Individual Defendants had access to the Oracle

8  database that tracked both customer orders and inventories and therefore knew that customer

9  orders were drying up and excess inventory was rising.  Moreover, the fact that demand was

10  declining and inventory was rising was no secret within JDS.  Indeed, as set forth above, that

11  information was very well known throughout all levels and facilities of the Company

12  (including Company headquarters in San Jose).

13  (b)      The Company publicly claimed to have 80 engineers who monitored

14  inventory levels at the Company's customers such that management knowledge as to customer

15  demand and forecasted results was excellent.  If indeed this representation was true, than

16  Defendants knew or must have known no later than the Summer of 2000 that the Company's

17  future results would not be as strong as their public statements indicated.  However, not one of

18  the more than 50 former employees of JDS interviewed as part of the investigation for this

19  Complaint had ever heard that JDS had any engineers who monitored customer inventory

20  levels.  Thus, at best, JDS knew or was deliberately reckless in not knowing that customer

21  inventory levels were rising such that their future need for JDS products was diminishing and,

22  at worst, JDS falsely represented that it was monitoring inventory levels in order to provide

23  investors with comfort that visibility was good when, in fact, JDS had no idea, and were

24  deliberately reckless as to what its customers' inventory levels or future needs were.

25  230.      In addition to their actual knowledge, the Individual Defendants were motivated

26  to disseminate the false statements about JDS's demand in order to continue their spree of

27  acquiring other companies for JDS common stock and to cash out their stock holdings at the

28  expense of unsuspecting shareholders.  Defendants and other high-ranking insiders were

1   successful in this plan and received the following proceeds from the sale or disposition of their

2   JDS stock during Subclass Period A.  These proceeds were a result of the artificially inflated

3   price of the stock which Defendants' false statements helped create:

| Insider | Shares | Proceeds |
|---------|--------|----------|
| Abbe | 250,000 | $ 20,637,000 |
| Cobb | 773,588 | $ 82,699,641 |
| Day | 80,000 | $ 9,717,600 |
| Deffebach | 80,000 | $ 9,496,000 |
| Enos | 20,000 | $ 2,500,000 |
| Furukawa | 10,164,000 | $ 1,118,650,423 |
| Ip | 657,108 | $ 80,626,462 |
| Kalkhoven | 1,312,500 | $ 158,722,200 |
| Leonberger | 167,500 | $ 16,021,050 |
| Macnaughton | 45,000 | $ 4,650,561 |
| Muller | 355,000 | $ 42,240,100 |
| Pettit | 832,000 | $ 100,237,160 |
| Phillips | 670,000 | $ 32,683,300 |
| Straus | 1,588,844 | $ 179,028,093 |
| Skrzypczak | 75,180 | $ 5,928,047 |
| **Totals** | 17,070,720 | $ 1,863,837,637 |

15   231.    Moreover, as detailed above, Defendants' motivation is even more apparent

16   from the timing of the insider sales.  **More than 50% of the unprecedented insider sales**

17   **during the entire Class Period occurred during Subclass Period A, constituting more than**

18   **$1.8 billion in proceeds, $1.6 billion of which took place between July 31 and August 31,**

19   **2001 -- which were the weeks immediately following the time that knowledge of the**

20   **Company's declining demand and rising inventories was so pervasive that it was known**

21   **to employees at all levels throughout the Company.**

22   232.    As a result of the dissemination of the materially false and misleading

23   information and failure to disclose material facts, as set forth above, the market price of JDS

24   securities was artificially inflated during Subclass Period A.  In ignorance of the fact that the

25   price of JDS securities was artificially inflated, and relying directly or indirectly on the false

26   and misleading statements made by Defendants, or upon the integrity of the market, Lead

27   Plaintiff and the other members of Subclass A acquired JDS's securities during Subclass

28   Period A at artificially inflated prices and were damaged thereby.

233.        Had Lead Plaintiff and the other members of Subclass A known the truth concerning the misrepresented and omitted facts described above, they would not have purchased or otherwise acquired their JDS securities during the Subclass Period A, or, if they had acquired such securities during the Subclass Period A, they would not have done so at the artificially inflated prices which they paid.

234.        By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

### ELEVENTH CLAIM FOR RELIEF

#### For Violation of § 10(b) of the Exchange Act and Rule 10b-5
#### (On Behalf of Subclass B Against JDS, Straus, Kalkhoven and Muller)

235.        Lead Plaintiff incorporates ¶¶ 1 - 234 by reference as if fully set forth herein.

236.        This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Subclass B.

237.        During Subclass Period B, Defendants JDS, Straus, Kalkhoven and Muller and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout Subclass Period B, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JDS securities; (iii) cause the Lead Plaintiff and other members of Subclass B to purchase JDS securities at inflated prices; and (iv) enable JDS insiders to unload $3.2 billion of Company common stock at inflated prices both during Subclass Period B and Subclass Period A.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

238.        Defendants JDS, Straus, Kalkhoven and Muller, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to purposely misrepresent that demand for the Company's products would remain strong when they knew that a significant portion of the demand during Subclass Period B was due to JDS's deceptive sales practices and that Defendants intentionally pushed back orders into subsequent quarters

1   in order to create the false impression that demand was growing from quarter to quarter, which

2   operated as a fraud and deceit upon the purchasers of JDS securities during Subclass Period B.

3   239.    As alleged herein, the Individual Defendants acted with scienter in that they

4   knew or were deliberately reckless in not knowing that: (i) statements during the July 27, 1999,

5   October 29, 1999, January 26, 2000, and April 25, 2000 analyst conference calls and meetings;

6   (ii) statements by Kalkhoven during his March 3, 2000 meeting with CIBC Oppenheimer; and

7   (iii) the OCLI and E-TEK Registration Statements and Proxy-Prospectuses were materially

8   false and misleading as detailed above; knew that such statements or documents would be

9   issued or disseminated to the investing public; and knowingly and substantially participated or

10  acquiesced in the issuance or dissemination of such statements or documents.  By virtue of

11  their receipt of information reflecting the true facts regarding JDS and their failure to take steps

12  to rectify the situation, the Individual Defendants named in this Count participated in the

13  fraudulent scheme alleged herein.

