1

2

3

4

5

6

7

8

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  In re JDS UNIPHASE CORPORATION              No. C 02-1486 CW
    SECURITIES LITIGATION
14                                              ORDER GRANTING IN
                                                PART DEFENDANTS
15                                              JDS, STRAUS,
                                                MULLER AND ABBE'S
16                                              MOTION FOR
                                                SUMMARY JUDGMENT,
17                                              GRANTING IN PART
                                                DEFENDANT
18                                              KALKHOVEN'S
                                                MOTION FOR
19                                              SUMMARY JUDGMENT
                                                AND DEFERRING
20                                              RULING ON
                                                PLAINTIFFS'
21                                              CROSS-MOTION FOR
                                                PARTIAL SUMMARY
22  _____/          JUDGMENT

23

24       Defendants JDS Uniphase Corporation (JDS), Josef Straus,

25  Anthony R. Muller and Charles Abbe jointly move for summary

26  judgment.  Defendant Kevin Kalkhoven moves separately for summary

27  judgment.  Lead Plaintiff Connecticut Retirement Plans and Trust

28

Funds opposes the motions and cross-moves for partial summary judgment that Defendants have not met their burden of showing that the decline in JDS's stock value was based on some event independent of the alleged misrepresentations for purposes of their section 11 claims.  The matter was heard on July 26, 2007 and the parties filed supplemental letter briefs following the hearing. Having considered the parties' papers, the evidence cited therein and oral argument on the motions, the Court GRANTS in part Defendants JDS, Straus, Muller and Abbe's motion for summary judgment and DENIES it in part.  The Court GRANTS in part Defendant Kalkhoven's motion for summary judgment and DENIES it in part.  The Court DEFERS RULING on Plaintiffs' cross-motion for partial summary judgment.

BACKGROUND

Defendant JDS manufactures and supplies components of fiber-optic networks to telecommunications and cable television system providers.  Defendants Straus, Muller, Abbe and Kalkhoven are current and former executive officers and directors of JDS. Kalkhoven retired from his position as director and officer of JDS in late September, 1999, although he continued to be employed full-time by JDS until July 31, 2000, and part-time until July 31, 2001. He received a $400,000 salary for the year ending July 31, 2000, and $200,000 for the subsequent year of part-time work; Lead Plaintiff alleges that he continued to be employed at the San Jose headquarters of JDS and consulted with upper management on strategic and operational issues throughout the class period.

Lead Plaintiff represents a class of persons and entities that

United States District Court
For the Northern District of California

purchased or otherwise acquired securities of JDS between October 28, 1999 and July 26, 2001, including sub-classes of plaintiffs who acquired securities of JDS through its mergers with Optical Coating Laboratory, Inc., E-TEK Dynamics, Inc. and SDL, Inc.(the OCLI, E-TEK and SDL subclasses).  Plaintiffs allege that, during the class period, Defendants engaged in a scheme to inflate artificially the price of JDS stock by falsely representing that demand for JDS products was strong and by overstating the value of its inventory by failing to write off excess inventory.[1]  Plaintiffs allege that Defendants benefitted from this scheme by selling stock at inflated prices and by using the value of JDS stock to purchase other companies for less than their worth.

In the SACC, Plaintiffs allege that, beginning in March, 2000, demand for JDS products began to decrease substantially across the country, as reported by confidential witnesses employed at a majority of JDS manufacturing plants in North America.[2]  Plaintiffs further allege that as demand decreased, increased numbers of order cancellations occurred at JDS facilities, resulting in large stockpiles of excess inventory.  In response, JDS plants did not stop manufacturing goods, but rather continued to ship products on canceled orders and to ship goods prematurely in anticipation of

---

[1]The second amended consolidated complaint (SACC) includes revenue recognition claims, which Plaintiffs are no longer pursuing.

[2]Plaintiffs do not produce any evidence based on the testimony of the confidential witnesses.  Defendants provide declarations and deposition testimony from some of the confidential witnesses denying the statements Plaintiffs allege in the SACC that they made.

United States District Court
For the Northern District of California

1 future orders.

2     Plaintiffs allege that the decrease in demand for JDS products

3 continued to worsen throughout the summer of 2000.  Excess

4 inventory also continued to accumulate.  Plaintiffs allege that, as

5 a result, JDS began discussions about a wide-scale company

6 downsizing as early as June, 2000; cost-cutting measures were

7 already being implemented on a smaller scale at individual plants,

8 most notably in Ottawa, one of JDS's headquarters.  On August 18,

9 2000, manager of demand management Thomas Pitre sent an internal

10 email to twenty upper-level management employees that stated, in

11 pertinent part, "Considering all the recent demand changes over the

12 past few weeks . . . a major disconnect exists between future

13 forecasted demand and our growth curve.  It seems that we have a

14 divergence between our overarching growth of 25% QTR/QTR and the

15 forecast demand out in Q3 and Q4."

16     Meanwhile, in a conference call with securities analysts on

17 April 25, 2000, Defendants Kalkhoven and Muller reported strong

18 demand for JDS products and strong visibility regarding future

19 demand.[3]  In conference calls with securities analysts on July 26,

20 2000, October 26, 2000 and January 25, 2001, Defendants Straus,

21 Muller and Abbe similarly reported strong demand for JDS products.

22     On November 4, 1999, JDS had acquired OCLI.[4]  JDS acquired E-

23

24     [3]Plaintiffs originally challenged statements made as early as July, 1999.  The April, 2000 conference call included the earliest

25 statements they now challenge.

26     [4]In their motion for summary judgment Defendants argue that they are entitled to summary judgment on all claims made by the

27 OCLI subclass because Plaintiffs no longer challenge any statements made before JDS acquired OCLI.  Plaintiffs do not contest this

28                            4

United States District Court
For the Northern District of California

TEK on June 30, 2000, and recorded approximately $15.7 billion in good will in connection with the acquisition.  Plaintiffs allege that Defendants knew or were reckless in not knowing that $15.7 billion was a vast overstatement of E-TEK's good will; Defendants wrote off $13 billion of it in the third quarter of 2001. Defendants also announced a $41 billion dollar acquisition of SDL on July 10, 2000, although JDS did not obtain shareholder consent for the merger until February, 2001.  Defendants made all three acquisitions by exchanging shares of stock with the acquired companies, and it was thus in Defendants' best interest to keep the JDS stock price artificially high in order to secure a more favorable exchange rate.  JDS's stock price was near an all-time high in June, 2000, and had increased significantly just before the OCLI acquisition, as well.  Additionally, Plaintiffs allege that proxy-prospectuses that JDS filed with the Securities and Exchange Commission (SEC) in connection with the acquisition of E-TEK were fraudulent in that they identified strong demand based in part on JDS's faulty accounting practices.  The original E-TEK statement was signed by Defendants Kalkhoven, Straus and Muller, although an amended version was signed only by Straus and Muller.

