1  [COUNSEL LISTED ON SIGNATURE
2  PAGES]

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11

12  IN RE JDS UNIPHASE CORPORATION        Master File No. C-02-1486 CW (EDL)
    SECURITIES LITIGATION
13                                        CLASS ACTION

14                                        **JOINT PRETRIAL CONFERENCE
                                          STATEMENT (JURY TRIAL)**
15
                                          Trial Date:  October 22, 2007
16                                        Pre-trial Conference: October 9, 2007
                                          Time: 2:00 p.m.
17                                        Ctrm: 2, 4th Floor
                                           Before:   Hon. Claudia Wilken
18

19

20

21

22

23

24

25

26

27

28

1  **I.**     **THE ACTION**

2          **A.**     **SUBSTANCE OF THE ACTION**

3              **1.**     **Background and Parties**

4          This is a class action alleging violations of the federal securities laws.  On December 21,

5  2005, the Court certified a class of all persons and entities who purchased or otherwise acquired

6  the securities of JDS Uniphase Corporation ("JDSU") between October 28, 1999, and July 26,

7  2001, inclusive (the "Class").  (*See* Dec. 21, 2005 Order.)  The Court appointed Connecticut

8  Retirement Plans and Trust Funds ("CRPTF") as Lead Plaintiff to represent the Class

9  ("Plaintiffs").  The Court also certified three subclasses consisting of:  (1)  investors who

10  exchanged stock they owned in SDL, Inc. ("SDL") for JDSU's stock in connection with JDSU's

11  merger with SDL (the "SDL Subclass"); (2) investors who exchanged stock they owned in

12  Optical Coating Laboratories, Inc. for JDSU stock in connection with JDSU's merger with OCLI

13  (the "OCLI Subclass"); and (3) investors who exchanged stock they owned in E-TEK Dynamics,

14  Inc. ("E-TEK") for JDSU's stock in connection with JDSU's merger with E-TEK (the "E-TEK

15  Subclass").  The Court appointed Houston Municipal Employees Pension System as

16  representative of the SDL subclass, Dennis McCool as representative of the E-TEK Subclass, and

17  Oklahoma Firefighters Pension and Retirement System as representative of the OCLI Subclass.

18          On August 24, 2007, the Court issued an order granting in part and denying in part

19  Defendants' motions for summary judgment (the "Summary Judgment Order").  The Court

20  denied summary judgment as to 29 statements challenged by CRPTF in its claim under

21  Section 10(b).  The Court granted summary judgment on all claims made by the OCLI Subclass

22  (the First, Fourth, & Seventh Claims for Relief in the Second Amended Consolidated Complaint

23  ("Complaint")).  (Summary Judgment Order at 4. n4.)  The Court also granted summary judgment

24  as to all statements underlying the claims asserted by the E-TEK Subclass under Section 14(a) of

25  the Securities Exchange Act of 1934 and Sections 11 and 12(a)(2) of the Securities Act of 1933

26  (the Second, Fifth, and Eighth Claims for Relief).  (Summary Judgment Order at 14.)  The Court

27  denied Defendants' motions for summary judgment with respect to the claims asserted by the

28  SDL Subclass based on the allegation that the SDL Registration Statements overstated the value

1   of JDSU's goodwill arising from the E-TEK acquisition.  (Complaint, Third, Sixth, and Ninth

2   Claims for Relief.)  The Court deferred ruling on CRPTF's motion for summary judgment

3   seeking dismissal of Defendants' negative causation defense to the claims under Sections 11

4   and 12 of the Securities Act, and allowed supplemental briefing, which is now complete.  The

5   Court also recognized that "Plaintiffs originally challenged statements made as early as July,

6   1999," but that they earliest statements now challenged are from JDSU's April 25, 2000

7   conference call.  (Summary Judgment Order at 4 n.3.)  Accordingly, "Class Period" in this Joint

8   Pretrial Conference Statement refers to the period from April 25, 2000, through July 26, 2001,

9   inclusive.[1]

10      The Defendants are JDSU and four of its former officers, Charles Abbe (JDSU's former

11  President and Chief Operating Officer), Kevin Kalkhoven (JDSU's former Co-Chairman and

12  CEO, until his retirement on May 18, 2000)[2], Anthony Muller (JDSU's former CFO), and Jozef

13  Straus (JDSU's former Co-Chairman and CEO).  In this Joint Pretrial Conference Statement,

14  Messrs. Abbe, Kalkhoven, Muller, and Straus will be referred to collectively as the "Individual

15  Defendants."  JDSU and Messrs. Abbe, Muller, and Straus will be referred to collectively as the

16  "JDSU Defendants."

17          2.      **Claims and Defenses**

18                  a.      **Section 10(b) of the Exchange Act and SEC Rule 10b-5**

19      Claim.  CRPTF contends that Defendants JDSU, Jozef Straus, Kevin Kalkhoven, Anthony

20  Muller, and Charles Abbe violated Section 10(b) of the Securities Exchange Act of 1934

21  ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.  (Complaint,

22  Tenth Claim for Relief.)  CRPTF alleges that each of the Defendants knowingly or with

23

24          [1] During the summary judgment hearing, CRPTF indicated that it "welcome[d] the Court shortening the Class Period, which is essentially what [was] telegraphed in [CRPTF's] papers."  (July 26, 2007 Hrg. Tr. 9.)

25          [2] CRPTF does not agree that Mr. Kalkhoven "retired" on May 18.  CRPTF contends that JDSU's board of

26  directors forced Mr. Kalkhoven to resign because of his purported improper conduct.  Defendants dispute CRPTF's contention.  Defendants contend that there is no evidence that Mr. Kalkhoven engaged in any misconduct, and

27  CRPTF's contention appears to be based solely on an insinuation that there were "circumstances suggesting [Mr. Kalkhoven's] misconduct" at the time of his retirement (Opp. to Defs.' Mot. for Summ. J. at 6 n.5), and is the subject of a motion *in limine* pending before the Court.

28

1  deliberate recklessness made material misstatements of fact and material omissions in their

2  publicly disseminated statements, including but not limited to JDSU's quarterly conference calls

3  and JDSU's filings with the SEC.  CRPTF alleges that these misstatements and omissions

4  concern:  (1) demand for JDSU's products; (2) JDSU's business prospects; (3) guidance about

5  revenue growth, and earnings, beginning in January 2001; (4) the reported value of JDSU's

6  goodwill in certain of its financial statements beginning on September 1, 2000; (5) the reported

7  value of JDSU's inventory in certain of its financial statements beginning on January 25, 2001;

8  and (6) the reported value of JDSU's equity investment in ADVA in certain of its financial

9  statements issued on April 24 and May 11, 2001.  CRPTF also contends that the Individual

10 Defendants engaged in insider trading in violation of Section 10(b) of the Exchange Act by

11 selling hundreds of millions of dollars of JDSU stock while in possession of adverse, material,

12 non-public information.  CRPTF alleges that when the truth emerged, JDSU's stock price fell

13 causing CRPTF to suffer economic loss.  CRPTF contends that the members of the E-TEK and

14 SDL subclasses, as members of the Class, have claims under Section 10(b) based on allegedly

15 false or misleading statements made prior to the dates of E-TEK and SDL mergers, respectively.

16 A chart containing the challenged statements still at issue is attached as Exhibit A.[3]

17        Defenses.  Defendants deny that they are liable for the alleged violations.  In particular,

18 Defendants contend that they accurately described the Company's performance and expectations.

19 As the Court acknowledged, "overall demand for JDS's products was strong during calendar year

20 2000," and Defendants demonstrated that "overall growth in the industry and demand for JDS's

21 product were strong during calendar year 2000."  (Summary Judgment Order at 14.)  Defendants

22 contend that Plaintiffs' claims rest on allegations regarding isolated events concerning isolated

23 products and customers, none of which undermined the overall strength of JDSU's business or

24 was material in any way.  Defendants also contend that JDSU's accounting at all times complied

25

26 _____

[3] Exhibit A identifies the date of the statement, the person making the statement and whether the statement was forward looking.  The underlined portion of the statement is the portion that CRPTF claims is false.  CRPTF contends that all defendants are liable for the statements made on conference calls, not just the person actually speaking.  Defendants dispute that contention.  (CRPTF does not contend that Mr. Kalkhoven is liable for any statements made after April 25, 2000.)  To the extent that the parties could not agree on whether a statement is forward looking, that is noted on the chart.

27

28

1   with GAAP and they deny that JDSU made any false or misleading statement about the value of

2   its inventory, goodwill, or equity investment in ADVA at any time.  Defendants contend that they

3   acted at all times in good faith, and Defendants based their statements on the best information that

4   was available to them at the time of the challenged statements, and believed their statements to be

5   true and did not act with scienter or fail to use ordinary or reasonable care.  Defendants also deny

6   that Plaintiffs' losses were caused by, or that Plaintiffs suffered damages as a result of,

7   Defendants actions or omissions, and contend that JDSU's stock declined as the result of market

8   forces and new information about JDSU and its industry.  Defendants further contend that they

9   are not liable for any forward-looking statements because those statements (and the assumptions

10  underlying them) are protected by both "safe harbors" provided by the Exchange Act, as well as

11  by the "bespeaks caution" doctrine, because those statements were not made with "actual

12  knowledge" that they were false and, in any event, were accompanied by meaningful cautionary

13  language.  Further, Defendants' statements were not false or misleading because the relevant

14  information already was available to the market and investors.  Defendants also note that the

15  Court granted summary judgment in favor of Mr. Kalkhoven as to all statements made after April

16  25, 2000, including all statements regarding inventory, goodwill, and ADVA.  (Summary

17  Judgment Order at 40.)  Finally, Defendants contend there is *no* evidence that any information

18  relied upon by the Court in permitting Plaintiffs' claim related to two statements from JDSU's

19  April 25, 2000 conference call — the only statements still at issue preceding Mr. Kalkhoven's

20  retirement — to go forward was sent to, received by, or discussed with Mr. Kalkhoven.