14  240.    The Individual Defendants named herein acted with scienter in that, as

15  described above, they knew and/or recklessly disregarded the false and misleading nature of

16  the information that they caused to be disseminated to the investing public:

17      (a)    the Individual Defendants knew of JDS's "FUD" policy which was

18  meant to use Fear, Uncertainty and Desperation so that JDS's customers would order more

19  product than they needed to create the impression that demand was stronger than it actually

20  was; and

21      (b)    the Individual Defendants caused JDS to delay the shipment of orders

22  received during Subclass Period B in order to push those revenues into Subclass Period A and

23  create the false impression that demand for JDS's products was continuing to grow even after

24  the Company began to experience a downturn in its business.

25  241.    In addition to their actual knowledge, the Individual Defendants were motivated

26  to disseminate the false statements about JDS's demand in order to cash out their stock

27  holdings at the expense of unsuspecting shareholders.  Specifically, Defendants were motivated

28  to participate in the false statements alleged herein due to their ability to sell or dispose of large

amounts of their JDS stock during Subclass Period B and Subclass Period A.  Defendants and other high-ranking insiders were successful in this plan and received the following proceeds from the sale or disposition of their JDS stock.  These proceeds were a result of the inflated price of the stock which Defendants' false statements helped create:

| Insider | Shares | | Proceeds |
|---|---|---|---|
| Abbe | 490,000 | $ | 45,813,400 |
| Cobb | 1,573,956 | $ | 100,062,353 |
| Day | 112,000 | $ | 10,355,520 |
| Deffebach | 80,000 | $ | 9,496,000 |
| Enos | 40,000 | $ | 4,200,000 |
| Furukawa | 17,864,000 | $ | 2,081,150,423 |
| Ip | 1,338,540 | $ | 103,993,549 |
| Kalkhoven | 3,561,204 | $ | 246,412,739 |
| Leonberger | 337,500 | $ | 37,106,850 |
| Macnaughton | 45,000 | $ | 4,650,561 |
| Muller | 1,055,000 | $ | 62,315,900 |
| Pettit | 3,016,124 | $ | 226,284,633 |
| Phillips | 670,000 | $ | 32,683,300 |
| Straus | 2,868,488 | $ | 206,743,908 |
| Skrzypczak | 150,180 | $ | 8,477,897 |
| **Totals** | 33,201,992 | $ | 3,179,747,033 |

242.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JDS securities was artificially inflated during Subclass Period B.  In ignorance of the fact that the price of JDS securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market, Lead Plaintiff and the other members of Subclass B acquired JDS's securities during the Subclass Period B at artificially inflated prices and were damaged thereby.

243.    Had Lead Plaintiff and the other members of  Subclass B known the truth concerning the misrepresented and omitted facts described above, they would not have purchased or otherwise acquired their JDS securities during Subclass Period B, or, if they had acquired such securities during Subclass Period B, they would not have done so at the artificially inflated prices which they paid.

244.    By virtue of the foregoing, Defendants have violated Section 10(b) of the

1    Exchange Act and SEC Rule 10b-5 promulgated thereunder.

2                             **TWELFTH CLAIM FOR RELIEF**

3                        **For Violation of §14 of the Exchange Act and**
4                                         **Rule 14a-9**
                               **(On Behalf of the OCLI Subclass**
5                        **Against Defendants Straus, Kalkhoven and Muller)**

6        245.      Lead Plaintiff incorporates ¶¶ 149 - 162 by reference as if fully set forth herein.

7        246.      This Count is brought pursuant to Section 14 of the Exchange Act on behalf of

8    the OCLI Subclass.

9        247.      Defendants caused to be issued the OCLI Proxy-Prospectus and Amended

10   OCLI Proxy-Prospectus, which were distributed to shareholders of OCLI soliciting their

11   approval of the respective mergers.

12       248.      The OCLI Proxy-Prospectuses described herein were each a "proxy solicitation"

13   within the meaning of Section 14 of the Exchange Act.

14       249.      The OCLI Proxy-Prospectuses were false and misleading in that they contained

15   false and misleading statements of material facts and failed to disclose material facts necessary

16   to make the statements made not false and misleading as described above at ¶ 153.

17       250.      Defendants sought to secure shareholders' approval of the OCLI merger by

18   means of the materially false and misleading OCLI Proxy-Prospectuses and permitted the use

19   of their names to solicit proxies from the members of the OCLI Subclass.

20       251.      Defendants, at the time they issued or caused to be issued the OCLI Proxy-

21   Prospectuses, acted without due care in distributing and caused to be distributed the OCLI

22   Proxy-Prospectuses containing the false and misleading statements and omissions.

23       252.      The OCLI merger required a majority vote of the shares of OCLI at the Special

24   Meeting held on February 4, 2000.  Accordingly, the materially false OCLI Proxy-Prospectus

25   was an essential link in the accomplishment of the OCLI merger.

26       253.      As a result of the foregoing, Defendants violated Section 14(a) of the Exchange

27   Act and Rule 14a-9 promulgated thereunder.

28       254.      Members of the OCLI Subclass have sustained injury and damages by reason of

1    Defendants' misrepresentations in connection with the OCLI Merger.

2

3                          **THIRTEENTH CLAIM FOR RELIEF**

4                      **For Violations of §14 of the Exchange Act and**
                                        **Rule 14a-9**
                             **(On Behalf of the E-TEK Subclass**
5                   **Against Defendants Straus, Kalkhoven and Muller)**

6        255.      Lead Plaintiff incorporates ¶¶ 163 - 177 by reference as if fully set forth herein.