According to Plaintiffs, it was in the interests of Defendants Kalkhoven, Abbe, Muller and Straus to inflate artificially JDS share prices for another reason.  Plaintiffs allege that during a time when JDS stock prices were near all-time highs, and with knowledge of wide-spread declining demand for JDS products, these

argument.  The Court grants summary judgment on all claims made by the OCLI subclass.

United States District Court
For the Northern District of California

Defendants sold millions of shares of JDS stock for profits in the hundreds of millions of dollars in the month of August, 2000 alone.

On January 25, 2001, JDS publicly announced that its quarterly sales would not meet projections, marking the first time that JDS or its agents acknowledged publicly that business was turning sour. Plaintiffs allege that, at the same time, JDS stated falsely that sales in the March quarter were projected to exceed sales for the quarter ending December 30, 2000 by as much as ten percent. Plaintiffs allege that Defendants continued to mislead investors and analysts in January, 2001 because it had yet to obtain shareholder approval of its SDL acquisition. Indeed, immediately after it obtained shareholder approval on February 12, 2001, JDS significantly adjusted downward its projections for the then-current quarter. JDS thereafter revealed additional bad financial forecasts, including on July 26, 2001, when it announced a $44.8 billion write-down of good will and, for the first time, claimed excess inventory ($270 million worth).

On the basis of these allegations, Plaintiffs claim that Defendants JDS, Straus, Muller and Kalkhoven violated section 11 of the Securities Act of 1933 (Securities Act); Defendants Straus, Kalkhoven and Muller violated section 15 of the Securities Act; Defendants JDS, Kalkhoven, Muller, Abbe and Straus violated section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5 promulgated thereunder; Defendants Kalkhoven, Muller and Straus violated section 14 of the Exchange Act and Rule 14a-9 promulgated thereunder; Defendants Kalkhoven, Muller, Straus and Abbe violated section 20(a) of the Exchange Act; and Defendants

Kalkhoven, Muller, Straus and Abbe violated section 20A of the Exchange Act.

On October 11, 2002, Lead Plaintiff filed a first amended consolidated complaint (FACC).  Defendants filed motions to dismiss, which the Court granted in part and with leave to amend on November 3, 2003.  On January 9, 2004, Lead Plaintiff filed the SACC.  Defendants filed motions to dismiss, which the Court denied. The class and subclasses were certified by stipulation.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the

United States District Court
For the Northern District of California

outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods.  <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it

8

must produce affirmative evidence of such negation.  <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  <u>Id.</u>  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a <u>prima facie</u> showing in support of its position on that issue.  <u>UA Local 343 v. Nor-Cal Plumbing, Inc.</u>, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  <u>Id.</u>; <u>see also</u> <u>Int'l Shortstop, Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1264-65 (5th Cir. 1991).  Once it has done so, the non-moving party must set forth specific facts controverting the moving party's <u>prima facie</u> case.  <u>UA Local 343</u>, 48 F.3d at 1471.  The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible."  <u>Id.</u>  This standard does not change merely because resolution of the relevant issue is "highly fact specific."  <u>Id.</u>

DISCUSSION

I.   Claims Properly Before the Court

Defendants first argue that many of the statements Plaintiffs challenge are not properly at issue in this case either because

United States District Court
For the Northern District of California

they were not identified in the SACC or because Plaintiffs have abandoned them.  Defendants do not clearly indicate which statements they challenge on each basis.  However, of the fifty-six statements Plaintiffs continue to challenge, Defendants appear to attack twenty-four on these bases.[5]

Statements six, twenty-six, twenty-seven, thirty-nine and fifty-one[6] were clearly addressed in the SACC.  Therefore, Defendants apparently believe that these claims were abandoned because Plaintiffs did not include them in their responses to Defendants' interrogatories.  As evidenced by their inclusion in Plaintiffs' complaint, their opposition to Defendants' motion and the chart of challenged statements filed with their opposition, Plaintiffs clearly intend to pursue their claims based on these statements.  The Court finds that they are properly at issue.

The remaining nineteen statements do not appear in the SACC.  Therefore, Defendants argue that Plaintiffs are barred from raising them under Kaplan v. Rose, 49 F.3d 1363 (9th Cir. 1994).  In Kaplan, the Ninth Circuit held that, in considering the parties' motions for summary judgment, the district court had properly excluded statements which did not appear in the complaint.  Because the statements were missing from any pleading other than the plaintiff's motion, the court held that they were not fairly

---

[5]Plaintiffs no longer challenge any statements made before April 25, 2000, including all statements supporting their revenue recognition claims.

[6]The Court refers to the alleged false or misleading statements according to the statement numbers assigned by Plaintiffs in exhibit A to the declaration of Jon Adams.

10

reflected in the complaint pursuant to Federal Rule of Civil Procedure 9(b).  Id. at 1370.  The court noted that the "addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend," but held that the district court did not abuse its discretion in precluding the plaintiff from pursuing claims based on the new statements because it found that the defendants would be prejudiced if the plaintiff was allowed to amend its complaint.  Id. (citing Roberts v. Arizona Bd. of Regents, 661 F.2d 796, 798 n.1 (9th Cir. 1981).

Plaintiffs counter that Defendants were on notice that they were challenging the disputed statements because they included them in their responses to Defendants' contention interrogatories.  The responses at issue were signed by Plaintiffs' counsel in February and March, 2007.  Therefore, Defendants were on notice of the additional claims almost three months before their motion for summary judgment was filed and over seven months before trial.  In Kaplan, the plaintiff first challenged the statements in his motion for summary judgment, only two months before trial and after the close of discovery.  Id.  In this case, Defendants did not seek additional discovery; nor did they seek to strike the interrogatory responses as the defendants did in In re Cypress Semiconductor Securities Litigation, 1995 WL 241441 (N.D. Cal. 1995).

Federal Rule of Civil Procedure 15(a) provides that leave of the court allowing a party to amend its pleading "shall be freely given when justice so requires."  Leave to amend lies within the sound discretion of the trial court, which discretion "must be guided by the underlying purpose of Rule 15 to facilitate decision

11

on the merits, rather than on the pleadings or technicalities."

<u>United States v. Webb</u>, 655 F.2d 977, 979 (9th Cir. 1981) (citations omitted).  Thus, Rule 15's policy of favoring amendments to pleadings should be applied with "extreme liberality."  <u>Id.</u>; <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 186 (9th Cir. 1987) (citations omitted).

The Supreme Court has identified four factors relevant to whether a motion for leave to amend should be denied: undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party.  <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  Defendants do not argue that allowing amendment would prejudice them or that Plaintiffs have demonstrated undue delay, bad faith or dilatory motive.[7]  Therefore, the Court will consider statements four, ten, eleven, twelve, twenty-eight through thirty, thirty-two, forty, forty-two, forty-eight through fifty, fifty-two, fifty-three and fifty-six in deciding the motion for summary judgment.  These statements are deemed part of the complaint.  Defendants are not required to answer.