21          Defendants also contend that the Complaint does not allege insider trading claims

22  pursuant to Section 10(b).  Regardless, the Individual Defendants deny that they sold JDSU stock

23  on the basis of adverse material nonpublic information.  Rather, the Individual Defendants were

24  not in possession of any adverse material non-public information at the time of their challenged

25  stock sales, all of which were made pursuant to their established practices of periodically selling

26  some of their shares and were entirely consistent with their past sales, which were made at a time

27  that Plaintiffs do not accuse them of having adverse, material non-public information about

28  JDSU.  All of the sales by Mr. Kalkhoven were made after his retirement on May 18, 2000, when

1  he was advised to and did sell JDSU stock to reduce his concentration of assets in JDSU stock.

2  Defendants also reserve the right to contest any Section 10(b) claims asserted by the members of

3  the E-TEK and SDL subclasses based upon their receipt of JDSU shares in connection with the E-

4  TEK and SDL mergers, respectively.  Defendants contend that whether those claims are valid is

5  an issue for Phase 2 of these proceedings.

6             **b.**      **Section 14(a) of the Exchange Act and SEC Rule 14a-9**

7         Claim.  The SDL Subclass contends that Defendants Jozef Straus and Anthony Muller

8  violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9

9  promulgated thereunder, in connection with JDSU's acquisition of SDL on February 13, 2001.

10  (Complaint, Thirteenth Claim for Relief.)  Specifically, the SDL Subclass contends that the

11  registration statement and proxy prospectus contained in the Form S-4 filed with the SEC on

12  November 17, 2000 misstated the value of JDSU's goodwill.  CRPTF contends that the statement

13  was false because the balance sheets incorporated into the November 17 registration statement

14  and proxy prospectus included approximately $14.3 billion of impaired goodwill arising from

15  JDSU's acquisition of E-TEK.  (*See* Exhibit A, Statement 35.)  CRPTF contends that as the truth

16  emerged through leakage and when JDSU announced on April 24, 2001 that it would write down

17  its goodwill, the price of JDSU stock fell, causing the SDL Subclass to suffer damages.

18        Defenses.  Dr. Straus and Mr. Muller deny that they are liable for the alleged violations.

19  (Neither JDSU, Mr. Kalkhoven, nor Mr. Abbe are defendants to this claim.)  In particular,

20  Defendants contend that JDSU's accounting at all times complied with GAAP, and that the

21  registration statements and proxy prospectuses accurately stated the value of JDSU's goodwill.

22  Defendants contend that they acted at all times in good faith, and Defendants based their

23  statements on the best information that was available to them at the time of the challenged

24  Registration Statements, and believed their statements to be true and did not act with scienter or

25  fail to use ordinary or reasonable care.  Defendants also contend that Plaintiffs cannot show

26  causation as required by Section 14(a).  Further, Defendants deny that Plaintiffs suffered damages

27  as a result of the alleged overstatement of goodwill in the November 17, 2000 Registration

28

1 Statement, or that there were any "leakage" events or other disclosures that revealed the alleged

2 falsity of JDSU's prior goodwill accounting.

3 ### c.      Section 20(a) of the Exchange Act

4 Claim.  CRPTF contends that the Individual Defendants were controlling persons with

5 respect to JDSU as defined under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  As

6 controlling persons under Section 20(a), CRPTF contends that the Individual Defendants are

7 liable for any violations of Sections 10(b) that JDSU committed.  (Complaint, Fourteenth Claim

8 for Relief.)

9 Defenses.  The Individual Defendants assert that they are not liable as controlling persons

10 because they did not directly or indirectly induce the act or acts constituting any alleged violation

11 or cause of action, because they acted at all times in good faith, and because they did not exert

12 actual power or control over the person who committed the alleged violation at the time of the

13 alleged violation.  In its Summary Judgment Order, the Court determined that Mr. Kalkhoven was

14 not a controlling person of JDSU after May 18, 2000.  (Summary Judgment Order at 40.)

15 ### d.      Section 20A of the Exchange Act

16 Claim.  CRPTF contends that the Individual Defendants engaged in insider trading in

17 violation of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, because each Individual

18 Defendant sold JDSU stock while in the possession of adverse material, non-public information

19 and members of the Class purchased JDSU stock contemporaneously with the Individual

20 Defendants and suffered damages when they sold their shares at a loss.  (Complaint, Fifteenth

21 Claim for Relief.)  CRPTF contends that the Individual Defendants' sales of JDSU stock while in

22 possession of material, adverse, non-public information, in violation of Section 10(b) of the

23 Exchange Act, serve as the predicate acts required to prove the Individual Defendants' violations

24 of Section 20A of the Exchange Act.

25 Defenses.  Each Individual Defendant denies that he committed a predicate violation of

26 the Exchange Act or sold JDSU stock on the basis of adverse material nonpublic information.

27 Rather, the Individual Defendants were not in possession of any adverse material non-public

28 information at the time of their challenged stock sales, all of which were made pursuant to their

1   established practices of periodically selling some of their shares and were entirely consistent with

2   their past sales, which were made at a time that Plaintiffs do not accuse them of having adverse,

3   material non-public information about JDSU.  All of the sales by Mr. Kalkhoven were made after

4   his retirement on May 18, 2000, when he was advised to and did sell JDSU stock to reduce his

5   concentration of assets in JDSU stock.  There is only one statement remaining in the case made

6   by Mr. Kalkhoven before the stock sales that allegedly violated Section 20A.

7                          **e.        Section 11 of the Securities Act**

8          <u>Claim</u>.  The SDL Subclass contends that Defendants JDSU, Jozef Straus, and Anthony

9   Muller violated Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, in

10  connection with JDSU's acquisition of SDL on February 13, 2001.  (Complaint, Third Claim for

11  Relief.)  Specifically, the SDL Subclass contends that the registration statements and proxy

12  prospectus ("Registration Statements") contained in Forms S-4 filed with the SEC on

13  November 17, 2000 and February 12, 2001 misstated the value of JDSU's goodwill.  CRPTF

14  contends that these statements were false because the balance sheets incorporated into the

15  Registration Statements included approximately $14 billion of impaired goodwill arising from

16  JDSU's acquisition of E-TEK.  (*See* Exhibit A, Statements 35 & 42.)

17         <u>Defenses</u>.  JDSU, Dr. Straus, and Mr. Muller deny they are liable for the alleged

18  violations.  (Neither Mr. Abbe nor Mr. Kalkhoven is a defendant to this claim.)  In particular,

19  Defendants contend that JDSU's accounting at all times complied with GAAP, and that the

20  Registration Statements accurately stated the value of JDSU's goodwill.  Defendants also assert

21  that the SDL Subclass's claims under the Securities Act are barred by the defense of negative

22  causation, because their claimed loss did not result from any act or omission by Defendants.

23  Defendants further assert that the SDL Subclass cannot recover under the Securities Act because

24  Defendants exercised due diligence and reasonable care and they had a reasonable basis to

25  believe, and did believe, that the challenged statement from the Registration Statement/Proxy-

26  Prospectus for the SDL merger was true when made and did not omit any material fact.

27  Defendants also assert a reliance defense with respect to the allegation that the SDL Registration

28  Statement Proxy-Prospectus misstated the value of JDSU's goodwill by incorporating JDSU's

1  previously-filed financial statements, because Defendants had no reasonable ground to believe,

2  and did not believe, that those financial statements certified by Ernst & Young were false or

3  misleading.  Further, Defendants contend that the February 12, 2001 Form S-4 cannot serve as the

4  basis for Plaintiffs' Section 11 claim, as no shares were issued as part of the JDSU-SDL merger

5  pursuant to that registration statement.

6  #### f.        Section 12(a)(2) of the Securities Act

7  Claim.  The SDL Subclass also contends that JDSU violated Section 12(a)(2) of the

8  Securities Act, 15 U.S.C. § 77l, in connection with JDSU's acquisition of SDL on February 13,

9  2001.  (Complaint, Sixth Claim for Relief.)  Specifically, the SDL Subclass contends that the

10  November 17, 2000 Registration Statement misstated the value of JDSU's goodwill.  CRPTF

11  contends that this statement was false because the balance sheets incorporated into the November

12  17, 2000 Registration Statement included approximately $14 billion of impaired goodwill arising

13  from JDSU's acquisition of E-TEK.  (*See* Exhibit A, Statement 35.)

14  Defenses.  JDSU denies that it is liable for the alleged violations.  (No Individual

15  Defendant is a defendant to this claim.)  In particular, JDSU contends that its accounting at all

16  times complied with GAAP, and that the Registration Statements accurately stated the value of its

17  goodwill.  JDSU also asserts that the SDL Subclass's claims under the Securities Act are barred

18  by the defense of negative causation, because their claimed loss did not result from any act or

19  omission by JDSU.  JDSU further asserts that the SDL Subclass cannot recover under the

20  Securities Act because Defendants exercised reasonable care and did not know, and in the

21  exercise of reasonable care, could not have known, of the alleged misstatement or omission.

22  #### g.        Section 15 of the Securities Act

23  Claim.  CRPTF contends that Jozef Straus and Anthony Muller are controlling persons

24  with respect to JDSU as defined under Section 15 of the Securities Act, 15 U.S.C. § 77o.  As

25  controlling persons under Section 15, defendants Straus and Muller are liable for any violations of

26  Section 11 and/or Section 12(a)(2) that JDSU committed.  (Complaint, Ninth Claim for Relief.)

27  Defenses.  Dr. Straus and Mr. Muller assert that they are not liable as controlling persons

28  because they had no knowledge of or reasonable grounds to believe in the existence of the facts

1  by reason of which the liability of the controlled person is alleged to exist, because they did not

2  exert actual power or influence over the person who committed the alleged violation at the time

3  of the alleged violation, because they were not culpable participants in the activity that is alleged

4  to have been unlawful, and because they acted at all times in good faith.

5  **B.   RELIEF PRAYED**

6  CRPTF reserves the right to pursue both aggregate and per share damages for the claims

7  set forth above.  CRPTF's claimed aggregate damages are set forth in the table attached as

8  Exhibit B.  Per share damages are attached as Exhibits C-1 and C-2.  CRPTF's expert on damages

9  is expected to be Dr. Scott Hakala.