7        256.      This Count is brought pursuant to Section 14 of the Exchange Act on behalf of

8    the E-TEK Subclass.

9        257.      Defendants caused to be issued the E-TEK Proxy-Prospectus and Amended E-

10   TEK Proxy-Prospectuses, which were distributed to shareholders of E-TEK soliciting their

11   approval of the respective mergers.

12       258.      The E-TEK Proxy-Prospectuses described herein were each a "proxy

13   solicitation" within the meaning of Section 14 of the Exchange Act.

14       259.      The E-TEK Proxy-Prospectuses were false and misleading in that they

15   contained false and misleading statements of material facts and failed to disclose material facts

16   necessary to make the statements made not false and misleading as described above at ¶ 168.

17       260.      Defendants sought to secure shareholders' approval of the E-TEK merger by

18   means of the materially false and misleading E-TEK Proxy-Prospectuses and permitted the use

19   of their names to solicit proxies from the members of the E-TEK Subclass.

20       261.      Defendants, at the time they issued or caused to be issued the E-TEK Proxy-

21   Prospectuses, acted without due care in distributing and caused to be distributed the E-TEK

22   Proxy-Prospectuses containing the false and misleading statements and omissions.

23       262.      The E-TEK merger required a majority vote of the shares of E-TEK at the

24   Special Meeting held on June 28, 2000.  Accordingly, the materially false E-TEK Proxy-

25   Prospectus was an essential link in the accomplishment of the E-TEK merger.

26       263.      As a result of the foregoing, Defendants violated Section 14(a) of the Exchange

27   Act and 14a-9 promulgated thereunder.

28       264.      Members of the E-TEK Subclass have sustained injury and damages by reason

1   of Defendants' misrepresentations in connection with the E-TEK Merger.

2
                        **FOURTEENTH CLAIM FOR RELIEF**
3
                  **For Violations of §14 of the Exchange Act and**
4                                   **Rule 14a-9**
                         **(On Behalf of the SDL Subclass**
5                     **Against Defendants Straus and Muller)**

6       265.       Lead Plaintiff incorporates ¶¶ 178 - 193 by reference as if fully set forth herein.

7       266.       This Count is brought pursuant to Section 14 of the Exchange Act on behalf of

8   the SDL Subclass.

9       267.       Defendants caused to be issued the SDL Proxy-Prospectus and Amended SDL

10  Proxy-Prospectus, which were distributed to shareholders of SDL soliciting their approval of

11  the respective mergers.

12      268.       The SDL Proxy-Prospectuses described herein were each a "proxy solicitation"

13  within the meaning of Section 14 of the Exchange Act.

14      269.       The SDL Proxy-Prospectuses were false and misleading in that they contained

15  false and misleading statements of material facts and failed to disclose material facts necessary

16  to make the statements made not false and misleading as described above at ¶ 184.

17      270.       Defendants sought to secure shareholders' approval of the SDL merger by

18  means of the materially false and misleading SDL Proxy-Prospectuses and permitted the use of

19  their names to solicit proxies from the members of the SDL Subclass.

20      271.       Defendants, at the time they issued or caused to be issued the SDL Proxy-

21  Prospectuses, acted without due care in distributing and caused to be distributed the SDL

22  Proxy-Prospectuses containing the false and misleading statements and omissions.

23      272.       The SDL merger required a majority vote of the shares of SDL at the Special

24  Meeting held on February 12, 2000.  Accordingly, the materially false SDL Proxy-Prospectus

25  was an essential link in the accomplishment of the SDL merger.

26      273.       As a result of the foregoing, Defendants violated Section 14(a) of the Exchange

27  Act and 14a-9 promulgated thereunder.

28      274.       The Lead Plaintiff and the members of the SDL Subclass have sustained injury

1   and damages by reason of Defendants' misrepresentations in connection with the SDL Merger.

2

3   **FIFTEENTH CLAIM FOR RELIEF**

4   **For Violations of §20(a) of the Exchange Act**
    **(On Behalf of Subclass A Against Defendants Straus, Muller and Abbe)**

5   275.    Lead Plaintiff incorporates ¶¶ 1 - 174 by reference as if fully set forth herein.

6   276.    This Count is brought pursuant to Section 20(a) of the Exchange Act on behalf

7   of Subclass A.

8   277.    Each of Straus, Muller and Abbe, by reason of his JDS stock ownership and

9   management position, was a controlling person of JDS and had the power and influence, and

10  exercised such power and influence, to cause JDS to engage in the violations of law

11  complained of herein.

12  278.    As set forth above, JDS issued false and misleading statements in violation of

13  Section 10(b) and Section 14(a).   By virtue of their positions as controlling persons, the

14  Individual Defendants named herein are liable pursuant to Section 20(a) of the Exchange Act

15  to the same extent as JDS for its violations of Sections 10(b) and Section 14(a).   As a direct

16  and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of

17  Subclass A suffered damages in connection with their purchases of the Company's securities

18  during Subclass Period A.

19

20  **SIXTEENTH CLAIM FOR RELIEF**

21  **For Violations of §20(a) of the Exchange Act**
    **(On Behalf of Subclass B Against Defendants Straus, Kalkhoven and Muller)**

22  279.    Lead Plaintiff incorporates ¶¶ 1 - 278 by reference as if fully set forth herein.

23  280.    This Count is brought pursuant to Section 20(a) of the Exchange Act on behalf

24  of Subclass B.

25  281.    Each of Straus, Kalkhoven and Muller, by reason of his JDS stock ownership

26  and management position, was a controlling person of JDS and had the power and influence,

27  and exercised such power and influence, to cause JDS to engage in the violations of law

28  complained of herein.

1    282.    As set forth above, JDS issued false and misleading statements in violation of

2    Section 10(b) and Section 14(a).   By virtue of their positions as controlling persons, the

3    Individual Defendants named herein are liable pursuant to Section 20(a) of the Exchange Act

4    to the same extent as JDS for its violations of Sections 10(b) and Section 14(a).   As a direct

5    and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of

6    Subclass B suffered damages in connection with their purchases of the Company's securities

7    during Subclass Period B.