At the hearing and its supplemental letter brief, Defendants indicated that if the Court allowed Plaintiffs to pursue claims related to ADVA, they likely would file a motion to dismiss those claims.  Defendants may include a motion to dismiss the claims related to ADVA with their motions in limine if they have grounds to do so that were not raised or addressed in their motion for

---

[7]Defendants do argue that allowing amendment would be futile because the claims based on these statements are without merit.  However, the Court will determine the merit of the claims when it considers them in deciding the motion for summary judgment.

United States District Court
For the Northern District of California

summary judgment.

The Court finds that statements forty-one, forty-six and fifty-five are not properly at issue in this case because the documents in which they were made were not cited in the relevant sections of the SACC or interrogatory responses.  For that reason, leave to amend to add them is denied.

II.   Statements About Demand

Defendants argue that all of Plaintiffs' claims fail because they cannot establish that any of the challenged statements were materially false or misleading when made in that each statement was either true, too vague to be misleading, or reasonably supported by internal forecasts, which took into account the negative information Plaintiffs cite.

A.   Historical Statements about Demand

Defendants first argue that the statements they characterize as historical statements regarding demand in 2000 were true, noting that JDS met or exceeded each of its revenue projections for the calendar year 2000.  Therefore, Defendants contend that statements in which they asserted that revenue and earnings during the 2000 calendar year were attributable to strong or increasing demand were true and not materially misleading.  Plaintiffs counter that on May 15, 2000, Defendants were already aware of declining demand when they issued their Form 10-Q for the third quarter of fiscal year 2000 stating, "Strong demand for virtually all of our optical components and modules products combined with the increased operations resulting from the JDS merger contributed to the increases in gross profit."  Hrvatin Declaration, Exhibit 6 at 14.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

For example, Plaintiffs point to evidence that demand was declining for various products during the first three quarters of fiscal year 2000. Even so, the fact remains that demand was strong enough for JDS to continue to grow throughout calendar year 2000. Defendants provide evidence, which Plaintiffs do not rebut, that overall demand for JDS's products was strong during calendar year 2000.

Defendants also argue that their statements in the E-TEK and SDL prospectuses--that the mergers with E-TEK in June, 2000 and SDL in July, 2000 were "in response to unprecedented growth in the telecommunications industry and demand for the fiber optic networks that are enabling such growth"--were based on accurate historical assessments of demand in calendar year 2000. Statements 7, 8, 17, 35. Again, Plaintiffs do not provide evidence to rebut Defendants' demonstration that overall growth in the industry and demand for JDS's product were strong during calendar year 2000.

Therefore, the Court grants Defendants' motion for summary judgment to the extent it contests Plaintiffs' claims based on historical statements regarding demand for JDS's products in calendar year 2000. The Court grants summary judgment on statements five, seven, eight, nine, twelve, thirteen, seventeen, twenty-one, twenty-three and thirty-three.

B.   Optimistic Statements

Defendants next argue that the optimistic predictions about future demand and revenue projections for 2000 and 2001 are not actionable. In the Ninth Circuit, expressions of optimism and projections "are only actionable as misrepresentations if (1) the statement is not genuinely believed, (2) there is no reasonable

14

basis for such expression, or (3) the speaker is aware of undisclosed facts undermining the statement." Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1158 (9th Cir. 1996) (citing In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990)).

Plaintiffs contend that the statements are misleading because Defendants were aware at the time the statements were made that demand was declining and inventory was increasing, but did not disclose that information.

1.   Demand Predictions Made in 2000

Plaintiffs challenge statements regarding existing and future demand that Defendants made in conference calls with analysts on April 25, July 26 and October 26, 2000.  Statements 1-4, 11, 19, 20, 22, 24, 26-31.  Plaintiffs also challenge a similar statement made in the May 18, 200 press release, announcing Kalkhoven's departure from the company.  Statement 6.  However, Plaintiffs do not challenge Defendants' actual revenue projections for 2000. Defendants argue that their general statements, for example that "the demand for bandwidth technology and components remains incredibly strong," Statement 3, and that JDS's "growth remains determined by the rate at which we can expand capacity," Statement 9, are too vague to mislead investors.  See In re Syntex Corp. Sec. Litig., 855 F. Supp. 1086, 1096 (N.D. Cal. 1994), aff'd, 95 F.3d 922 (9th Cir. 1996).

Plaintiffs counter that they have produced evidence of specific problems sufficient to undermine the optimistic statements.  See In re Syntex Corp. Sec. Litig., 95 F.3d 922, 926

15

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(9th Cir. 1996).  Plaintiffs cite declines in demand and increases in inventory starting in early 2000.  For example, they note that one of Defendants' biggest customers was interested in changing from a 2.5 gigabit product to a 10 gigabit product.  Therefore, demand for the 2.5 gigabit product declined and inventory increased, but JDS was not yet able to produce the 10 gigabit product.  Plaintiffs note significant drops in demand for other specific products as well, particularly within the fiberoptic products group (FPG), JDS's largest department.[8]  Defendants counter that, while demand declined and inventory increased for some products, growth continued for the company as a whole and cite evidence demonstrating that JDS continued to meet its projections each quarter.  Indeed, many of the exhibits Plaintiffs cite as evidence that demand for specific products was declining address those declines and cite gains in other areas that offset them.

For example, Plaintiffs argue that Defendants misled the public by stating that declines in inventory turnover were due to increased growth.  Statement 14.  Plaintiffs note that the declines in inventory turnover in the Transmission Systems Group (TSG) were due to a slow-down in purchasing by one of JDS's customers rather than increased growth.  However, other documents indicate that the company was also seeing declines in inventory turnover in other groups, which were attributed to increased growth.  See, e.g., Okun Declaration, Exhibit 21 (email from Muller stating, "Our business

---

[8]Plaintiffs produce evidence that the FPG made up between 49% and 73% of the company's total revenue throughout calendar year 2000.

16

is booming, and I know each of you is focused on meeting customer demand.  However, during this time of production increases our inventories have been growing faster than sales.  This is a real problem and we must get our inventory turns back into line at 4.5 turns annualized.").

Other specific statements that Plaintiffs challenge also are either supported by the evidence that Plaintiffs cite to establish that they are untrue or are mis-cited.  For example, Plaintiffs point to Abbe's statement, "We do not see double bookings," at the July 26, 2000 conference call with analysts.  Hrvatin Declaration, Exhibit 13 at 5.  Plaintiffs cite testimony by Russell Johnson, JDS's Vice President of Sales and Marketing from May, 1998 through August, 2000 and Vice President of Special Projects from August, 2000 through January, 2001, to support their claim that the statement was false.  However, while Johnson stated that there had been double bookings, he recalled that they had been "resolved within the month of July."  Further, an email chain Plaintiffs cite regarding double bookings establishes that JDS began addressing double bookings in July, 2000 and that by August 14, 2000, JDS was "continu[ing] to keep track of any _potential_ product overlap."  Okun Declaration, Exhibit 47 (emphasis added).  Plaintiff has not provided any evidence of double bookings between August and October, 2000 when the allegedly misleading statement was made.