10  Defendants deny that Plaintiffs are entitled to the relief sought, and Defendants seek

11  judgment that they are not liable under the Securities Act or the Exchange Act, and that Plaintiffs

12  have no damages.  To the extent that the jury finds Defendants liable for any of the claims

13  asserted, Defendants contend that Plaintiffs' claimed aggregate damages are based on subjective

14  and otherwise flawed methodologies and have no basis in fact or law.  (As noted below,

15  Defendants may move the Court to exclude the supplemental report of Plaintiffs' damages expert,

16  Dr. Hakala.)  Defendants also contend that determination of damages, if any is necessary, in the

17  first phase of trial should be limited to a finding of per-share inflation per day, followed by a

18  second phase of proceedings during which actual damages will be determined for each class

19  member.  Defendants' witness on the issues of causation, materiality and damages is expected to

20  be Dr. Alan Kleidon.

21  **II.   THE FACTUAL BASIS OF THE ACTION**

22  **A.   UNDISPUTED FACTS**

23  Listed below are the relevant facts that are not reasonably disputed by any party to this

24  action.

25  1.   JDS Uniphase Corporation ("JDSU") was formed by the merger of JDS Fitel,

26  Inc.("JDS Fitel") and Uniphase Corporation ("Uniphase").  JDS Fitel and Uniphase combined

27  their operations on June 30, 1999, and the merger closed on July 6, 1999.  JDSU, a corporation

28  organized under the laws of Delaware and headquartered in Milpitas, California, is a leading

1    manufacturer of, among other things, optical products for telecommunications and service

2    providers, cable operators, and network equipment manufactures.

3         2.    Kevin Kalkhoven, the former CEO of Uniphase Corporation, was the CEO and

4    Co-Chairman of JDSU from the closing of the JDS Fitel-Uniphase merger through May 17, 2000.

5    Mr. Kalkhoven was not involved in JDSU's management after that date.  (Summary Judgment

6    Order at 40.)

7         3.    Jozef Straus, the former CEO of JDS Fitel, was the President and Chief Operating

8    Officer ("COO") and Co-Chairman of JDSU from the closing of the JDS Fitel-Uniphase merger

9    through May 17, 2000.  From May 18, 2000, through the end of the Class Period, Dr. Straus was

10   CEO and Co-Chairman of JDSU.

11        4.    Anthony Muller, the former CFO of Uniphase, was the CFO of JDSU from the

12   closing of the JDS Fitel-Uniphase merger through the end of the Class Period.

13        5.    Charles Abbe, the former CEO of OCLI, joined JDSU upon the closing of the

14   JDSU-OCLI merger on February 4, 2000, and served as JDSU's Senior Operations Officer

15   through May 17, 2000.  On May 18, 2000, Mr. Abbe became President and Chief Operating

16   Officer of JDSU.  In January 2001, Mr. Abbe took on the additional role of acting president of

17   JDSU's Fiberoptics Product Group ("FPG"), and in February 2001, Mr Abbe became President

18   and COO of JDSU's WDM, Switching, and Thin Films Product Group.  Mr. Abbe retired from

19   JDSU in June 2001.

20                    JDSU's Financial Reporting and Accounting

21        6.    JDSU's fiscal year began on July 1 and ended on June 30 of each year.  Thus,

22   Fiscal 2000 ran from July 1, 1999, through June 30, 2000, and Fiscal 2001 ran from July 1, 2000,

23   through June 30, 2001.

24        7.    JDSU's independent auditor throughout the Class Period was Ernst & Young, LLP

25   ("Ernst & Young").

26        8.    Ernst & Young reviewed each of JDSU's quarterly financial statements and

27   audited each of JDSU's year-end financial statements during the Class Period.

28

9.      Ernst & Young issued unqualified audit opinions for JDSU's financial statements for the fiscal years that ended on June 30, 2000, and June 30, 2001.

10.     JDSU's quarterly revenues and pro forma earnings per share from the completion of the JDS Fitel-Uniphase merger through the end of the Class Period were as follows:

| Quarter | Q1 FY2000 July-Sept. 1999 | Q2 FY2000 Oct.-Dec. 1999 | Q3 FY2000 Jan.-Mar. 2000 | Q4 FY2000 Apr.-June 2000 | Q1 FY2001 July-Sept. 2000 | Q2 FY2001 Oct.-Dec. 2000 | Q3 FY2001 Jan.-Mar. 2001 | Q4 FY2001 Apr.-June 2001 |
|---|---|---|---|---|---|---|---|---|
| Revenues (millions) | $230.1 | $281.7 | $394.6 | $524.0 | $786.5 | $925.1 | $920.1 | $601.1 |
| Q/Q | n/a | +22.4% | +40.4% | +32.8% | +22.7% | +17.6% | -0.5% | -35.0% |
| Pro Forma EPS | 0.29 | 0.18 | 0.105 | 0.14 | 0.18 | 0.21 | 0.14 | -0.36 |

11.     The following table accurately reflects the value and classification of the net inventory JDSU reported every quarter from the completion of the JDS Fitel-Uniphase merger through the end of the Class Period, as well as the level of JDSU's inventory reserves at the end of each quarter during that period of time, and the annualized inventory turn figure reported for each quarter during that period of time:

| Quarter | Q1 FY2000 July-Sept. 1999 | Q2 FY2000 Oct.-Dec. 1999 | Q3 FY2000 Jan.-Mar. 2000 | Q4 FY2000 Apr.-June 2000 | Q1 FY2001 July-Sept. 2000 | Q2 FY2001 Oct.-Dec. 2000 | Q3 FY2001 Jan.-Mar. 2001 | Q4 FY2001 Apr.-June 2001 |
|---|---|---|---|---|---|---|---|---|
| Raw Materials (Millions) | $39.8 | $55.6 | $72.6 | $159.5 | $190.3 | $267.2 | $334.2 | $132.3 |
| Work in Process (Millions) | $43.5 | $62.4 | $98.9 | $176.7 | $136.0 | $191.0 | $197.7 | $99.2 |
| Finished Goods (Millions) | $14.7 | $16.7 | $25.6 | $39.2 | $68.2 | $35.7 | $141.0 | $56.1 |
| Total Net Inventory (Millions) | $98.0 | $134.7 | $197.1 | $375.4 | $394.5 | $493.9 | $672.9 | $287.6 |
| Inventory Reserves (Millions) | $21.5 | $22.4 | $32.1 | $85.2 | $143 | $172.5 | $312.6 | $705.8 |
| Annualized Inventory Turns | 4.6[4] | 4.3 | 3.9 | 4.0 | 4.0 | 4.0 | 3.6 | 6.7 |

[4] The inventory turn ratio of 4.6 reported for the first quarter of fiscal year 2000 was reported prior to JDSU's acquisition of E-TEK. After the E-TEK acquisition closed on June 30, 2000, JDSU adjusted internally the 4.6 figure to 5.1, to account for acquisitions.

12.     JDSU hosted a conference call for investors on April 25, 2000, after the markets had closed on the East Coast, during which it announced results for the quarter ended March 31, 2000.  Mr. Abbe, Mr. Kalkhoven, Mr. Muller, and Dr. Straus participated in the call.  The parties agree that the transcript attached as Exhibit D accurately reflects, in all material respects, what was said during the April 25, 2000 conference call.

13.     JDSU hosted a conference call for investors on July 26, 2000, after the markets had closed on the East Coast, during which it announced results for the quarter and year ended June 30, 2000.  Mr. Abbe, Mr. Muller, and Dr. Straus participated in the call.  The parties agree that the transcript attached as Exhibit E accurately reflects, in all material respects, what was said during the July 26, 2000 conference call.

14.     On September 1, 2000, JDSU filed a Form 8-K with the SEC.  Mr. Muller signed the September 1, 2000 Form 8-K.

15.     On September 7, 2000, JDSU filed a Form S-4 Registration Statement with the SEC.  The September 7, 2000 Form S-4 contained a Proxy Statement-Prospectus in connection with the JDSU-SDL merger.  Mr. Muller and Dr. Straus signed the September 7, 2000 Form S-4.

16.     On September 28, 2000, JDSU filed with the SEC a Form 10-K for the fiscal year ended June 30, 2000.  Mr. Muller and Dr. Straus signed the September 28, 2000 Form 10-K.

17.     JDSU hosted a conference call for investors on October 26, 2000, after the markets had closed on the East Coast, during which it announced results for the quarter ended September 30, 2000.  Mr. Abbe, Mr. Muller, and Dr. Straus participated in the call.  The parties agree that the transcript attached as Exhibit F accurately reflects, in all material respects, what was said during the October 26, 2000 conference call.

18.     On November 14, 2000, JDSU filed with the SEC a Form 10-Q for the quarter ended September 30, 2000.  Mr. Muller signed the November 14, 2000 Form 10-Q.

19.     On November 17, 2000, JDSU filed with the SEC a Form S-4/A Amended Registration Statement.  The November 17, 2000 Form S-4/A contained a Proxy Statement-Prospectus in connection with the JDSU-SDL merger.  Mr. Muller and Dr. Straus signed the

1   November 17, 2000 Form S-4/A.  On November 17, 2000, the SEC declared effective the

2   November 17, 2000 Registration Statement.

3        20.     On January 25, 2001, after the markets had closed on the East Coast, JDSU issued

4   a press release entitled "JDS Uniphase Announces Second Quarter Results; Sales Increase 18%

5   from the First Quarter."

6        21.     JDSU hosted a conference call for investors on January 25, 2001, after the markets

7   had closed on the East Coast, during which it announced results for the quarter ended

8   December 30, 2000.  Mr. Abbe, Mr. Muller, and Dr. Straus participated in the call.  The parties

9   agree that the transcript attached as Exhibit G accurately reflects, in all material respects, what

10  was said during the January 25, 2001 conference call.