8

9                      **SEVENTEENTH CLAIM FOR RELIEF**

10                     **For Violation of §20A of the Exchange Act**
                       **(Against the Individual Defendants and Furukawa)**

11   283.    Lead Plaintiff incorporates ¶¶ 1 - 282 by reference as if fully set forth herein.

12   284.    This claim is brought by Lead Plaintiff on behalf of Class members who

13   purchased JDS securities at or about the time that the Individual Defendants and Furukawa

14   sold JDS common stock during the Class Period.

15   285.    Defendant Abbe sold 50,000 shares of JDS common stock on August 1, 2000.

16   Defendants Kalkhoven, Muller and Straus sold 62,500, 17,500 and 9,700 shares of JDS

17   common stock on August 4, 2000, respectively, while in possession of material adverse

18   nonpublic information.

19   286.    Lead Plaintiff purchased shares of JDS common stock on August 4, 2000 (i.e.,

20   contemporaneously with the Individual Defendants' sales of August 1 and August 4, 2000).

21   Other Class members purchased JDS stock contemporaneously with the Individual Defendants

22   other sales during the Class Period.

23   287.    Furukawa sold 17.9 million shares of JDS common stock on June 20, 2000,

24   August 31, 2000 and October 12, 2000.   As the Company's largest shareholder, Furukawa had

25   access to information that was not publicly disclosed.   Indeed, Furukawa had an agreement

26   with JDS that JDS would:

27              make available on a timely basis to Furukawa and its accountants and
                auditors any information, including Confidential Information, that
28              Furukawa requires to prepare any of its financial statements (including

1     the notes thereto) or Tax Returns.

2     288.     As a result of its access to confidential JDS information, Furukawa knew that

3  demand for JDS products had declined dramatically by the Summer of 2000.   While in

4  possession of that material adverse undisclosed information, Furukawa sold 7.7 million shares

5  of JDS common stock on June 20, 2000, 8.8 million shares on August 31, 2000 and 1.4 million

6  shares on October 12, 2000 for collective proceeds in excess of $2 billion.

7     289.     Lead Plaintiff purchased shares of JDS common stock on October 13, 2000 (i.e.,

8  contemporaneously with Furukawa's October 12, 2000 sale).  Other Class members purchased

9  JDS stock contemporaneously with Furukawa's sales of August 31 and October 12, 2000.

10    290.     As a result of the foregoing, the Individual Defendants and Furukawa violated

11  Section 20A of the Exchange Act and are liable to Lead Plaintiff and other Class Members

12  who purchased shares of JDS common stock contemporaneously with the Individual

13  Defendants and Furukawa's insider sales.

14                         **PRAYER FOR RELIEF**

15    WHEREFORE, Lead Plaintiff prays for judgment as follows:

16    A.     Declaring this action to be a proper class action pursuant to Rule 23;

17    B.     Awarding Lead Plaintiff and the members of the Class damages, interest and

18  costs; and

19    C.     Awarding such equitable/injunctive or other relief as the Court may deem just

20  and proper.

21  / / /

22  / / /

23  / / /

1

**JURY DEMAND**

2

Lead Plaintiff demands a trial by jury.

3

DATED:  October 11, 2002

4

**BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO**

5

6

By: /s/_____

7

Jennifer S. Abrams

8

Joseph J. Tabacco, Jr.

9

Christopher T. Heffelfinger
425 California Street, Suite 2025

10

San Francisco, CA 94104

11

**GOODKIND LABATON RUDOFF & SUCHAROW LLP**

12

Jonathan M. Plasse
Barbara J. Hart

13

Louis Gottlieb

14

Lisa Buckser-Schulz
David J. Goldsmith

15

100 Park Avenue
New York, New York 10017

16

Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

17

18

Attorneys for Plaintiff

19

20

Of Counsel:

21

Catherine E. LaMarr
General Counsel

22

Office of the Treasurer
    of the State of Connecticut

23

55 Elm Street
Hartford, Connecticut  06106

24

25

Hon. Richard Blumenthal
Attorney General of Connecticut
Joseph Rubin

26

Associate Attorney General
55 Elm Street

27

Hartford, Connecticut  06106

28

[C-02-1486 CW] FIRST AMENDED CONSOLIDATED COMPLAINT            83

## CERTIFICATION RE: LEAD PLAINTIFF

Catherine E. LaMarr hereby certifies and swears as follows:

1.      I am the General Counsel of the Office of the Treasurer of the State of Connecticut, and submit this affidavit in support of the application of the Connecticut Retirement Plans and Trust Funds ("Connecticut") to be designated Lead Plaintiff.

2.      Connecticut did not purchase securities of JDS Uniphase Corporation ("JDS Uniphase") at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Connecticut has reviewed the matters referenced in complaints filed against JDS Uniphase and/or certain of its officers and directors, and against Furukawa Electric Co. Ltd., a controlling shareholder of JDS Uniphase, alleging violations of the securities laws;

4.      Connecticut is willing to serve as a lead plaintiff on behalf of the Class in those cases and all other related cases that may be consolidated with them, including providing testimony at deposition and at trial, if necessary;

5.      See the attached Schedule A for identification of transactions of Connecticut in the securities of JDS Uniphase;

6.      Connecticut has not served as lead plaintiff in any class action under the federal securities laws during the last three years except in In re Waste Management, Inc. Securities Litigation, Civ. No. H-99-2183 (S.D. Tex) and In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574 (D.N.J. 2001);

7.      Further Connecticut has not sought to serve as a lead plaintiff in any other class action under the federal securities laws during the last three years, except in In re Cendant

Corporation Litigation, 98-1664 (WHW) (D.N.J.) and in <u>Roffe v. Winnick</u>, Civ. No.02-1039, an

action against the officers, directors, and auditors of Global Crossing, Ltd.