Similarly, Plaintiffs challenge Straus's statement regarding inventory, which they cite as stating that JDS did "not see _any_ inventory buildup at customers."  Plaintiffs' Opposition at 19 (emphasis added by Plaintiffs).  However, the transcript actually

17

states that "we do not see any inventory buildup by our customers for our products beyond the normal ebb and flow of good supply-chain management and new product introductions." Hrvatin Declaration, Exhibit 13 at 2 (emphasis added). Although Plaintiffs provide evidence of various cancelled orders and indications that there would be some instances in which JDS could "be stuck with a very large inventory at quarter's end," Okun Declaration, Exhibit 77, they do not indicate that this is evidence of anything beyond what Defendants describe as the "normal ebb and flow."

Because Plaintiffs have not provided evidence demonstrating that Defendants' company-wide statements regarding demand were false or misleading, Defendants' motion for summary judgment is granted with respect to statements one, four, six, fourteen, eighteen, nineteen, twenty, twenty-two, twenty-four, twenty-seven, twenty-eight and thirty-one.

However, Plaintiffs also challenge several of Defendants' statements with respect to demand for specific products or by specific customers and provide evidence that Defendants were aware that demand in those areas was decreasing. First, Defendants made optimistic statements about demand for long haul and metro products in their April 25, 2000 conference call. Statement 3. Plaintiffs provide evidence that at the time Defendants made this statement, they had evidence of upcoming reductions in demand for both types of products. On March 23, 2000, Defendants reduced their projections for Lucent's metro product by sixty-five percent for the next six months. Okun Declaration, Exhibit 27. The president of the FPG described that product as "a huge cost sinkhole." Okun

18

United States District Court
For the Northern District of California

Declaration, Exhibit 26.  Similarly, Defendants saw significant reductions in forecasts for Nortel's long haul product, with the president of the FPG noting a "dramatic reduction in requirements starting in March 00."  Okun Declaration, Exhibit 12.  Therefore, the Court denies Defendants' motion for summary judgment with respect to statement three.

Defendants also stated in their July 26, 2000 conference call that "2.5Gb modulators continue to demonstrate strong growth".  Statement 11.  However, Plaintiffs provide evidence that Lucent, JDS's largest customer, had informed it as early as January, 2000 that it was no longer interested in the 2.5 gigabit product.  The Court denies Defendants' motion for summary judgment with respect to statement eleven.

Similarly, in the same conference call, Straus responded to a question regarding a "loss of momentum" with respect to product transitions from Lucent and Nortel by stating, "No, we are firing on all cylinders."  Statement 29.  Given the changes in forecasts, and JDS's inability to transition quickly from production of the 2.5 gigabit to the 10 gigabit product, there is a triable question of fact whether this statement is misleading.  These same factors also call into question Defendants' more general statement regarding JDS's progress "in expanding capacity to enable [it] to meet customer demand and serve the needs of [its] markets."  Statement 30.  Similarly, Defendants' statement in April, 2000 that the "market is exceeding [JDS's] ability to ramp up" and their statement in October, 2000 that JDS was "capacity constrained" had the potential to mislead investors inappropriately to believe that

19

the company was not having any problems with transitions in products.  Statements 2 and 26.  The Court denies Defendants' motion for summary judgment with respect to statements two, twenty-six, twenty-nine and thirty.

    2.    Revenue Predictions Made in 2000

    Plaintiffs also challenge Defendants' statements about guidance made in the July 26, 2000 conference call.  Statement 10. During that call, Muller stated that JDS was increasing its revenue guidance to the high teens from previous quarters based on the strength of the company's business.  Hrvatin Declaration, Exhibit 9 at 8.  Plaintiffs allege that this was a false statement because the guidance in the last quarter had been twenty percent.  However, it is clear that Muller was comparing the high teens to the ususal guidance which was "sequential growth of 15 percent in sales, except where our forecast was affected by acquisition-related purchase accounting, such as last quarter."  Id. (emphasis added). Therefore Plaintiffs' challenge is unavailing.  Muller's "high teens" prediction was higher than the past quarters' guidance of fifteen percent.

    Similarly Plaintiffs challenge Defendants' earnings projections for the fiscal year ending June 30, 2000, which they announced during the October 26, 2000 conference call with analysts.  Statement 25.  Plaintiffs note that JDS had originally projected earnings of $.70 per share in the annual plan approved by the board on August 2, 2000 but raised its projections to $.80 per share prior to the call.  However, as Defendants point out, the monthly forecast prepared for the October, 2000 Operations

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Committee (OpCom) meeting projected earnings of $.83 per share for fiscal year 2001.  Plaintiffs do not challenge the accuracy of the later monthly forecast.  Defendants' motion for summary judgment is granted with respect to revenue predictions made in 2000 in statements ten and twenty-five.

### 3.   Projections Made in 2001

Plaintiffs also challenge Defendants' earnings projections and revenue growth projections made in a conference call with analysts on January 25, 2001 and in a press release issued February 13, 2001.  Hrvatin Declaration, Exhibits 16, 17.  Plaintiffs' challenges are based on conflicts between Defendants' statements and projections made in an earlier OpCom report.  As with the revenue prediction statements made in 2000, there were intervening reports that support Defendants' public statements.  However, Plaintiffs have produced evidence that creates a triable question of fact regarding Defendants' motivation in creating the intervening reports.

On January 11, 2001, Defendants issued an OpCom report that projected negative 2.4% growth and revenues of $903 million for the third quarter of fiscal year 2001.  Okun Declaration, Exhibit 166. During that meeting Abbe asked the president of each of the company's groups to create a "Q3 challenge plan" for exceeding the $903 million growth by $150 million.  Okun Declaration, Exhibit 135.  One week later, on January 18, 2001, the OpCom met again to review the Q3 challenge plan.  Although the fiberoptic products group (FPG), which was responsible for meeting $75 million of the $150 million target, stated that it was still in the process of

21

"identifying opportunities" to "achieve the [$75 million] stretch target," Defendants issued a new OpCom report on January 18 projecting 7% growth.  Okun Declaration, Exhibit 8.

In the January 25 conference call with analysts, Defendants projected seven to ten percent growth for the third quarter of fiscal year 2001.  Hrvatin Declaration, Exhibit 16.  One week later, E-TEK reported that its $63 million share of the FPG's $75 million target was "too high, double counting, and wishful thinking."  Okun Declaration at 140.  E-TEK estimated that its Q3 "upsides" were closer to $39 million.  Id.  Nonetheless, Defendants issued a press release on February 13, 2001, projecting revenues "at or above $1 billion."  Hrvatin Declaration, Exhibit 17.

Plaintiffs have demonstrated that there is a triable question of fact regarding the misleading nature of Defendants' earnings and growth projections made in January and February, 2001.  Statements 36-39, 43.