11       22.     On February 12, 2001, JDSU filed with the SEC a Form S-4.  Mr. Muller and Dr.

12  Straus signed the February 12, 2001 Form S-4.

13       23.     On February 13, 2001, after the markets had closed on the East Coast, JDSU

14  issued a press release entitled "JDS Uniphase and SDL Merger Completed – Sale of Zurich

15  Subsidiary to Nortel Networks Completed."

16       24.     JDSU hosted a conference call for investors on February 13, 2001, after the

17  markets had closed on the East Coast, during which it announced the completion of its merger

18  with SDL.  Mr. Abbe, Mr. Muller, and Dr. Straus participated in the call.  The parties agree that

19  the transcript attached as Exhibit H accurately reflects, in all material respects, what was said

20  during the February 13, 2001 conference call.

21       25.     On February 13, 2001, JDSU filed with the SEC a Form 10-Q for the quarter

22  ended December 30, 2000.  Mr. Muller signed the February 13, 2001 Form 10-Q.

23       26.     On February 13, 2001, the same day that JDSU's merger with SDL closed, JDSU

24  completed the sale of its Zurich plant to Nortel Networks ("Nortel"), one of JDSU's largest

25  customers.  As payment for its Zurich plant, JDSU accepted $2.5 billion in Nortel stock.  Nortel

26  agreed to pay an additional $500 million in Nortel stock if Nortel did not achieve certain purchase

27  commitments under new and existing programs.

28

1       27.     On February 15, 2001, after the markets had closed on the East Coast, Nortel

2   issued a press release reducing its guidance for 2001 "[b]ased on a Faster and More Severe U.S.

3   Economic Downturn."  Nortel's stock, which closed at $29.75 on February 15, 2001, lost 32% of

4   its value the next day, closing at $20.00 on February 16, 2001.

5       28.     On March 6, 2001, JDSU filed with the SEC a Form 8-K lowering its revenue

6   projection for the quarter ending March 31, 2001, to approximately $925 million.

7       29.     On March 23, 2001, JDSU filed with the SEC a Form 8-K/A, which amended the

8   Form 8-K that JDSU filed with the SEC on February 26, 2001.  Mr. Muller signed the March 23,

9   2001 Form 8-K/A.

10       30.     On April 24, 2001, JDSU issued a press release entitled "JDS Uniphase

11   Announces Third Quarter Results and Global Realignment Program."

12       31.     JDSU hosted a conference call for investors on April 24, 2001, before the markets

13   opened on the East Coast, during which it announced results for the quarter ended March 31,

14   2001.  Mr. Muller and Dr. Straus participated in the call.  The parties agree that the transcript

15   attached as Exhibit I accurately reflects, in all material respects, what was said during the

16   April 24, 2001 conference call.

17       32.     On May 11, 2001, JDSU filed with the SEC a Form 10-Q for the quarter ended

18   March 31, 2001.  Mr. Muller signed the May 11, 2001 Form 10-Q.

19       33.     On June 14, 2001, JDSU issued a press release entitled "JDS Uniphase Revises

20   Outlook."

21       34.     On July 26, 2001, JDSU issued a press release entitled "JDS Uniphase Announces

22   Fourth Quarter Results."

23       35.     JDSU hosted a conference call for investors on July 26, 2001, after the markets

24   had closed on the East Coast, during which it announced results for the quarter and year ended

25   June 30, 2001.

26                         JDSU's Mergers and Acquisitions

27       36.     JDS Uniphase Corporation ("JDSU") was created by the merger of JDS Fitel, Inc.,

28   headquartered in Ottawa, Canada, and Uniphase Corporation, headquartered in San Jose,

1   California.  JDS Fitel and Uniphase Corporation combined their operations on June 30, 1999, and

2   the merger officially closed on July 6, 1999.

3       37.    On January 17, 2000, JDSU's Board of Directors authorized and approved the

4   acquisition of E-TEK Dynamics, Inc. ("E-TEK").

5       38.    JDSU and E-TEK announced on January 17, 2000, that they intended to merge.

6   E-TEK, headquartered in San Jose, California, was a leader in the design and manufacturing of

7   passive optical components and modules, including wavelength division multiplexers ("WDMs"),

8   isolators, and couplers.

9       39.    E-TEK's shareholders voted to approve the merger on June 28, 2000, and the

10  merger closed on June 30, 2000.

11      40.    On July 9, 2000, JDSU's Board of Directors authorized and approved the

12  acquisition of SDL, Inc. ("SDL").

13      41.    JDSU and SDL announced on July 10, 2000, that they intended to merge.

14      42.    On February 12, 2001, the shareholders of JDSU and SDL voted to approve the

15  merger, and the merger closed on February 13, 2001.

16  <center>JDSU's Stock Splits</center>

17      43.    JDSU's common stock split 2-for-1, meaning that investors received two shares of

18  (or options to buy) JDSU stock for every share (or option to buy) that they held, on:  July 27,

19  1999, December 30, 1999, and on March 10, 2000.  In addition, JDS Fitel's common stock split

20  3-for-1 on April 15, 1998, and Uniphase common stock split 2-for-1 on June 4, 1996, and

21  November 13, 1997.

22      44.    The stock price table attached as Exhibit J accurately reflects the split-adjusted

23  price of JDSU's common stock on the dates indicated.

24  <center>Stock Sales</center>

25      45.    The table attached as Exhibit K accurately reflects the "trading windows" during

26  which the Individual Defendants were permitted, pursuant to JDSU policy, to sell JDSU stock.

27      46.    As of July 31, 2000, Mr. Kalkhoven was no longer subject to JDSU's "trading

28  windows."

47. The table attached as Exhibit L accurately reflects the beneficial holdings (the amount of JDSU shares plus vested options to purchase JDSU shares) held by Mr. Abbe, Mr. Muller, and Dr. Straus at the end of each open trading window from the close of the JDS Fitel-Uniphase merger through July 26, 2001.[5]

48. The table attached as Exhibit M accurately reflects Mr. Abbe's exercises of options to buy and sales of JDSU securities from the completion of the JDSU-OCLI merger in February 2000 through July 26, 2001.

49. The table attached as Exhibit N reflects Mr. Kalkhoven's exercises of options to buy and sales of JDSU securities from the completion of the JDS Fitel-Uniphase merger in 1999 through July 26, 2001, as well as his vested holdings during that period.[6]

50. The table attached as Exhibit O accurately reflects Mr. Muller's exercises of options to buy and sales of JDSU securities from the completion of the JDS Fitel-Uniphase merger in 1999 through July 26, 2001.

51. The table attached as Exhibit P accurately reflects Dr. Straus's exercises of options to buy and sales of JDSU securities from the completion of the JDS Fitel-Uniphase merger in 1999 through July 26, 2001.

**B.    DISPUTED FACTUAL ISSUES**

Listed below are the disputed factual issues which remain to be decided.

APRIL 25 CONFERENCE CALL

1. Whether the statement that "we do have 4x planned, three months later that 4x is only 2x, and so we've got to continuously — this is a continuous update to 4x, and we, as Kevin indicated, the market is exceeding, you know, our ability to ramp up before you," made during the question-and-answer portion of JDSU's April 25, 2000 conference call with investors was, in context, false or misleading.  (*See* Exhibit A, Statement 2.)

---

[5] Plaintiffs contend that the total holdings data in Exhibit L are irrelevant and do not stipulate to the accuracy of that information.

[6] Counsel for Plaintiffs and Mr. Kalkhoven have not yet reached agreement as to the accuracy of the information in Exhibit N.  They are continuing to meet and confer on the issue, and will inform the Court about the outcome of those discussions shortly, and provide an updated Exhibit N, if necessary.

2. Whether the following statement, made during JDSU's April 25, 2000 conference call, was, in context, false or misleading:

> As you know, there are really three markets that we serve. The largest to date is long-haul and its related submarine technology. Cable television is the second, and the biggest long-term market, which is still nascent but approaching is metro, and we expect it to add significantly to the demand in calendar 2001. In all of these markets, the demand for bandwidth technology and components remains incredibly strong, and I believe we will see this demand accelerated. (*See* Exhibit A, Statement 3.)

3. Whether either challenged statement made during JDSU's April 25, 2000 conference call was material.

4. Whether either challenged statement made during JDSU's April 25, 2000 conference call was made with scienter.

5. Whether any challenged forward-looking statement made during JDSU's April 25, 2000 conference call is protected by the Reform Act's safe harbor provisions.

6. Whether any challenged forward-looking statement made during JDSU's April 25, 2000 conference call is protected by the "bespeaks caution" doctrine.

7. Whether the speaker made any challenged statement of opinion or belief during JDSU's April 25, 2000 conference call with knowledge that it was false.

8. Whether the speaker genuinely believed any challenged projection made during JDSU's April 25, 2000 conference call.

9. Whether the speaker had a reasonable basis for his belief in the accuracy of any challenged projection made during JDSU's April 25, 2000 conference call.

10. Whether any challenged projection made during JDSU's April 25, 2000 conference call ultimately came true.

11. Whether either challenged statement made during JDSU's April 25, 2000 conference call caused the injury or loss claimed by CRPTF.

12. If either challenged statement made during JDSU's April 25, 2000 conference call caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

JULY 26, 2000 CONFERENCE CALL

13.     Whether the statement that "[t]wo-and-a-half-gigabit modulators continue to demonstrate strong growth," made during JDSU's July 26, 2000 conference call with investors, was, in context, false or misleading.  (*See* Exhibit A, Statement 11.)

14.     Whether the challenged statement made during JDSU's July 26, 2000 conference call was material.

15.     Whether the challenged statement made during JDSU's July 26, 2000 conference call was made with scienter.

16.     Whether any challenged forward-looking statement made during JDSU's July 26, 2000 conference call is protected by the Reform Act's safe harbor provisions.

17.     Whether any challenged forward-looking statement made during JDSU's July 26, 2000 conference call is protected by the "bespeaks caution" doctrine.

18.     Whether the speaker made any challenged statement of opinion or belief during JDSU's July 26, 2000 conference call with knowledge that it was false.