        8.      Connecticut will not accept payment for serving as a lead plaintiff beyond

its pro rata share of any recovery, except such reasonable costs and expenses (including lost

wages) as ordered or approved by the Court.

        I declare that the foregoing is true and correct to the best of my knowledge,

information and belief.

Dated: May 23, 2002

                                   Catherine E. LaMarr
                                   General Counsel
                                   Office of the Treasurer
                                   State of Connecticut

## SCHEDULE A

## CONNECTICUT'S TRANSACTIONS IN JDS UNIPHASE COMMON STOCK
### DURING THE PERIOD 7/27/99 TO 7/26/01

| TRADE DATE | TRANSACTION | SHARES | UNIT PRICE | TOTAL COST |
|---|---|---|---|---|
| 09/01/99 | PURCHASE | 10,000 | $27.0313 | $270,312.50 |
| 10/20/99 | PURCHASE | 22,000 | $29.6540 | $652,388.00 |
| 02/07/00 | PURCHASE | 7,795 | $112.6050 | $877,778.66 |
| 02/07/00 | PURCHASE | 11,136 | $94.7125 | $1,054,718.10 |
| 04/11/00 | SALE | 6,431 | $103.6358 | $666,502.84 |
| 04/13/00 | SALE | 11,000 | $97.6523 | $1,074,175.78 |
| 04/19/00 | PURCHASE | 700 | $91.9867 | $64,390.69 |
| 04/25/00 | SALE | 11,000 | $91.6429 | $1,008,072.39 |
| 04/28/00 | SALE | 1,400 | $101.7440 | $142,441.60 |
| 05/25/00 | SALE | 16,400 | $81.3961 | $1,334,895.80 |
| 05/26/00 | SALE | 6,100 | $80.2575 | $489,570.89 |
| 07/03/00 | PURCHASE | 11,220 | $96.8750 | $1,086,937.50 |
| 07/21/00 | PURCHASE | 10,500 | $133.7591 | $1,404,470.55 |
| 07/21/00 | PURCHASE | 21,000 | $133.7591 | $2,808,941.10 |
| 07/21/00 | PURCHASE | 4,700 | $133.7591 | $628,667.77 |
| 07/24/00 | PURCHASE | 8,100 | $131.8699 | $1,068,146.19 |
| 07/24/00 | PURCHASE | 14,800 | $136.5509 | $2,020,953.32 |
| 07/24/00 | PURCHASE | 1,100 | $136.5509 | $150,205.99 |
| 07/24/00 | PURCHASE | 11,500 | $136.5509 | $1,570,335.35 |
| 07/25/00 | PURCHASE | 4,700 | $129.4000 | $608,180.00 |
| 07/25/00 | PURCHASE | 4,800 | $130.3385 | $625,624.80 |
| 07/25/00 | PURCHASE | 21,300 | $130.3385 | $2,776,210.05 |
| 07/25/00 | PURCHASE | 7,300 | $130.3385 | $951,471.05 |
| 07/26/00 | PURCHASE | 24,600 | $133.8995 | $3,293,927.70 |
| 07/26/00 | PURCHASE | 111,200 | $135.8133 | $15,102,438.96 |

461398v1
05/23/02 15:40

| TRADE DATE | TRANSACTION | SHARES | UNIT PRICE | TOTAL COST |
|---|---|---|---|---|
| 07/26/00 | PURCHASE | 36,400 | $135.8125 | $4,943,575.00 |
| 07/26/00 | PURCHASE | 10,100 | $133.8995 | $1,352,384.95 |
| 07/27/00 | PURCHASE | 8,800 | $132.8563 | $1,169,135.44 |
| 07/27/00 | PURCHASE | 16,100 | $133.2572 | $2,145,440.92 |
| 07/28/00 | PURCHASE | 20,300 | $125.6507 | $2,550,709.21 |
| 07/28/00 | PURCHASE | 63,800 | $119.1280 | $7,600,366.40 |
| 07/28/00 | PURCHASE | 13,400 | $119.1280 | $1,596,315.20 |
| 08/04/00 | PURCHASE | 8,800 | $116.0694 | $1,021,410.72 |
| 08/29/00 | PURCHASE | 3,200 | $120.7363 | $386,356.16 |
| 08/31/00 | SALE | 11,220 | $119.4681 | $1,340,432.27 |
| 08/31/00 | SALE | 6,700 | $124.4844 | $834,045.31 |
| 09/05/00 | PURCHASE | 2,500 | $121.5227 | $303,806.75 |
| 09/26/00 | PURCHASE | 3,700 | $106.3751 | $393,587.87 |
| 09/26/00 | PURCHASE | 7,700 | $106.0918 | $816,906.86 |
| 09/27/00 | PURCHASE | 37,100 | $102.0686 | $3,786,745.06 |
| 10/05/00 | PURCHASE | 41,600 | $94.7088 | $3,939,886.08 |
| 10/13/00 | PURCHASE | 32,800 | $89.0685 | $2,921,446.80 |
| 10/13/00 | PURCHASE | 19,600 | $89.0685 | $1,745,742.60 |
| 11/28/00 | PURCHASE | 4,300 | $60.4703 | $260,022.29 |
| 11/29/00 | PURCHASE | 12,500 | $57.6572 | $720,715.00 |
| 12/01/00 | PURCHASE | 22,200 | $57.1805 | $1,269,407.10 |
| 12/11/00 | SALE | 700 | $71.7476 | $50,223.32 |
| 12/12/00 | SALE | 2,400 | $66.8372 | $160,409.20 |
| 12/13/00 | SALE | 23,800 | $69.1227 | $1,645,120.16 |
| 12/15/00 | PURCHASE | 4,100 | $58.1468 | $238,401.88 |
| 12/27/00 | PURCHASE | 6,900 | $43.4423 | $299,751.87 |
| 01/02/01 | PURCHASE | 30,700 | $40.1900 | $1,233,833.00 |
| 01/03/01 | PURCHASE | 19,800 | $42.9704 | $850,813.92 |
| 01/04/01 | PURCHASE | 4,080 | $49.8565 | $203,414.52 |
| 01/12/01 | PURCHASE | 4,090 | $52.1174 | $213,160.17 |