III. Forward-Looking Statements

Defendants also argue that all of the challenged forward-looking statements discussed above are protected under the safe harbor in the Private Securities Litigation Reform Act (PSLRA) of 1995.  Pursuant to the PSLRA's statutory safe harbor, liability in a private securities action cannot be based on a forward-looking statement if the statement is identified as such and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  See 15 U.S.C. § 78u-5(c)(A)(I).  Moreover, even if the statement is not accompanied by meaningful

United States District Court

For the Northern District of California

cautionary statements, a person will be liable for making such a statement only if the plaintiff proves that the statement was made with actual knowledge that the statement was false or misleading. See id. § 78u-5(c)(B).

Independent of the statutory safe harbor, the judicially-created "bespeaks caution" doctrine immunizes certain forward-looking statements. "The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1413 (9th Cir. 1994) (citation and quotation marks omitted). In order to invoke the bespeaks-caution doctrine, it is not enough that the defendants included some cautionary language. Rather, the defendants must "include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) (emphasis, citation, and internal quotation marks omitted).

The PSLRA defines the phrase "forward-looking statement" to include, among other things, a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items. See 15 U.S.C. § 78u-5(i)(1)(A). A statement of the assumptions underlying such projections is also a forward-looking statement. See id. § 78u-

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

5(i)(1)(D).  Case law applying the bespeaks-caution doctrine defines "forward-looking statement" in a similar manner.  See, e.g., Worlds of Wonder, 35 F.3d at 1414 (doctrine applies to future projections, estimates and forecasts).

Plaintiffs counter that cautionary statements may only immunize Defendants' forward-looking statements if they are "precise and directly address the defendants' future projections." Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996) (quoting Worlds of Wonder, 35 F.3d at 1414 (internal modifications omitted)).  Because the Court grants summary judgment to Defendants on each of the forward-looking statement claims, aside from those made in the April 25, 2000, July 26, 2000, October 26, 2000 and January 25, 2001 conference calls and the February 13, 2001 press release, the applicability of the safe harbor and bespeaks caution doctrine is only considered with respect to these statements.

A.   April 25, 2000 Conference Call

At the beginning of the April 25, 2000 conference call, Muller stated generally,

> All forward-looking statements mentioned are subject to risks and uncertainties that could cause the actual results to differ, possibly materially, from those projected in the forward-looking statements.  The risks and uncertainties related to any forward-looking statements are described in our required SEC filings including our annual report on Form 10-K, our 10-Q's and various registration statements.

Hrvatin Declaration, Exhibit 5 at 1-2.  The documents referenced do mention that demand is a possible source of risk.  For example, the form 10-Q for the quarter ending March 30, 2000 acknowledges that "Lucent and Nortel each accounted for over 10% of our net sales"

United States District Court
For the Northern District of California

and that "sales would suffer if one or more of our key customers substantially reduced orders for our products." Hrvatin Declaration, Exhibit 6 at 23. However, nowhere in the conference call is there any suggestion that future demand might be questionable. The only projection that Defendants exhibit any uncertainty about at all is their ability to expand capacity. Therefore, the general statements regarding the risks of forward-looking statements and the general warning regarding changes in demand in the document cited are insufficient to establish as a matter of law that Defendants' statements made in the April 25, 2000 conference call are protected by the bespeaks-caution doctrine.

B.   July 26, 2000 Conference Call

Muller made a similar general warning about forward-looking statements at the beginning of the July 26, 2000 conference call, but also specifically pointed analysts to "the risk factor section of [JDS's] Form S-3 registration statement that [it] filed with respect to the Canadian securities that [it] issued in the E-TEK acquisition." Hrvatin Declaration, Exhibit 9 at 1. The remaining challenged statement from the July 26, 2000 conference call is specifically related to demand for 2.5 gigabit modulators. The Court finds that the general warning is not sufficient to establish as a matter of law that this statement is protected by the bespeaks-caution doctrine.[9]

_____

[9]Defendants did not attach the Form S-3 registration statement to their declarations in support of their motion for summary judgment and the Court was unable to locate the document.

25

United States District Court

For the Northern District of California

1    C.    October 26, 2000 Conference Call

2    As in the earlier conference calls, Muller made a general

3  warning about forward-looking statements at the beginning of the

4  October 26, 2000 conference call.  He also directed analysts to the

5  "risk factor section of [JDS's] Form 10-K filed on September 28,

6  2000 and [its] Form S-4 filed in conjunction with the SDL

7  transaction on September 7th."  Hrvatin Declaration, Exhibit 13.

8  Both of the cited documents include more specific warnings,

9  including the acknowledgment that Lucent and Nortel comprised a

10  significant part of JDS's business and that JDS would suffer if

11  either of those customers substantially reduced its orders.

12  Hrvatin Declaration, Exhibit 11 at 32.  These general warnings were

13  overshadowed by JDS's specific statements that there was no loss of

14  momentum with respect to its business with either Lucent or Nortel.

15  Further, any general statements regarding the volatility of the

16  market or the need to meet precise demands by customers were

17  undermined by more specific statements about "a continuing surge of

18  demand in the fiberoptics communications industry" and JDS's

19  "substantial progress in expanding capacity to enable us to meet

20  customer demand and serve the needs of the market."  Hrvatin

21  Declaration, Exhibit 13 at 2.  Defendants have not established as a

22  matter of law that the forward-looking statements they made in the

23  October 26, 2000 conference call are protected by the bespeaks-

24  caution doctrine.

25    D.    January 25, 2001 Conference Call

26    Muller again gave a general warning about forward-looking

27  statements at the beginning of the January 25, 2001 conference

28                                    26

United States District Court
For the Northern District of California

call, but specifically directed analysts to "the risk factors section of our Form 10-Q filed on November 14, 2000, and our Form S4-A filed in conjunction with the SDL transaction on November 17." Hrvatin Declaration, Exhibit 16 at 1.  In turn, each of the two cited documents contains multiple pages of risk factors.  For example, the Form 10-Q warned,

> Recently, the Nasdaq National Market, in general, and our stock and the stock of our customers and competitors, in particular has experienced substantial price and volume fluctuations, in many cases without any direct relationship to the affected companies' operating performance. . . . Consequently, these multiples and, hence, market prices may not be sustainable.  These broad market and industry factors have and may in the future cause the market price of our stock to decline, regardless of the actual operating performance or the operating performance of our customers.

Hrvatin Declaration, Exhibit 14 at 26.  Further, the statement noted that JDS's "customer base is highly concentrated;" that "[s]ales to any single customer may vary significantly from quarter to quarter;" and that "[i]f current customers do not continue to place orders, we may not be able to replace these orders from new customers." Id.  The form 10-Q also stated, "We anticipate that average selling prices will decrease in the future." Id. at 28.

On the call, Straus went on to state that JDS's "optimistic outlook for the March quarter" was "prudently tempered only by uncertain carrier spending prospects, customer inventory adjustments and the sometimes lower level of near-term sales visibility." Id. at 2.  Abbe later stated,

> Notwithstanding some near-term slowing and order growth rates for certain product lines due to [inventory issues] . . ., the underlying growth in telecommunications bandwidth [] we believe continues unabated.