19.     Whether the speaker genuinely believed any challenged projection made during JDSU's July 26, 2000 conference call.

20.     Whether the speaker had a reasonable basis for his belief in any challenged projection made during JDSU's July 26, 2000 conference call.

21.     Whether any challenged projection made during JDSU's July 26, 2000 conference call ultimately came true.

22.     Whether the challenged statement made during JDSU's July 26, 2000 conference call caused the injury or loss claimed by CRPTF.

23.     If the challenged statement made during JDSU's July 26, 2000 conference call caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

SEPTEMBER 1, 2000 FORM 8-K

24.     Whether the statement contained in JDSU's September 1, 2000 Form 8-K that as of June 30, 2000, the value of JDSU's intangible assets was $22.3 billion, including goodwill of

1  $21.3 billion, at June 30, 2000, was, in context, false or misleading.  (*See* Exhibit A,

2  Statement 15.)

3       25.    Whether the challenged statement from JDSU's September 1, 2000 Form 8-K was

4  materially false or misleading.

5       26.    Whether the challenged statement from JDSU's September 1, 2000 Form 8-K was

6  made with scienter.

7       27.    Whether the challenged statement from JDSU's September 1, 2000 Form 8-K

8  caused the injury or loss claimed by CRPTF.

9       28.    If the challenged statement JDSU's September 1, 2000 Form 8-K caused the injury

10  or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of

11  the Class Period.

12  <div align="center">SEPTEMBER 7, 2000 FORM S-4</div>

13       29.    Whether the statement contained in the September 7, 2000 Form S-4 that the value

14  of JDSU's intangible assets, including goodwill, was $22.3 billion at June 30, 2000, was, in

15  context, false or misleading.  (*See* Exhibit A, Statement 16.)

16       30.    Whether the challenged statement from JDSU's September 7, 2000 Form S-4 was

17  materially false or misleading.

18       31.    Whether the challenged statement from JDSU's September 7, 2000 Form S-4 was

19  made with scienter.

20       32.    Whether the challenged statement from JDSU's September 7, 2000 Form S-4

21  caused the injury or loss claimed by CRPTF.

22       33.    If the challenged statement from JDSU's September 7, 2000 Form S-4 caused the

23  injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each

24  day of the Class Period.

25  <div align="center">OCTOBER 26, 2000 CONFERENCE CALL</div>

26       34.    Whether the statement that "because we still are supply or capacity constrained,

27  we are continually talking with our customers about the lead-time process," made during the

28

question-and-answer portion of JDSU's October 26, 2000 conference call with investors, was, in context, false or misleading.  (*See* Exhibit A, Statement 26.)

35.     Whether the statement that "[n]o, we are firing on all cylinders," made during the question-and-answer portion of JDSU's October 26, 2000 conference call, was, in context, false or misleading.  (*See* Exhibit A, Statement 29.)

36.     Whether the statement that "[t]hese results reflect a continuing surge of demand in the fiberoptic communications industry, our broad product line, our extensive customer relationships, and our substantial progress in expanding capacity to enable us to meet customer demand and serve the needs of our markets," made during JDSU's October 26, 2000 conference call, was, in context, false or misleading.  (*See* Exhibit A, Statement 30.)

37.     Whether any challenged statement made during JDSU's October 26, 2000 conference call was material.

38.     Whether any challenged statement made during JDSU's October 26, 2000 conference call was made with scienter.

39.     Whether any challenged forward-looking statement made during JDSU's October 26, 2000 conference call is protected by the Reform Act's safe harbor provisions.

40.     Whether any challenged forward-looking statement made during JDSU's October 26, 2000 conference call is protected by the "bespeaks caution" doctrine.

41.     Whether the speaker made any challenged statement of opinion or belief during JDSU's July 26, 2000 conference call with knowledge that it was false.

42.     Whether the speaker genuinely believed any challenged projection made during JDSU's October 26, 2000 conference call.

43.     Whether the speaker had a reasonable basis for his belief in any challenged projection made during JDSU's October 26, 2000 conference call.

44.     Whether any challenged projection made during JDSU's October 26, 2000 conference call ultimately came true.

45.     Whether any challenged statement made during JDSU's October 26, 2000 conference call caused the injury or loss claimed by CRPTF.

1    46.    If any challenged statement made during JDSU's October 26, 2000 conference call

2    caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share

3    basis on each day of the Class Period.

4                            OCTOBER 30, 2000 FORM S-3

5    47.    Whether JDSU's Form S-3 Registration Statement filed with the SEC on

6    October 30, 2000, was false or misleading because it incorporated JDSU's September 1, 2000

7    Form 8-K and the value of goodwill stated in that Form 8-K.  (*See* Exhibit A, Statement 32.)

8    48.    Whether the challenged goodwill statement from JDSU's October 30, 2000

9    Form S-3 was materially false or misleading.

10    49.    Whether the challenged goodwill statement from JDSU's October 30, 2000

11    Form S-3 was made with scienter.

12    50.    Whether the challenged goodwill statement from JDSU's October 30, 2000

13    Form S-3 caused the injury or loss claimed by CRPTF.

14    51.    If the challenged goodwill statement from JDSU's October 30, 2000 Form S-3

15    caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share

16    basis on each day of the Class Period.

17                            NOVEMBER 14, 2000 FORM 10-Q

18    52.    Whether the statement contained in JDSU's Form 10-Q for the period ended

19    September 30, 2000, filed with the SEC on November 14, 2000, that as of September 30, 2000,

20    JDSU's goodwill was $21.1 billion, was, in context, false or misleading.  (*See* Exhibit A,

21    Statement 34.)

22    53.    Whether the challenged goodwill statement from JDSU's November 14, 2000

23    Form 10-Q was materially false or misleading.

24    54.    Whether the challenged goodwill statement from JDSU's November 14, 2000

25    Form 10-Q was made with scienter.

26    55.    Whether the challenged goodwill statement from JDSU's November 14, 2000

27    Form 10-Q caused the injury or loss claimed by CRPTF.

28

56.     If the challenged goodwill statement from JDSU's November 14, 2000 Form 10-Q caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

**NOVEMBER 17, 2000 FORM S-4**

57.     Whether JDSU's Amended Registration Statement / Proxy - Prospectus filed with the SEC on November 17, 2000, as Amendment No. 1 to Form S-4, was false or misleading because it incorporated JDSU's September 1, 2000 Form 8-K and November 14, 2000 Form 10-Q and the value of JDSU's goodwill stated in those filings.  (*See* Exhibit A, Statement 35.)

58.     Whether the challenged goodwill statements from JDSU's November 17, 2000 Form S-4 were materially false or misleading.

59.     Whether there is a substantial likelihood that a reasonable shareholder would have considered the challenged goodwill statements from JDSU's November 17, 2000 Form S-4 important in deciding how to vote on the merger.

60.     Whether the challenged goodwill statements from JDSU's November 17, 2000 Form S-4 were made with scienter.

61.     Whether the challenged goodwill statements from JDSU's November 17, 2000 Form S-4 were made negligently.

62.     Whether the challenged goodwill statements from JDSU's November 17, 2000 Form S-4 caused the injury or loss claimed by CRPTF.

63.     If the challenged goodwill statements from JDSU's November 17, 2000 Form S-4 caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

64.     Whether Defendants acted with reasonable diligence, had reasonable ground to believe, and did believe on November 17, 2000, that the challenged goodwill statements from JDSU's November 17, 2000 Form S-4 were accurate and that there was no omission that made it materially misleading.

65.     Whether Defendants had no reasonable ground to believe, and did not believe, that the financial statements certified by Ernst & Young and incorporated by reference by the

1  November 17, 2000 Form S-4 were untrue or that there was an omission to state a material fact

2  required to be stated to make those financial statements not misleading.

3       66.    Whether Defendants did not know, and in the exercise of reasonable care, could

4  not have known, of the alleged material misstatement or omission.

5  <center>JANUARY 25, 2001 CONFERENCE CALL</center>

6       67.    Whether the statement that "[w]e don't expect lead times to come down in the

7  near-term because our demand is so strong," made during the question-and-answer portion of

8  JDSU's January 25, 2001 conference call with investors, was, in context, false or misleading.

9  (*See* Exhibit A, Statement 36.)

10       68.    Whether the statement that "[o]ur backlog, as you implied, is enormous and we do

11  expect some new customers to emerge," made during the question-and-answer portion of JDSU's

12  January 25, 2001 conference call, was, in context, false or misleading.  (*See* Exhibit A,

13  Statement 37.)

14       69.    Whether the guidance provided during JDSU's January 25, 2001 conference call

15  for earnings-per-share of $0.82 for the year ending June 30, 2001, was, in context, false or

16  misleading.  (*See* Exhibit A, Statement 38.)

17       70.    Whether the statement that "[w]e anticipate sales in the March quarter to be 7

18  percent to 10 percent above sales for the quarter ended December 30," made during JDSU's

19  January 25, 2001 conference call, was, in context, false or misleading.  (*See* Exhibit A,

20  Statement 39.)

21       71.    Whether any challenged statement made during JDSU's January 25, 2001

22  conference call was material.

23       72.    Whether any challenged statement made during JDSU's January 25, 2001

24  conference call was made with scienter.

25       73.    Whether the speaker made any challenged statement of opinion or belief with

26  knowledge that it was false during JDSU's January 25, 2001 conference call.

27       74.    Whether any challenged forward-looking statement made during JDSU's

28  January 25, 2001 conference call is protected by the Reform Act's safe harbor provisions.

75.     Whether any challenged forward-looking statement made during JDSU's January 25, 2001 conference call is protected by the "bespeaks caution" doctrine.

76.     Whether the speaker genuinely believed any challenged projection made during JDSU's January 25, 2001 conference call.

77.     Whether the speaker had a reasonable basis for his belief in any challenged projection made during JDSU's January 25, 2001 conference call.

78.     Whether any challenged statement made during JDSU's January 25, 2001 conference call caused the injury or loss claimed by CRPTF.