Page 4

| TRADE DATE | TRANSACTION | SHARES | UNIT PRICE | TOTAL COST |
|---|---|---|---|---|
| 01/19/01 | SALE | 28,000 | $60.6740 | $1,698,871.37 |
| 01/23/01 | SALE | 2,500 | $58.5718 | $146,429.61 |
| 02/05/01 | PURCHASE | 16,690 | $49.8287 | $831,641.00 |
| 02/14/01 | PURCHASE | 47,800 | $41.1875 | $1,968,762.50 |
| 02/26/01 | PURCHASE | 1,100 | $31.8750 | $35,062.50 |
| 02/26/01 | PURCHASE | 54,650 | $32.4425 | $1,772,982.63 |
| 03/15/01 | PURCHASE | 42,000 | $25.8832 | $1,087,094.40 |
| 03/16/01 | SALE | 14,500 | $22.8540 | $331,383.55 |
| 03/16/01 | PURCHASE | 11,200 | $22.4175 | $251,076.00 |
| 03/19/01 | SALE | 96,100 | $23.4579 | $2,254,305.92 |
| 03/20/01 | SALE | 10,800 | $24.5617 | $265,266.16 |
| 03/21/01 | SALE | 9,200 | $22.3648 | $205,755.74 |
| 03/22/01 | SALE | 5,100 | $22.9211 | $116,897.79 |
| 03/30/01 | SALE | 6,900 | $18.4375 | $127,218.75 |
| 03/30/01 | SALE | 2,400 | $18.4369 | $44,248.52 |
| 03/30/01 | SALE | 3,400 | $18.4375 | $62,687.50 |
| 05/10/01 | SALE | 900 | $22.7260 | $20,453.43 |
| 05/10/01 | SALE | 12,400 | $22.0778 | $273,764.26 |
| 05/10/01 | SALE | 500 | $22.7042 | $11,352.12 |
| 05/18/01 | SALE | 200 | $21.6843 | $4,336.85 |
| 05/22/01 | SALE | 100 | $22.9141 | $2,291.41 |
| 05/23/01 | SALE | 9,500 | $22.7797 | $216,407.54 |
| 05/23/01 | SALE | 9,600 | $23.1842 | $222,568.57 |
| 06/25/01 | SALE | 35,800 | $12.0925 | $432,911.39 |
| 06/25/01 | SALE | 37,900 | $12.0925 | $458,305.63 |
| 06/26/01 | SALE | 60,100 | $11.7825 | $708,128.68 |
| 07/17/01 | PURCHASE | 26,300 | $10.2033 | $268,346.79 |
| 07/24/01 | PURCHASE | 23,670 | $9.1800 | $217,290.60 |

Page 5

1

**EXHIBIT B**

2

**Listing of other Plaintiffs and their Counsel**

3

Matthew J. Ide
COHEN, MILSTEIN, HAUSFELD & TOLL

4

999 Third Avenue
Seattle, Washington  98104

5

6

Counsel for Plaintiff Houston Municipal Employees Pension System who exchanged shares of SDL common stock into 53,150 shares of JDS common stock.

7

Michael Goldberg
GLANCY & BINKOW LLP

8

1801 Avenue of the Stars
Los Angeles, California, 90067

9

10

Counsel for Plaintiff Dennis McCool who purchased 400 shares of JDS common stock on January 5, 2000 and exchanged 3,300 shares of E-TEK common stock into shares of JDS common stock.

11

12

Sharon M. Lee, Esq.
RABIN & PECKELL LLP
275 Madison Avenue

13

New York, NY  10016

14

Counsel for Plaintiff Ilene Armour who purchased a total of 500 shares of JDS common stock from December 2000 through April 2001.

15

16

Richard A. Lockridge, Esq.
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200

17

Mineapolis, MN  55401

18

Counsel for Plaintiff Michael Salter who purchased 50 shares of JDS common stock on November 6, 2000.

19

20

Marc I. Willner, Esq.
SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Suite 400

21

Bala Cynwyd, PA  19004

22

Counsel for Plaintiff Robert J. Sullivan who purchased a total of 8000 shares of JDS common stock from November 2000 through April 2001.

23

Marc S. Henzel, Esq.

24

LAW OFFICES OF MARC S. HENZEL
273 Montgomery Avenue, Suite 202

25

Bala Cynwyd, PA  19004

26

Counsel for Plaintiff Lynne Sinay who purchased 43,900 shares of JDS common stock from January 14, 2000 through January 29, 2001.

27

28

1  Robert C. Susser, Esq.
   ROBERT C. SUSSER, P.C.
2  6 East 43rd Street, Suite 1900
   New York, NY  10017
3
   Counsel for Plaintiff Jeff Brandes who purchased 15 shares of JDS common stock on April 5, 2000.
4  William B. Federman, Esq.