27

Id. at 5.  Finally Muller stated that the reduction in guidance to a seven to ten percent increase in sales over the quarter ended December 30, 2000 "reflects uncertain near-term carrier capital spending plans, customer inventory adjustments, and the somewhat lower level of near-term sales visibility than we and our customers have experienced in recent periods."  Id. at 6.

Although the cautionary statements in the Form 10-Q and Form s4-A contained general warnings that could ostensibly address the declines that Plaintiffs allege should have been disclosed, they were overshadowed by the more specific and more limited warnings included in the call itself, each of which was accompanied by more optimism.  For example, Straus stated that the company's optimistic outlook was tempered only by certain issues.  Further, Abbe's warning was not really a warning at all.  He stated that, notwithstanding some near-term slowing and inventory issues, the company continued to expect growth.  Finally, any caution attached to Muller's report of the decreased guidance entirely masked the fact that the company was "stretching" to reach even that guidance, as discussed above.

Although the cautionary language might have mentioned the "important factors that could cause actual results to differ materially from those in the forward-looking statement" as required by 15 U.S.C. § 77z-2(c)(1)(A)(I), all of those factors were overshadowed by language limiting the emphasis on the cautions. The Court denies Defendants' motion for summary judgment to the extent it is based on cautionary statements made in the January 25, 2001 conference call.

28

United States District Court
For the Northern District of California

E.    February 13, 2001 Press Release

The February 13, 2001 press release contained only a general warning that the forward-looking statements "involve risks and uncertainties" and informed readers how to request SEC filings from the company.  Hrvatin Declaration, Exhibit 17.  However, this type of blanket reference to previous warnings is not sufficient to invoke the safe harbor or bespeaks-caution doctrine.  "In order for the safe harbor or bespeaks caution doctrine to apply, a cautionary statement must 'accompan[y]' or be 'contained' in the statement that is the basis for a plaintiff's claim."  In re Apple Computer, Inc., Sec. Litig., 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002).  Defendants' motion for summary judgment is denied to the extent it relies upon cautionary statements made in the February 13, 2001 press release.

IV.  Accounting Claims

A.    Inventory

Plaintiffs' sole remaining accounting claim related to inventory is that Defendants should have written down $254 million of inventory during the quarter ending December 30, 2000 instead of waiting until the end of the fiscal year,[10] because Plaintiffs allege that in August, 2000, the FPG, JDS's largest product group, forecasted a $532 million decline in demand over the next twelve months.  Therefore, Plaintiffs challenge statements forty, forty-five, forty-nine, fifty, fifty-two and fifty-four in which, they allege, Defendants misstated JDS's inventory or overstated its

---

[10]JDS wrote down $274 million for excess inventory and $236.6 million for obsolete inventory in its June 30, 2001 Form 10-K.

profits because it failed to reserve for its inventory.  Plaintiffs submit the report of their expert Steven Henning in support of their claim.

Defendants argue that Plaintiffs' claim fails because it is based only on the FPG, rather than a company-wide forecast, and because Henning's report is unreliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Defendants cite various pages from Henning's deposition to support their argument that his report is not based upon sufficient facts or data and is not the product of reliable principles and methods as required by Federal Rule of Evidence 702.  However, the deposition testimony establishes that Henning used a methodology he thought was consistent with JDS's policy for writing down inventory. Defendants also cite testimony that the FPG forecast was unreliable because it was "unconstrained," meaning that it was not limited by variables such as capacity, lead times, or technical issues. However, Defendants do not offer any expert testimony establishing an alternative interpretation of the FPG forecast or which materials Henning should have considered instead of that forecast. Further, Defendants' Daubert challenge was raised only in a footnote in their reply brief.  The Court finds that, for purposes of these motions, Henning's report is sufficiently relevant and reliable to satisfy the Daubert standard.  Defendants may renew their Daubert challenge in their motions in limine prior to trial.

There remains a triable question of fact whether JDS should have written down its inventory prior to June, 2001.  The Court denies Defendants' motion for summary judgment with respect to

United States District Court
For the Northern District of California

statements forty, forty-five, forty-nine, fifty, fifty-two and fifty-four.

B.   Good Will

Plaintiffs next claim that Defendants overstated the good will arising from the acquisition of E-TEK and SDL beginning in the quarters in which the companies were acquired.

1.   Acquisition of E-TEK

Plaintiffs acquired E-TEK on January 17, 2000 in an agreement requiring an exchange of 2.2 shares of JDS stock for each common share and outstanding option of E-TEK.  Based on the value of JDS stock at that time, the purchase price was $17.5 billion.  $15.6 billion of the purchase price was allocated to good will. According to Henning, even if Defendants' internal forecasts showing increasing revenues for E-TEK were accurate, the allocation of eighty-nine percent of the purchase price to good will was an overstatement.  Further, Henning opines that at the time of the acquisition, there was a decrease in customer spending, which is a significant adverse change in the business climate requiring an assessment of impairment.

Defendants counter that JDS's auditors, relying on JDS management's own assessment of whether there were indicators of impairment, did not believe that there was any reason to evaluate whether the good will was impaired prior to the close of the quarter ending March 31, 2001.  Further, Defendants point out that the SEC did not state that JDS should have written down the good will earlier once it declared its intent to do so at the close of the quarter ending March 31, 2001.  However, neither the auditors'

31

United States District Court
For the Northern District of California

reliance on JDS management's own assessment of the situation nor

the SEC's failure to question JDS's earlier accounting is

sufficient to rebut Plaintiffs' expert's testimony.  There remains

a triable question of fact with respect to Defendants' decision not

to write down the good will related to the acquisition of E-TEK

until the close of the quarter ending March 31, 2001.  Defendants'

motion for summary judgment is denied with respect to statements

fifteen, sixteen, thirty-two, thirty-four, thirty-five, forty-two,

forty-seven, forty-eight and fifty-one.

>    2.   Merger with SDL

JDS's merger with SDL closed on February 13, 2001.  However,

the merger agreement had been signed in July, 2000, calling for the

exchange of 3.8 shares of JDS common stock and options for each

common share and outstanding option of SDL.  When the sale closed,

JDS recorded the price as $41.2 billion based on an average of the

higher July, 2000 stock prices and the lower February, 2001 prices.

$39.2 billion was allocated to good will.  According to Plaintiffs'

expert, the purchase price would have been only $13 billion if it

had been based on the February, 2001 stock price.  As early as May

11, 2001, when it filed its Form 10-Q for the quarter ending March

31, 2001, JDS acknowledged that its good will, including that

associated with the acquisition of SDL, was impaired.  Plaintiffs

argue that the good will was overstated and therefore impaired at

the time the merger closed.

Defendants argue that JDS's acknowledgment in an April 24,

2001 press release and conference call that its good will was

impaired is sufficient to inform investors of the issue.