79.     If any challenged statement made during JDSU's January 25, 2001 conference call caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

### JANUARY 25, 2001 PRESS RELEASE

80.     Whether JDSU misstated the value of its inventories in its January 25, 2001 Press Release announcing results for the quarter ended December 30, 2000. (*See* Exhibit A, Statement 40.)

81.     Whether the challenged inventory statement from JDSU's January 25, 2001 Press Release was materially false or misleading.

82.     Whether the challenged inventory statement from JDSU's January 25, 2001 Press Release was made with scienter.

83.     Whether the challenged inventory statement from JDSU's January 25, 2001 Press Release caused the injury or loss claimed by CRPTF.

84.     If the challenged inventory statement from JDSU's January 25, 2001 Press Release caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

### FEBRUARY 12, 2001 FORM S-4

85.     Whether JDSU's Registration Statement on Form S-4 filed with the SEC on February 12, 2001, which incorporated JDSU's November 17, 2000 Form S-4, was false or misleading because it misstated JDSU's goodwill. (*See* Exhibit A, Statement 42.)

86.     Whether the challenged goodwill statement from JDSU's February 12, 2001 Form S-4 was materially false or misleading.

87.     Whether the challenged goodwill statement from JDSU's February 12, 2001 Form S-4 was made with scienter.

88.     Whether the challenged goodwill statement from JDSU's February 12, 2001 Form S-4 caused the injury or loss claimed by CRPTF.

89.     If the challenged goodwill statement from JDSU's February 12, 2001 Form S-4 caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

FEBRUARY 13, 2001 PRESS RELEASE

90.     Whether the statement contained in JDSU's February 13, 2001 Press Release announcing the completion of the JDSU - SDL merger that "[t]he Company expects sales in the quarter ending March 31 to be at or slightly above $1 billion with earnings per share of $0.17" was, in context, false or misleading.  (*See* Exhibit A, Statement 43.)

91.     Whether the challenged statement from JDSU's February 13, 2001 Press Release was material.

92.     Whether the challenged statement from JDSU's February 13, 2001 Press Release was made with scienter.

93.     Whether the challenged projection from JDSU's February 13, 2001 Press Release was genuinely believed.

94.     Whether there was a reasonable basis for believing in the challenged projection from JDSU's February 13, 2001 Press Release.

95.     Whether the challenged statement from JDSU's February 13, 2001 Press Release is protected by the Reform Act's safe harbor provisions.

96.     Whether the challenged statement from JDSU's February 13, 2001 Press Release is protected by the "bespeaks caution" doctrine.

97.     Whether the challenged statement from JDSU's February 13, 2001 Press Release caused the injury or loss claimed by CRPTF.

98.     If the challenged statement from JDSU's February 13, 2001 Press Release caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

FEBRUARY 13, 2001 FORM 10-Q

99.     Whether the statement contained in JDSU's Form 10-Q for the period ended December 30, 2000, filed with the SEC on February 13, 2001, that:  "Strong demand for virtually all our optical components and modules products combined with the increased operations resulting from our acquisitions completed subsequent to December 31, 1999 contributed to the increased in gross profit" experienced by JDSU during the period ending December 30, 2000, compared to the same period of the prior year, was, in context, false or misleading.  (*See* Exhibit A, Statement 44.)

100.    Whether the statement contained in JDSU's Form 10-Q for the period ended December 30, 2000, filed with the SEC on February 13, 2001, that JDSU's inventories balance was $493.9 million at December 30, 2000, was, in context, false or misleading.  (*See* Exhibit A, Statement 45.)

101.    Whether the statement contained in JDSU's February 13, 2001 Form 10-Q that JDSU's goodwill was $21.2 billion at December 30, 2000, was, in context, false or misleading. (*See* Exhibit A, Statement 47.)

102.    Whether any challenged statement from JDSU's February 13, 2001 Form 10-Q was materially false or misleading.

103.    Whether any challenged statement from JDSU's February 13, 2001 Form 10-Q was made with scienter.

104.    Whether any challenged statement from JDSU's February 13, 2001 Form 10-Q caused the injury or loss claimed by CRPTF.

105.    If any challenged statement from JDSU's February 13, 2001 Form 10-Q caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

1      MARCH 23, 2001 FORM 8-K/A

2          106.    Whether the statement contained in JDSU's Form 8-K/A filed with the SEC on

3  March 23, 2001, that, on a pro-forma consolidated basis, JDSU and SDL's combined intangible

4  assets, including goodwill, were $60.2 billion at December 30, 2000, was, in context, false or

5  misleading.  (*See* Exhibit A, Statement 48.)

6          107.    Whether the statement contained in JDSU's March 23, 2001 Form 8-K/A that

7  JDSU's inventory balance was $493.9 million at December 30, 2000, was, in context, false or

8  misleading.  (*See* Exhibit A, Statement 49.)

9          108.    Whether either challenged statement from JDSU's March 23, 2001 Form 8-K/A

10 was materially false or misleading.

11         109.    Whether either challenged statement from JDSU's March 23, 2001 Form 8-K/A

12 was made with scienter.

13         110.    Whether either challenged statement from JDSU's March 23, 2001 Form 8-K/A

14 caused the injury or loss claimed by CRPTF.

15         111.    If either challenged statement from JDSU's March 23, 2001 Form 8-K/A caused

16 the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on

17 each day of the Class Period.

18      APRIL 24, 2001 CONFERENCE CALL

19         112.    Whether JDSU's statement during its April 24, 2001 conference call with investors

20 that its pro forma earnings per share was $0.14 for the quarter ended March 31, 2001, was, in

21 context, false or misleading because JDSU did not correctly reserve for its inventory.  (*See*

22 Exhibit A, Statement 50.)

23         113.    Whether JDSU's statement during its April 24, 2001 conference call that its pro

24 forma gross margin was 48.6 percent of sales for the quarter ended March 31, 2001, was, in

25 context, false or misleading because JDSU did not correctly reserve for its inventory.  (*See*

26 Exhibit A, Statement 50.)

27         114.    Whether either challenged statement made during JDSU's April 24, 2001

28 conference call was materially false or misleading.

1      115.    Whether either challenged statement made during JDSU's April 24, 2001

2  conference call was made with scienter.

3      116.    Whether either challenged statement made during JDSU's April 24, 2001

4  conference call caused the injury or loss claimed by CRPTF.

5      117.    If either challenged statement made during JDSU's April 24, 2001 conference call

6  caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share

7  basis on each day of the Class Period.

8                              APRIL 24, 2001 PRESS RELEASE

9      118.    Whether the statement from JDSU's April 24, 2001 Press Release announcing

10  results for the quarter ended March 31, 2001, that "[t]he Company is evaluating the carrying

11  value of certain long-lived assets, consisting primarily of $56.2 billion of goodwill recorded on its

12  balance sheet at March 31, 2001," was, in context, false or misleading.  (*See* Exhibit A,

13  Statement 51.)

14      119.    Whether the Gross Profit reported in the Condensed Consolidated Statements of

15  Operations table contained in JDSU's April 24, 2001 Press Release was, in context, false or

16  misleading because JDSU did not correctly reserve for its inventory.  (*See* Exhibit A,

17  Statement 52.)

18      120.    Whether the Total Assets reported in the Condensed Consolidated Balance Sheets

19  table contained in JDSU's April 24, 2001 Press Release was, in context, false or misleading

20  because JDSU overstated the value of its equity investment in ADVA.  (*See* Exhibit A,

21  Statement 53.)

22      121.    Whether any challenged statement from JDSU's April 24, 2001 Press Release was

23  materially false or misleading.

24      122.    Whether any challenged statement made during JDSU's April 24, 2001 Press

25  Release was made with scienter

26      123.    Whether any challenged statement from JDSU's April 24, 2001 Press Release

27  caused the injury or loss claimed by CRPTF.

28

124. If any challenged statement from JDSU's April 24, 2001 Press Release caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

<div align="center">MAY 11, 2001 FORM 10-Q</div>

125. Whether the statement contained in JDSU's Form 10-Q for the period ended March 31, 2001, filed with the SEC on May 11, 2001, that JDSU's inventories balance was $672.9 million at March 31, 2001, was, in context, false or misleading. (*See* Exhibit A, Statement 54.)

126. Whether the statement contained in JDSU's May 11, 2001 Form 10-Q that the value of JDSU's assets at March 31, 2001, was $65,039.5 million was, in context, false or misleading because it overstated the value of JDSU's investment in ADVA. (*See* Exhibit A, Statement 56.)

127. Whether either challenged statement from JDSU's May 11, 2001 Form 10-Q was materially false or misleading.

128. Whether either challenged statement from JDSU's May 11, 2001 Form 10-Q was made with scienter.

129. Whether either challenged statement from JDSU's May 11, 2001 Form 10-Q caused the injury or loss claimed by CRPTF.

130. If either challenged statement from JDSU's May 11, 2001 Form 10-Q caused the injury or loss claimed by CRPTF, the amount of damages suffered, on a per-share basis on each day of the Class Period.

<div align="center">Controlling Person Liability</div>

131. Whether any Individual Defendant was a "controlling person."

132. Whether CRPTF suffered damages as a result of the actions of any Individual Defendant who was a "controlling person."

133.    If any Individual Defendant was a "controlling person" of a person found to have violated the Exchange Act, whether that Individual Defendant acted in good faith.[7]

134.    If any Individual Defendant was a "controlling person" of a person found to have violated the Securities Act, whether that Individual Defendant had no knowledge of, nor any reasonable ground to believe in the existence of, the facts forming the basis of the Securities Act violation.

Insider Trading

135.    Whether any Individual Defendant committed a predicate violation of the Exchange Act.[8]

136.    Whether any Individual Defendants who committed a predicate violation of the Exchange Act sold JDSU stock while having actual knowledge of nonpublic information about the facts that form the basis of that violation.

137.    Whether any such nonpublic information was material.

138.    Whether Mr. Kalkhoven received material, adverse, non-public information about JDSU after his May 18, 2000 retirement.