5  FEDERMAN & SHERWOOD
   120 N. Robinson Avenue. Suite 2720
6  Oklahoma City, OK  73102

7  Counsel for Plaintiff Gene Balsom who purchased a total of 11,600 shares of JDS common stock
   from January 2001 through September 2001.
8
   Barbara A. Podell, Esq.
9  BERGER & MONTAGUE, P.C.
   1622 Locust Street
10 Philadelphia, PA 19103

11 Charles J. Piven, Esq.
   LAW OFFICES OF CHARLES J. PIVEN
12 The World Trade Center
   401 East Pratt Street, Suite 2525
13 Baltimore, MD  21202

14 Counsel for Plaintiff S. Leonard Sollins, Trustee, Trust u/w/o Max A. Cohen who purchased 100
   shares of JDS common stock on January 25, 2000.
15
   Gregory M. Nespole, Esq.
16 WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
   270 Madison Avenue
17 New York, NY  10016

18 Counsel for Plaintiff L.A. Murphy who purchased a total of 5,000 shares of JDS common stock from
   January 2000 through July 2000.
19
   Anthony Vozzolo, Esq.
20 FARUQI & FARUQI, LLP
   320 East 39th Street
21 New York, NY  10016

22 Counsel for Plaintiff Prena Smajlaj who purchased 300 shares of JDS common stock between
   March 15, 2000 and February 15, 2001.
23
   Michael I. Fistel, Esq.
24 HOLZER & HOLZER
   6135 Barfield Road, Suite 102
25 Atlanta, GA  30328

26 Counsel for Plaintiff Regina Monaco who purchased 1,900 shares of JDS common stock on January
   2, 2001.
27

28

Curtis V. Trinko
LAW OFFICES OF CURTIS V. TRINKO, LLP
16 West 46th Street, 7th Floor
New York, NY 10036

Counsel for Plaintiff Warren C. Sterrett who purchased a total of 1,000 shares of JDS common stock from August 2000 through March 2001.

Joseph H. Weiss
WEISS & YOURMAN
The French Building
551 Fifth Avenue
New York, NY 10176

Counsel for Plaintiff Martin Hacker who purchased 200 shares of JDS common stock between September 8, 2000 and March 22, 2001.

Deborah R. Gross
LAW OFFICES OF BERNARD M. GROSS, P.C.
1515 Locust Street
Philadelphia, PA 19102

Counsel for Plaintiff Shirley Chess who purchased 1,000 shares of JDS common stock on June 15, 2001.

Joseph Garland, Esq.
KLEIN & SOLOMON, LLP
275 Madison Avenue, 11th Floor
New York, NY 10016

Jeffrey Neiman, Esq.
THE NEIMAN LAW FIRM
1412 Coney Island Avenue
Brooklyn, NY 11230

Mel Urbach
LAW OFFICES OF MEL URBACH
One Exchange Plaza, Suite 1000
Jersey City, NJ 07302

Counsel for Plaintiff Aaron Jungreis who purchased 500 shares of JDS common stock on March 13, 2000.

1

## CERTIFICATE OF SERVICE

2

   I, Tyler Kelly, declare that I am over the age of 18 years and not a party to this action. My business address is 425 California Street, Suite 2025, San Francisco, CA 94104.  On October 11, 2002,  I served **FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** on the following, by placing same in sealed envelopes, addressed as shown, affixing proper first class postage, and depositing them in the United States Mail at San Francisco, California:

3

4

5

6

Melvin R. Goldman
Jordan Eth
Terri Garland
Holly H. Tambling
**Morrison & Foerster LLP**
425 Market Street
San Francisco, CA 94105

Mark C. Dosker
Joseph A. Meckes
Angela N. O'Rourke
**Squire, Sanders & Dempsey L.L.P.**
One Maritime Plaza, Third Floor
San Francisco, CA 94111-3492

7

8

9

Solomon B. Cera
Joseph M. Barton
**Gold Bennett Cera & Sidener LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105

Laurence D. King
**Kaplan Fox & Kilsheimer LLP**
601 Montgomery Street, Suite 300
San Francisco, CA 94111

10

11

12

Aaron H. Darsky
**Schubert & Reed, L.L.P.**
Two Embarcadero Center
Suite 1660
San Francisco, CA 94111

Richard S.E. Johns
**Kipperman & Johns**
57 Post Street, Suite 604
San Francisco, CA 94104

13

14

15

Lynn Lincoln Sarko
Juli F. Desper
Elizabeth A. Leland
**Keller Rohrback LLP**
1201 Third Avenue, Suite 3200
Seattle, WA 98101

Randi D. Bandman
Kimberly C. Epstein
Connie Cheung
Reed R. Kathrein
**Milberg Weiss Bershad Hynes & Lerach LLP**
100 Pine St., Suite 2600
San Francisco, CA 94111

16

17

18

19

20

Francis M. Gregorek
Betsy C. Manifold
Francis A. Bottini, Jr.
**Wolf Haldenstein Adler Freeman & Herz LLP**
750 B Street, Suite 2770
San Diego, CA 92101

Michael D. Braun
Timothy J. Burke
**Stull Stull & Brody**
10940 Wilshire Blvd., Suite 2350
Los Angeles, CA 90024

21

22

23

24

Jonathan M. Plasse
Barbara J. Hart
Louis Gottlieb
**Goodkind Labaton Rudoff & Sucharow LLP**
100 Park Avenue, 12th Floor
New York, NY 10017-5563

Andrew L. Barroway
Stuart L. Berman
**Schiffrin & Barroway LLP**
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Steven E. Cauley
Curtis L. Bowman
Randall K. Pulliam
**Cauley Geller Bowman & Coates, LLP**
P.O. Box 25438
Little Rock, AR 72221

William S. Lerach
Darren J. Robbins
**Milberg Weiss Bershad Hynes
& Lerach LLP**
401 B Street, Suite 1700
San Diego, CA 92101

Paul J. Geller
**Cauley, Geller, Bowman & Coates LLP**
2255 Glades Road, Suite 421A
Boca Raton, FL 33431

Marc S. Henzel
**Law Offices of Marc S. Henzel**
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004

Mel E. Lifshitz
Gregory M. Egleston
**Bernstein, Liebhard & Liftshitz LLP**
10 East 40th Street, 22nd Floor
New York, NY 10016

John Frith Stewart
**Segal, Stewart, Cutler,
Lindsay, James & Berry, PLLC**
1400-B Waterfront Plaza
325 West Main Street
Louisville, KY 40202

Daniel L. Brockett
**Squire, Sanders & Dempsey L.L.P.**
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304