Therefore, Defendants argue that Plaintiffs' claim that JDS's May, 2001 Form 10-Q, which acknowledged the need to write down good will, but did not actually record the write-down, is barred by In re Convergent Technologies Security Litigation, 948 F.2d 507 (9th Cir. 1991).  In Convergent, the Ninth Circuit held that "an omission is materially misleading only if the information has not already entered the market."  Id. at 513.

Defendants' April 24, 2001 press release states that as of "March 31, 2001, the value of the Company's net assets, including unamortized goodwill exceeded the Company's market capitalization by approximately $40 billion."  Hrvatin Declaration, Exhibit 30 at 3.  During the conference call on the same day, Muller predicted that "we will be writing down the value of our goodwill so that our net assets are no higher than our market capitalization at the end of March."  Hrvatin Declaration, Exhibit 33 at 9.  Further, the May, 2001 Form 10-Q states that JDS "is currently evaluating the carrying value of certain long-lived assets and acquired equity method investments, consisting primarily of $56.2 billion of goodwill."  Hrvatin Declaration, Exhibit 20 at 4.  The Form 10-Q also acknowledged, "Goodwill will be reduced to the extent that net assets are greater than market capitalization.  At March 31, 2001, the value of the Company's assets . . . exceeded the Company's market capitalization by approximately $39.5 billion."  Id. at 11.  Therefore, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' claims based on the reporting of good will in the May, 2001 Form 10-Q.  Statement 55.  However, Plaintiffs also challenge the inclusion of the SDL good will on the

33

United States District Court
For the Northern District of California

Form 8-K related to the acquisition of SDL filed on March 23, 2001.
Statement 48.   Defendants do not specifically address Plaintiffs'
claim based on that document.

  C.   Carrying Value of ADVA

  Plaintiffs' final accounting claim is based on Defendants'
valuation of ADVA, a company in which JDS acquired a twenty-nine
percent interest through its acquisition of E-TEK.   Plaintiffs
claim that Defendants should have written down the carrying value
of ADVA during the quarter ending December 31, 2000.   In their
motion, Defendants argue only that Plaintiffs' claims related to
ADVA are barred because they were not included in the complaint.
However, as discussed above, Defendants were on notice of the claim
because Plaintiffs included it in their interrogatory responses.
See Adams Declaration, Exhibit B at 147-148.   Therefore Defendants'
April 24, 2001 press release and JDS's Form 10-Q for the quarter
ended March 31, 2001, which reported assets of $65,039.5 million,
including $714.5 million based on JDS's valuation of its investment
in ADVA, are properly before the Court.   Statements 53 and 56.

  Plaintiffs argue that JDS was required to write down its
interest in ADVA beginning in the quarter ended December 30, 2000
because of declines in ADVA's stock prices.   Defendants challenge
the substance of the claim in their reply brief, arguing that JDS
was not required to write down its interest in ADVA under Generally
Accepted Accounting Principles (GAAP) because ADVA performed
strongly in the December, 2000 quarter.   Under GAAP, a write-down
is necessary only when the decline in the stock price of the equity
investment is not temporary.   Defendants argue that the later

34

strong performance precludes a finding that the decline was anything other than temporary and fault Henning for failing to consider that strong performance.  However, Defendants provide no evidence of the strong performance or of any increase in ADVA's stock prices.  Therefore, the Court finds that there remains a disputed issue of fact and denies Defendants' motion for summary judgment with respect to statements fifty-three and fifty-six.

V.   Scienter

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under section 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) reliance, (3) scienter, and (4) resulting damages." Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1157 (9th Cir. 1996); see also McCormick v. Fund Am. Cos., 26 F.3d 869, 875 (9th Cir. 1994).  The question of a defendant's mental state is so subjective that summary judgment is rarely appropriate.  See, e.g., White v. Roper, 901 F.2d 1501, 1505 (9th Cir. 1990) ("Where the defendant's intent is at issue, summary judgment is appropriate 'only if all reasonable inferences defeat the plaintiff's claims.'" (quoting SEC v. Seaboard Corp., 677 F.2d 1297, 1299 (9th Cir. 1982)).

Defendants argue that Plaintiffs have failed to set forth significant evidence that Defendants acted with the requisite

35

United States District Court
For the Northern District of California

scienter to support any of Plaintiffs' section 10(b) claims. Further, Defendants argue that their approval of capital investments during the class period undermines any claim of scienter.  Plaintiffs counter that Defendants' stock sales and evidence of their knowledge of declining demand are sufficient to establish a triable question of fact regarding Defendants' state of mind.

In evaluating stock sales as evidence of scienter, the Ninth Circuit considers "three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004) (citing In re Silicon Graphics Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)). Plaintiffs note that during the trading window that opened on July 31, 2000 and closed on August 31, 2000, the individual Defendants sold a total of $391 million of JDS stock.  Plaintiffs also provide evidence that fourteen non-defendant insiders sold $503 million of JDS stock during the same period.  Further, Plaintiffs argue that the stock sales were made at a time when insiders had material information regarding declines in demand for specific products, which they withheld from investors.

Defendants argue that each of the individual Defendants' August, 2000 sales are consistent with his earlier sales and that the timing of the sales is explained by the trading window. Further, Defendants argue that the fact that JDS continued to meet expectations for several months following the stock sales undermines any finding of scienter.  However, this is consistent

36

with Plaintiffs' overall theory that Defendants were aware of declines in demand for specific products and withheld that information from investors.  That it took several more months for the declines that began in early 2000 to impact the company as a whole does not undermine the scienter that can be inferred from the failure to disclose those declines when they began.

The Court finds that Defendants' stock sales, standing alone, are not sufficient to create a triable question of fact with respect to Defendants' scienter.  However, the stock sales contribute to the quantum of evidence needed.  Given the triable questions of fact with respect to false or misleading statements made prior to the sales, the size and timing of the sales are sufficient to establish a triable question of fact related to Defendants' scienter throughout the class period.[11]

In addition to the stock sales, Plaintiffs have presented further evidence to support a finding of scienter with respect to the statements made in 2001.  As discussed above, there is a triable question of fact whether on January 18, 2001 Defendants purposely created a "challenge" to increase projections in spite of projections established just days earlier.

_____

[11]Defendants state that they also seek summary judgment in their favor on Plaintiffs' insider trading claims but do not provide written argument in support of that motion.  As stated above, the Court finds that there are triable questions of fact with respect to whether three statements made prior to the allegedly improper sales were false or misleading.  Therefore, there remains a triable question of fact whether Defendants had material non-public information, which they had wrongfully failed to disclose, when they sold stocks in August, 2000.  The Court denies Defendants' motion for summary judgment with respect to Plaintiffs' insider trading claims.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Some forms of recklessness are sufficient to satisfy the

2  element of scienter in a section 10(b) action.  See Nelson v.