139.    Whether any Individual Defendant with actual knowledge of material nonpublic information used that information in formulating and consummating his sale of JDSU stock.[9]

140.    Whether, during August 2000, CRPTF purchased JDSU stock contemporaneously with any Individual Defendant who committed a predicate violation of the Exchange Act and who used material non-public information in selling JDSU stock.

---

[7] In its Summary Judgment Order, the Court granted Mr. Kalkhoven's motion with respect to CRPTF's claims under Section 20(a) of the Exchange Act for every statement after April 25, 2000.

[8] Plaintiffs object to the inclusion of this paragraph as a disputed fact because Plaintiffs assert that they need not prove a predicate violation of the Exchange Act to prove an insider trading violation of Section 10(b). Plaintiffs also assert that an insider trading violation of Section 10(b) constitutes the predicate violation for purposes of the insider trading claims under Section 20A. Defendants contend that the Complaint does not allege insider trading claims pursuant to Section 10(b) and Rule 10b-5.

[9] Plaintiffs object to the inclusion of this paragraph as a disputed fact because Plaintiffs do not agree that there is a "use" element to an insider trading claim under Section 10(b) or Section 20A.

Other

141.     Whether any alleged misstatement was materially misleading in light of information already available to the market and investors.

142.     If there was a violation of any provision of the securities laws, the amount of damages per-share attributable to that violation on each day of the Class Period.[10]

**C.     AGREED STATEMENT**

This action is not, in whole or in part, appropriate for resolution solely on the basis of an agreed statement of facts.

**D.     STIPULATIONS**

1.     The parties stipulate that all documents produced by JDSU to CRPTF for purposes of this litigation are authentic.

2.     The parties stipulate to the authenticity of all published print news articles and publicly-available press releases and analyst reports, but preserve all hearsay objections.

3.     The parties stipulate that JDSU common stock traded actively and openly in an efficient market.

4.     The parties stipulate that, as JDSU common stock was openly traded on a national securities exchange, the purchases or sales of JDSU common stock at issue in this action were effectuated by means of an instrumentality of interstate commerce.

5.     The parties stipulate that all documents listed on any party's exhibit list that JDSU filed with the Securities and Exchange Commission are authentic.

6.     Additional stipulations about evidence are contained in the stipulation regarding uncontested motions *in limine*, filed with the Court on September 18, 2007.

---

[10] As discussed below, if there is a jury finding of liability in the first phase of trial, a second phase should take place to determine individualized issues such as reliance and damages for each class member.  The parties do not yet agree on what additional issues should be reserved for Phase 2.  *See infra* at § V.C.  The parties also disagree about whether damages should be calculated on a per-share basis or an aggregate basis during the first phase of trial.

### III.   DISPUTED LEGAL ISSUES

In addition to the legal issues raised in the parties' Motions *in limine*, filed on September 18, 2007, in the parties' *Daubert* Motions filed on August 31, 2007, and in the parties' trial briefs, the following legal issues remain to be decided:

1.      Whether the JDSU Defendants are liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation Defendants made false or misleading statements of material fact about demand for JDSU's products during the Class Period.  (*See* Exhibit A, Statements 2, 3, 11, 26, 29, 30, 36, 37, 38, 39, 43, 44.)

2.      Whether the JDSU Defendants are liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation that Defendants misrepresented the value of JDSU's inventories by failing to record sufficient inventory reserves by the quarter ended December 30, 2000.  (*See* Exhibit A, Statements 40, 45, 49, 50, 52, 54.)

3.      Whether the JDSU Defendants are liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation that Defendants misrepresented the value of JDSU's goodwill by failing to write down the value of E-TEK goodwill by the quarter ended September 30, 2000.  (*See* Exhibit A, Statements 15, 16, 32, 34, 35, 42, 47, 48, 51.)

4.      Whether the JDSU Defendants are liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation that Defendants misrepresented the value of JDSU's goodwill by including goodwill attributable to SDL on the pro-forma consolidated balance sheet as of December 30, 2000 in JDSU's March 23, 2001 Form 8-K/A, and in the text of JDSU's April 24, 2001 press release.  (*See* Exhibit A, Statements 48, 51.)

5.      Whether the JDSU Defendants are liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation that Defendants misrepresented the value of JDSU's equity investment in ADVA in its April 24, 2001 press release and in its May 11, 2001 Form 10-Q, by failing to write down that investment by the quarter ended December 30, 2000.  (*See* Exhibit A, Statements 53, 56.)

6.      Whether the JDSU Defendants are liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation that the JDSU Defendants knowingly issued false guidance on earnings in 2001.  (*See* Exhibit A, Statement 38.)

7.      Whether the JDSU Defendants are liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation that the JDSU Defendants knowingly issued false guidance on revenues in 2001.  (*See* Exhibit A, Statements 39, 43.)

8.      Whether any Individual Defendant is liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegations that the Individual Defendants traded JDSU's stock while in possession of material adverse non-public information.[11]

9.      Whether Mr. Kalkhoven is liable under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on the allegation that he made a false or misleading statement of material fact about demand for JDSU's products during JDSU's April 25, 2000 conference call with investors, or otherwise is liable under Section 10(b) and Rule 10b-5 for the statement made by Dr. Straus on that call.  (*See* Exhibit A, Statements 2, 3.)

10.     Whether Messrs. Straus and Muller are liable to the SDL Subclass under Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, based on the alleged misstatement of the value of JDSU's goodwill at June 30, 2000 and September 30, 2000, contained in the Registration Statement / Proxy-Prospectus related to JDSU's merger with SDL. (*See* Exhibit A, Statement 35.)

11.     Whether any Individual Defendant is liable as a controlling person under Section 20(a) of the Exchange Act.

12.     Whether any Individual Defendant is liable for insider trading under Section 20A of the Exchange Act to any person who traded contemporaneously with that Individual Defendant.

---

[11] Defendants contend that this is not a relevant "Disputed Legal Issue" issue because the Complaint does not allege insider trading claims pursuant to Section 10(b) and Rule 10b-5.  Plaintiffs contend that the Tenth Claim for Relief in the Complaint contains an insider trading claim pursuant to Section 10(b) and Rule 10b-5.

13.     Whether Messrs. Straus and Muller are liable to the SDL Subclass under Section 11 of the Securities Act, based on the alleged misstatement of the value of JDSU's goodwill at June 30, 2000 and September 30, 2000, contained in the Registration Statement / Proxy-Prospectus related to JDSU's merger with SDL.  (*See* Exhibit A, Statements 35, 42.)

14.     Whether JDSU is liable to the SDL Subclass under Section 12(a)(2) of the Securities Act, based on the alleged misstatement of the value of JDSU's goodwill at June 30, 2000 and September 30, 2000, contained in the Registration Statement / Proxy-Prospectus related to JDSU's merger with SDL.  (*See* Exhibit A, Statement 35.)

15.     Whether Messrs. Abbe, Muller, or Straus are liable as controlling persons under Section 15 of the Securities Act.

## IV.     FURTHER DISCOVERY OR MOTIONS

### A.     Remaining Discovery

1.     On September 13, 2007, the JDSU Defendants filed a motion for leave to supplement disclosures and seek limited discovery.  Mr. Kalkhoven joined that motion on September 17, 2007.  On September 14, 2007, the Court issued an order granting expedited briefing on that motion.  CRPTF opposed on September 20, 2007, and the JDSU Defendants' reply is due on September 24, 2007.  In accordance with the Court's September 14, 2007 order, the motion is set for hearing on September 27, 2007, at 2:00 p.m., or it will be decided on the papers.

2.     On August 22, 2007, Magistrate Judge Laporte determined that Mr. Kalkhoven had not complied with the Court's orders of April 10 and 20, 2007, and ordered Mr. Kalkhoven to produce further documents.  (Aug. 22, 2007 Order at 2:10-12.)  Mr. Kalkhoven produced further responsive documents on September 19 and September 21, 2007.  Plaintiffs contend that Magistrate Judge Laporte's order required Mr. Kalkhoven to complete his production by September 21.  As of this writing Plaintiffs have not received the completed production and reserve the right to seek further relief.  Mr. Kalkhoven expects to complete his production by September 25, which he contends is in compliance with the agreement reached between counsel during the August 21, 2007 hearing before Magistrate Judge Laporte.

### B.    Remaining Motions

1.    CRPTF and Defendants filed *Daubert* motions on August 31, 2007.  The parties filed their oppositions to these motions on September 21, 2007.

2.    CRPTF and Defendants filed their Motions *in limine* on September 18, 2007.  Oppositions are due on September 24, 2007.

3.    On September 14, 2007, the Court granted in part the JDSU Defendants' motion for leave to file a motion for partial reconsideration.  On September 14, 2007, in accordance with that order, the JDSU Defendants filed their motion for partial reconsideration.  CRPTF filed an opposition on September 21, 2007.  The JDSU Defendants' Reply is due on September 26, 2007.  The Court has indicated that the matter will be decided on the papers.

4.    Pursuant to the Summary Judgment Order, Defendants filed their motion to dismiss CRPTF's ADVA claims on September 18, 2007.  Pursuant to the Court's September 20, 2007 Order, CRPTF's opposition is due on September 29, 2007, by noon Pacific time, and Defendants' Reply is due on October 3, 2007.  The Court has indicated that the matter will be heard on October 9, 2007, at 2:00 p.m., or will be decided on the papers before the hearing.

5.    The Court ordered additional briefing on Plaintiffs' motion to dismiss Defendants' negative causation defense to the claims under Sections 11 and 12 of the Securities Act.  That briefing is complete.

6.    Defendants filed a motion for leave to supplement disclosures and seek limited discovery that Plaintiffs have opposed.