William B. Federman
**Federman & Sherwood**
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102

Kevin J. Yourman
Jennifer Williams
Behram V. Parekh
Jordan Lurie
**Weiss & Yourman**
19040 Wilshire Blvd., 24th Floor
Los Angeles, CA 90024

Steven J. Toll
Mark S. Willis
**Cohen, Milstein, Hausfeld & Toll,
PLLC**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

Matthew J. Ide
**Cohen, Milstein, Hausfeld & Toll,
PLLC**
999 Third Avenue, Suite 3600
Seattle, WA 98104-4001

Lionel Z. Glancy
Michael Goldberg
**Glancy & Binkow LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067

Alfred G. Yates, Jr.
**Law Offices of Alfred G. Yates, Jr.**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

Anthony Bolognese
**Bolognese & Associates LLC**
One Penn Center Plaza
1617 JFK Blvd., Suite 650
Philadelphia, PA 19103

Jeffrey P. Fink
**Robbins Umeda & Fink, LLP**
1010 Second Avenue, Suite 2360
San Diego, CA 92101

Curtis V. Trinko
**Law Offices of Curtis V. Trinko**
16 West 46th Street, 7th Floor
New York, NY 10036

1

2   Andrew M. Schatz                          Bruce G. Murphy
    Patrick A. Klingman                       **Law Offices of Bruce G. Murphy**
3   **Schatz & Nobel, P.C.**                  265 Lloyds Lane
    330 Main Street                           Vero Beach, FL 32963
    Hartford, CT 06106
4

5   Jules Brody                               Paul J. Scarlato
    Aaron L. Brody                            **Weinstein Kitchenoff Scarlato &**
6   **Stull, Stull & Brody**                  **Goldman Ltd.**
    6 East 45th Street                        1845 Walnut Street, Suite 1100
    New York, NY 10017                        Philadelphia, PA 19103
7

8   Marc A. Topaz                             Michael Donovan
    **Schiffrin & Barroway**                  **Donovan Searles, LLC**
9   Three Bala Plaza East, Suite 400          1845 Walnut Street, Suite 1100
    Bala Cynwyd, PA 19004                     Philadelphia, PA 19103

10  John G. Emerson, Jr.                      Sherrie R. Savett
11  **The Emerson Firm**                      Barbara A. Podell
    830 Apollo Lane                           **Berger & Montague, P.C.**
    Houston, TX 77058                         1622 Locust Street
12                                            Philadelphia, PA 19103

13  David R. Scott                            Charles J. Piven
    James E. Miller                           **Law Offices of Charles J. Piven, P.A.**
14  **Scott & Scott, LLC**                    The World Trade Center – Baltimore
    108 Norwich Avenue                        401 East Pratt Street, Suite 2525
15  Colchester, CT 06415                      Baltimore, MD 21202

16  Deborah R. Gross                          Joseph P. Garland
    **Law Offices of Bernard M. Gross, P.C.** **Klein & Solomon, LLP**
17  1515 Locust Street, 2nd Floor             275 Madison Avenue, 11th Floor
    Philadelphia, PA 19102                    New York, NY 10016
18
    David M. Goldstein
19  **Maricic & Goldstein, LLP**
    10535 Foothill Blvd., Suite 300           Mel Urbach
20  Rancho Cucamonga, CA 91730                **Law Offices of Mel Urbach**
                                              One Exchange Place, Suite 1000
21                                            Jersey City, NJ 07302

22  Fred Taylor Isquith                       Kimberly Walker
    **Wolf, Haldenstein, Adler, Freeman & Herz** **Berger & Montague, P.C.**
    **LLP**                                   1622 Locust Street
23  270 Madison Avenue                        Philadelphia, PA 19103
    New York, NY 10016
24
    Kenneth A. Elan                           James A. Caputo
25  **Law Offices of Kenneth A. Elan**        **Spector Roseman & Kodroff, PC**
    217 Broadway, Suite 404                   401 B Street, Suite 1600
26  New York, NY 10007                        San Diego, CA 92101

27

28

    [C-02-1486 CW (EDL)] CERTIFICATE OF SERVICE                    3

1

2   William B. Federman                    Donald J. Enright
    **Dreier Baritz & Federman**          Andrew J. Morganti
3   120 N. Robinson, Suite 2720           **Finkelstein Thompson & Loughton**
    Oklahoma City, OK 73102               1055 Thomas Jefferson Street NW
4                                         Washington, D.C. 20007

5   Karen M. Hanson                       Christopher Lovell
    **Lockridge Grindal Nauen P.L.L.P.**  Christopher J. Gray
6   100 Washington Avenue South, Suite 2200  **Lovell & Stewart, L.L.P.**
    Minneapolis, MN 55401                 500 Fifth Avenue
7                                         New York, NY 10110

8   Bruce D. Oakes                        Jeffrey Neiman
    **Law Offices of Bruce D. Oakes**     **The Neiman Law Firm**
9   8050 Watson Road, Suite 240           1412 Coney Island Avenue
    St. Louis, MO 63119                   Brooklyn, NY 11230

10  Jacqueline Sailer                     Barbara A. Podell
    **Rabin & Peckel, L.L.P.**            **Savett Frutkin Podell & Ryan, P.C.**
11  275 Madison Avenue                    325 Chestnut Street, Suite 700
    New York, NY 10016                    Philadelphia, PA 19106

12

13  Sherrie R. Savett
    **Berger & Montague, P.C.**
14  1622 Locust Street
    Philadelphia, PA 19103
15

16         I declare under penalty of perjury pursuant to the laws of the United States that the
    foregoing is true and correct.

17         Executed at San Francisco, California, on October 11, 2002.

18

19                                        /s/ _____
                                          Tyler Kelly
20

21

22

23

24

25

26

27

28

[C-02-1486 CW (EDL)] CERTIFICATE OF SERVICE                                    4