3  Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context

4  of section 10(b) claims, the Ninth Circuit defines "recklessness"

5  as

6         a highly unreasonable omission [or misrepresentation],
        involving not merely simple, or even inexcusable
7         negligence, but an extreme departure from the standards
        of ordinary care, and which presents a danger of
8         misleading buyers or sellers that is either known to the
        defendant or is so obvious that the actor must have been
9         aware of it.

10  Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir.

11  1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553

12  F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Ninth

13  Circuit in In re Silicon Graphics, 183 F.3d at 976-77,

14  recklessness, as defined by Hollinger, is a form of intentional

15  conduct, not merely an extreme form of negligence.  Thus, although

16  section 10(b) claims can be based on reckless conduct, the

17  recklessness must "reflect[] some degree of intentional or

18  conscious misconduct."  Id. at 977.  The Silicon Graphics court

19  refers to this subspecies of recklessness as "deliberate

20  recklessness."  Id.

21    The evidence of the January, 2001 efforts to increase

22  projections despite Defendants' knowledge of declining demand,

23  growing inventory, overstated good will and understated inventory

24  reserves is sufficient to support an inference that Defendants were

25  reckless in later publicizing the more optimistic statements.  This

26  is sufficient to create a triable question of fact with respect to

27  Defendants' scienter for statements made in 2001.

28
                                    38

United States District Court
For the Northern District of California

1    Defendants also argue that their continued investment in JDS's

2   growth undermines any evidence of scienter.  However, there is a

3   triable question of fact whether what Defendants cite as investment

4   was actually a result of the acquisition of other companies.

5   VI.  Loss Causation

6    Finally, Defendants argue that they are entitled to summary

7   judgment on all claims because Plaintiffs cannot demonstrate loss

8   causation.  However, the Court has already rejected Defendants'

9   interpretation of Dura Pharmeceuticals, Inc. v. Broudo, 544 U.S.

10  336 (2005).  See July 21, 2005 Order denying Defendants' Motion for

11  Judgment on the Pleadings.  Defendants do not cite any intervening

12  Ninth Circuit or Supreme Court precedent undermining the Court's

13  earlier decision.

14   Plaintiffs cross-move for partial summary judgment, arguing

15  that Defendants failed to meet their burden to rebut the

16  presumption of loss causation for Plaintiffs' Section 11 claims and

17  therefore should not be permitted to raise loss causation as an

18  affirmative defense to those claims.  Defendants counter that they

19  are not required to show that JDS's stock declines were caused by

20  something other than the alleged misrepresentation because

21  Plaintiffs failed to identify the "alleged truth" that Defendants

22  should have disclosed instead of the alleged misstatements.

23   Although Plaintiffs do not identify any specific announcements

24  that were made prior to the later declines in stock prices, it is

25  implicit in their argument that various "truths" were disclosed in

26  2001 that preceded the drop in the value of JDS stock.  For

27  example, JDS wrote down $44.8 billion of good will and claimed $270

28                                    39

**United States District Court**
For the Northern District of California

million of excess inventory.  Counsel for Defendants represented at the hearing on these motions that Defendants' expert could provide analysis to support their defense that some or all of the loss was caused by factors other than the alleged misleading statements.  In the interest of justice the Court will allow Defendants to continue to pursue the affirmative defense of loss causation if they are able to produce expert opinion to meet their burden.

The Court defers ruling on Plaintiffs' cross-motion for summary judgment.  Defendants may file an expert declaration by September 5, 2007.  Defendants may also file a supplemental brief of five pages or less.  Plaintiffs may file a supplemental opposition of five pages or less by September 19, 2007.

VII. Claims Against Kalkhoven

A.   False or Misleading Statements

As discussed above, the Court has found that there are triable questions of fact related to statements made in the April 25, 2000 conference call prior to Kalkhoven's retirement from JDS on May 18, 2000.  Therefore, the Court denies Kalkhoven's motion for summary judgment with respect to statements two and three.

Plaintiffs acknowledge that Kalkhoven was not involved in the company's management after May 18, 2000.  Further, Plaintiffs do not argue that Kalkhoven made any statements after May 18, 2000 giving rise to liability.  Therefore, the Court grants Kalkhoven's motion for summary judgment with respect to all other statements.

B.   Insider Trading Claims

Plaintiffs base their insider trading claim only on Defendants' trading during August, 2000.  Kalkhoven argues that

40

**United States District Court**
For the Northern District of California

1   Plaintiffs have not established that he actually received any

2   inside information after May 18, 2000.  He submits the affidavit of

3   Sandra Thompson, the individual identified as confidential witness

4   8, who Plaintiffs alleged would testify that Kalkhoven continued to

5   work in San Jose following his retirement.  Thompson now declares

6   that she "does not recall ever seeing [Kalkhoven] there after his

7   retirement."  Caro Declaration, Exhibit 6 at ¶ 6.  Further,

8   Thompson states that she does not know whether Kalkhoven ever

9   received reports following his retirement as asserted in the SACC.

10  Id. at ¶ 7.

11      However, Plaintiffs provide evidence that Kalkhoven received

12  at least some reports regarding JDS's performance following his

13  retirement.  See Supplemental Briefing, Exhibit K (June 30, 2000

14  email including June FLASH Reports sent to Kalkhoven).  Further,

15  that there are triable questions of fact related to whether

16  statements made prior to Kalkhoven's departure from the company

17  were misleading.  Thus there are triable questions of fact related

18  to whether Kalkhoven had material non-public information that he

19  had wrongfully failed to disclose when he sold JDS stock in August,

20  2000.  Therefore, the Court denies Kalkhoven's motion for summary

21  judgment with respect to Plaintiffs' insider trading claims.

22                          CONCLUSION

23      For the foregoing reasons, the Court GRANTS in part and DENIES

24  in part Defendants JDS, Muller, Straus and Abbe's motion for

25  summary judgment (Docket No. 1090) and GRANTS in part and DENIES in

26  part Defendant Kalkhoven's motion for summary judgment (Docket No.

27

28                              41

1    1103).[12]  The Court DEFERS RULING on Plaintiffs' cross-motion for

2    partial summary judgment (Docket No. 1194).

3         IT IS SO ORDERED.

4

5    Dated:  8/24/07                _____
                                    CLAUDIA WILKEN
6                                   United States District Judge

United States District Court
For the Northern District of California

_____

[12]Defendants request that the Court take judicial notice of a table setting forth the price of JDS stock as recorded by the Dow News Service.  This information is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be requested."  Fed. R. Evid. 201(b)(2).  The Court GRANTS Defendants' request for judicial notice (Docket No. 1100). Defendants' objections to evidence submitted by Plaintiffs are DENIED as moot.  The Court did not consider any improper or inadmissible evidence in deciding these motions.  The Court DENIES Plaintiffs' motion challenging the designation of documents and deposition testimony as confidential and highly confidential without prejudice to renewing it after they have met and conferred with Defendants (Docket No. 1300).  The Court GRANTS Plaintiffs' motion for leave to supplement its summary judgment submissions (Docket No. 1303).