7.    Defendants may move to strike the purported supplemental expert report of Plaintiffs' damages expert, Dr. Hakala.  The basis for this motion is that Plaintiffs and Dr. Hakala justify Dr. Hakala's supplemental report as necessary to adjust for changes in the case following the Court's August 24, 2007 Summary Judgment Order, focusing in particular on Statement Nos. 2 and 3, which Dr. Hakala characterized as "statements related specifically to" demand for specific product lines; Dr. Hakala accordingly undertook a statement-by-statement analysis of those events.  This justification is directly contrary to Plaintiffs' opposition to Defendants' motion for leave to seek limited additional discovery, in which they argued that the change of Plaintiffs'

1   theory that Defendants seek to address during discovery was illusory, and that Plaintiffs have

2   been advancing the same theories for many months before Dr. Hakala submitted his opening

3   report.

4   **V.   TRIAL ALTERNATIVES AND OPTIONS**

5         **A.   Settlement Discussions**

6         The parties were scheduled to participate in a mediation session on September 7, 2007,

7   before mediator Hon. Daniel Weinstein (Ret.) in San Francisco, but that session had to be

8   rescheduled due to a death in counsel's family.  The parties expect that the mediation will be

9   rescheduled for a date in October.

10        **B.   Consent to Trial Before a Magistrate Judge**

11        The parties do not consent to a jury trial before a Magistrate Judge.

12        **C.   Bifurcation, Separate Trial of Issues**

13        The parties agree that trial in this action should proceed in two phases.  The parties agree

14  that issues of individualized reliance and damages should be reserved for the second phase of

15  these proceedings.  The parties disagree, however, about whether other issues should be reserved

16  for the second phase of these proceedings.

17        CRPTF's Position:  CRPTF contends that individual issues of reliance and damages are

18  the only issues to be resolved in the second phase.  CRPTF's position is that these issues can be

19  resolved in a court-supervised claims proceeding.

20        Defendants' Position:  Defendants contend that all class-wide issues, including class-wide

21  issues of liability, reliance, causation, and damages, should be tried during Phase 1 of trial.  As

22  discussed more fully in Defendants' concurrently filed Trial Brief, damages issues in Phase 1

23  should be limited to a jury finding of per share damages for each day during the Class Period.  If

24  necessary, the jury then would proceed immediately to a determination of proportionate liability.

25  All issues that are not class-wide should be reserved for the second phase of trial (if necessary).

26  Accordingly, assuming that there is a finding of liability during the initial phase of trial,

27  Defendants propose that the following non-class-wide issues be reserved for Phase 2:

28

- Rebutting the "fraud on the market" presumption of reliance as to any class member, as appropriate;

- Determining actual damages for each class member, based on:  (1) the per share damages on each day of the Class Period determined by the jury during Phase 1; and (2) the actual purchases and sales for each class member; and,

- Determining actual damages for each member of the SDL Subclass, including: (1) whether the purported subclass members "exchanged stock they owned" in SDL for JDSU stock "in connection with JDSU's acquisition" of SDL; (2) the "amount paid" by those subclass members for JDSU stock as part of the exchange transaction; (2) the amount of actual damages suffered by each subclass member, based on the date that each subclass member sold their shares.

## VI.    MISCELLANEOUS

### A.    Verdict Form

CRPTF's Position:  Defendants' verdict form discourages the jury from reaching a verdict by requiring the jury to answer an onerous amount of questions.  CRPTF's verdict form poses all the questions that the law requires, without imposing unnecessary burdens on the jury.  Plaintiffs also object to Defendants' verdict form because it restates some, but not all, of the charges.  The standards for liability are set forth in the charges and should not be restated in the verdict form because it creates potential inconsistencies and grounds for reversal.

Defendants' Position:  Plaintiffs' proposed verdict form is problematic for multiple reasons and should not be given.  Perhaps most importantly, the verdict form fails to require the jury to specifically identify the statements that they find materially false and misleading.  *See* 15 U.S.C. § 78u-4(b)(1).  Plaintiffs challenge numerous statements over a long period of time, made by several authors and speakers.  The parties and the Court will need to know which statements the jury found false and misleading for, among other things, the subsequent phases of this proceeding and any post-trial challenges to the jury's verdict.  Similarly, the form does not require the jury to identify any trades that they find violated Section 20A.  That information is

1    essential for the subsequent phases of this proceeding.  Likewise, Plaintiffs' form also fails

2    to acknowledge that all defendants are not even charged with liability for all of the statements

3    remaining in the case -- for example, that Mr. Kalkhoven cannot be liable under Sections 10(b) or

4    20(a) for any statements after April 25, 2000.  Other Individual Defendants cannot be liable on

5    certain claims under Section 14 of the 1934 Act, and Sections 11, 12 and 15 of the 1933 Act.

6           The verdict form also dramatically oversimplifies, and in some instances misstates, the

7    findings the jury must make to conclude that any defendant was liable under a particular claim.

8    For example, the form fails to identify the correct scienter standards for Section 10(b) forward-

9    looking and non-forward looking statements.  The form fails to identify any of the defenses (for

10   example, that the defendant acted in good faith) that the jury must reject before it can find

11   liability.

12          There are several other problems with Plaintiffs' proposed form, which on the whole

13   ignores the prevailing legal standards, the number of statements at issue in the case and the

14   manifest differences between the various defendants.  Defendants suggest that the Court require

15   the parties to meet and confer and submit revised proposed verdict forms after the Court has ruled

16   on all pretrial motions.  Those rulings will affect the final verdict form.

17          **B.    Witness Lists**

18          CRPTF's Position:  Plaintiffs submitted their witness list in good faith.  The preparation

19   of the Pretrial Order in this complex litigation has involved a tremendous amount of work.  In

20   addition, during the preparation of the pretrial order, Defendants have made a number of motions,

21   many of which are baseless, that have prevented Plaintiffs from conducting the analysis of the

22   evidence needed to shorten Plaintiffs' witness list.

23          Defendants' Position:  Defendants reserve the right to object to the list of intended trial

24   witnesses that Plaintiffs submit to the Court.  The proposed witness list exchanged by Plaintiffs as

25   part of the pretrial meet-and-confer process identified more than 45 witnesses that Plaintiffs

26   "expect to present" and more than 25 additional witnesses that Plaintiffs "may call" at trial.

27   There is no question that Plaintiffs' list identified more witnesses than Plaintiffs possibly could

28   call during trial.  For that reason, Defendants contend that Plaintiffs' proposed witness list did not

1   in good faith disclose the witnesses that Plaintiffs actually intend to call at trial.  If Plaintiffs' final

2   list has this same defect, Defendants reserve the right to object on those, or other appropriate,

3   grounds.

4       **C.      Exhibit Lists**

5       CRPTF's Position:  Defendants preliminary exhibit list contains approximately 2,300

6   exhibits.  There is no question that Defendants' list identified more exhibits than Defendants

7   could possibly use during trial.  Plaintiffs contend that Defendants' exhibit list did not in good

8   faith disclose the exhibits Defendants intend to offer at trial.  If Defendants' final list has this

9   same defect, Plaintiffs reserve the right to object on those, or other appropriate grounds.

10      Defendants' Position:  Defendants' exhibit list in good faith disclosed the exhibits that

11  Defendants may be required to introduce at trial.  The breadth of Defendants' exhibit list was

12  necessitated by Plaintiffs' late addition of numerous additional challenged statements and new

13  theories of liability, the over-breadth of Plaintiffs' witness list, and Plaintiffs' failure to provide

14  promptly sponsoring witness information.

1   Dated:  September 24, 2007                    Barbara J. Hart
                                                  Jonathan M. Plasse
2                                                 Mark S. Arisohn
                                                  Anthony J. Harwood
3                                                 Michael Stocker (179083)
                                                  Stefanie J. Sundel
4                                                 LABATON SUCHAROW LLP
                                                  140 Broadway
5                                                 New York, New York 10005
                                                  Telephone:  (212) 907-0700
6                                                 Facsimile:  (212) 818-0477

7                                                      - and -

8

9                                                 Joseph J. Tabacco, Jr.
                                                  Christopher T. Heffelfinger
10                                                BERMAN DeVALERIO PEASE
                                                       TABACCO BURT & PUCILLO
11                                                425 California Street, Suite 2025
                                                  San Francisco, CA 94104-2205
12                                                Telephone: (415) 433-3200
                                                  Facsimile: (415) 433-6382
13

14                                                By: _____/s/  Anthony J. Harwood_____
                                                         Anthony J. Harwood
15

16                                                Attorneys for Lead Plaintiff
                                                  Connecticut Retirement Plans and Trust
17                                                Fund

18
     Dated: September 24, 2007                    James P. Bennett
19                                                Jordan Eth
                                                  Terri Garland
20                                                Philip T. Besirof
                                                  MORRISON & FOERSTER LLP
21                                                425 Market Street
                                                  San Francisco, California  94105
22                                                Telephone: (415) 268-7000
                                                  Facsimile: (415) 268-7522
23                                                pbesirof@mofo.com

24
                                                  By: _/s/  Jordan Eth_____
25                                                        Jordan Eth

26                                                Attorneys for the JDSU Defendants

27

28

1   Dated: September 24, 2007          Michael J. Shepard
                                       Howard S. Caro
2                                      HELLER EHRMAN LLP
                                       333 Bush Street
3                                      San Francisco, California  94104
                                       hcaro@hellerehrman.com
4
                                       Michael L. Charlson
5                                      J. Christopher Mitchell
                                       HELLER EHRMAN LLP
6                                      275 Middlefield Road
                                       Menlo Park, California  94025
7

8                                      By:  _/s/__ Howard S. Caro_____
                                                Howard S. Caro
9
                                       Attorneys for Defendant
10                                     Kevin Kalkhoven

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## GENERAL ORDER 45 ATTESTATION

2

3    I, Jordan Eth, am the ECF User whose ID and password are being used to file this Joint

4    Pretrial Conference Statement.  In compliance with General Order 45, X.B., I hereby attest that

5    Anthony J. Harwood, attorney for CRPTF, and Howard S. Caro, attorney for Defendant Kevin

6    Kalkhoven, have concurred in this filing.

7    Dated:   September 24, 2007                      MORRISON & FOERSTER LLP

8                                                     By:  /s/ Jordan Eth
                                                          Jordan Eth
9
                                                     Attorneys for the JDSU Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28