# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE JDS UNIPHASE CORPORATION SECURITIES LITIGATION | MASTER FILE NO: C 02-1486 CW |

## REBUTTAL EXPERT REPORT OF ALLAN W. KLEIDON

**I.    Qualifications**

1.     I am a Senior Vice President at Cornerstone Research, a financial and economic consulting firm.  My qualifications and compensation are described in my previous report in this matter dated February 5, 2007 (the "Kleidon Report").

**II.    Assignment**

2.     I have been asked by counsel for JDS Uniphase Corporation ("JDSU") and Jozef Straus, Anthony Muller and Charles Abbe, and counsel for Kevin Kalkhoven, to review the reports of three of plaintiffs' experts (Scott D. Hakala, Steven L. Henning, and Terrence L. Barnich) filed February 5, 2007 ("Hakala Report," "Henning Report," and "Barnich Report") as they relate to damages issues.  I have further been asked to comment upon Hakala's damages analysis.  Additional documents reviewed are cited in this report and exhibits.  My work in this matter is ongoing.

### III.    Summary of Rebuttal Opinions

3.    Below is a summary of my additional findings in this matter.  The bases for each finding are detailed in the sections that follow.

   a.    Computation of per share recoverable damages in a case such as this requires analysis of inflation and analysis of loss causation.  Before any financial economist can compute reliable damages estimates, plaintiffs must first specify what they allege could and should have been disclosed in lieu of the alleged misstatements and omissions (*i.e.*, "the alleged truth"), and when during the class period the alleged truth should have been disclosed, in sufficient detail to allow a financial economist to quantify damages using accepted scientific valuation techniques.

   b.    Plaintiffs have not specified the alleged truth in this case with anywhere close to the necessary detail.  This means that no financial economist can apply standard valuation techniques to compute alleged inflation and recoverable damages correctly.  Plaintiffs' damages expert, Scott Hakala ("Hakala"), computes inflation and damages numbers, but his numbers are inherently arbitrary because his calculations are not grounded in a clear specification by plaintiffs of the alleged truth on different dates throughout the class period.

   c.    Stock price inflation in a case such as this is defined as the difference between the price paid for the security and the price that would have prevailed absent the alleged fraud.  Specification of the alleged truth in sufficient detail is necessary to allow any financial economist to value the stock price in the but-for world in which the alleged truth had, hypothetically, been revealed.  Specification of the details and required timing of the alleged truth (*i.e.*, specification of the but-for world) requires more than identifying the alleged false or misleading statements.

   d.    Loss causation in a case such as this requires the identification of when the alleged truth in fact entered the market, and its stock price impact when it

was disclosed.  This analysis cannot take place in this case since plaintiffs have not clearly specified the alleged truth.  Absent knowledge of what allegedly should have been disclosed, it is not possible to determine when (or if) that information was actually disclosed.

e.  Plaintiffs fail to state a coherent, quantitative description of defendants' alleged overstatement of demand.  Plaintiffs' alleged accounting misstatements are inextricably linked to plaintiffs' vague and unquantified allegations that demand was overstated.  These flaws, by themselves, preclude formulation of any reliable, scientific damages analysis.

f.  Hakala's per share damages analysis is unscientific and unreliable for the following reasons:

- As discussed above, Hakala's analysis is fundamentally unsound because it is not based on what defendants allegedly should have said throughout the class period; it cannot be based on the alleged undisclosed truth because plaintiffs themselves have not specified that alleged truth;

- Hakala's "relevant event" methodology *cannot* be expected to calculate inflation correctly based upon what allegedly should have been said, first because plaintiffs have not specified that alleged truth, and second because Hakala's methodology is based only on actual disclosures in the real world rather than the hypothetical disclosures in the but-for world that are needed to define inflation correctly;

- Hakala's "relevant event" methodology is based on unsupported assumptions and *does not* calculate inflation correctly based upon what allegedly should have been said, and Hakala fails in his appeal to Hakala fails in his appeal to an article by Cornell and Morgan;

- Hakala's choice of "relevant events" is unscientific, unsupported, arbitrary, and internally inconsistent;

- Hakala's purported inflation numbers are illogical and incompatible with plaintiffs' allegations and with accepted principles of financial economics; and

- Hakala's event study is non-standard and flawed.

g.    A separate and independent reason that Hakala's analysis does not provide a reliable measure of recoverable damages in this case is that Hakala's damages analysis focuses solely on the calculation of inflation and ignores loss causation as discussed in the U. S. Supreme Court's *Dura* decision.

h.    Hakala's method for computing *aggregate* damages is unscientific and unreliable. Instead of using actual trading data, Hakala uses a trading model to estimate aggregate damages.

i.    To date, plaintiffs have not specified what could and should have been said in lieu of the alleged false and misleading statements in the OCLI, E-TEK and SDL registration statements. This information is necessary to enable me to calculate damages and assess negative causation under Section 11.

j.    Defendants' counsel has asked me to compare the "amount paid" for JDSU shares in the E-TEK and SDL mergers to the alleged true value of JDSU's shares on specified dates, using Henning's analysis "fair value" of the E-TEK and SDL shares, and Hakala's "true value" the JDSU shares. My analysis shows that Hakala's "true value" of the JDSU shares that the E-TEK and SDL shareholders received was significantly greater than Henning's "fair value" of the E-TEK and SDL shares that those shareholders gave up. Thus, my analysis shows that a rational investor would have still voted for the merger absent the alleged misstatements and omissions if one were to assume that Henning's and Hakala's analyses are correct.

IV.     **Scientific Foundations of Damages Calculations in Securities Cases**

4.      Computation of per share recoverable damages in a case such as this requires two distinct analyses, both of which depend critically on plaintiffs' specification of what could and should have been said in lieu of the allegedly false and misleading statements that were actually made.  I define these analyses briefly and then discuss each in turn in Sections IV.A and IV.B below:

- Share price inflation (that is, the difference between the actual share price and the "true value" that would have prevailed absent the alleged misstatements or omissions on each day throughout the class period).

- Loss causation (that is, the actual losses suffered by the shareholder caused by the alleged misstatements or omissions).

A.     *Share Price Inflation*

5.      For each day in the class period, share price inflation ("inflation") equals the actual price of JDSU's stock minus the price that would have existed if the alleged fraud had never occurred.  Thus, calculating inflation requires one to determine the price that would have prevailed absent the alleged misstatements or omissions for each day during the class period. That is, what would the price have been had the alleged truth been told as plaintiffs allege it could and should have been?  This hypothetical price is also called the "but-for" price or the "true value."  There is a standard framework in financial economics that is appropriate for determining the but-for price.

6.      The calculation of the but-for price on a particular day requires two steps.  First, one must specify any change in the information available to the market caused by the hypothetical correction of the alleged fraud.  Second, one must determine the stock price after that hypothetical change in the information available to the market.

7.      These two steps are required because of the way that efficient markets work.  In an efficient market, a company's stock price will at all times equal the present value of expected future cash flows discounted at the appropriate risk-adjusted rate.  In determining the present value of future cash flows, the market considers only the information available to it as of the valuation date.[1]  The stock price will change significantly only if there is a change in the information available to the market that significantly changes the present value of expected future cash flows.[2]

8.      The first step, namely the specification of the hypothetical change in the information available to the market but for the alleged fraud, is *not* the province of financial economics and instead must be provided by plaintiffs.  It is intrinsically tied to the allegations in the case, because the hypothetical change is based on plaintiffs' allegations of misstatements and omissions.

9.      Only if plaintiffs allege what could and should have been said on each day during the class period, instead of the alleged false and misleading statements that were actually made, can a financial economist then calculate a but-for price.  In this report, I sometimes refer to the hypothetical world in which defendants timely disclosed everything that plaintiffs allege that

---

[1] See, *e.g.*, Eugene F. Fama, *Foundations of Finance*, Basic Books, Inc., Publishers, 1976, Chapter 5, pp. 133, 138.
[2] Pure accounting changes that do not change expectations of future cash flows will not change stock prices in an efficient market.  See, *e.g.*, Brealey and Myers, *Principles of Corporate Finance* 7th ed., McGraw-Hill 2003, pp. 566-568.

defendants could and should have said (but all non-fraud related information remains the same) as the "but-for world." Failure to specify on a daily basis the hypothetical change in the information available to the market (to adequately describe the but-for world) precludes a financial economist from applying scientific tools to calculate reliably the but-for price and resulting inflation.

10.     Financial economics provides the framework for conducting the second step— valuing the hypothetical incremental information and calculating the but-for price—but only if plaintiffs have specified what could and should have been said throughout the class period.

11.     In principle, this is no different than, for example, the problem of valuing a company (say Company ABC) that is not publicly traded. For such a task, there are various standard valuation techniques that all attempt to calculate the present value of the relevant expected future cash flows (or, on a per share basis, the present value of expected future cash flows per share). Choosing the appropriate technique to value Company ABC will depend on the specific facts of the situation. If a company identical to ABC (say Company XYZ) were publicly traded in an efficient market, XYZ's public price (with any required adjustments for, say, differences in liquidity) would provide the market's assessment of ABC's value (that is, the present value of expected future cash flows per share discounted at the appropriate risk-adjusted rate). If, at the other extreme, there were no information available for companies comparable to ABC, a discounted cash flow analysis, requiring direct specification of expected future cash flows and discount rates, would be appropriate. Consider yet another situation where Company ABC goes public soon after the required valuation date. Provided that Company ABC's financial condition remained stable, ABC's future public stock price (with any required

adjustments for, say, differences in liquidity) might reasonably estimate the value of Company ABC at the time it was private.

12.     It is essential that any valuation be restricted to the information and circumstances as of the time of valuation, without the benefit of hindsight.  For example, it would not be appropriate to value a company as of a particular date using a discounted cash flow analysis if the projected cash flows were based on information that was not available as of the valuation date but that became available later.

13.     In the current litigation context, to calculate accurately the but-for price on a particular day, all non-fraud related information on that day must be held constant.  Doing so allows the financial economist to value *only* the change in information on that day attributable to the alleged fraud (that is, the hypothetical information that removes the effect of the alleged fraud).  In particular, the calculation of inflation on, say, the first day of the class period requires that only the non-fraud related information available to the market on that actual day, plus the specific hypothetical information that plaintiffs allege could and should have been disclosed on that day, be considered in the valuation of the but-for price.

14.     For example, suppose that plaintiffs allege that defendants could and should have announced at the start of the class period that there was a decline in demand for *one product* but that demand remained strong for all of the defendant's other products.  Business conditions then deteriorated.  Then, at some future date, it was disclosed that demand for *all products* had declined such that revenues fell substantially below the market's expectations.

15.     The calculation of inflation at the start of the class period must be based on the hypothetical price effect on that date of *only* the fraud related information specified by plaintiffs

(*i.e.*, declining demand for *only one* product).  This hypothetical price effect cannot be equated with the later price decline that occurred when much more non-fraud related information was disclosed (*i.e.*, lower demand for *all* products and a consequent quantified decline in revenues in this example).  Hence, to calculate the but-for price and inflation, it is essential to value the effect of the hypothetical disclosure specified by plaintiffs in their allegations, holding constant the non-fraud related information available to the market at the time of the valuation.  Any attempt to use future changes in a stock's price to infer a price change that hypothetically would have occurred some time in the past must control carefully for new information reflected in that future price that did not relate solely to the hypothetical disclosure specified by plaintiffs.

16.     Moreover, the plaintiffs' specification of what allegedly could and should have been said on each day throughout the class period must be specific enough to allow a financial economist to value that incremental information.  For example, if plaintiffs allege that defendants did not disclose that demand was declining for one product, that allegation by itself is not specific enough to allow a financial economist to calculate the but-for price (and hence inflation).  Among other things, how much is demand expected to decline?  Is the decline in demand for one product likely to be offset by increased sales of other products?  What is the effect on total revenues and profits?  How long is the decline in demand expected to last?  This level of specificity in the allegation is necessary to calculate the but-for price, because the stock price in an efficient market equals the present value of expected future cash flows.  It is not possible for a financial economist to quantify reliably the cash flow impact of simply a "decline in demand for one product."  Different assumptions regarding the precise meaning of "decline in demand for one product" can have very different valuation impacts on the but-for price and inflation.

B.    *Loss Causation*

17.    Analysis of recoverable damages cannot stop at an analysis of inflation, because recoverable damages are also limited by loss causation.  Loss causation differs conceptually from inflation.  As discussed in the preceding section, inflation is defined as the difference between the actual stock price on a particular day and the hypothetical price that would have prevailed *in the but-for world* (*i.e.*, absent the fraud).  Loss causation, by contrast, considers the actual share price performance experienced by shareholders *in the real world*.

18.    Loss causation asks what (if any) actual shareholder losses were caused by the alleged misstatements or omissions— that is, what actual losses were suffered in the real world when the alleged truth was revealed to the market.  Plaintiffs must specify the alleged truth in order for the financial economist to identify corrective statements and measure what losses were suffered when the alleged truth was revealed.

19.    Using the hypothetical situation discussed below, I demonstrate how analysis of inflation in the but-for world can differ from actual losses suffered in the real world (loss causation).  Assume that a company:

- first, significantly overstates its earnings for one quarter;

- then, accurately reports earnings for each of the next eight quarters; and

- finally, both announces the prior overstatement and verifies the accuracy of the interim earnings.

20.     In this hypothetical, plaintiffs may be able to demonstrate that there had been inflation at the time the overstated earnings were first announced.  Stock price is the present value of expected future cash flows. Current period earnings (for certain companies) may play a role in the market's expectation of future cash flows.  For such a company, a significant earnings overstatement might have caused the company's stock price to trade at a higher price than it would have traded at in the but-for world (where the earnings overstatement was known).

21.     In the same hypothetical, it is possible that plaintiffs suffered no loss that was caused by the fraud, and, thus, that plaintiffs suffered no recoverable damages.  Given that two years had passed since the overstatement, and because the interim eight quarters' earnings were accurate, it is possible that the announcement would not change the market's expectation of future cash flows, and, thus, would not change the company's stock price.  In addition, any losses suffered by shareholders before the market learned about the overstatement must have been caused by new information about something other than the overstatement of earnings (*i.e.*, those losses were not caused by the fraud).  This is because, in an efficient market, all available information will be reflected in the stock price, but the market cannot price information it does not have.

22.     Although inflation is conceptually different from loss causation, damages analysis by a financial economist addresses very similar questions with respect to both inflation and loss causation.  To calculate inflation one must specify the additional information that plaintiffs allege could and should have been disclosed ("the alleged truth"), because without that foundation it is impossible to calculate the but-for price.  Similarly, to calculate the loss caused by the fraud, one must specify what "the alleged truth" was supposed to be in order to know when (or if) the market became aware of that information.  One must identify when the market

became aware of "the alleged truth" before one can measure the actual price effect that occurred when the market learned "the alleged truth."

23.     Moreover, as I suggested with my demand hypothetical in ¶¶14-15, it is frequently the case that actual disclosures to the market do not correspond one-to-one with the hypothetical disclosures required to calculate inflation (especially if those hypothetical disclosures change over time).  In these circumstances, analysis of loss causation requires the financial economist to separate the actual price decline when a disclosure is made between:  1) the effect of any new fraud-related information and 2) the effect of any other, non-fraud related information simultaneously disclosed to the market.  This again requires plaintiffs to identify what could and should have been disclosed in the but-for world.

## V.     Plaintiffs' Imprecise Liability Assumptions Preclude Reliable, Scientific Calculation of Damages

24.     Section IV above explains why well-specified liability assumptions are necessary to assess inflation and loss causation.  I next examine plaintiffs' and plaintiffs' experts' discussion of both demand and accounting allegations (goodwill, inventory, and ADVA) in Sections V.A and V.B, respectively, and show how plaintiffs' failure to state a coherent, quantitative description of the alleged demand overstatement precludes formulation of a reliable, scientific damages analysis.

*A.     Demand*

25.     Plaintiffs (discussed in Section V.A.i) and plaintiffs' experts (Hakala and Barnich, discussed in V.A.ii and V.A.iii, respectively) offer only vague and conflicting descriptions of the alleged misstatements and omissions regarding demand.  They do not quantify in any meaningful

way the alleged demand overstatement.  For example, neither plaintiffs nor plaintiffs' experts quantify by how much demand was allegedly overstated, the impact of that alleged overstatement on management's revenue guidance or stated future revenue growth estimates, or the period for which management's revenue guidance or stated future growth estimates would have been affected by the alleged overstatement of demand.  Moreover, plaintiffs and plaintiffs' experts do not even agree as to the timing of any alleged demand overstatement.

26.     Plaintiffs' expert Henning (discussed in Section V.A.iv) does not discuss demand allegations directly, but does establish that his assertions regarding alleged accounting misstatements are inextricably linked to plaintiffs' demand allegations.  Given this link, plaintiffs' vague, unquantified demand allegations also preclude any reliable, scientific analysis of plaintiffs' accounting allegations.

i.     *Plaintiffs*

27.     Plaintiffs do not provide a clear statement of what could and should have been said in lieu of the allegedly false and misleading statements in the Complaint (or plaintiffs' responses to interrogatories).  Plaintiffs assert that a number of statements regarding demand are allegedly false and misleading, but do not quantify by how much demand was allegedly overstated.  Moreover, given plaintiffs' vague articulation of their liability assumptions, it is not possible to infer what could and should have been said regarding demand and compare that to what was actually said (*i.e.*, the statements that plaintiffs now allege were false and misleading).

28.     This is especially true when these statements are taken in the context of JDSU's performance relative to historical results and management's guidance.  For example, consider

plaintiffs' first alleged misrepresentation[3] regarding demand—the December 8, 1999 OCLI Registration Statement in which the statement that "OCLI and JDS Uniphase believe there is increasing demand for products designed, manufactured and distributed by merchant suppliers" was alleged to be false and misleading (Complaint, ¶198).  As shown in Exhibit 1, JDSU's revenues had been increasing as of December 8, 1999 (FY 2000 Q2) and continued to increase for the next four quarters.  Further, JDSU met or beat its revenue guidance through calendar year 2000 (Exhibit 2).  Particularly in light of these facts, it is unknown what plaintiffs allege could and should have been said in the December 8, 1999 OCLI Registration Statement instead of what actually was said.

29.      Another reason that one cannot infer the nature and size of the alleged demand overstatement is that some of the alleged false and misleading statements refer to historical (as opposed to forecasted) demand.  For example, plaintiffs allege that the May 15, 2000 statement, "Strong demand for virtually all our optical components and modules products combined with the JDS merger contributed to the increases in gross profit [in FY 2000 Q3]," was false and misleading (Plaintiffs' Supplemental and Amended Responses to Plaintiffs' Supplemental Responses to Defendant Charles J. Abbe's First Set of Interrogatories to Plaintiffs, 1/12/07 ("Abbe Supplemental Responses"), p. 5).  Because plaintiffs do not allege that gross profits were overstated in FY 2000 Q3 and those gross profits did in fact increase over FY 2000 Q2, it is unclear what plaintiffs claim could and should have been said instead of what was actually said.

---

[3] As discussed in ¶32, Hakala states that the first signs of slowing growth in demand occurred on January 6, 2000, an example of how Hakala's liability assumptions differ from those of plaintiffs.  Moreover, Hakala first asserts inflation in JDSU's stock price on January 3, 2000, which corresponds to neither December 8, 1999 nor January 6, 2000 (see Hakala Report, Exhibit C).

30.     The problem with plaintiffs' failure to quantify the alleged demand overstatement is exacerbated when one considers plaintiffs' alleged corrective disclosures. Plaintiffs point to a number of alleged partially corrective disclosures, but they do not specify how much these alleged "partial" corrections change the quantification of any prior alleged demand overstatement. Without such quantification, a financial economist would be unable to arrive at a reliable estimate of the "true value" of JDSU absent the alleged fraud.

ii.     *Hakala*

31.     Plaintiffs' damages expert, Hakala, likewise offers a vague opinion regarding the alleged demand overstatement. Although Hakala spends considerable time recounting various alleged "facts" concerning JDSU and the industry (see, *e.g.*, Hakala Report, ¶¶5, 31-103), he does not specify what plaintiffs allege could and should have been said throughout the class period to allow quantification of the price effects of those hypothetical but-for disclosures. Moreover, Hakala's opinions regarding the alleged demand overstatement conflict with plaintiffs' allegations, Hakala's own assumptions, and the opinions of plaintiffs' other experts.

32.     To begin, Hakala's assumptions regarding demand are inconsistent with plaintiffs' allegations. For example, plaintiffs allege that the first misrepresentation with respect to demand occurred in the December 8, 1999 OCLI registration statement; however, Hakala assumes that signs of slowing demand were not apparent at least until January 6, 2000 (Hakala Report, ¶5a, emphasis added):

> Beginning in January through April 2000, the Defendants knew of declining demand for certain of JDS's products through rising inventory levels and anticipated slowdowns in demand as a result of reduced forecasts. *Signs of slowing growth in demand and reduced margins were first identified* when Lucent announced poor results and lower guidance *on January 6, 2000.* Additionally,

throughout the first four months of calendar 2000 competitive local exchange carriers (CLECs) began to tighten and reduce their capital spending and experience more limited access to capital. Despite this evidence, the Defendants continued to emphasize the explosive and accelerating growth for JDS's products in statements made around January 18 and January 25, 2000 (as identified in the Interrogatory Responses) and continued to affirm those statements in various interviews and presentations between January and April 2000.

33.     Hakala's brief summary of his assumptions for the January to April 2000 period highlights additional issues that make it impossible to infer the size and nature of the alleged demand overstatement from his analysis.  His analysis relies on vague assumptions.  Take, for example, Hakala's statement that "[b]eginning in January through April 2000, the Defendants knew of declining demand for certain of JDS's products through rising inventory levels and anticipated slowdowns in demand as a result of reduced forecasts."  Hakala does not answer key questions here or elsewhere in his report, such as:  How much was demand declining?  For what period?  For which "certain products"?  Exactly when (which day) did JDSU know?

34.     Hakala recognizes that the information available to the market was constantly changing.  He describes the majority of the class period as a "tug-of-war" between alleged inflating statements and alleged partially corrective disclosures (Hakala Report, ¶8):

> Throughout the period from January to December 2000, the event study summarized in Exhibit B and event chronology summarized in Exhibit B-1 illustrates a sort of "tug-of-war" between the allegedly false and/or misleading statements of the Defendants that tended to prop up JDS's share price and the industry information that was being disclosed over time that tended to pull down JDS's share price.

35.     During much of this time, the only alleged misstatements and omissions are those regarding demand (since the first date plaintiffs or plaintiffs' experts currently cite regarding

accounting misstatements is June 30, 2000).[4]  However, Hakala fails to quantify the alleged

overstatement in demand on any particular day, let alone how it increased due to alleged new

false and misleading statements or decreased due to alleged corrective statements.

*iii.*   *Barnich*

36.     Plaintiffs' industry expert Barnich offers yet another vague opinion regarding the

alleged demand overstatement.  Barnich claims that some undisclosed indications of a decline in

demand began in March 2000 (Barnich Report, p. 2, emphasis added):

> Internal e-mail reports that percolated through management ranks *beginning in March 2000*, which detailed inventory build-ups, product returns and more importantly, major customer downward revised demand forecasts, provided JDS Uniphase management at the time they were selling their stock with nonpublicly available information that the deteriorating financial condition of the competitive telecommunications industry would adversely affect the company and result in a significant collapse in the demand for and sales of its own products.

37.     Barnich provides no quantification of the alleged demand overstatement as of

March 2000 or anytime thereafter.

38.     Moreover, although the Complaint (¶8) also mentions March 2000, Barnich's

identification of March 2000 as the first date of undisclosed internal indications of a decline in

demand is inconsistent with both plaintiffs' assertion that the December 8, 1999 OCLI

registration statement contained false and misleading statements with respect to demand, and

with Hakala's assertion that "[s]igns of slowing growth in demand and reduced margins were

first identified [with the Lucent announcement]…on January 6, 2000" (Hakala Report, ¶5a).

---

[4] "On June 30, 2000, JDS merged with E-TEK. …at the time of the E-TEK merger JDS knew and should have disclosed, at least, that it expected to record a substantial impairment charge for a portion of the goodwill recorded in connection with the merger." (Hakala Report, ¶5c)

39.     Additionally, Barnich offers an opinion about the timing of the correction of the alleged demand overstatement that conflicts with Hakala's analysis.  Much of Barnich's analysis is based on public information.  He claims (Barnich Report, pp. 1-2):

> By July and August 2000, there were significant public warning signs that indicated that the competitive telecommunications industry was facing significant deteriorating financial conditions and cash constraints. By September, 2000, it was evident that a full-blown substantial downturn was in effect.

40.     In an efficient market, the stock price will rapidly incorporate all publicly available information.  Barnich's statement posits that there were allegedly corrective public disclosures concerning demand in July and August 2000, and certainly by September 2000.  This assertion is at odds with Hakala's analysis, which asserts that the first "major" corrective event did not occur until October 25, 2000 (Hakala Report, ¶118).

*iv.*     *Henning*

41.     Plaintiffs' accounting expert, Henning, does not directly address the issue of what could and should have been said with respect to demand during the class period.  However, his analysis presumes that the alleged accounting overstatements (goodwill, inventory, and ADVA) are inextricably linked to plaintiffs' demand allegations.  For example, Henning asserts:

> When E-TEK was acquired by JDSU on June 30, 2000, there were several impairment indicators present which necessitated that JDSU perform an immediate impairment analysis, including the fact that the goodwill attributable to the E-TEK acquisition was not recoverable based on expected undiscounted cash flows and the decline in customer spending.
>
> *Henning Report, p. 1-8*

> …[t]he factors that contributed to this severe industry downturn did not arise in the period between the [SDL] acquisition date and the end of the quarter [FY 2001 Q3].
>
> *Henning Report, p. 1-16*

JDSU ignored the declining demand forecasts prepared in 2000 by not writing off its excess and obsolete inventory at December 31, 2000.  By waiting until June 30, 2001 to record the inventory write-off of $274 million, JDSU was able to conceal from the general public, investors and analysts, as a result of the reductions in customer spending that it was experiencing, that a large percentage of its inventory was either excess or obsolete.

*Henning Report, p. 2-40*

…ADVA's stock fell by nearly 50 percent during the last six months of calendar 2000.  This decline in value was not dissimilar to the erosion in stock price that JDSU experienced during the same time period.  JDSU failed to consider in its evaluation the private information it held at December 31, 2000 that it was experiencing significant declines in customer spending from companies such as Nortel, a direct competitor of ADVA.

*Henning Report, pp. 3-8, 3-9*

B.    *Accounting Allegations*

42.    With respect to goodwill-related allegations, plaintiffs contended that they were unable to specify the "dollar amount of the misrepresentation" of the value of JDSU's goodwill without "expert information" or analysis that "may be the subject of expert testimony" (Plaintiffs' Supplemental Responses and Objections to Defendant Anthony Muller's First Set of Interrogatories to Plaintiffs ("Muller Supplemental Responses"), 2/2/07, pp. 71-72).  With respect to inventory-related allegations, plaintiffs contended that they were unable to specify the "amount or growth of inventory at JDSU" without "expert information" or analysis that "may be the subject of expert testimony" (Abbe Supplemental Responses, pp. 85-86).

43.    Henning provides specific overstatement amounts for goodwill, inventory, and ADVA, and opines on how the alleged accounting misstatements affect financial statements for the year ended June 30, 2000, the quarter ended September 30, 2000, the quarter ended December 31, 2000, and the quarter ended March 31, 2001 (Henning Report, Exhibit G).

However, Henning does not specify when the allegedly appropriate alternative amounts could and should have been revealed to the market in the but-for world.

44.     Hakala states when the allegedly appropriate amounts should have been disclosed, but as will be discussed later in Section VI, his analysis of inflation is inconsistent with these statements.

45.     With respect to E-TEK goodwill, Hakala states (Hakala Report, ¶5c):

> On June 30, 2000, JDS merged with E-TEK. …[A]t the time of the E-TEK merger JDS knew and should have disclosed, at least, that it expected to record a substantial impairment charge for a portion of the goodwill recorded in connection with the merger.

46.     With respect to SDL goodwill, Hakala states (Hakala Report, ¶5j):

> [O]n February 13, 2001, JDS should have disclosed that it could not justify the price paid for SDL and that a substantial portion of the purchase price would have to be written off as impaired.

47.     With respect to inventory, Hakala states (Hakala Report, ¶5i):

> On January 25, 2001, JDS announced earnings for the second quarter of fiscal 2001 and revised modestly downward its guidance for revenue growth in the third fiscal quarter ended March 2001. … JDS failed to disclose that, by this point in time, it was taking increasing inventory reserves, reported inventory that was significantly impaired, and its visibility for customer demand was substantially reduced.

48.     Hakala says nothing regarding the timing of the allegedly appropriate disclosure regarding ADVA.

## VI.     Hakala's Per Share Damages Analysis is Unscientific and Unreliable

49.     Because plaintiffs fail to describe what could and should have been disclosed on each day during the class period, they have failed to provide the necessary first step to enable a

financial economist to calculate the true but-for price and hence inflation, or to evaluate any potential disclosure to determine the price effect and hence actual shareholder losses attributable to revelation of the truth that plaintiffs allege should have been disclosed earlier.  This is why, in my prior report (Kleidon Report, ¶38), I stated that I could not undertake a damages analysis without that prior specification by plaintiffs.

50.    Nevertheless, Hakala purports to be able to compute per share damages even given plaintiffs' failure to specify what could and should have been said on each day during the class period.  There is no scientific basis for his doing so.  Moreover, Hakala's analysis is necessarily divorced from plaintiffs' allegations in fundamental ways, which is one of the factors that render his per share damages calculations unscientific and unreliable.

51.    This section first describes Hakala's methodology for computing damages and then explains the following fundamental flaws in his analysis:

- As discussed above, Hakala's analysis is fundamentally unsound because it is not based on what defendants allegedly should have said throughout the class period; it cannot be based on the alleged undisclosed truth because plaintiffs themselves have not specified that alleged truth;

- Hakala's "relevant event" methodology *cannot* be expected to calculate inflation correctly based upon what allegedly should have been said, first because plaintiffs have not specified that alleged truth, and second because Hakala's methodology is based only on actual disclosures in the real world rather than the hypothetical disclosures in the but-for world that are needed to define inflation correctly;

- Hakala's "relevant event" methodology is based on unsupported assumptions and *does not* calculate inflation correctly based upon what allegedly should have been said, and Hakala fails in his appeal to an article by Cornell and Morgan;

- Hakala's choice of "relevant events" is unscientific, unsupported, arbitrary, and internally inconsistent;

- Hakala's purported inflation numbers are illogical and incompatible with plaintiffs' allegations and with accepted principles of financial economics; and

- Hakala's event study is non-standard and flawed.

A.      *Description of Hakala's procedures*

52.     There are two main steps in Hakala's calculation of stock price inflation (which in turn forms the basis of Hakala's damages calculations).  First, he conducts an event study that attempts to adjust JDSU's actual stock returns (*i.e.*, percentage price changes) during the class period for market and industry effects, resulting in daily "residual returns."  These residual returns reflect changes in JDSU's stock price not explained by market and industry effects as captured by Hakala's model.  Second, Hakala calculates a "True Value" for each day in the class period based on the residual returns for certain selected days on which Hakala asserts that "relevant events" occur.  Hakala's inflation is defined as the difference between the actual JDSU stock price and his True Value for each day in the class period.  I first discuss Hakala's event study, then his True Value line and inflation.

*i.      Hakala's event study*

53.     The main purpose of Hakala's event study is to adjust JDSU's actual stock price returns for market and industry effects. Hakala's implementation of his event study methodology can be compared to standards established in the academic literature.[5] The event study is based on a statistical regression of JDSU returns on market and industry indices, and predicts the JDSU return that would be expected on a date given the returns on the market and industry indices on that date. The difference between the actual JDSU return on a given day and the return predicted by the regression model is called the "residual return." The residual return measures the actual percentage stock price change that is not explained in the regression by market and industry effects, and reflects JDSU specific information. Hakala uses these company-specific residuals in his calculation of the "True Value" of JDSU's stock.

*ii.     Hakala's True Value line and inflation*

54.     Hakala's selection of relevant events is key to his calculation of inflation and, hence, damages. Hakala begins with all trading days during a period that includes the class period as well as periods before and after the class period. From these trading days, Hakala selects a subset of days that contain events that he deems are "material," *i.e.*, that contain information that he believes investors would find important to JDSU (these events are listed in Exhibit B). From this group of "material events," Hakala then subjectively selects a list of "relevant events," *i.e.*, events he deems relevant to plaintiffs' fraud claims (these events are also listed in Exhibit B and are identified with a "1" in the column labeled "Relevant Events"). These so-called "relevant events" then serve as the basis for Hakala's calculation of the True Value of

---

[5] Hakala's event study is non-standard and flawed, as discussed in Section VI.G below.

JDSU's stock price, and thus inflation,[6] during the class period.  The relevant events selected by Hakala occur only on some days during the class period; in order to calculate the True Value for every day, Hakala assumes that the True Value Percent (true value/actual trading price) between relevant days remains constant.

55.     Hakala defines relevant events in his report (Hakala Report, ¶113):

> I begin the inflation analysis with the selection of relevant events. Relevant events are those that either would not have occurred but for the allegations in the Complaint or would have occurred (or equivalent disclosure[7] events would have occurred) at or before the beginning of the Class Period but for the allegations in the Complaint.

56.     It is important to note that Hakala's selection of "relevant events" is not based on any procedure explained by Hakala.  Nor is there any standard procedure in financial economics for such selection.  This makes it impossible to replicate Hakala's analysis using established scientific procedures in the field of financial economics.[8]

57.     For each day that Hakala selects as having a "relevant event," he changes his True Value Percent and percent inflation numbers based on the sign (positive or negative) of the residual return on that day.  In particular, if the residual return were positive, he classifies the relevant event as "inflationary" and assumes that the percent inflation increased on that day in proportion to the residual return.  If the residual return were negative, he classifies the relevant event as a "corrective disclosure" and assumes that the percent inflation decreased on that day in proportion to the residual return.  Whether the relevant event is inflationary or corrective, Hakala

---

[6] Percent inflation and True Value Percent are related and sum to 100%.  For example, if inflation is alleged to be 20% of the actual stock price on a particular day, then True Value Percent is 80% on that day.

[7] Hakala cites, in his footnote 59, Cornell and Morgan, "Using Finance Theory to Measure Damages in 'Fraud on the Market Cases,'" *UCLA Law Review,* June 1990, pp. 894-7.

[8] As demonstrated in Section VI.E below, Hakala's selection of "relevant events" is arbitrary, internally inconsistent and at odds with plaintiffs' allegations.

asserts that 100% of the actual residual return on that day is related to the allegations in this case, and adjusts his True Value Percent and percent inflation numbers for that full residual return on each day that he asserts contains a "relevant event."

58.     Hakala calculates his percent inflation (and his True Value Percent) by working backwards from the last "relevant event," when he assumes zero inflation and, equivalently, 100% True Value.  Working backward, percent inflation on the day preceding each day with a "relevant event" decreases if the "relevant event" day has a positive residual return, and increases if the "relevant event" day has a negative residual return.  For example, Hakala alleges a corrective relevant event on July 27, 2001.  Working backward, inflation increases on July 26, 2001.  Days without "relevant events" do not lead to changes in percent inflation and True Value Percent.

59.     In particular, Hakala first assumes that the True Value is 100% of the actual price on July 31, 2001 (after the end of the class period, but corresponding to the last "relevant event" that Hakala selects), and then works backwards to recalculate True Value Percent by adjusting his True Value Percent based on the residual return for each "relevant event" as described above. Hakala proceeds backwards in this fashion, using all his selected "relevant events," until he reaches December 31, 1999.  On this date, although his procedure (if consistently implied) would imply a True Value of 113%, he arbitrarily caps his True Value line at 100% of actual stock price value.  Moreover, although his Report Exhibit C identifies six "relevant events" during the class period before December 31, 1999, Hakala ignores those days in calculating his True Value line, and keeps the True Value capped at 100% of the actual stock price from December 31, 1999 back until the beginning of the class period on October 28, 1999.

B.   *Hakala's analysis is fundamentally unsound because it is not based on specification of what allegedly should have been said throughout the class period*

60.     The fundamental problem with Hakala's calculations of per share damages is that he does not follow the scientific procedures described in Section IV above that tie inflation and damages to plaintiffs' allegations.  This problem, by itself, renders Hakala's analysis unscientific and unreliable.

61.     Hakala claims in his Report (¶113) that he bases his inflation analysis on the allegations in the Complaint.  This is a vital issue, because plaintiffs allege fraudulent misstatements or omissions during the class period and Hakala purports to calculate the damages that result from plaintiffs' allegations.  However, neither Hakala's calculation of his "True Value" line and his resulting inflation numbers, nor his analysis of actual price changes to determine loss causation, are based on any specification of what allegedly should have been said throughout the class period, and in fact plaintiffs have not specified what defendants allegedly should have said.

62.     As discussed in Section IV, true value is by definition the hypothetical price that would have prevailed absent the alleged misstatements or omissions; that is, the hypothetical price had information available to the market changed as specified by plaintiffs.  Hakala, however, does not specify what should have been said on each day throughout the class period and then calculate the but-for price given that additional information, as he should (discussed in Section IV).

63.     Similarly, Hakala's evaluation of actual disclosures in the real world is not based on any specification of what could and should have been said throughout the class period.  Absent that specification, however, it is impossible to determine (i) whether any actual

disclosure corresponds to information that plaintiffs allege should have been disclosed earlier, or if so, when it allegedly should have been disclosed; or (ii) whether there was additional information in the actual disclosure, not related to plaintiffs' allegations, that caused part or all of any actual losses on the actual disclosure.

64.     Plaintiffs have not supplied Hakala with the necessary first step to enable a financial economist to calculate the true but-for price or to evaluate loss causation because they have been vague about what allegedly should have been disclosed on each day during the class period.  Hakala's True Value and inflation numbers, which he purports to calculate in the absence of such vital information, are therefore invalid.  Similarly, Hakala's analysis of actual disclosures in the absence of clear specification by plaintiffs of what allegedly should have been disclosed is invalid.

C.     *Hakala's "relevant event" methodology* **cannot** *calculate inflation correctly based upon what allegedly should have been said*

65.     There is no scientific basis for believing that 100% of the information disclosed to the market on each of the days that Hakala has selected as containing a "relevant event" corresponds to information allegedly omitted or misstated.  Hakala does not specify the information available to the market in the but-for world and then calculate the resulting but-for price, as described in Section IV above.  Instead, Hakala arrives at his True Value line by selecting "relevant events" and utilizing residual stock price returns that *actually* occurred during or after the class period, as described in Section VI.A above.  This is a fundamental flaw in Hakala's analysis.

66.     Given the complexities of the allegations in this matter, it would be extremely unlikely that Hakala's assumption that 100% of the information actually disclosed to the market

on each of his selected "relevant events" days corresponded to information allegedly omitted or misstated.  If this in fact occurred, it would be purely by chance, as there is no step in Hakala's methodology that is designed to detect and subtract out information that was revealed to the market on days with "relevant events" but that does not relate to the alleged misstatements or omissions.  As discussed below (section VI.E), as a factual matter, Hakala's choice of "relevant events" does not correspond to the information allegedly omitted or misstated.

67.     However, even if, as Hakala asserts, 100% of the information disclosed to the market on each of the days that he has selected as containing a "relevant event" had corresponded to information allegedly omitted or misstated, there would still be a problem with Hakala's analysis.  Hakala's procedures will not calculate inflation correctly in this matter, because Hakala bases his inflation numbers *only* on information actually disclosed to the market and does not address the but-for price that would result if that information were disclosed on other, hypothetical, dates.

68.     To the extent that plaintiffs allege negative information should have been disclosed (but was not disclosed) *after* the start of the class period, a correct calculation of inflation would require that inflation increased on the date when the information should have been disclosed.  Hakala's inflation numbers, however, would not change on that date unless, by chance, that date coincided with a real world "relevant event."  Moreover, even if Hakala had, by chance, selected that date as one with a "relevant event," there is no reason to expect that the price change on that day would correspond to a change in inflation associated with the allegedly omitted or misstated information.  In an efficient market, price changes in the actual world should correspond to new information disclosed to the market.  Conversely, the market cannot

react to information that is not disclosed.  In other words, the but-for price impact of *undisclosed* bad news on a particular day cannot be measured by the actual price change on that day.

D.   *Hakala's "relevant event" methodology **does not** calculate inflation correctly based upon what allegedly should have been said, and Hakala fails in his appeal to the Cornell and Morgan article  to support his methodology*

69.     As noted, the key to Hakala's inflation calculation is his selection of "relevant events."  Hakala's discussion of "relevant events" (Report, ¶113) specifies that those events with a positive residual return are regarded as having increased percentage inflation and are deemed not to have occurred but for the allegations in the Complaint ("inflationary events"); while those with a negative residual are deemed "corrective events," which either (i) would have occurred at or before the beginning of the class period (which I term "possible corrective events"), or (ii) would not have occurred at or before the beginning of the class period but for which Hakala asserts an "equivalent disclosure" would have occurred at or before the beginning of the class period ("equivalent disclosure" events).

70.     While Hakala's Report (¶113) defines Hakala's relevant events as events that would not have occurred or would have occurred at or before the start of the class period but for plaintiffs' allegations, it is silent on disclosures of bad news that would have occurred at some date after the start of the class period.  Hakala presents no method to identify and value allegations that some negative information should have been disclosed (but was not disclosed) on some interim date during the class period (as opposed to the beginning of the class period).  As discussed above in Section VI.C, the but-for price impact of *undisclosed* bad news on a particular day cannot be measured by the actual price change on that day.  If there were undisclosed bad news, it should cause a decrease in price in the but-for world and an increase in inflation.  Hakala does not purport to identify any such events.  Instead, the only events in

Hakala's analysis that cause an increase in inflation are actual events that are associated with a positive residual return (which is based on information disclosed in the real world, and cannot be caused by the non-disclosure of bad news). This, by itself, demonstrates that Hakala's methodology does not calculate inflation correctly based upon what allegedly should have been said.

71.     None of the three categories of Hakala's "relevant events"—namely "inflationary events," "possible corrective events" and "equivalent disclosure events"—can properly be identified absent plaintiffs' clear specification of what allegedly should have been disclosed on each day during the class period. "Inflationary events" are actual events that allegedly would not have occurred in the but-for world, and accurate identification of such events clearly presupposes knowledge of what the but-for world was on the specific day the event actually occurred. Moreover, because Hakala's inflation calculations assume that 100% of the residual return on a day with an inflationary event was caused by that event, correct implementation of his methodology requires verification that all information disclosed on that day corresponded with the but-for information specified by plaintiffs for that day.

72.     Similarly, "possible corrective events" are actual events that allegedly would have occurred at or before the beginning of the class period in the but-for world, and the accurate identification of such events presupposes knowledge of what plaintiffs specify should have been disclosed at the start of the class period. Again, because Hakala's calculation of inflation assumes that 100% of the residual return on days with corrective events corresponds to a change in inflation, correct implementation of his methodology presupposes knowledge of the but-for information to verify that only allegation-related information caused the residual return.

73.     Whether or not Hakala is correct in his identification of "inflationary events" or "possible corrective events" (and I demonstrate in Section VI.E below that his selection of these events is arbitrary and inconsistent), at least they can be understood within his framework:  they are asserted either not to have occurred, or to have occurred at or before the beginning of the class period, absent the alleged fraud.  However, Hakala's "equivalent disclosure" events are quite different.

74.     Hakala's interpretation of "equivalent disclosure" of an actual event which he selects as "relevant" is that although the actual event itself could not have occurred at or before the beginning of the class period, an "equivalent disclosure" event would have occurred at or before the beginning of the class period with exactly the same price effect as the actual event that did occur.  Hakala's idea of "equivalent disclosure" is no more than an unsupported *assumption* that the percentage price decline that actually occurred on some assumed corrective disclosure (which will correspond to one of Hakala's selected "relevant events") would have occurred earlier, even though the actual disclosure itself could not have been made earlier.  Hakala claims (Hakala Report, ¶112, emphasis added):

> The concept of "equivalent disclosure" *requires* that percentage declines associated with later corrective disclosures be translated into percentage declines that would have occurred earlier in time had the alleged truth been disclosed in a timely manner.

75.     Thus, once Hakala selects his "relevant events," he simply *assumes* that what was in fact disclosed to the market corresponds to a change in inflation, without any analysis of what plaintiffs allege should have been announced on those days.  This explains why Hakala calculates ostensible "inflation" and "True Value" numbers in the absence of any precise

specification of what plaintiffs allege could and should have been disclosed.  Hakala asserts that this procedure is "required" by the "concept of 'equivalent disclosure'" (Hakala Report, ¶112).

76.     Hakala cites a paper by Cornell and Morgan (cited in fn. 7 above) as justification for his assumption of "equivalent disclosure" events that allow him to ignore a precise specification, day by day, of what plaintiffs say could and should have been disclosed.  However, the paper by Cornell and Morgan does not support Hakala's procedures—quite the opposite.

77.     Cornell and Morgan define an "equivalent disclosure price" (p. 894, emphasis in original):

> …The equivalent disclosure price is the price at which the security would have traded if the omitted and misrepresented information—and *only* that information—were accurately disclosed at the start of the class period.  To calculate the equivalent disclosure price, one must precisely determine the information that was omitted or misrepresented.  Second, one must estimate the impact on security prices of the disclosure of that information, and only that information.

78.     It is clear from this definition that Cornell and Morgan use the same framework as I describe in Section IV above.  In particular, the "equivalent disclosure price" defined by Cornell and Morgan corresponds exactly to the hypothetical but-for price I discuss above.  They also describe precisely the valuation exercise concerning expected future cash flows that I discuss in Section IV above, once plaintiffs have specified the information that allegedly should have been disclosed (Cornell and Morgan, p. 895):

> …In order to calculate the equivalent disclosure price, one must estimate how disclosure of the omitted or misrepresented information would affect investor beliefs regarding the magnitude of future cash payouts on the security and the likelihood of receiving those payments.

79.     Hakala mis-cites their work.  Cornell and Morgan do not espouse the proposition that Hakala attributes to them, namely that the concept of "equivalent disclosure" requires that the percentage price decline accompanying a real-world disclosure be "translated into percentage declines that would have occurred earlier in time had the alleged truth been disclosed in a timely manner" (Hakala Report, ¶112).  To the contrary, Cornell and Morgan point out that actual disclosures often do not correspond to the disclosures that plaintiffs allege should have been made, and, indeed, they use this fact to motivate their discussion of "equivalent disclosure."  The section of their paper immediately before their "Equivalent Disclosures" section is titled, "Over- and Under-Disclosure" (pp. 889-894), and explicitly discusses that actual disclosures often do not correspond exactly to a correction of the specific alleged misstatement or omission.  For example, they cite the facts in *Basic Inc. v. Levinson, 485 U.S. 224 (1988)* ("*Basic*") to show that there was "over-disclosure" of the fraud (Cornell and Morgan, p. 889):

> …The December 20 disclosure was more than corrective of the prior information because what Basic had failed to disclose earlier was that there *were* talks regarding a possible merger.  By the close of trading on December 20, the market price of Basic's stock reflected the information that Basic had signed a merger agreement, not just the information that talks had occurred.

> In this respect, *Basic* is not unique. ...

80.     Cornell and Morgan also point out other problems with trying to tie actual disclosures to the alleged misstatements or omissions.  For example, they state (pp. 889-891): "Yet cases in which a company announces 'A' and then announces strictly 'A is not true' are rare."  "When the fraud consists of an exaggeration or overstatement, it is difficult to determine when corrective disclosure occurs."  "The analysis is further complicated if there is a series of exaggerations, misstatements, and omissions, rather than one isolated misrepresentation followed by a series of revelations."

81.     It is precisely these problems with using actual disclosures that motivate Cornell and Morgan's analysis of "Equivalent Disclosure."  They begin the paragraph that defines their "equivalent disclosure price" as follows (p. 894, emphasis in original):

> A potential solution to the problem illustrated by these examples is the construction of an equivalent disclosure price.  The equivalent disclosure price is the price at which the security would have traded if the omitted and misrepresented information—and *only* that information—were accurately disclosed at the start of the class period.

Thus, it is clear that Cornell and Morgan recognize that actual disclosures often do not correspond to *only* the omitted and misrepresented information specified by plaintiffs, which is what must be analyzed to construct the "equivalent disclosure price."  This is 180 degrees from Hakala's apparent assertion that the "concept of 'equivalent disclosure'" *requires* that the information in actual disclosures corresponds to what should have been disclosed, without any comparison of the actual disclosure information with precisely and *only* what plaintiffs allege should have been disclosed.[9]

82.     Hakala does not begin to construct the "equivalent disclosure price" as defined by Cornell and Morgan (which is identical to the hypothetical but-for price I discuss in Section IV above).  It is significant that the current matter corresponds to the difficulties Cornell and Morgan identify (p. 891) when the alleged fraud consists of a "series of exaggerations, misstatements, and omissions, rather than one isolated misrepresentation followed by a series of revelations."  Hakala never attempts, day by day throughout the class period, to "*precisely* determine the information that was omitted or misrepresented," nor does he then "estimate the

---

[9] Having carefully identified and analyzed these issues, Cornell and Morgan (p. 895) assume them away for their value line analysis:  "To focus on the value line, this Article puts aside the problems discussed in the previous section and assumes that the disclosure date and the disclosure price are known."

impact on security prices of the disclosure of that information, and *only* that information"
(Cornell and Morgan, p. 894, emphasis added).  Instead, he inappropriately *assumes* that 100%
of the information disclosed to the market on his selected "relevant event" days corresponds
precisely to the information that was allegedly omitted or misrepresented.

E.    *Hakala's choice of "relevant events" is unscientific, unsupported, arbitrary, and
      internally inconsistent*

        83.     Because Hakala's inflation numbers are driven by his selected "relevant events,"
a minimal criterion to test the validity of his procedures would be that his "relevant events"
match the characteristics that he assumes they have for his calculation of inflation.  I find that
they do not.  To the contrary, I find his choices unscientific, unsupported, arbitrary, and
internally inconsistent.  Moreover, this is not surprising since the only description Hakala gives
for his choice of "relevant events" (Hakala Report, ¶113) does not specify an investigation of
whether they have the characteristics he assumes in his calculation of inflation.

        84.     One test of whether Hakala's selection procedures make sense is to check whether
his "inflationary events" truly meet his criterion that they would not have occurred but for the
allegations in the Complaint.  The "relevant event" that first creates inflation in Hakala's
calculations occurred on January 3, 2000.  Because it is an "inflationary event" (*i.e.*, January 3
had a positive residual in Hakala's event study), Hakala claims that that event would not have
occurred but for plaintiffs' allegations.  The "relevant event" that Hakala cites on January 3,
2000 is:  "JDS Uniphase Corp.'s board approved a 2-for-1 stock split" (Hakala Report, Exhibit
B, p. 8).

        85.     Hakala provides absolutely no analysis or support for his assertion that this event
would not have occurred but for plaintiffs' allegations.  Moreover, since Hakala claims that the

true value was exactly equal to the observed price on the previous trading day, December 31, 1999 (Hakala Report, Exhibit C), it seems absurd to me to claim that the board would not have approved the 2-for-1 split on January 3, 2000 but for plaintiffs' allegations, especially since Hakala claims that the true value on January 3, 2000 was fully 97.62% of the observed price (Hakala Report, Exhibit C).  Hakala's assertion that this event (which clearly has no intrinsic connection to plaintiffs' demand allegations) would not have occurred but for those allegations is, in my opinion, unscientific, unsupported, and arbitrary.  Nor does it appear to conform to Hakala's description of "inflationary events" (Hakala Report, ¶113):

> …The inflationary or offsetting events are associated with various statements or assurances by the Defendants or representatives of JDS regarding earnings and current industry demand that were false and/or misleading in light of the allegations of the Plaintiffs and with any analyst reports or market comments that were based upon such false and/or misleading statements.

86.     Moreover, Hakala is inconsistent in his identification of "relevant events" regarding stock splits.  Not only does Hakala classify the January 3, 2000 board approval as an event that would not have occurred but for plaintiffs' allegations, but he classifies December 27, 1999 the same way, even though according to Hakala there was zero price inflation on that date.  Hakala describes the December 27, 1999 event in his Report, Exhibit B (p. 8):

> JDS Uniphase gained ahead of its 2-for-1 split.  Stock splits don't alter a company's financial picture or stock valuation, they just lower its share price.  But investors have lately viewed any split announcement as wildly bullish (The Los Angeles Times 12.28.99)

87.     According to Hakala's description of events on December 27, 1999 and January 3, 2000, it appears that his selection criteria determine that days on which there is news associated with stock splits are "relevant events" that would not have occurred but for plaintiffs' allegations.  However, Hakala fails to identify the December 16, 1999 shareholder approval of

the stock split as a "relevant event" (Hakala Report, Exhibit B, p. 7).  We are left with the absurd result that Hakala claims that shareholders would have approved the split in his but-for world on December 16, 1999, but the December 27 event related to this split would *not* have occurred, even though Hakala asserts that there was zero inflation on both dates.  This demonstrates that Hakala's methodology is not consistent in classifying events that ostensibly would not have occurred but for plaintiffs' allegations.

88.     As another example, one event that Hakala does not regard as "relevant" is the July 20, 2000 announcement that JDSU would be included in the S&P 500 Index.  Hakala asserts that the January 3, 2000 2-for-1 stock split would not have occurred but for plaintiffs' allegations, when according to his inflation numbers the true value was 97.62% of the observed price.  Hence, one might question whether JDSU would have been included in the S&P 500 if its but-for value had fallen by 33.19%, as Hakala calculates (Exhibit C, p. 5).  At the very least, Hakala's assertions that inclusion in the S&P would have gone ahead under these circumstances, whereas the board would not have approved the 2-for-1 split, seems worthy of some discussion given the importance for Hakala's inflation numbers, but he provides no analysis or support for his conclusions.

89.     Similarly, Hakala provides no justification or analysis for his assertions regarding "corrective events" (*i.e.*, selected "relevant events" with negative residual returns).  Especially for the events that require "equivalent disclosures" (and Hakala does not identify which of his "corrective events" fall into this category), one would expect some analysis to support his assertion that, absent plaintiffs' allegations, these events could not have been disclosed earlier but there would have been an "equivalent disclosure" with exactly the same price impact at or before the start of the class period.  Hakala provides none.

90.     These examples illustrate that there is no coherent relation between plaintiffs' allegations and Hakala's "relevant events" or resulting inflation numbers.  This is highlighted by the overall lack of correspondence between Hakala's "relevant events" and days on which plaintiffs claim that JDSU made false and misleading statements.  The Complaint and plaintiffs' responses to interrogatories through February 2, 2007 cite 73 public announcements during the class period, tabulated in Exhibit 3.[10]  Hakala identifies 74 "relevant events" during the same period, but only 32 of Hakala's 74 "relevant events" coincide with days cited by plaintiffs in the Complaint and responses to interrogatories (see Exhibit 4).

91.     Hakala also identifies "relevant events" that are outside plaintiffs' class period (October 28, 1999 to July 26, 2001).  For example, Hakala's Exhibit B identifies October 26, 1999 and July 31, 2001 as "relevant events," even though the first date plaintiffs currently identify on which JDSU allegedly made a false or misleading statement regarding demand is December 8, 1999, and plaintiffs state (Complaint, ¶292) that as of July 26, 2001: "The Full Extent of the Bad News is Finally Disclosed."

92.     Moreover, I have discerned no coherent explanation for Hakala's choice of the other 42 "relevant events" that are not cited in either the complaint or interrogatory responses.  Many of these allegedly "relevant events" seem completely divorced from plaintiffs' basic claims regarding demand, goodwill, inventory, and ADVA.  Hakala's description of events in his Report, Exhibit B, demonstrates many apparent inconsistencies in Hakala's ostensible procedures to identify "relevant events."

---

[10] This exhibit incorporates the additional claims discussed in plaintiffs' Responses to Interrogatories dated 2/2/07. These claims do not change the conclusions in the Kleidon Report.

93.     For example, Hakala is inconsistent in his identification of "relevant events" regarding JDSU's mergers with E-TEK and SDL.  Hakala identifies September 7, 2000 as a "relevant event."  In his Exhibit B description for this day, he states:

> JDS Uniphase Sees $410M In Merger-Related Costs For SDL (Federal Filings Newswire); The SDL Proxy-Prospectus includes the balance sheet which represented that JDS's inventories balance at 06.30.00 was $375.4M and its intangible assets, including goodwill, was $22.3B (Form S-4); SDL and JDS Uniphase are proposing to merge in response to unprecedented growth in telecommunications industry and demand for the fiber optic networks that are enabling such growth (Form S-4)

94.     From this description, it appears as though Hakala determines that September 7, 2000 is an event day since JDSU filed its Form S-4 regarding the merger with SDL, and plaintiffs claim that JDSU made false and misleading statements in this Form S-4 (Abbe Supplemental Responses, p. 11).  However, Hakala does not identify February 11, 2000 as a "relevant event," although plaintiffs claim that JDSU made false and misleading statements in its Form S-4 for the E-TEK merger filed on February 11, 2000 (Abbe Supplemental Responses, pp. 4, 11).  Hakala's description for February 11, 2000 (Hakala Report, Exhibit B, p. 11) does not even mention the S-4 which plaintiffs claim was false and misleading:

> JDS Uniphase Corp. will take an $84.1M charge in the quarter ending March 31 for in-process research and development in connection with the company's acquisition of Optical Laboratory Inc., which was completed on Friday (Dow Jones News Service 02.10.00)

95.     As another example, Hakala identifies February 13, 2001 as a "relevant event," and states (Hakala Report, Exhibit B): "JDS Uniphase and SDL rise after shareholders OK merger (Reuters)."  However, he does not identify June 28, 2000 (the day on which E-TEK shareholders voted to approve the merger) as a "relevant event."

96.     Hakala is also inconsistent in his identification of "relevant events" in which his descriptions relate to information regarding third party sales of JDSU's stock.  Hakala identifies March 9, 2000 as a "relevant event," and his Exhibit B description states:

> Goldman Sachs International filed with the Securities and Exchange Commission to sell 816, 819 common shares of JDS Uniphase Corp. (Bloomberg 03.08.00)

97.     However, Hakala does not identify December 1, 1999 as a "relevant event" even though his Exhibit B description states:

> JDS Uniphase Corp. and its largest shareholder, Furukawa Electric Co., said Furukawa has sold 1.8M common shares of JDS, cutting its stake to about 20% of those shares outstanding from 21% (Dow Jones Business News)

98.     It is not clear why a decision to sell 816,819 common shares of JDSU is "relevant," but a decision to sell more than twice that amount, 1,800,000 common shares, is not. Moreover, plaintiffs do not allege any false and misleading statements on March 9, 2000.

F.      *Hakala's inflation numbers are illogical and incompatible with plaintiffs' allegations*

99.     To further illustrate the problems with Hakala's analysis, consider Hakala's asserted inflation at the start of the class period (which begins on October 28, 1999).  Hakala does not specify what allegedly could and should have been said on October 28, 1999, and in fact Hakala's Exhibit C states that there is zero inflation from the beginning of the class period through December 31, 1999.

100.    Hakala's assumption (Hakala Report, ¶5a) that "[b]eginning in January through April 2000, the Defendants knew of declining demand…" appears inconsistent with plaintiffs' Complaint and responses to interrogatories.  Plaintiffs claim that JDSU made false and misleading statements regarding demand as early as December 8 and December 22, 1999 (Abbe

Supplemental Responses, p. 3). However, Hakala assumes that there were no misleading statements prior to January 2000, and asserts zero inflation through December 31, 1999 (see Hakala Report, Exhibit C) despite plaintiffs' allegations of false and misleading statements beginning December 8, 1999. Thus, Hakala ignores plaintiffs' actual allegations and in effect substitutes his own allegations.

101.    Why would Hakala assert that there was zero inflation in JDSU's stock price from December 8, 1999 through December 31, 1999, despite plaintiffs' allegations of false and misleading statements on December 8, 1999? The procedures that Hakala follows to generate his inflation numbers after January 2000 can be readily extended back to December 8, 1999, and I have done so to determine what inflation Hakala's methods would calculate as of that date. The result is revealing. Had Hakala applied his inflation calculations back to December 8, he would have calculated an asserted true value on that date of 128% of the actual stock price, that is, *negative* inflation of 28%. Thus, Hakala's methods imply that on December 8, 1999, the first date for which plaintiffs identify allegedly false and misleading statements about demand, the stock price would have been 28% *higher* had the truth been told. This simply makes no sense, and illustrates that Hakala's procedures for calculating inflation produce numbers that bear no relation to plaintiffs' allegations.

102.    In fact, Hakala's procedures produce inflation numbers that are inconsistent with even his own assumptions regarding liability. Hakala states (Report, ¶5a, emphasis added): "Signs of slowing growth in demand and reduced margins were *first identified* when Lucent announced poor results and lower guidance *on January 6, 2000*." If this were true, as Hakala assumes, there should be no inflation prior to January 6, 2000. However, Hakala's Exhibit C asserts that the True Value Percent was 100% from the beginning of the class period through

December 31, 1999, but fell to 97.62% on January 3, 2000 through January 6, 2000, implying 2.38% inflation. This is simply inconsistent with Hakala's own statement of when the first sign of slowing demand occurred.

103.    Moreover, Hakala's inconsistency with his own assumptions would have been clear had Hakala followed the procedures I outline in Section IV and that are described in Cornell and Morgan. Had Hakala attempted to specify what should have been disclosed on January 3, 2000 that caused his asserted but-for price to decline by 2.38%, he would immediately have seen that this result is inconsistent with his own assumption that the first sign of a decline occurred on January 6, 2000.

104.    Alternatively, suppose Hakala had abandoned his own liability assumption and tried to implement plaintiffs' claims that there were false and misleading statements of "allegedly strong demand in the fiber optic industry" and "increasing demand for products designed, manufactured and distributed by merchant suppliers" on December 8, 1999 (Abbe Supplemental Responses, p. 3). Hakala would have been confronted with the lack of specificity in plaintiffs' claims. For example, which products did not have increasing demand? Was a decline in one product offset for other products? Was it relevant to the market? Moreover, Hakala does not attempt to reconcile this alleged absence of strong demand with the fact that JDSU met or exceeded its revenue guidance for the following four quarters, which resulted in continued quarter-to-quarter growth during this period. Exactly what analysis of expected future cash flows would produce Hakala's ostensibly precise inflation figure of 2.38% on January 3, 2000?

105.    As another illustration that Hakala's inflation numbers are illogical and incompatible with plaintiffs' allegations, he asserts (Hakala Report, ¶5c) that "at the time of the E-TEK merger [June 30, 2000] JDS knew and should have disclosed, at least, that it expected to record a substantial impairment charge for a portion of the goodwill recorded in connection with the merger."  However, Hakala's Event Study Summary (Exhibit B) neither mentions the closing of the E-TEK merger nor shows any increases in inflation due to the alleged overstatement of E-TEK goodwill on June 30, 2000.  Moreover, the first reference to E-TEK goodwill in Hakala's Event Study Summary occurs on September 7, 2000 in a Form S-4 filed in conjunction with the SDL merger.  Hakala's inflation *decreases* on that day, rather than increase as one would expect given plaintiffs' allegations.

106.    Hakala's procedures are so inconsistent with scientific analysis that, if defendants were to win with respect to liability concerning some "relevant events" that ostensibly increased inflation, Hakala's resulting inflation numbers could increase rather than decrease as logic would dictate.

107.    To illustrate the problem, consider Hakala's "relevant event" on January 3, 2000, namely the board's approval of a 2-for-1 stock split previously approved by shareholders.  Hakala (Exhibit C) computes a residual price increase on that day of 14.85% (continuously compounded), which he attributes to the board approval.  Hakala's selection of this as a "relevant event" must mean that he believes that, absent the alleged misstatements or omissions, this event would not have occurred.  Assuming this were true, the logical implication is that inflation increased on that day due to that board approval.  As discussed above, in my opinion there is no justification for Hakala's assertion that this board approval would not have occurred in the but-

for world, and plaintiffs make no claim that this board approval had anything to do with their allegations.

108.     Suppose, therefore, that defendants win on this point, and obtain a ruling that the board approval of the split did *not* cause stock price inflation on January 3, 2000.  Logic would dictate that inflation should decrease if an ostensibly inflation-creating event is removed. However, Hakala's inflation and damages numbers would actually *increase*.  Since Hakala calculates inflation by working backwards in time (as discussed in Section VI.A above), his inflation numbers after January 3, 2000 remain exactly the same whether or not the January 3 board approval caused inflation or did not cause inflation; but Hakala's inflation numbers before January 3 *increase* if the board approval on January 3 is held not to have created inflation.

G.     *Hakala's event study is non-standard and flawed*

109.     Hakala's event study raises other methodological issues that further invalidate his results.  To perform his event study, Hakala first selects "potential material events" that he excludes from his estimation sample (Hakala Report, ¶24).  This section discusses Hakala's apparent failure to follow a consistent, scientific protocol for selecting potentially material events in his event study, which results in flawed tests of statistical significance.[11]

110.     Hakala selects his "relevant events" (days on which his alleged inflation changes) discussed in Section VI from a larger set of "potentially material events" listed in his Exhibit B, which in turn he ostensibly selected "to control for all days when potentially material information came into the market" (Hakala Report, ¶24).  Hakala removes all identified

---

[11] Other issues with Hakala's event study include his non-standard confidence intervals, his definition and calculation of standard errors of residuals, and his use of residuals on "relevant days" that are not statistically distinguishable from random noise as discussed in ¶126 below.

potentially material event days from the sample used in his statistical estimation procedures by assigning "dummy variables" to each potentially material event day.  Thus, because his choice of potentially material event days determines the sample that forms the basis of his statistical analysis, the validity of his statistical procedures depends crucially on how he selects the potentially material event days he chooses to remove from his sample.

111.    According to Hakala, material events are identified on the basis of "NASDAQ guidelines as recognized by the SEC" (Hakala Report, ¶ 24).  It is my understanding that, among other things, Hakala also includes analyst reports "if and only if they contain changes in recommendations, earnings or revenue estimates or price targets" (Plaintiffs' Response to Defendants' Requests for Documents Related to Plaintiffs' Expert Reports, February 8, 2007 ("Expert Reports Response")).

112.    The NASDAQ guidelines provide a vague description of types of events considered "material" for the exchange.  For example, the guidelines specify (*Federal Register*, Vol. 67, No. 157, August 7, 2002, pp. 51306-10):  "the public or private sale of a significant amount of additional securities" is material, but fail to specify how much is a significant amount.  Because of the vagueness of these guidelines, Hakala employs substantial subjectivity in selecting his "material events."

113.    Hakala's event study procedure is highly unusual; in fact, I have been teaching financial economics for over 30 years, and I have seen no published academic paper that follows his procedures.  *A priori* formulation and consistent application of an objective, scientific protocol is only a necessary first step to validate Hakala's methodology.  Without such a protocol, another researcher cannot replicate the experiment.  One can neither test whether

Hakala's implementation was correct, nor can one determine whether Hakala's criteria successfully accomplish his stated intent "to control for all days when potentially material information came into the market" (Hakala Report, ¶24).

114.    My analysis of the events he has chosen in his Exhibit B leads me to question whether such an objective, scientific protocol has been applied consistently in the selection of events.  For example, plaintiffs state that "analyst reports are included in the protocol *if and only if* they contain changes in recommendations, earnings or revenue estimates or price targets" (Expert Reports Response, emphasis added).  Hakala excludes March 8, 2001 from his regression when the news on that day, according to Hakala (Report, Exhibit B, p. 31) was:

> JDS Uniphase Canada was maintained "buy" by analyst Benoit Chotard at National Bank Financial.  The 12-month target price was reduced to C$61 from C$90 per share(Bloomberg);   PNC Advisors reduced its fiscal 2001 EPS from 73¢ to 64¢ and lowered its price target from $75 to $50(Analyst Report);   CIBC World Markets reduced its FY01 EPS from 70¢ to 64¢ and FY02 EPS from 91¢ to 59¢ after JDS lowered guidance(Analyst Report)

115.    However, Hakala does not exclude all days on which a securities analyst changes his or her EPS estimate as one would expect if he were consistently implementing this protocol.  Below are examples of days on which (according to analyst reports) an analyst changed his or her EPS estimate, but where Hakala does not exclude a corresponding date from his regression:

- April 24, 2000, Prudential Securities initiated coverage with a "Strong Buy" rating.

- January 30, 2001, PNC Advisors lowered their fiscal 2001 EPS projection and price target.

- March 20, 2001, Kintisheff Research lowered their EPS estimates for Q3 and for FY 2002.

116.   I also noticed contradictions regarding Hakala's treatment of public announcements of stock transactions as "potentially material" events.  For example, Hakala excludes October 4, 2000 from his regression when the only news on that day according to Hakala (Report, Exhibit B, p. 21) was: "JDS Uniphase Director Files to Sell 51,200 Common Shares (Federal Filings Newswires)."  However, August 21, 2000, is not excluded from Hakala's regression despite a seemingly similar disclosure (Federal Filings Newswires):  "JDS Uniphase Senior Vice President Files to Sell 200,000 Co Shares."

117.   In sum, my analysis of Hakala's choices of days with "potentially material events" leads me to conclude that they do not match his ostensible aim of removing from his sample all days with such events.

## H.   Conclusion

118.   Hakala does not follow the accepted scientific procedures discussed in Section IV above and advocated by Cornell and Morgan for calculating the hypothetical but-for price, or equivalent disclosure price.  Hakala does not specify, for each day during the class period, the information that defendants allegedly could and should have disclosed, and then value the effect on the stock price of that additional information.  Instead, he selects an apparently arbitrary set of "relevant events" and assumes, rather than demonstrates, that the information disclosed on these selected days corresponds to plaintiffs' allegations, even though this assumption is demonstrably false.  The result is that his "inflation" calculations bear no relation to plaintiffs' allegations.

**VII.    Hakala's Damages Analysis Based on Percent Inflation is Also Inconsistent with**
***Dura***

119.    Plaintiffs' damages analysis in this matter focuses solely on the calculation of

inflation.  Because Hakala's analysis ignores loss causation, plaintiffs provide no measure of

recoverable damages under *Dura Pharmaceuticals v. Broudo, 125 S. Ct. (2005)* ("*Dura*").

Moreover, as discussed in detail above, plaintiffs fail to quantify what could and should have

been said throughout the class period with respect to demand in any economically meaningful

way.  Their vaguely articulated liability assumptions with respect to demand renders impossible

any reliable, scientific estimate of loss causation stemming from demand allegations.

Additionally, as discussed in Section VI.B above, plaintiffs' accounting allegations are

inextricably tied to their demand allegations.  Therefore, without specifying precisely what could

and should have been said with respect to demand throughout the class period, one cannot

determine a scientific estimate of loss causation stemming from the alleged accounting

misstatements.

120.    I understand that maximum recoverable damages under *Dura* are the share price

declines actually caused by the alleged misstatements and omissions and suffered when the truth

enters the market via some corrective event(s).  Therefore, to arrive at an estimate of maximum

recoverable damages in this matter, plaintiffs must first identify and value any new, allegation-

related information contained in alleged corrective disclosures, carefully separating out any

information that corrects alleged prior misrepresentations from information revealing "changed

economic circumstances, changed investor expectations, new industry-specific or firm-specific

facts, conditions, or other [non-litigation related] events" (*Dura* at 1629).  Plaintiffs must then

parse the purported allegation-related declines among the alleged misrepresentations in this

matter (*i.e.*, demand, goodwill, inventory, and ADVA) and allocate those declines across alleged inflationary events.

A.    *Hakala Does Not Identify and Value Declines Due to Correction of Alleged Misstatements and Omissions*

121.    Hakala's analysis neither identifies nor attempts to value purported litigation-related information contained in alleged corrective disclosures.  Even assuming that Hakala is correct in his identification of "relevant events" (that is, assuming away a critical flaw in his analysis which I discuss above), under *Dura* it is not sufficient simply to identify days when alleged litigation-related information is disclosed and attempt to remove the effect of market and industry events using an event study as he does.  Hakala must take the critical next step of determining which portion of the remaining firm-specific stock price change is due to allegation-related events and which portion of that firm-specific stock price change is due to events unrelated to the allegations.  He fails to do so.

122.    Examples of firm-specific information unrelated to the allegations in this case include information unrelated to the alleged misstatements regarding demand, goodwill, inventory, or ADVA.  Firm-specific information unrelated to the allegations also includes information regarding demand, goodwill, inventory, or ADVA that is disclosed in a timely fashion (*i.e*., could not have been disclosed earlier).

123.    Hakala's description of events included in his damages analysis provides no indication of his assumptions regarding which events occurring on his purported "relevant event" days are related to the litigation and which are not.  For example, Hakala's description of the events on April 24, 2001 (Hakala Report, Exhibit B, p. 33) states:

JDSU fell after the company said it would announce key developments early Tuesday, which analysts speculated would involve the purchase of Lucent Technologies Inc.'s fiber-optic cable unit (Reuters News 04.23.01); JDSU lost nearly $1.3B in its latest quarter and plans to eliminate 5,000 jobs, or 20% of its worldwide work force. The realignment will cost $375M to $425M, and will cut annual expenses by more than $250M (AP Newswires); The company is evaluating the carrying value of certain long-lived assets, consisting primarily of $56.2B of goodwill recorded on its balance sheet at 03.31.01. The majority of the goodwill was recorded based on stock prices at the time merger agreements were executed and announced. The company's policy is to assess enterprise level goodwill if the market capitalization of the company is less than its net assets. Goodwill will be reduced to the extent that net assets are greater than market capitalization. At 03.31.01, the value of the company's net assets, including unamortized goodwill exceeded the company's market capitalization by approximately $40B (PR Newswire); JDSU rated hold in new coverage to McDonald Investments (Bloomberg); JDSU cut to "market perform" from "strong buy" at Raymond James (Bloomberg).

124.    Even accepting his synopsis, Hakala's assumptions regarding which events are related to the litigation are unclear. Is Hakala assuming that JDSU's purchase of Lucent's fiber optic cable unit is related to allegations in this case? Is he assuming that none of the information regarding job cuts, future outlook and the Global Realignment Program reflects new industry developments and is thus disclosed in a timely fashion? Hakala does not state his assumptions regarding what portion of the information is related to the allegations, let alone provide any basis for his assumptions.

125.    Not only does Hakala fail to identify adequately the purported allegation-related information released to the market on alleged corrective disclosure dates, but he also provides no credible valuation analysis of any allegation-related information. Hakala arbitrarily uses the entire residual return (*i.e.*, adjusting for market and industry effects) on alleged corrective disclosure dates in his damages analysis. In doing so, Hakala makes the unsupported assumption that all of the firm-specific information released on his purported "relevant event" days is related to plaintiffs' allegations.

126.    Hakala's inclusion of statistically insignificant stock price declines in his calculation of damages further undermines the credibility of his analysis.  In effect, Hakala is including as damages stock price movements that may simply be statistical noise, that is, reflect no material firm-specific information at all.  Indeed, of Hakala's 35 alleged corrective disclosure dates ("relevant event" days with negative residual returns), 21 (or 60%) are not statistically significant using a 95% one-tailed test.  Hakala includes in his damages analysis corrective disclosures with t-statistics as low as -0.32.  A t-statistic of -0.32 corresponds to a confidence level of 63% (one-tailed), which is far below the 95% confidence level generally employed in academic studies.

B.     *Hakala Does Not Allocate Allegation-Related Declines Among Alleged Misrepresentations*

127.    I understand that calculation of alleged recoverable damages under *Dura* requires not only isolating litigation-related stock price declines on alleged corrective disclosure dates but also allocating that litigation-related decline among the various alleged misstatements and omissions that gave rise to the decline.  Consider the following simplified hypothetical:

- Three alleged misstatements—one regarding demand on December 8, 1999, one regarding goodwill on September 28, 2000, and one regarding inventory on February 13, 2001.

- All three of these misstatements are corrected in a single disclosure on July 27, 2001.  Moreover, it is assumed that (unlike the facts of the current matter) this corrective information is precisely the information that plaintiffs alleged to have been omitted or disclosed.

- Through some credible valuation methodology, it is determined that only $1.00 of the stock price drop was attributable to correction of misstatements regarding demand.

128.   Assume further that Plaintiff A purchased on March 28, 2000 (that is, after the alleged misstatement regarding demand but before the alleged misstatements regarding goodwill and inventory) at $129.06, and held through the corrective disclosure on July 27, 2001, selling on July 30, 2001.  Plaintiff A is entitled to the stock price decline due to correction of the misstatement regarding demand ($1.00), but not any decline attributed to correction of misstatements regarding goodwill and inventory since those misstatements did not affect the stock price at the time Plaintiff A purchased.

129.   Obviously, this hypothetical is much simpler than the current matter, where, for example, there is not a single alleged misstatement regarding demand but rather multiple alleged misstatements regarding demand and an alleged demand overstatement that is changing frequently over the course of the class period.  The hypothetical is simply meant to illustrate the importance of parsing each of the purported drops due to corrective events and allocating them correctly among the alleged misstatements and omissions.

130.   Hakala does not attempt to parse the stock price declines due to allegedly corrective disclosures among plaintiffs' various allegations (*i.e.*, demand, goodwill, inventory, and ADVA), let alone map those declines to specific alleged false and misleading statements. For example, his analysis does not address what portion (if any) of the July 27, 2001 price decline related to goodwill or which alleged prior misstatement(s) were corrected.  Without

performing such an exercise, Hakala's damages analysis does not meet my understanding of the requirements under *Dura*.

C.   *Hakala's Approach Awards Different Dollar Damages to Plaintiffs Purchasing Under Identical Alleged Misrepresentations and Selling Under Identical Sets of Alleged Disclosures*

131.   I understand that maximum recoverable damages under *Dura* are the price declines actually caused by the alleged misstatements and omissions and suffered when the truth enters the market through some corrective event(s).  Thus, properly employed, an analysis of maximum recoverable damages under *Dura* will show that every plaintiff who bought subsequent to a particular alleged misstatement or omission and retained through its correction will suffer exactly the same dollar loss due its correction.

132.   In an efficient market, no stock price decline prior to correction of a particular alleged misstatement or omission could have been caused by that corrective event.  The market was unaware of the alleged fraud and thus could not react to it.  Only the stock price decline(s) observed when the truth enters the market is properly included in a calculation of maximum recoverable damages.  Again, that will be precisely the same dollar amount for each plaintiff purchasing under an identical set of alleged misrepresentations and holding his or her shares over an identical set of alleged corrective disclosures.

133.   Consider again the simplified hypothetical above, but add a second plaintiff. Plaintiff B purchased JDSU stock on April 14, 2000 at $79.63 and held his or her stock through the July 27, 2001 disclosure, selling on July 30, 2001.  Like Plaintiff A, Plaintiff B purchased subsequent to the alleged misstatement regarding demand but before the alleged misstatements regarding goodwill and inventory, but Plaintiff B paid nearly $50 less for his or her stock than

Plaintiff A paid ($79.63 v. $129.06).  JDSU's price fell substantially subsequent to the two plaintiffs' purchases, closing at $9.47 on July 26, 2001, notwithstanding the fact that the alleged misstatement regarding demand remained concealed from the market.  The decline to $9.47 on July 26, 2001 was due to factors other than correction of the alleged misstatement regarding demand and is thus not included in maximum recoverable damages under *Dura*.  In fact, both Plaintiff A and Plaintiff B suffered the same $1.00 loss due to the corrective disclosure regarding demand on July 27, 2001, despite the fact that Plaintiff A paid significantly more for his or her stock than Plaintiff B.

134.    Hakala's flawed percentage-based inflation approach would award Plaintiff A and Plaintiff B very different damages.  Using Hakala's own assumptions regarding purported "relevant" dates, Plaintiff A and Plaintiff B purchased under an identical set of alleged misrepresentations.  The hypothetical plaintiffs then sold on the same date after the close of the class period.  Under Hakala's approach, Plaintiff A's damages ($39.71) exceed Plaintiff B's ($24.50) by nearly $15 despite the fact that each suffered the same dollar loss when the "truth" regarding the alleged misrepresentations was revealed to the market.

D.    *Hakala's Approach Yields Damages without Corrective Disclosure*

135.    Hakala's apparent attempt to comply with *Dura* by simply removing "in and out" damages for class members selling their stock prior to October 25, 2000 acknowledges a problem with Hakala's inflation-based approach—it creates damages without any corrective disclosure—but does not adequately correct the problem.  Hakala's model still awards damages to plaintiffs who did not own JSDU stock when any alleged corrective event occurred.  For example, a hypothetical plaintiff purchasing on November 9, 2000 (alleged inflation level

$22.24) and selling on November 29, 2000 (alleged inflation level $17.34) would be awarded $4.90 in damages even though there is no alleged corrective disclosure during the 20 days that the hypothetical plaintiff owned the stock.  Indeed, under Hakala's model, any plaintiff selling on or after October 25, 2000 is entitled to damages as long as inflation at purchase exceeds inflation at sale, regardless of whether he or she owned JDSU stock when an alleged corrective disclosure occurred.  This is inconsistent with my understanding of loss causation.

136.    Moreover, Hakala's exclusion of damages for pre-October 25, 2000 sellers does not cure the fundamental problem with his percentage based inflation approach discussed in Section C above.  Plaintiffs purchasing under an identical set of alleged misrepresentations and holding over an identical set of alleged corrective disclosures will be awarded different dollar damages awards based on alleged inflation at purchase minus alleged inflation at sale, even though they would have suffered precisely the same dollar loss when the "truth" regarding the alleged misstatements and omissions entered the market.

## VIII.   Hakala's Calculation of Aggregate Damages Is Unreliable and Lacks Any Scientific Basis

137.    Aggregate damages in this class action are based on two distinct analyses.  The first concerns per share damages, and the second is intrinsically tied to the particular trading behavior of individual plaintiffs during the class period.  Total damages for an individual plaintiff are a function of the per share damages related to the particular dates on which he or she traded.  An accurate measurement of that plaintiff's damages, if any, will depend on the particular timing and amount of trading during the class period.

138.     Instead of using actual trading data, Hakala, for "informational purposes," uses a computerized trading model in an attempt to estimate plaintiffs' trading behavior.  Trading models that are not based on plaintiffs' actual trades in the subject stock during the class period are known to be inaccurate measures of actual individual trading behavior, and have been strongly criticized in the academic literature and rejected by courts.  For example:

- *Kaufman v. Motorola*: [12] the proportional trading model "does not meet any of the Daubert standards ..., has never been tested against reality …, has never been accepted by professional economists.  It seems to be a theory developed more for securities litigation than anything else."

- *Clearly Canadian Securities Litigation*: [13] the proportional trading model is "simply not credible";

- *Broadcom Corporation Securities Litigation*: [14] excluded testimony concerning Hakala's trading model (which used a multi-trader model Hakala similar to the one used in the current matter), stating that "because of its Daubert shortcomings, and because of its questionable accuracy, the trading model technique is of significantly questionable reliability."

139.     Moreover, given that accurate trading data for individual plaintiffs will be available from the proof of claims process, estimation of aggregate damages using an inaccurate trading model is unnecessary.  For example, the Court in *Kaufman v. Motorola* found:

---

[12] *Kaufman v. Motorola*, 2000 U.S. Dist. LEXIS 14267 (N.D. Ill. 2000)
[13] *Clearly Canadian Securities Litigation*, 1999 U.S. Dist. LEXIS 14273 (N.D. Cal. Sept. 7, 1999)
[14] *Broadcom Corporation Securities Litigation*, 2005 U.S. Dist. LEXIS 12118 (C.D. Cal. 2005)

> Therefore, assuming liability, an adequate remedy may be fashioned by having the jury determine a per share damage loss and requiring the filing of claims by each shareholder who claims that he, she or it has been damaged.

140.    Hakala's attempts to support the scientific validity of his trading model fail. Hakala states (Hakala Report, ¶121):  "I applied standard assumptions regarding the distribution of short-term and long-term shareholders as set forth in NERA's working paper on this issue." However, the cited NERA paper[15] falls far short of supporting the applicability of its trading parameters to trading in JDSU stock during the class period.  Instead it states (p. 11, emphasis added):  "The multi-sector, multi-trader approach can also be implemented in *rough-and-ready fashion* with as little data as figure into the single-trader model by utilizing the multi-trader parameter estimates and observed aggregate intraday trading rate from other NERA cases." Moreover, the paper demonstrates just how variable trading behavior for different companies can be (NERA, Table 5):

**Table 5**

**Observed Intraday Trading Rates, Estimated Multi-Trader Parameters and Goodness of Fit of the Multi-Trader Relative to the Single-Trader Model**

| Case | Observed Intraday Trading Rate [1] | Estimated Multi-Trader Parameters | | | Weighted Average Squared Residual Retention Rate, Multi-Trader Relative to Single-Trader Model [5] |
| | | High/Low Relative Sale Rate [2] | High Activity Purchases [3] | High Activity Initial Ownership [4] | |
| | (1) | (2) | (3) | (4) | (5) |
| 1 | 1.4% | NM [6] | 100.0% | 75.1% | 0.655 |
| 2 | 23.6% | 9.25 | 74.8% | 24.3% | 0.559 |
| 3 | 44.0% | 5.31 | 67.3% | 27.9% | 0.344 |
| 4 | 48.3% | NM [6] | 100.0% | 42.7% | 0.112 |
| 5 | 0.8% | NM [6] | 100.0% | 87.8% | 0.785 |
| 6 | 0.5% | NM [6] | 100.0% | 90.5% | 0.956 |
| 7 | 18.3% | 14.12 | 29.8% | 2.9% | 0.243 |
| 8 | 58.3% | 13.12 | 79.4% | 22.7% | 0.063 |
| 9 | 0.2% | 5.54 | 76.6% | 37.2% | 0.954 |
| 10 | 1.5% | 7.36 | 68.1% | 22.5% | 0.615 |
| 11 | 12.4% | 10.92 | 91.1% | 48.4% | 0.570 |
| 12 | 52.6% | 14.00 | 71.3% | 15.1% | 0.173 |
| Pooled Sample | 33.7% | 8.56 | 83.4% | 37.1% | 0.356 |

---

[15] Marcia Kramer Mayer, "Best Fit Estimation of Damages Volume in Shareholder Class Actions: the Multi-Sector, Multi-Trader Model of Investor Behavior," NERA Working Paper, October 2000.

141.     An additional problem with Hakala's model is that it does not compute damages accurately for individual plaintiffs engaging in multiple trades during the class period.  It is my understanding that, while net damages cannot be less than zero for any individual plaintiff, alleged inflationary gains may be used to offset alleged inflationary losses for individual plaintiffs engaging in multiple class period trades.  For example, maximum damages for a hypothetical plaintiff engaging in two class period trades, one with an alleged inflation gain of $5 and one with an alleged inflation loss of $10, would be $5 (the net inflation loss).

142.     To determine aggregate damages accurately for class members, one needs to identify the net losers.  The identity of the traders matters.  Hakala's model treats each class period trade as though it were executed by a distinct plaintiff, and does not allow for this netting of gains and losses caused by the alleged fraud.  Without access to actual trading data that identifies transactions with distinct plaintiffs, there is no way to identify in the current matter how many class members were net losers (once all alleged inflationary gains and losses are appropriately accounted for), and thus no way to estimate the aggregate amount of their alleged loss reliably.

## IX.     Section 11

143.     Section 11 precludes plaintiffs from recovering damages resulting from share price declines shown to be caused by information other than that which was alleged to be misrepresented or omitted in the prospectus or registration statement (Section 11(e) of the 1933 Act):

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1)

the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought:

*Provided*, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

144.    I earlier stated (Kleidon Report, ¶40): "With respect to the Section 11 claims, I cannot address the causation or damages issues in this matter until plaintiffs specify precisely what could and should have been disclosed in respective registration statements for the OCLI, E-TEK, and SDL mergers." To date, plaintiffs have not specified what could and should have been said in lieu of the alleged false and misleading statements in the registration statements, in particular with respect to demand.

145.    If plaintiffs were to specify the misstated and omitted information in the OCLI, E-TEK, and SDL registration statements with sufficient precision, I could then analyze Section 11 damages, which would not include losses due to factors including:

- general declines in the market or industry;

- disclosures regarding demand that were made on a timely basis (that is, could not have been revealed earlier);

- disclosures regarding any accounting allegations that were made on a timely basis; and

- other firm-specific information unrelated to plaintiffs' allegations.

146.    With well-specified liability assumptions, I could use my event study, among other potential valuation methods, to determine which portion of shareholder losses was not caused by the allegedly misstated and omitted information, and is thus not recoverable under Section 11.  In an efficient market, a company's stock price on a given day reflects the total mix of information available to the market on that day.  Moreover, the stock price responds quickly to new information.  If plaintiffs were to specify what could and should have been said instead of the alleged false and misleading statements in the registration statement, one could use an event study to identify stock price drops caused by revelation of the alleged truth regarding those allegedly fraudulent statements.  All other declines must, of necessity, have resulted from something other than the alleged false and misleading statements in the registration statement and are thus not recoverable under Section 11.  In particular, Section 11 precludes plaintiffs from recovering Section 11 damages based on any stock price decline prior to the first alleged corrective event, since that drop was caused by factors other than revelation of the alleged false and misleading statements.

147.    In an efficient market, plaintiffs cannot recover Section 11 damages for misstatements that were never corrected, since such misstatements caused none of the stock price decline.  For example, plaintiffs allege that the value of goodwill resulting from the E-TEK merger as of June 30, 2000 was overstated in the SDL registration statement.[16]  I understand that the E-TEK goodwill value as of June 30, 2000 has never been restated.  Moreover, my review of the analyst reports and other public information has found no evidence that market participants ever doubted the veracity of the June 30, 2000 E-TEK goodwill value prior to the filing of this

---

[16] Complaint, ¶247 and 9/7/2000 SDL Form S-4.

action.  Thus, none of JDSU's stock price decline prior to the filing of this action can be attributed to revelation of the alleged truth regarding JDSU's June 30, 2000 E-TEK goodwill value.  In other words, the entire stock price decline was due to factors other than the alleged misstatement of the June 30, 2000 E-TEK goodwill value.

148.    For the E-TEK and SDL mergers, I have been asked by counsel to compare the "amount paid" for JDSU shares to the true value of JDSU shares using certain assumptions. Specifically, I have been asked to assume the following:

- Valuation dates for E-TEK:  June 28, 2000 (E-TEK shareholder vote); June 1, 2000 (E-TEK's registration statement filed May 31, 2000 after market close)

- Valuation dates for SDL:  February 13, 2001 (SDL shareholder vote); November 17, 2000 (SDL registration statement filed);

- Henning's "fair value" of SDL and E-TEK, equivalently Henning's "present value of undiscounted cash flows," represents the "amount paid" by shareholders in the respective companies for the JDSU shares that they acquired in the merger;

- The alleged true value of JDSU shares in the Hakala Report represents the value of JDSU shares absent the fraud.

149.    Analysis for each of the four valuation dates shows that a rational investor (*i.e.*, one that is interested in maximizing his or her wealth) would have voted to approve the merger absent the alleged misstatements.  That is, the alleged misstatements did not change the rational investor's decision.

150.    Henning's "fair value" of $3.2 billion for the outstanding shares of E-TEK as of June 30, 2000 (Henning Report, p. 1-15) implies that E-TEK shares were worth approximately $47.06 per share as of that date.  On June 28, 2000, E-TEK shareholders voted to exchange each E-TEK share for 2.2 JDSU shares.  On that day, Hakala's (albeit flawed) analysis asserts that each JDSU share was worth $81.43.  Thus, in the assumed but-for world, E-TEK shareholders were faced with the decision of trading their E-TEK shares worth $47.06 per share for JDSU shares worth $179.15.  Faced with this choice, a rational investor would clearly have voted to approve the merger absent the alleged misstatements.

151.    The E-TEK registration statement was filed on May 31, 2000 (received by Thomson Research after market close) and E-TEK's price was $209.19.  Hakala's alleged true value of JDSU shares on June 1, 2000 was $65.64.  Thus, in the but-for world on June 1, 2000, E-TEK shareholders were faced with the decision of exchanging their E-TEK share worth approximately $47.06 for 2.2 JDSU shares with an alleged true value of $144.41.  Again, a rational investor would clearly have voted to approve the merger absent the alleged misstatements.

152.    Henning's "fair value" of SDL was only $5.3 billion as of January 31, 2001,[17] or $60.62 on a per share basis (Henning Report, pp. 1-19).  On February 13, 2001, SDL shareholders voted to exchange each SDL share for 3.8 JDSU shares.  On that day, Hakala's analysis alleges each JDSU share was worth $25.46.  Thus, in the assumed but-for world, SDL shareholders were faced with the decision of trading their SDL shares worth $60.62 for JDSU

---

[17] According to Henning's Report (pp. 1-18 to 1-19), SDL's "present value of [undiscounted] cash flows," or Henning's "fair value," was $3.8 billion and $3.7 billion on July 19, 2000 and November 17, 2000, respectively. My use of the $5.3 billion figure as of January 31, 2000 is conservative, since it increases the "amount paid" for JDSU shares.

shares worth $96.74.  Faced with this choice, a rational investor would clearly have voted to approve the merger absent the alleged misstatements.

153.    The SDL registration statement was filed on November 17, 2000.  Henning's "fair value" of SDL was only $3.7 billion as of that date, or $42.32 on a per share basis (Henning Report, pp. 1-19).  Hakala's alleged true value of JDSU shares on November 17, 2000 was $48.98 per share.  Thus, in the but-for world specified by plaintiffs' experts on November 17, 2000, SDL shareholders were faced with the decision of exchanging an SDL share worth approximately $42.32 for 3.8 JDSU shares with an alleged true value of $186.11.  Again, a rational investor would clearly have voted to approve the merger absent the alleged misstatements.

Executed on this 5th day of March in 2007 in Menlo Park, CA.

Allan W. Kleidon

Exhibit 1

**Exhibit 1**

**JDS Uniphase Corp.**

**Quarterly Revenues for Fiscal Years 1999 – 2001**

Source:  JDSU SEC Form 10-Q and 10-K Filings



Note:  The class period ends on 7/26/01, which falls in Q1 FY02; however, the plaintiffs do not allege any misstatements related to any quarters past those in FY01.

Exhibit 2

**Exhibit 2**
**JDS Uniphase Corp.**
**Management Revenue Guidance**
**Q2 FY00 to Q2 FY01**

Source:  JDSU Conference Call Transcripts and Audio Files; Analyst Reports

| | Current Quarter | | | Next Quarter | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Quarter | Period Ending | Actual Revenue (millions) | Quarter | Period Ending | Revenue Guidance (millions) | Actual Revenue (millions) | Notes | Source for Guidance |
| 10/28/99 | Q1 FY00 | 9/30/99 | $230.0 | Q2 FY00 | 12/31/99 | $264.5 | $282.0 | "In the past our guidance has been for 15% sequential growth and that guidance shall continue.  Of course, our challenge continues to be to expand capacity rapidly enough to respond to very strong demand growth." | Conference Call Audio File (10/28/99, 18:00 – 21:00) |
| 1/26/00 | Q2 FY00 | 12/31/99 | $282.0 | Q3 FY00 | 3/31/00 | $352.5 | $395.0 | "On the conference call, management raised their guidance for the FQ3 to 25% sequential revenue growth, reflecting the OCLI acquisition." | C.E. Unterberg Analyst Report (1/27/00, p. 2) |
| 4/25/00 | Q3 FY00 | 3/31/00 | $395.0 | Q4 FY00 | 6/30/00 | $480.0 | $524.0 | "Our guidance has typically been for growth at 15% or better sequentially and based on what's happening to our business both in terms of demand and capacity expansion, we believe that this should be increased to over 20% sequentially for the fourth quarter...This would result in fourth quarter revenue of over $480 million..." | Conference Call Audio File (4/25/00, 29:00 – 31:00) |
| 7/26/00 | Q4 FY00 | 6/30/00 | $524.0 | Q1 FY01 | 9/30/00 | $735 to $760[1] | $786.0 | "Those following our Company know that our guidance has been for sequential growth of 15% (except where affected by acquisition-related purchase accounting, such as last quarter when we had the effect of the OCLI acquisition); however, because of the strength of our business (including considerable strength at E-TEK), we must increase this guidance to the high teens." | Conference Call Script (7/26/00, p. 10) |
| 10/26/00 | Q1 FY01 | 9/30/00 | $786.0 | Q2 FY01 | 12/31/00 | $904 to $935[2] | $925.0 | "Those following our Company know that our guidance for the first quarter was for sequential sales growth in the high teens; we feel that the same guidance is appropriate for the second quarter based on the strength we see in our markets, our significantly higher backlog, and our capacity expansion plans." | Conference Call Script (10/26/00, p. 9) |

Note:
[1] Original guidance did not include the E-Tek acquisition.   However, in the Conference Call dated 10/26/00, JDSU announced that sales of $786 million "represented a 23% sequential increase from pro forma fourth quarter sales..." and that "[t]his growth was well above our 'high teens' guidance for this quarter."  Therefore, guidance for the quarter ending 10/26/00 is adjusted to account for the E-Tek acquisition, according to the following formulas:
$786 / (1.23) * (1.15); $786 / (1.23) * (1.19).   A range of 15% to 19% growth is shown to represent guidance in the "high teens".
[2] A range of 15% to 19% growth is shown to represent guidance in the "high teens".
The conference call audio files referenced in this exhibit were produced by defendants by plaintiffs' counsel on December 11, 2006, along with a cover letter explaining that plaintiffs' counsel had recorded these files utilizing Bloomberg.

Exhibit 3

# Exhibit 3
# JDS Uniphase Corp.
# Summary of Days Mentioned in Complaint and Plaintiffs' Responses to Interrogatories [*]
## 10/28/99 – 7/26/01

Source:  Second Amended Consolidated Complaint; Plaintiffs' Responses to Interrogatories;  *Bloomberg; Factiva; Thomson Research; 10-K Wizard*

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 1 | 10/28/99 Thu [†] | 4:19 PM | 10/29/99 Fri | "On October 28, 1999, JDS announced its results for the first quarter of fiscal 2000 ('1Q 00')...The net sales reported by JDS in the October 28, 1999 press release and 1Q 00 10-Q were intentionally overstated by at least $1 million to $3 million due to the fraudulent shipment of products..." (Complaint ¶¶ 192, 195). |
| 2 | 11/4/99 Thu [†] | 8:02 AM | 11/4/99 Thu | "On November 4, 1999, JDS filed its Form 10-Q for the quarterly period ending September 30, 1999 ('1Q 00 10-Q')"  (Complaint ¶ 194). |
| 3 | 12/8/99 Wed | 5:35 PM | 12/9/99 Thu | "On December 8, 1999, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with OCLI (the 'OCLI Registration Statement')... According to the OCLI Proxy-Prospectus, the primary reason for the proposed merger was the allegedly strong demand in the fiber optic industry..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 3). |
| 4 | 12/22/99 Wed | 10:40 AM | 12/22/99 Wed | "On December 22, 1999, JDS filed an amended Registration Statement on Form S-4 for the OCLI merger (the 'Amended OCLI Registration Statement'), which contained an amended Proxy Statement-Prospectus (the 'Amended OCLI Proxy-Prospectus').  The Amended OCLI Proxy-Prospectus was signed by the same Defendants, contained the same statements, and incorporated the same misstatements regarding demand as the original OCLI Proxy-Prospectus" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 3-4). |
| 5 | 12/30/99 Thu [2] | No Time | 12/29/99 Wed 12/30/99 Thu | "On December 30, 1999, JDS common stock split in a two-for-one stock split" (Complaint ¶ 201). |
| 6 | 1/17/00 Mon | 8:17 PM | 1/18/00 Tue | "On January 17, 2000, JDS announced the signing of a definitive agreement to merge with E-TEK, a supplier of optical components and component packaging" (Complaint ¶ 202). |
| 7 | 1/18/00 Tue | 1:20 PM | 1/18/00 Tue | "The January 18, 2000 conference call statements set forth above regarding demand were false or misleading..." (Connecticut's Second Amended & Fifth Supplemental Responses to Defendant Kevin Kalkhoven's First Set of Interrogatories, 2/2/07, Interrogatory No. 4, p. 24). |
| 8 | 1/26/00 Wed [†] | 4:44 PM | 1/27/00 Thu | "On January 26, 2000, JDS issued a press release announcing its results for the second quarter of fiscal 2000 ('2Q 00'), in which it disclosed that it achieved sales of $282 million during the quarter, a 22% increase over sales in the previous quarter" (Complaint ¶ 204). |
| 9 | 2/4/00 Fri | 5:28 PM | 2/7/00 Mon | "On February 4, 2000, JDS completed the acquisition of OCLI for 54 million shares of JDS stock, valued at $2.7 billion" (Complaint ¶ 205). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 10 | 2/10/00 Thu [†] | 8:20 AM | 2/10/00 Thu | "On February 10, 2000, JDS filed its Form 10-Q for the second quarter ending December 31, 1999 ('2Q 00 10-Q')… The net sales … were intentionally due to the fraudulent shipments of products… JDS's reported net sales were also inflated due to JDS's practice of recognizing revenue on shipments to customers such as Lucent and Nortel... " (Complaint ¶¶ 206-207). |
| 11 | 2/11/00 Fri | 5:12 PM | 2/14/00 Mon | "On February 11, 2000, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with E-TEK (the 'E-TEK Registration Statement')... According to the OCLI Proxy-Prospectus, the primary reason for the proposed merger was the allegedly strong demand in the fiber optic industry..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 4). |
| | | 5:12 PM | | "On February 11, 2000, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with E-TEK (the 'E-TEK Registration Statement')... <br>… <br>The foregoing statement in the E-TEK Proxy-Prospectus was false and misleading because it failed to disclose that at least part of the seemingly increasing demand was due to JDS's practice of recognizing revenue on shipments to its customers that were merely being held in inventory ... and JDS's practice of deferring sales into later quarters once sales quotas have been achieved. (Complaint ¶¶ 208-210). |
| 12 | 3/10/00 Fri [3] | No Time | 3/10/00 Fri<br>3/13/00 Mon | "On March 10, 2000, JDS completed another two-for-one stock split" (Complaint ¶ 211). |
| 13 | 4/25/00 Tue | 4:03 PM | 4/26/00 Wed | "Subsequent to the release of its 3Q 00 results on April 25,2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and its prospects. During the call, Kalkhoven, Muller, Abbe and Straus made presentations and answered questions. During the follow-up conversations with participants, Kalkhoven, Muller, Abbe and Straus directly disseminated important information to the market. Specifically, Kalkhoven stated that 'demand remains incredibly strong', that he believed that 'we will see demand accelerate,' and that 'whatever we make is going to be used'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 4). |
| 14 | 4/26/00 Wed | 7:00 AM | 4/26/00 Wed<br>4/27/00 Thu | "Mr. Kalkhoven gave an interview to CNBC on April 26, 2000. During that interview, Mr. Kalkhoven stated, 'Well, at this moment in time the demand is so strong it is just a question of being able to get everything out of the door, so manufacturing issues'" (Connecticut's Second Amended & Fifth Supplemental Responses to Defendant Kevin Kalkhoven's First Set of Interrogatories, 2/2/07, Interrogatory No. 4, p. 26). |
| | | No Time | | "On April 26, 2000, the day after the conference call, securities analysts issued reports on JDS, which were based on and repeated statements disseminated by Defendants…" (Complaint ¶ 215). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 15 | 5/15/00 Mon | 5:15 PM | 5/16/00 Tue | "On May 15, 2000, the Company filed its 10Q for the quarter ending March 31, 2000 ('3Q 00 10-Q')... The 3Q 00 10-Q also contained the following representations: (a) 'Strong demand for virtually all our optical components and modules products combined with the JDS merger contributed to the increases in gross profit...'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 5). |
| | | 5:15 PM | | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). |
| 16 | 5/18/00 Thu | 7:00 AM | 5/18/00 Thu | "Jozef Straus stated in this [CNBC/Dow Jones Business Video] public interview, 'Well, if you would recall the company JDS Uniphase came about by merger of JDS Fitel and Uniphase Corporation last July and since that time the company has really grown very, very fast. We have had several good quarters, the market is really exploding, and we think that we will be a strong force moving forward. In today's conference call our CFO has given a guidance of 75, 80 percent growth for the next fiscal year. We have our way cut out for us next year'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 6). |
| | | 7:03 AM | | "On May 18, 2000, JDS issued a press release announcing that defendant Kalkhoven was retiring as Co-Chairman and CEO and from the Board of Directors" (Complaint ¶ 220). |
| 17 | 5/23/00 Tue | 5:21 PM | 5/24/00 Wed | "JDS filed amendments to the E-TEK Registration Statement on May 23, 2000 and May 31, 2000 (the 'Amended E-TEK Registration Statements'), which were signed by Defendants Straus and Muller. The Amended E-TEK Registration statements contained a Proxy Statement- Prospectus (the 'Amended E-TEK Proxy-Prospectuses') which repeated the statements in the original E-TEK Registration Statement that the proposed merger was in response to 'unprecedented growth in the telecommunications industry and demand for the fiber optic networks that are enabling such growth'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 6). |
| | | 5:21 PM | | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 18 | 5/31/00 Wed | 4:34 PM | 6/1/00 Thu | "JDS filed amendments to the E-TEK Registration Statement on May 23, 2000 and May 31, 2000 (the 'Amended E-TEK Registration Statements'), which were signed by Defendants Straus and Muller. The Amended E-TEK Registration statements contained a Proxy Statement- Prospectus (the 'Amended E-TEK Proxy-Prospectuses') which repeated the statements in the original E-TEK Registration Statement that the proposed merger was in response to 'unprecedented growth in the telecommunications industry and demand for the fiber optic networks that are enabling such growth'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 6). |
| | | 4:34 PM | | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). |
| 19 | 6/15/00 Thu [4] | No Time | 6/15/00 Thu 6/16/00 Fri | "Muller stated in this public interview [reported in the Wall Street Transcript], '[w]ithout question, the most compelling trend is the overwhelming growth in demand. This demand is continually exceeding our forecasts and those of our customers....The biggest opportunities we have for improvement are to continue to add capacity. We are currently in a program where we are working to quadruple our capacity over the next 18 months....We have provided specific guidance for the current quarter and for our next fiscal year ending June 30, 2001. This guidance reflects the strong growth we anticipate.... The first reason I would give is that the fiberoptic industry is growing extremely rapidly, and I believe it will continue to grow rapidly for years to come.... I have never seen an industry where the growth prospects look to be as bright as they are in fiberoptics..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 6-7). |
| | | 11:08 AM | | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). |
| 20 | 6/22/00 Thu | 5:34 PM | 6/23/00 Fri | "On June 22, 2000, the U.S. Department of Justice cleared JDS's merger with E-TEK" (Complaint ¶ 227). |
| 21 | 6/28/00 Wed | 11:38 AM | 6/28/00 Wed | "E-TEK shareholders subsequently approved the merger on June 28, 2000" (Complaint ¶ 227). |
| 22 | 6/30/00 Fri | 10:43 AM | 6/30/00 Fri | "The merger was completed on June 30, 2000 for 150.1 million shares of JDS stock, for a total purchase price of $17.5 billion" (Complaint ¶ 227). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 23 | 7/10/00 Mon | 12:03 AM | 7/10/00 Mon 7/11/00 Tue | "On July 10, 2000, JDS announced that it agreed to merge with SDL, a fiber optic communications company, in a transaction valued at approximately $41 billion" (Complaint ¶ 228). |
| | | 9:30 AM | | "Straus stated [in another publicly broadcast interview on July 10 on Market Call, CNNFN], '[w]hat we have to look at is really what bandwidth explosion allows more people to reach higher opportunities with respect to the Internet...I really can't say whether we will cap the acquisition streak, but all we have to look at is whether we can produce whatever customers need....Both of us feel that we are capacity constrained, and we both believe that this in an incredible opportunity moving forward the next several years'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 7-8). |
| | | 5:00 PM | | "In this publicly broadcast interview [on CNBC/Dow Jones Business Video], Straus stated, Straus stated [sic], '[w]ell, actually the market is moving very, very fast. The customers are demanding new products. Our products, we are bringing products forward in every six to nine months. There is really very little overlap. What we really need to bring is more capacity to our customers to therefore we feel that we, with our synergies, technological synergies, we will bring products closer to our customers...'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 7). |
| 24 | 7/19/00 Wed | 5:40 PM | 7/20/00 Thu | "On July 19, 2000, it was announced that JDS stock would be added to the S&P 500 index after the close of trading on July 26, 2000" (Complaint ¶ 229). |
| 25 | 7/20/00 Thu | No Time | 7/20/00 Thu 7/21/00 Fri | "On July 20, 2000, an article in the M2 Presswire noted that 'the news [on JDS] keeps getting better and better and the recent stock price of both JDS Uniphase and SDL is a good indicator that things are going very well'" (Complaint ¶ 230). |
| 26 | 7/26/00 Wed [†] | 4:56 PM | 7/27/00 Thu | "On July 26, 2000, JDS announced its fourth quarter fiscal 2000 ('4Q 00') results in a release which stated that the Company's sales for the quarter were $524 million, or 33% above net sales of $395 million for the quarter ended March 31, 2000" (Complaint ¶ 231). |
| | | 7:39 PM | | "On July 26,2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's fourth quarter 2000 results, its business and prospects. During the call, Defendants Straus, Muller and Abbe made presentations and answered questions. As senior managers, each of them is responsible for all the false statements in this call, as is JDS. Specifically, Muller falsely stated that 'demand for our products remains very strong and our growth remains determined by the rate at which we can expand capacity' and Straus added that the 'demand for bandwidth' is 'grow[ing] exponentially'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 8). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 27 | 7/27/00 Thu | 5:00 PM | 7/27/00 Thu<br>7/28/00 Fri | "Straus stated in this public interview [on CNBC/Dow Jones Business Video], 'This industry is really growing very, very fast and we have a multiple strategy. One of the strategies is to put increased capacity four times over an 18 month period. We have been doing this consistently and we believe our capacity expansion plan and all the activities will meet the demand... Well, we have been growing at an incredible pace over the five, six years. We see the growth of the Internet and the corresponding wideband continuing unabating and we fell [sic] that the growth rate is what we have educated in yesterday's conference call will unabated. We are very comfortable with what we are seeing here in the future.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 8). |
| | | No Time | | "Following the conference call, on July 27, 2000, securities analysts issued reports on JDS, which were based on, and repeated statements disseminated by Defendants, including on the quarterly conference call" (Complaint ¶ 236). |
| 28 | 8/30/00 Wed | 8:51 PM | 8/31/00 Thu | "On August 30, 2000 [as reported in the DowJones NewsWires] Abbe reiterated guidance, provided in late July, of sequential revenue growth for the first fiscal quarter, ending in September.  He said the revenue growth will be in the "very high teens" from the $524 million posted in the fiscal fourth quarter ended June 30..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 8). |
| 29 | 9/1/00 Fri | 4:54 PM | 9/1/00 Fri<br>9/5/00 Tue | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). |
| | | 4:54 PM | | "On September 1, 2000, JDS filed a Form 8-K with the SEC which ... [stated] "Strong demand for virtually all of our optical components and module products combined with the increased operations resulting from the JDS FITEL merger contributed to the increases in gross profit for 2000" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 9). |
| | | 4:54 PM | | "...JDSU failed to account for the fact that a substantial part of the goodwill for ETEK was impaired at the time of the closing of the acquisition of the company.  Instead, goodwill should have been written down at the date each acquisition closed..." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, pp. 60-61). |
| | | No Time | | "Straus stated publicly in a Wall Street Transcript interview, '[t]he greatest single opportunity is really the growth of the Internet and the growth of bandwidth in telecommunications. What we are seeing is an increase in demand for more information that in the end will provide the further need for our components and modules...'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 9). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 30 | 9/6/00 Wed | 6:30 PM | 9/7/00 Thu | "Straus stated in this public interview [on CNN Moneyline News Hour], 'As you know, Internet is really just exploded the last three, four years, we are just barely seeing the beginning of it, e-commerce, download videos, real-time videos are not even there. We believe the expansion will continue unabated for long, long time, which creates a great demand for fiber-optic networks, create a great demand for fiber-optic systems, and consequently, create great demand for our products.' "Muller stated in this public interview, 'Well, we have many challenges in our business, and the biggest challenge is keeping up with our customer demands.  And the business is growing very quickly, the technology is changing quickly, we're expanding all over the world, as Josef mentioned...'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 10). |
| 31 | 9/7/00 Thu | 8:16 AM | 9/7/00 Thu | "On September 7, 2000, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with SDL (the 'SDL Registration Statement')… As with the E-TEK merger, JDS once again cited strong demand as the impetus for its merger with SDL..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 11). |
| | | 8:16 AM | | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). |
| | | 8:16 AM | | "In its Form S-4 filed with the SEC on September 7, 2000, JDSU stated in the Unaudited Pro Forma Consolidated Balance Sheet of JDS Uniphase and SDL, that as of June 30, 2000 goodwill was worth $22.3 billion and that total assets were worth $26.4 billion..."  (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 60). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 32 | 9/12/00 Tue [5] | No Time | 9/12/00 Tue<br>9/13/00 Wed<br>9/14/00 Thu | "Maurice Tavares, President of the largest division at JDS (fiber products group) stated [in a meeting of 200 analysts], 'There is no slowdown or stopping of the growth. We will grow at tremendous rate in Ottawa to meet the demand.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 11). |
| | | No Time | | "The Globe and Mail reported that JDS set a goal of quadrupling its production capacity over 18 months in 2000. Straus stated that the company was 'on pace' to achieving that goal.  'The market is there, we've got to respond.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 11-12). |
| 33 | 9/18/00 Mon | No Time | 9/18/00 Mon<br>9/19/00 Tue | "Muller said [at an Investor's conference in Boston] demand for optical-networking gear is doubling every six to nine months as telecommunications providers struggle to expand capacity. 'We are now in a major revolution.' Muller said. He continued, '[t]hat phenomenon is what's driving growth at JDS Uniphase.' And, '[t]he fact is JDS Uniphase needs the additional production capacity in order to meet customer demand.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). |
| 34 | 9/20/00 Wed | No Time | 9/20/00 Wed<br>9/21/00 Thu | "At the Banc of America Securities Investment Conference in San Francisco on September 20, 2000 [as reported by CBS MarketWatch], Straus stated, 'We feel the explosion of bandwidth is going to continue unabated.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). |
| 35 | 9/28/00 Thu | 4:00 PM | 9/29/00 Fri | "On September 28, 2000, JDS filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2000 ('Fiscal 2000 10-K'). The Fiscal 2000 10-K incorporated by reference the financial statements filed with the SEC in the September 1, 2000 8-K. The Fiscal 2000 10-K was signed by Defendants Straus and Muller and was false and misleading and contained the same false and misleading statements regarding revenue as that statement..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). |
| | | 4:00 PM | | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). |
| | | 4:00 PM | | "...Because each of these statements [of goodwill and total assets in JDSU's Form S-4 filed on September 7, 2000] were false, both the September 28, 2000 Form 10-K and the September 7, 2000 Form S-4 contained false statements"  (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 60). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 36 | 10/10/00 Tue | 4:30 PM | 10/11/00 Wed | "On October 10, 2000, Lucent, one of JDS's two biggest customers, announced in a press release that it was experiencing a slow down in its optical networking business" (Complaint ¶ 249). |
| 37 | 10/25/00 Wed [6] | 5:15 PM | 10/25/00 Wed | "On October 25, 2000, Nortel reported its results for the quarter ending September 30, 2000 and noted that it was experiencing a downturn in its optical networking equipment division -- the division which made Nortel one of JDS's two largest customers" (Complaint ¶ 250). |
| 38 | 10/26/00 Thu | 6:40 PM | 10/26/00 Thu 10/27/00 Fri | "…JDSU misrepresented inventory trends in its October 26, 2000 conference call with investors and analysts …. During this conference call, defendant Abbe, president and COO of the Company, stated that '[w]e do not see indications of systematic across the board component or module inventory builds either at our customers or in our own shops;' and that '[c]ustomer orders for our products are keeping up with our output'" (Plaintiffs' Amended and Supplemental Responses and Objections to Defendant Anthony Muller's First of Interrogatories, 2/2/07, Interrogatory No. 10, pp. 7-8). |
| | | 6:40 PM | | "Subsequent to the release of its 1Q 01 results, on October 26, 2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and its prospects" (Complaint ¶ 253). |
| | | No Time | | "Straus stated in this public interview [on CNBC], 'We still feel that the industry is very robust, and we providing [sic] right solution to our customers. And we look very comfortable for next quarter and the whole fiscal year beyond.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). |
| 39 | 10/27/00 Fri | No Time | 10/27/00 Fri 10/30/00 Mon | "Following the conference call, on October 27, 2000, securities analysts issued reports on JDS, which were based on, and repeated statements disseminated by Defendants, including on the quarterly conference call..." (Complaint ¶ 258). |
| | | No Time | | "An October 27, 2000 Wall Street Journal article about JDS's first quarter 2001 results repeated similar positive sentiments about demand for JDS's products…" (Complaint ¶ 259). |
| | | No Time | | "Straus misrepresented demand for JDSU products in an October 27, 2000 appearance on CTV-TV with interviewer Linda Sims. When Sims questioned Straus about declining demand for JDSU products, Straus responded that 'On the contrary, we are finding that there's a great demand from a variety of our customers. We have a very wide and diverse customer base, and each of the customers from different backgrounds are continually requesting our product'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 15). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 40 | 10/30/00 Mon | 4:46 PM | 10/31/00 Tue | "In its Form S-3 filed with the SEC on October 30, 2000, the Company incorporated by reference the Form 8-K filed September 1, 2000, and the misrepresentations regarding goodwill contained therein" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 60). |
| | | 4:46 PM | | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). |
| 41 | 11/1/00 Wed | No Time | 11/1/00 Wed 11/2/00 Thu | "As described in a November 1, 2000 Motley Fool article recounting the conference call '[i]t's rare that I've listened to any conference call in which I've heard so many comments from management about how good things went in the past quarter and how good they expect business to be in the future'" (Complaint ¶ 257). |
| 42 | 11/13/00 Mon [7] | 8:09 AM | 11/14/00 Tue | "On or about November 13, 2000, JDS filed a Form 10-Q with the SEC which contained its financial statements for the fiscal 2001 first quarter ('1Q 01 10-Q') and was signed by Defendant Muller. The 1Q 01 10-Q also stated that "[s]trong demand for virtually all our optical components and modules products combined with the increased operations resulting from our acquisitions completed in fiscal 2000 contributed to the increases in gross profit" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 15). |
| | | 8:09 AM | | "...JDSU stated that the total value of its inventory as of September 30, 2000 was $394.5 million, of which $68.2 million was finished goods.  Both of these statements were false" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 56). |
| 43 | 11/14/00 Tue | 8:09 AM | 11/14/00 Tue | "The November 14, 2000 Form 10-Q for the quarter ended September 30, 2000 is incorporated by reference within the Forms S-4 filed November 17, 2000 and February 12, 2001.  In its Form 10-Q filed with the SEC on November 14, 2000, JDSU stated in its Consolidated Balance Sheets that as of September 30, 2000, intangible assets including goodwill were worth $21.1 billion and that total assets were worth $25.7 billion..." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 65). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 44 | 11/15/00 Wed | 2:56 PM | 11/15/00 Wed 11/16/00 Thu | "In this public conference [UBS Warburg Global Telecom Conference], Straus stated, '[JDSU] will see sequential revenue growth in the high teens during the current second fiscal quarter.' And, '[J]DS Uniphase continues to increase capacity worldwide while adding automation to its manufacturing process.' Straus and Muller reiterated previous guidance, saying 'the company expects year-over-year sales growth of 75% in the January quarter, 80% in the April quarter, 90% in the July quarter, and 110% in the October quarter'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 15). |
| 45 | 11/17/00 Fri | 3:20 PM | 11/17/00 Fri 11/20/00 Mon | "On November 17, 2000, JDS filed an amendment to the SDL Registration Statement with the SEC.... The Amended SDL Registration Statement included Proxy-Prospectuses ... which contained the same rationale for the merger as the original SDL Registration Statement and incorporated by reference the same documents that were incorporated into the original SDL Proxy-Prospectus as well as JDSU's 1Q 01 10-Q" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). |
| | | 3:20 PM | | "The November 14, 2000 Form 10-Q for the quarter ended September 30, 2000 is incorporated by reference within the Forms S-4 filed November 17, 2000 and February 12, 2001. In its Form 10-Q filed with the SEC on November 14, 2000, JDSU stated in its Consolidated Balance Sheets that as of September 30, 2000, intangible assets including goodwill were worth $21.1 billion and that total assets were worth $25.7 billion. Because each of these statements were false, both the November 14, 2000 Form 10-Q and the November 17, 2000 Form S-4 contained false statements" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 65). |
| 46 | 11/20/00 Mon | 1:03 AM | 11/20/00 Mon | "On November 20, 2000, JDS and SDL set December 27, 2000 as the date for their shareholders to vote on the proposed merger at special meetings of their shareholders" (Complaint ¶ 265). |
| 47 | 12/18/00 Mon | 5:00 AM | 12/18/00 Mon | "On December 18, 2000, JDS and SDL were forced to adjourn the December 27 meetings because of delays in the regulatory approval process" (Complaint ¶ 265). |
| 48 | 12/19/00 Tue | 1:00 PM | 12/19/00 Tue | "Straus stated [in a JDSU press release], 'JDS Uniphase is continually striving to increase manufacturing output to meet customer demand. The securing and opening of new and expanded facilities, such as those in West Trenton, New Jersey, is a vital step towards achieving that goal'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 49 | 12/21/00 Thu | No Time | 12/21/00 Thu 12/22/00 Fri | "Muller stated [in the Los Angeles Times, Business Section], 'I think capital-spending growth in the telecom space will be slowing but... as a percentage of... the telecommunications mix, fiber optics will be increasing'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). |
| 50 | 12/28/00 Thu [8] | 1:26 PM | 12/27/00 Wed | "On December 28, 2000, JDS and SDL set January 26, 2001 as the new date for the shareholders' meetings" (Complaint ¶ 265). |
| 51 | 1/1/01 Mon | No Time | 1/2/01 Tue [9] | "In this publication [Lightwave, No. 1, Vol. 18], Abbe is reported stating, 'From the industry point of view, the demand is like a bow wave pushed out in front of a boat; our goal will be a capacity expansion of four times over 18 months... We've seen shortages up and down the supply line... We are aware of a lot of recent concern. Many service providers' capital budgets aren't growing, and there has to be money generated to pay for all of this....'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). |
| 52 | 1/12/01 Fri | No Time | 1/12/01 Fri 1/16/01 Tue [10] | "In this publication [Hamilton Spectator, Friday Final Edition], Abbe stated that additional manufacturing space will help JDS Uniphase 'meet the ongoing demand for optical components in the global telecommunications market'"  (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 17). |
| | | No Time | | "Muller stated [in The Business Journal, Vol. 18, No. 37], in response to rumors that a large customer might be puling [sic] back on orders sending the price of JDS stock reeling: 'At times like this, rumors are rampant - rumors about our company and other companies in the optical space.' He continued, '[s]uch rumors have certainly contributed to the decline in the optical space.' And, '[m]any of these are purposely started by those who might have short positions in the stock'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 17). |
| 53 | 1/24/01 Wed | 3:09 PM | 1/24/01 Wed 1/25/01 Thu | "On January 24, 2001, the meetings were adjourned to February 12, 2001" (Complaint ¶ 265). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 54 | 1/25/01 Thu | 4:05 PM | 1/25/01 Thu 1/26/01 Fri | "In its condensed consolidated statement of operations table attached to this press release [January 25, 2001 Press Release], JDSU notes gross profit of $475.3 million… Had the Company correctly reserved for its inventory, its pro forma statements of gross profits and earnings per share would have been reduced" (Plaintiffs' Amended and Supplemental Responses to Defendant Anthony Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 7). |
| | | No Time | | "In its January 25, 2001 Conference Call... Had the Company correctly reserved for its inventory, its pro forma statement of gross margin would have been reduced" (Plaintiffs' Amended and Supplemental Responses to Defendant Anthony Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, pp. 6-7). |
| | | No Time | | "Subsequent to the release of its 2Q 01 results, JDS held a conference call on January 25, 2001 for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and prospects. During the call, Straus, Muller and Abbe made presentations and answered questions. Specifically, Straus represented that JDS had "another record quarter" and that JDS was looking forward to the next quarter 'with optimism.' Abbe stated that despite the inventory adjustments at JDS's customers, 'demand is so strong,' 'backlog is enormous,' 'we do not see oversupply,' and the 'underlying growth in telecommunications bandwidth we believe continues unabated'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 17). |
| 55 | 1/26/01 Fri | No Time | 1/26/01 Fri 1/29/01 Mon | "Following the conference call, on January 26, 2001, securities analysts issued reports on JDS, which were based on and repeated information provided by JDS management on the conference call and in follow-up conversations…" (Complaint ¶ 270). |
| | | No Time | | "Furthermore, notwithstanding that the Company finally alluded, in the January 25, 2001 press release, to the fact that demand was not quite as good as Defendants had primed the market to believe, Defendants continued to downplay the effect that this would have on JDS's future results and suggested instead that the downturn in demand would have only a minor and temporary effect on JDS. This is illustrated by an article in The Wall Street Journal on January 26, 2001..." (Complaint ¶ 268). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 56 | 1/30/01 Tue | No Time | 1/30/01 Tue<br>1/31/01 Wed | "Katherine Payne, vice-president of human resources for JDS's fiberoptic group, stated in this publication [National Post], 'We have several sites in mainland China, and we can and must use them to greater opportunity for the company. So we will be expanding our capacity in Asia and certainly that will have some impact on the production that is currently in some of our other sites. That would include, but not be exclusive to, Ottawa'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 17-18). |
| | | No Time | | "Katherine Payne, vice-president of human resources for JDS's fiberoptic group, stated in this publication [The Globe and Mail], 'I don't believe we're seeing a general slowdown in the industry'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 18). |
| | | No Time | | "Abbe stated in this publication [The Globe and Mail], 'We may experience a temporary slowing of order flow for certain products until this adjustment is completed'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 18). |
| 57 | 2/1/01 Thu | No Time | 2/1/01 Thu<br>2/2/01 Fri | "Abbe stated in this publication [China Telecom, No. 2, Vol. 8], 'Over the next year we will expect a greater percentage of our output to be manufactured in Asia. We find our competitors increasingly doing this and taking advantage of those economics, and we too must move directionally westward...'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 18). |
| | | No Time | | "Abbe stated in this publication [The Globe and Mail] that JDS had little choice because Asian workers were 'substantially' cheaper than their North American counterparts...'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 18-19). |
| | | No Time | | "After the layoff by JDS Uniphase of 700 contract workers in Ottawa, Abbe told reporters [of AFX European Focus and The Globe and Mail] in Ottawa following a meeting with shareholders that JDS expected to increase its workforce by at least 60 percent over the next year, to facilitate its expectation to double revenue...There's more uncertainty in the telecommunications sector than a few months ago but demand from JDS customers will continue to grow in the coming years...'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 19). |
| 58 | 2/12/01 Mon | No Time [11] | 2/12/01 Mon<br>2/13/01 Tue | "The November 14, 2000 Form 10-Q for the quarter ended September 30, 2000 is incorporated by reference within the Forms S-4 filed November 17, 2000 and February 12, 2001. In its Form 10-Q filed with the SEC on November 14, 2000, JDSU stated in its Consolidated Balance Sheets that as of September 30, 2000, intangible assets including goodwill were worth $21.1 billion and that total assets were worth $25.7 billion" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 65). |
| | | 10:32 PM | | "On February 12, 2001, JDS and SDL announced that their respective stockholders approved the merger at special meetings" (Complaint ¶ 272). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 59 | 2/13/01 Tue [12] | 4:52 PM | 2/13/01 Tue 2/14/01 Wed 4/9/01 Mon | "Also on February 13, 2001 - the day after JDS and SDL shareholders approved the merger - JDS issued a press release informing investors that JDS had unexpectedly lowered its guidance for the third quarter of Fiscal 2001 from $0.21 to $0.17 and reduced its EPS estimates for the full year from $0.82 to $0.74.<br>...<br>Shortly after the press release was issued on February 13, 2001, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers, and stock traders..." (Complaint ¶¶ 274-275). |
| | | No Time | | "JDS filed its Form 10-Q for 2Q 01 with the SEC on February 13, 2001 ('2Q 01 10-Q'), which was signed by Defendant Muller. The 2Q 01 10-Q stated that "Strong demand for virtually all our optical components and modules products combined with the increased operations resulting from our acquisitions completed subsequent to December 31, 1999 contributed to the increases in gross profit" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 19-20). |
| | | No Time | | "...JDSU amended its Form 10-K for the year ending June 30, 2000.  The amended 10-K lists in the Consolidated Balance Sheets that as of June 30, 2000 goodwill was worth $22.3 billion and that total assets were worth $26.4 billion" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 66). |
| | | No Time | | "In this [Form 10-Q] filed with the SEC, JDSU reported in its Consolidated Balance Sheets that net intangible assets including goodwill were $20.0 billion with $24.9 billion in total assets.  Note 5 also lists the value of goodwill at $21.2 billion as of December 30, 2000..."  (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 67). |
| | | No Time | | "In [the company's 10-K filed February 13, 2001], JDSU stated that the value of the company's total inventory for the year ended June 30, 2000 was $375.4 million, of which $39.2 million consisted of finished goods.  The Company's [sic] further misstated that its gross profits for the fiscal year ending June 30, 2000 was $678.8 million..."  (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 57). |
| | | No Time | | "In [JDSU's 10-Q filed February 13, 2001], the Company reported that the total value of its inventory was $493.9 million, of which $35.7 million was finished goods.  JDSU also falsely reported gross profits of $475.3 million for the three months ending December 30, 2000"  (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, pp. 57-58). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 60 | 2/23/01 Fri | No Time | 2/23/01 Fri 2/26/01 Mon | "Straus stated [as reported by The Ottawa Citizen] optical gear is grabbing a bigger slice of telecommunication spending because it provides the answers to the financial squeeze hitting the industry. 'I firmly believe that there will be strong growth'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 20). |
| 61 | 2/27/01 Tue | 9:01 AM | 2/27/01 Tue | "On February 27, 2001, JDS issued a press release announcing that it would be reducing its global workforce by approximately 3,000 people.  Despite that news, JDS stated in the press release that 'it remains confident about its long-term position in the industry and believes that its ongoing prospects remain very positive'" (Complaint ¶ 279). |
| 62 | 3/5/01 Mon | No Time | 3/5/01 Mon 3/6/01 Tue | "An unnamed Spokesman for JDS Uniphase stated [quoted in Telephony, 2001 WLNR], 'We see it as a short-term downturn.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 20). |
| 63 | 3/6/01 Tue | 5:14 PM | 3/7/01 Wed | "On March 6, 2001, the Company filed a Form 8-K with the SEC in which it revised its guidance for future periods downward for the third time in little over a month" (Complaint ¶ 280). |
| 64 | 3/20/01 Tue | No Time | 3/20/01 Tue 3/21/01 Wed | "On March 20, 2001, [in a presentation to investors at the OFC Conference] an unidentified speaker from JDS management states, 'The longer-term outlook for the optical component space is strong, driven by continued solid bandwidth demand growth and carriers' needs to minimize the cost per bit invested in equipment'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 20). |
| 65 | 3/23/01 Fri | 1:14 PM | 3/23/01 Fri | "In this document [Form 8-K] filed with the SEC, JDSU reported in the Consolidated Balance Sheets of JDS Uniphase and SDL that intangible assets including goodwill were $60.2 billion with $65.5 billion in total assets…" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 70). |
| 66 | 4/24/01 Tue | 6:00 AM | 4/24/01 Tue | "In its condensed consolidated statement of operations table attached to this press release [April 24, 2001 Press Release 'JDS Uniphase Announces Third Quarter Results and Global Realignment Program'], JDSU notes gross profit of $425.9 million for the quarter ended March 31, 2001…. Had the Company correctly reserved for its inventory, its statement of gross profits would have been reduced" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 7). |
| | | 6:00 AM | | "In the same press release, the Company also announced a "new" Global Realignment program being implemented by the Company to deal with the declining demand (i.e., the restructuring program that JDS had been planning since June 2000) and also announced that the Company's goodwill was impaired" (Complaint ¶ 284). |
| | | 8:15 AM | | "JDSU attached to this document [Form 8-K filed April 24, 2001] as an exhibit the script of a conference call in which the company announced pro forma earnings of $.14 per share. … Had the company correctly stated its inventory reserves, its cost of sales would have increased, and its gross profits and earnings per share would have decreased" (Plaintiffs' Amended and Supplemental Responses and Objections to Anthony Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 6). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| | | 8:15 AM | | "Despite this assertion, JDSU's press release dated April 24, 2001 announcing its results for the quarter ending 3/31/01 said nothing about ADVA being an impaired asset, and included ADVA on its balance sheet at a grossly exaggerated value…" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 10, p. 91). |
| 67 | 4/30/01 Mon | No Time | 4/30/01 Mon 5/1/01 Tue | "Muller reiterated [in a teleconference call sponsored by WR Hambrecht] the company's guidance for the June quarter with revenues of $700 million and EPS of $0.05. The tone of Muller's commentary was decidedly more positive during this conference call than at the previous week's earnings conference call. Muller stated he believed that the annual growth rate for JDS Uniphase could be in the range of 40-50%, once the inventory correction is completed and the carrier capital spending picture becomes more certain" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 20-21). |
| | | No Time | | "Muller says he believed that the inventory correction in the optical component space will be completed by September quarter, possibly sooner" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 5, p. 53). |
| 68 | 5/1/01 Tue | No Time | 5/1/01 Tue 5/2/01 Wed | "During the call [a May 1, 2001 conference call], Muller stated that [t]he [sic] industry's inventory glut is likely to be over no later than the end of September…." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 8). |
| 69 | 5/2/01 Wed | No Time | 5/2/01 Wed 5/3/01 Thu | "According to CBS Marketwatch, Muller stated [at the JP Morgan H&Q Technology Conference], 'We think the inventory correction among our customers will have run its course by September...'" (Plaintiffs' and Amended Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, p. 53). |
| | | No Time | | "In a May 2, 2001 statement printed in The Canadian Press, defendant Muller asserted that '[t]he industry's inventory glut is likely to be over no later than the end of September…'" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 11, p. 38). |
| 70 | 5/11/01 Fri | 5:24 PM | 5/14/01 Mon | "…JDSU misrepresented the value of its inventory in the following statements: … The statements of inventory set out in the Condensed Consolidated Balance Sheet at Part 1 Item 1 of the Company's Form 10-Q filed May 11, 2001 (stating inventory of $672.9 million, including $141 million in finished goods)... " (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, pp. 5-6). |
| | | 5:24 PM | | In this document [Form 10-Q filed May 11, 2001] filed with the SEC, JDSU reported in its Consolidated Balance Sheets, that net intangible assets including goodwill was $58.4 billion with $65.0 billion in total assets... (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 68). |
| | | 5:24 PM | | "…Moreover, the company continued to use this exaggerated value for ADVA in its May 11, 2001 Form 10-Q even after advising the SEC of the need to record an impairment charge" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 10, p. 91). |

| | Date | Time | Impact Date(s) [1] | Complaint/Plaintiffs' Responses to Interrogatories Notes |
|---|---|---|---|---|
| 71 | 6/12/01 Tue | 4:00 AM | 6/12/01 Tue | "On June 12, 2001, JDS announced the retirement of Charles Abbe as President and Chief Operating Officer and the appointment of Gregory Dougherty as Executive Vice President and Chief Operating Officer." (Complaint ¶ 289). |
| 72 | 6/14/01 Thu | 4:05 PM | 6/15/01 Fri | "On June 14, 2001, JDS issued a press release, downwardly revising for the fourth time its outlook and acknowledging for the first time the fact that its inventories balance was overstated due to declining demand" (Complaint ¶ 290). |
| 73 | 7/26/01 Thu | 3:58 PM | 7/26/01 Thu 7/27/01 Fri | "Finally, on July 26, 2001, JDS issued a press release in which it announced its fourth quarter Fiscal 2001 ('4Q 01') results and revealed that its 4Q 01 sales were 35% below its 3Q 01 sales. In addition to the dismal 4Q 01 results, the Company also announced large write-downs of inventory and goodwill" (Complaint ¶ 292).<br><br>Trading halted at approximately 3:38 PM on 7/26/01. |

Note:

[*]  As a result of the amended and supplemental interrogatory responses filed on 2/2/07, there was one new date, 1/18/00.  However, this date had already been included as an indicator variable due to a event that occurred after the close of the market on 1/17/00.  Also as a result of the amended and supplemental responses filed on 2/2/07, there are 5 dates that have been removed.  They are:  11/22/00, 11/24/00, 2/8/01, 2/22/01, and 4/12/01.

[†]  As a result of the amended and supplemental interrogatory responses filed on 2/2/07 regarding revenue recognition, it is unclear whether this event will remain in the list of allegations.

[1]  The impact date is the date of the event for which plaintiffs cite a public statement in the Complaint and Plaintiffs' Responses to Interrogatories and the following trading day if the information was disclosed late in the trading day (i.e. between 2:00 p.m. ET and the close of the market), or at an unknown time.  If the information was disclosed after market close, the impact date is only the trading day following the date of the event cited by plaintiffs.

[2]  The stock split was completed on 12/30/99 according to Bloomberg, but 12/29/99 was listed on Bloomberg as the Pay Date.

[3]  The stock split was completed on 3/13/00 according to Bloomberg, but 3/10/00 was listed on Bloomberg as the Pay Date and is the date listed in the Complaint.

[4]  The Abbe interrogatories from 1/12/07 allege this event on 6/15/00.  However, Thomson Research only has a record of this filing on 6/16/00.

[5]  The Abbe interrogatories from 1/12/07 allege this event on 9/12/00.  However, according to Hakala's Report dated 2/5/00, this event occurred on 9/13/00 with no time stamp.  Due to this new information, 9/14/00 was included as an indicator variable.

[6]  The Complaint places this event on 10/25/00, but the public press reports this event on 10/24/00.

[7]  The Abbe interrogatories from 1/12/07 allege this event on 11/13/00.  However, Thomson Research only has a record of this filing on 11/14/00.

[8]  The Complaint places this event on 12/28/00, but the public press reports this event on 12/27/00.

[9]  While this event has no time stamp, only 1/2/01 is the impact date because 1/1/01 was a holiday.

[10]  Because 1/15/01  was a trading holiday, 1/16/01 is the impact date.

[11]  According to 10-K Wizard, the S-4 was filed on 2/12/01.  However, Thomson Research has no record nor time stamp for this filing.

[12]  According to 10-K Wizard, the 10-Q for the period ending 12/30/00 was filed on 2/13/01.  However, according to Thomson Research, the 10-Q for the period ending 12/30/00 was filed on 4/6/01 at 8:35 PM.  According to 10-K Wizard, the 10-K for the period ending 6/30/00 was filed on 2/13/01.  However, according to Thomson Research, the 10-K for the period ending 6/30/00 was filed on 4/6/01 at 8:35 PM.

Exhibit 4

**Exhibit 4**
**JDS Uniphase Corp.**
**Comparison of Plantiffs' Complaint/Interrogatory Days and Hakala Event Days**
**7/7/99 – 10/26/01**

Source:  Second Amended Consolidated Complaint; Plaintiffs' Responses to Interrogatories;  Bloomberg; Factiva; Thomson Research; 10-K Wizard;  Hakala 2/5/07 Report

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 7/7/99 | | | | 7/7/99 | Warburg Dillon Read announced FY00 EPS estimate of $2.11, over $1.92 for Uniphase prior to the merger.  The estimates reflect increased spending on cap ex as the new company aggressively pursues capacity expansion to meet surging demand for its products(Analyst Report) | | Y | 0 |
| 7/8/99 | | | | 7/8/99 | JDS Uniphase Corp. announced that its Board of Directors has approved a 1-for-1 stock dividend on its common shares(Bloomberg);  Credit Suisse First Boston is raising 2000 pro forma sales projections by 10% to $959M and EPS to $2.10 from $2.01, excluding goodwill(Analyst Report) | | Y | 0 |
| 7/9/99 | | | | 7/9/99 | JDS Uniphase Corp. was rated new "buy on weakness" by analyst Susan Streeter at Sprott Securities.  The 12-month target price is $190 per share(Bloomberg) | | Y | 0 |
| 7/12/99 | | | | 7/12/99 | Yorkton is establishing estimates of $2.10 and $3.10 for FY00 and FY01 and price target of US$120 and C$175 for JDS Uniphase.  The new EPS estimates reflect higher revenue growth of 65% in 2000 versus previous estimate of 55% and 50% in 2001 to reflect merger synergy due to lower sales and marketing costs(Analyst Report) | | Y | 0 |
| 7/14/99 | | | | 7/14/99 | JDS Uniphase Corp. filed to sell up to 7.75M shares and announced $181M in charges in its fiscal 4Q.  The company said 2.25M shares of the offering will be sold by stockholders.  It will use proceeds for general purposes, including working capital and funding potential acquisitions(Bloomberg 07.13.99); JDS Uniphase Corp. was raised to "buy" from "outperform" by Salomon Smith Barney due to SSB visiting JDS Uniphase's new facility in Ottawa and the fact that there is now 32% appreciation to their $215 12-month price target(Analyst Report);   Needham is raising their 6-12 month price target for JDS Uniphase to $235 from $227, based on 65x their July 2000 to June 2001 EPS estimate of $3.62.  They are also raising FY00 and FY01 EPS estimates to $2.45 and $3.62 from $2.32 and $3.49, respectively.  They are also raising FY00 revenue estimates to $1.08B from $1.02B and FY01 to $1.66B from $1.60B(Analyst Report) | | Y | 0 |
| 7/22/99 | | | | 7/22/99 | C.E. Unterberg, Towbin is establishing 2000 revenue estimates of $992.7M and $2.17 in EPS and setting a price target of $195 based on PE of 90x 2000 EPS estimate of $2.17(Analyst Report); Salomon Smith Barney raised rating on JDS Uniphase from "outperform" to "buy" based on the accelerating revenue growth resulting from the merger beyond the pro-forma combination of JDS Fitel and Uniphase(Analyst Report) | | Y | 0 |
| 7/27/99 | | | | 7/27/99 | JDS Uniphase Corp. said its fiscal 4Q profit doubled as demand for gear to carry more data traffic boosted sales.  Earnings before acquisition costs rose to $41.7M, or 48¢ a share, from a pro forma $20.8M, or 26¢, in the year-ago period.  That beat JDS Uniphase's own forecast of 45¢ - 46¢, made on July 13, and the 44¢ average analyst estimate from First Call Corp.(Bloomberg 07.26.99);   Salomon Smith Barney is raising estimates to $1.09 from $1.05 for FY00 and to $1.56 from $1.55 for FY01 based on the fact that the margins for the quarter were up significantly for both companies, which indicates the scenario of declining margins is improbable, but the impact of additions to capacity, mix shift, and other factors indicate strong growth(Analyst Reports) | | Y | 0 |
| 7/28/99 | | | | 7/28/99 | An offering of 10M common shares of JDS Uniphase Corp. was priced at $82.63 each through underwriters led by Banc of America Securities LLC and Deutsche Bank Alex Brown(Business Wire) | | Y | 0 |
| 8/3/99 | | | | 8/3/99 | Salomon Smith Barney is raising estimates for JDS Uniphase to $1.09 from $1.05 for FY00 and $1.56 from $1.55 for FY01(Analyst Report) | | Y | 0 |
| 8/4/99 | | | | 8/4/99 | Warburg Dillon Read are increasing the EPS estimates for JDS Uniphase from 98¢ to $1.09 for FY00 and from $1.29 to $1.50 for FY01 based on the expectation for strong optical networking industry fundamentals and the strategic benefits of the merger, they have also increased the target price to $112 based on a forward P/E multiple of 75 on FY01 EPS estimate and recent pace of growth and potential revenue and cost synergies from the merged company(Analyst Report) | | Y | 0 |
| 8/5/99 | | | | 8/5/99 | JDS Uniphase Corp. announced the completion of a public offering of 9.25M JDS Uniphase Corp. common shares at $82.625 each.  In a news release, JDS Uniphase Corp. said it sold 7,034,308 of the shares, while 2,215,692 shares were sold by certain shareholders(Dow Jones Business News 08.04.99) | | Y | 0 |
| 8/11/99 | | | | 8/11/99 | JDS Uniphase Corp. was raised to "buy" from "buy on weakness" by analyst Susan Streeter at Sprott Securities.  The 12-month target price is US $110 per share(Bloomberg) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 8/23/99 | | | | 8/23/99 | The Ontario Securities Commission has released the Reasons for Decision in the matter of JDS Uniphase Canada Ltd.  On July 22, the Commission upheld a decision by OSC staff which refused to grant JDS Uniphase an exemption from a regulation requiring a Canadian GAAP reconciliation as part of the company's prospectus for an exchangeable share offering(Canada NewsWire 08.23.99) | | Y | 0 |
| 8/26/99 | | | | 8/26/99 | JDS Uniphase Corp. was up after Cisco Systems Inc. said it would pay $7.4B for 2 firms likely to buy JDS products(Reuters News) | | Y | 0 |
| 8/27/99 | | | | 8/27/99 | JDS Uniphase Corp. was downgraded to "buy" from "strong buy" by analyst Kevin Slocum at SoundView Technology Group(Bloomberg);   JDS Uniphase Corp. was raised to "strong buy" from "buy" by analyst Mark Langley at Gruntal & Co.  The 12-month target price is $185 per share(Bloomberg) | | Y | 0 |
| 8/30/99 | | | | 8/30/99 | CT Securities Lowers JDS Uniphase To Accumulate(Dow Jones News Service);   JDS Uniphase stock was downgraded to "neutral" from "buy" by Nesbitt Burns, with a 12-month target price of $106(US)(Canada Stockwatch 08.31.99) | | Y | 0 |
| 8/31/99 | | | | 8/31/99 | SG Cowen initiated coverage of JDS Uniphase Corp. with a strong buy rating and a 12-month price target of $130.  It said JDS offers investment on powerful optical trends in telecommunications and said JDS is the leading merchant provider of fiber optic communications components to the telecom and CATV industries.  It also said JDS is well positioned to take advantage of network build and upgrade opportunities in the telecom space as demand grows for its lasers, modulators and amplification products used in communications systems and that the company continues to strengthen its position in the marketplace through both internal development and an aggressive acquisition strategy(Reuters News);   JDS Uniphase Corp. was downgraded to "buy on weakness" from "buy" by analyst Susan Streeter at Sprott Securities.  The 12-month target price is in the range of US$110-$120(Bloomberg) | | Y | 0 |
| 9/3/99 | | | | 9/3/99 | JDS Uniphase Canada Ltd. rose.  The company's chief executive said the company is working hard to keep up with stiff demand for its products(Dow Jones News Service) | | Y | 0 |
| 9/8/99 | | | | 9/8/99 | Salomon Smith Barney is raising target price for JDS Uniphase to $130 from $108 based on JDS's high growth revenue and solid position in the market(Analyst Report) | | Y | 0 |
| 9/13/99 | | | | 9/13/99 | The National Post reports in its Saturday, September 11, edition that Robert McWhirter, Vice President and portfolio manager at Royal Bank Investment Management believes it is still too early to be rushing into software stocks as a group.  Mr. McWhirter, however, has reduced his overweight position in JDS Uniphase, which makes a broad range of products for the fiber optic communications market.  "The stock has performed very strongly and there was a need to trim the holding, but the outlook for the company continues to be favorable based on the strong demand for bandwidth," says Mr. McWhirter(Canada Stockwatch) | | Y | 0 |
| 9/21/99 | | | | 9/21/99 | JDS Uniphase Corp. said it has completed the acquisition of AFC Technologies of Hull, Quebec, a company specializing in the development of optical amplifiers and broadband instruments(Dow Jones Business News 09.20.99);   JDS Uniphase drop due to Scotia Capital cutting its rating(Dow Jones News Service);   JDS Uniphase Corp. was rated "buy" in new coverage by analyst Patrick Houghton at Sutro & Co.  The 12 - 18 month target price is $150 per share(Bloomberg) | | Y | 0 |
| 9/28/99 | | | | 9/28/99 | JDS Uniphase Corporation announced that it has successfully demonstrated a tunable 10 Gb/s transmitter module that combines a high power tunable laser and a lithium niobate modulator with compact driver electronics(Dow Jones News Service) | | Y | 0 |
| 9/29/99 | | | | 9/29/99 | JDS Uniphase sets 2-for-1 stock split(Reuters News 09.28.99) | | Y | 0 |
| 10/4/99 | | | | 10/4/99 | JDS Uniphase Corp. announced plans to acquire Epitaxx Inc. for $400M worth of stock(Dow Jones Business News) | | Y | 0 |
| 10/5/99 | | | | 10/5/99 | Warburg Dillon Read made some optimistic comments about JDS Uniphase's plans to buy Epitaxx(Dow Jones News Service);   JDS Uniphase Corp. was maintained "neutral" by analyst Brian J. Piccioni at Nesbitt Burns.  The 12-month target price has been raised to $125 from $106(Bloomberg);   Warburg Dillon Read increased target price for JDS Uniphase to $140 based on the forward P/E multiple of 75 and EPS estimate of $1.86 for 2001 and benefiting from the acquisition by adding passive and active components to the company(Analyst Report);   RBC Dominion Securities raised EPS estimates for JDS Uniphase from $1.13 to $1.18 in FY00 and from $1.60 to $1.70 in FY01 and target price from $140 to $145 based on JDS's acquisition of Epitaxx(Analyst Report) | | Y | 0 |
| 10/12/99 | | | | 10/12/99 | JDS Uniphase Corp. was rated "strong buy" in new coverage by analyst Robert V. Tango, Jr. at SunTrust Equitable Securities.  The 12-month price target range is between $160 and $165(Bloomberg) | | Y | 0 |
| 10/18/99 | | | | 10/18/99 | JDS Uniphase Corporation announced the acquisition of Ramar Corporation, a developer of lithium niobate-based integrated optical components(Bloomberg) | | Y | 0 |
| 10/21/99 | | | | 10/21/99 | JP Morgan has initiated research coverage of JDS Uniphase Corp. with a buy rating and a 12-month price target of $170.  JDS Uniphase is expected to earn $1.11 a share in FY00 and $1.56 in FY01(Reuters News) | | Y | 0 |

| | | | Plaintiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 10/26/99 | | | | 10/26/99 | Investors are betting that JDS Uniphase Corp. will continue its track record of beating expectations when it reports Q1 results that will send the stock to new highs(Reuters News) | | Y | 1 |
| 10/27/99 | | | | 10/27/99 | Gruntal & Co., LLC raised intermediate price target for JDS Uniphase to $167 from $143 and raised long term price target to $226 from $219 based on JDS's ability to execute and adjustments for the passage of time and expected earnings over next 18 months.  They also raised their estimate for JDSU 1Q00 to 27¢ from 24¢(Analyst Report) | | Y | 0 |
| 10/29/99 | 4:19 PM (10/28/99) | 10/29/99 Fri | "On October 28, 1999, JDS announced its results for the first quarter of fiscal 2000 ('1Q 00')... The net sales reported by JDS in the October 28, 1999 press release and 1Q 00 10-Q were intentionally overstated by at least $1 million to $3 million due to the fraudulent shipment of products..." (Complaint ¶¶ 192, 195). | 10/29/99 | JDSU extended its track record of exceeding analysts' predictions reporting solid profit growth in its 1Q. The company posted net income of $51.4M, or 29¢ a share, excluding charges, compared to a year-earlier $23.2M, or 14¢ a share.  The 24 brokers polled by research house First Call/Thomson Financial estimated, on average, that the company would earn 25¢ a share(Reuters News 10.28.99);   Robertson Stephens VP and Senior Communication and Semiconductor Analyst Arun Veerappan today initiated coverage of JDS Uniphase with a "buy" rating(Business Wire);   US Bancorp Piper Jaffray raised estimates and its price target for fiber-optic equipment maker JDS Uniphase; raised FY00 earnings per share estimate to $1.31 from $1.13; raised FY00 revenue estimate to $1.12B from $972M; raised FY01 per share estimate to $1.95 from $1.54; raised price target to $190 from $105(Reuters News); Warburg Dillon Read said it raised the 2000 earnings estimate on JDS Uniphase to $1.27 a share from $1.09 a share; raised the 2001 estimate to $1.67 a share from $1.50 a share; raised the price target to $175(Reuters News);   JDS Uniphase Canada Ltd. was raised to "strong buy" from "accumulate" by analy | Y | Y | 1 |
| 11/3/99 | | | | 11/3/99 | Warburg Dillon Read is raising target price to $195 from $175 due to their belief that Nortel's announcement of planning to invest $400M in its optical networking operations to triple production capacity by end of 2000 as a strong sign of its confidence in the growth potential of the optical business(Analyst Report) | | Y | 1 |
| 11/4/99 | 8:02 AM | 11/4/99 Thu | "On November 4, 1999, JDS filed its Form 10-Q for the quarterly period ending September 30, 1999 ('1Q 00 10-Q')"  (Complaint ¶ 194). | 11/4/99 | JDS Uniphase Corp. will acquire Optical Coating in a stock swap valued at about $2.8B(Reuters News); Morgan Stanley Dean Witter said it started coverage on shares of JDS Uniphase with an "outperform" rating and a price target of $225 a share(Reuters News);   JDS Uniphase Corp. expects its planned acquisition of Optical Coating Laboratory Inc. to boost its annual share earnings by 3% to 5%, once the transaction closes, JDS Uniphase's CFO Tony Muller said(Dow Jones News Service) | | Y | 0 |
| 11/5/99 | | | | 11/5/99 | Robert Gillam, President and Chief Investment Officer at McKinley Capital Management, told BusinessWeek that he believes JDS's stock can go further in its stock price(Reuters News 11.04.99); JDS Uniphase Corp. was downgraded to "accumulate" from "buy" by analyst Emil Savov at Goepel McDermid Inc.(Bloomberg);   Sutro & Co. is raising price target to $250 from $180(Analyst Report); Robertson Stephens issues new rating of buy and 2000 and 2001 EPS estimate of $1.31 and $1.85(Analyst Report) | | Y | 0 |
| 11/12/99 | | | | 11/12/99 | JDS Uniphase Corporation and Furukawa Electric Co., Ltd. announced that they look forward to ongoing collaboration with each other on future developments of optoelectronic and manufacturing technologies for rapidly developing fiber optic markets.  Furukawa Electric also reaffirmed its intention not to compete with JDS Uniphase on future products(Business Wire) | | Y | 0 |
| 11/16/99 | | | | 11/16/99 | JDS Uniphase Closes Buy Of Epitaxx For 2.2M Shares(Dow Jones News Service 11.15.99);   US Bancorp Piper Jaffray has increased estimates for JDS Uniphase Corp.  The fiscal Q2 (December) revenue estimate was raised by $5M to $270M, but the 31¢ EPS estimate was left unchanged.  The FY00 revenue estimate was raised by $25M to $1.14B.  The EPS estimate was raised 2¢ to $1.33.  The FY01 revenue estimate was raised by $57M to $1.79B and the EPS estimate was raised 5¢ to $2(Reuters News) | | Y | 0 |
| 11/19/99 | | | | 11/19/99 | JDS Uniphase rose more than 5% after renowned investor George Soros disclosed he owned almost 440,000 shares(Associated Press Newswires) | | Y | 0 |
| 11/22/99 | | | | 11/22/99 | JDS Uniphase Corp. said it has signed a definitive agreement to acquire Sifam Ltd.  JDSU said it will pay Sifam $60M in the transaction. It said holders of more than 90% of Sifam's shares have executed binding agreements to accept the JDS offer unconditionally(Dow Jones Business Wire);   Gruntal & Co. is raising intermediate and long term price target to $270 and $390 due to its acquisitions of  Sifam Ltd.(Analyst Report);   CIBC World Markets is raising FY00 and FY01 EPS estimates to $1.31 and $1.86 from $1.30 and $1.84 to reflect the closing of the Epitaxx acquisition(Analyst Report) | | Y | 0 |
| 11/23/99 | | | | 11/23/99 | Merrill Lynch said that it has increased confidence the company will exceed earnings forecasts(Dow Jones News Service);   Analyst Benn Mikula at RBC Dominion Securities said he expects the stock to trade at $260 in the next year, up from $220(Bloomberg);   Salomon Smith Barney is raising 2000 and 2001 EPS estimate to $1.30 and $1.83 from $1.27 and $1.78 to reflect the closing of the Epitaxx acquisition(Analyst Report);   Warburg Dillon Read is raising price target to $295 from $195 due to continued strong industry fundamentals and JDS's increasingly dominant industry position(Analyst Report) | | Y | 1 |

Exhibit 4: Page 3 of 32

| | | | Plaintiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 11/24/99 | | | | 11/24/99 | JDS Uniphase surged on optimism its record-setting gains this year still don't reflect its profit outlook(The Globe and Mail 11.25.99) | | Y | 1 |
| 11/30/99 | | | | 11/30/99 | JDS Uniphase tumbled after rising 36% over the course of 7 recent sessions(Associated Press Newswire);   JDS Uniphase Corp. shareholder Koninklijke Philips Electronics NV registered to sell 150,000 shares of the company's common stock, according to a Form 144 released by the Securities and Exchange Commission(Federal Filings Newswires) | | Y | 1 |
| 12/1/99 | | | | 12/1/99 | JDS Uniphase Corp. and its largest shareholder, Furukawa Electric Co., said Furukawa has sold 1.8M common shares of JDS, cutting its stake to about 20% of those shares outstanding from 21%(Dow Jones Business News) | | Y | 0 |
| 12/2/99 | | | | 12/2/99 | JDS Uniphase Corp. was rated "strong buy" in new coverage by analyst Thomas J. Erickson at Dain Rauscher Wessels.  The 12-month target price is $300 per share(Bloomberg) | | Y | 0 |
| 12/8/99 | | | | 12/8/99 | The Toronto Stock Exchange said that, effective before the open, the relative weight of JDS Uniphase Canada Ltd. will be changed in the TSE 300 Composite, S&P/TSE MidCap and the TSE 100 Indexes. In a news release, the TSE said the relative weight of JDS Uniphase Canada Ltd. will decrease by about 0.67% in the TSE 300 Composite Index, 3.71% in the S&P/TSE MidCap and 0.77% in the TSE 100 Index(Dow Jones News Service 12.07.99);   "The current demand for increased capacity in fiber optic telecommunications networks, which is largely the result of increased requirements for information transfer due to Internet usage, has caused the complexity and performance requirements of fiber optic network systems to substantially increase and the product life cycles for these network systems to decrease.  OEM system suppliers are under pressure from their customers to provide higher capacity and more complex systems in shorter time periods.  These same pressures apply at all levels of their system, including the component and module levels.  Given these factors, OCLI and JDS Uniphase believe there is increasing demand for products designed, manufactured and distributed by merchant sup | | Y | 0 |
| 12/9/99 | 5:35 PM (12/8/99) | 12/9/99 Thu | "On December 8, 1999, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with OCLI (the 'OCLI Registration Statement')... According to the OCLI Proxy-Prospectus, the primary reason for the proposed merger was the allegedly strong demand in the fiber optic industry..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 3). | 12/9/99 | | | | |
| 12/15/99 | | | | 12/15/99 | JDS Uniphase Corporation announced the acquisition of Oprel Technologies Inc., a developer of optical amplifiers, test equipment and opto-electronic packaging.  The terms of the transaction were not disclosed(Business Wire) | | Y | 0 |
| 12/16/99 | | | | 12/16/99 | JDS Uniphase Corp. shareholders approved a 2-for-1 stock split at the first annual meeting of the combined JDS Fitel Inc. and Uniphase Corp.(Dow Jones Business News);   JDS Uniphase Corp. will invest $125M to add an additional 600,000 square feet of capacity and related capital equipment to 7 of its facilities(Reuters News);  Sutro & Co. is raising FY00 and FY01 EPS estimates to $1.35 and $1.91 from $1.32 and $1.85 to reflect the closure of the Epitaxx acquisition(Analyst Report) | | Y | 0 |
| 12/20/99 | | | | 12/20/99 | Salomon Smith Barney is raising 12-month price target on JDS to $320 from $210 by rolling over current multiple on 2000 earnings (about 150x) to calendar 2001 estimate of $2.13 to reflect appreciation in share price, market's growing acceptance of large premiums to growth rates for technology companies with strong competitive positions in growing markets, particularly those driven by the internet(Analyst Report);  Wachovia Securities is initiating coverage on JDS Uniphase with long term buy rating and 12 - 18 month price target of $300(Analyst Report) | | Y | 0 |
| 12/22/99 | 10:40 AM | 12/22/99 Wed | "On December 22, 1999, JDS filed an amended Registration Statement on Form S-4 for the OCLI merger (the 'Amended OCLI Registration Statement'), which contained an amended Proxy Statement-Prospectus (the 'Amended OCLI Proxy-Prospectus').  The Amended OCLI Proxy-Prospectus was signed by the same Defendants, contained the same statements, and incorporated the same misstatements regarding demand as the original OCLI Proxy-Prospectus" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 3-4). | 12/22/99 | Gruntal & Co. is raising price target to $310 from $270 in the intermediate term and to $400 from $390 in the long term and adjusting EPS estimates for 2000-2004 from $1.34, $2.01, $2.93 and $4.04 to $1.37, $2.08, $3.03 and $4.18 to reflect increased comfort that JDS Uniphase will continue to beat expectations.  This improved outlook is based on several factors; a very positive quarter from OCLI, who is being acquired by JDS; and increased acquisition activity in the optics sector, specifically Nortel's pending purchase of Qtera and Cisco's pending purchase of Pirello optical equipment business(Analyst Report) | | Y | 0 |
| 12/27/99 | | | | 12/27/99 | JDS Uniphase gained ahead of its 2-for-1 split.  Stock splits don't alter a company's financial picture or stock valuation, they just lower its share price.  But investors have lately viewed any split announcement as wildly bullish(The Los Angeles Times 12.28.99) | | Y | 1 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 12/28/99 | | | | 12/28/99 | Gruntal & Co. said it had raised JDS Uniphase Corp.'s near-term target price to $420 from $310 in the immediate term and to $590 from $400 in the long term to reflect the belief that the optical components sector is in the sweet spot of optical equipment, which is in the sweet spot of the transition from copper and electronics to fiber and optics, which is in the sweet spot in telecommunications(Analyst Report) | | Y | 0 |
| 12/30/99 [3] | No Time | 12/29/99 Wed 12/30/99 Thu | "On December 30, 1999, JDS common stock split in a two-for-one stock split" (Complaint ¶ 201). | 12/30/99 | | | | |
| 1/3/00 | | | | 1/3/00 | JDS Uniphase Corp.'s board approved a 2-for-1 stock split(Dow Jones News Service) | | Y | 1 |
| 1/6/00 | | | | 1/6/00 | JDS Uniphase fell after news that a Chief Executive and several Vice Presidents at Optical Coating Laboratory Inc. plan to sell more than $26M worth of the company's stock.  JDS is in the process of acquiring the company(Reuters News);  Warburg Dillon Read raised price target to $200 from $150 due to belief that continued industry strength in the optical systems market place and strong underlying company performance from JDS should continue to drive the share price(Analyst Report); Lucent failed to meet earnings guidance led JDS stock price downward | | Y | 0 |
| 1/7/00 | | | | 1/7/00 | JDS Uniphase Corp. was added to the "focus list" by analyst Kevin Slocum at SoundView Technology Group(Bloomberg);  JDS Uniphase Corp. was raised to "outperform significantly" from "outperform" by analyst Stephen A. Koffler at Schroder Securities(Bloomberg) | | Y | 1 |
| 1/10/00 | | | | 1/10/00 | CE Unterberg, Towbin is transferring coverage of JDS Uniphase and maintain strong buy rating with earning estimates of 68¢ for FY00 and 98¢ for FY01 with revenue estimate for the company of $1.14B and $1.82B for FY00 and FY01 with a $225 price target(Analyst Report) | | Y | 1 |
| 1/11/00 | | | | 1/11/00 | JDS Uniphase Corp. was reiterated "outperform" by analyst Benn Mikula at RBC Dominion Securities. The 12-month target price raised to US$229 from US$180(Bloomberg) | | Y | 0 |
| 1/13/00 | | | | 1/13/00 | JDS Uniphase Corp. may be added to the Standard & Poor's 500 Index, stockwinners.com's "The Rumor Mill" reported.  The subscriber-based Internet site, which issues market alerts via e-mail, said there's speculation that the maker of lasers and filters used in fiber-optic telephone equipment would be added to the index of 500 stocks representing all major industries(Bloomberg) | | Y | 0 |
| 1/18/00 | 8:17 PM (1/17/00) | 1/18/00 Tue | "On January 17, 2000, JDS announced the signing of a definitive agreement to merge with E-TEK, a supplier of optical components and component packaging" (Complaint ¶ 202). | 1/18/00 | JDS Uniphase and E-TEK plan to merge in $15B deal(Reuters News 01.17.00);  Warburg Dillon Read is raising price target to $220 from $200(Analyst Report);  MR. URLOCKER, "Yeah.  We've also seen some weakness, uh, by Lucent in their systems business.  Uh, can you just describe the general health of your business with, uh, Lucent, please?"  MR. KALKHOVEN, "Well, we never talk specifically about a customer, Michael, but suffice it to say that Lucent did say very clearly in their release the demand was very, very strong in the optical arena, uh, and the, the 2 issues were execution and component shortages.  Uh, we believe that their [inaudible] will continue strongly with us.  Uh, and we do, in fact, have just about every single major telecommunications equipment, uh, vender as our customers.  And just about all of the new start-ups, as well.  Uh, and they will be major players in the future.  So, uh, rather than commenting on any one, uh, the, the market is extremely strong.  Uh, all the customers in, in their, uh, uh, public conferences has said, uh, demand remains strong"(Conference Call with Kalkhoven);  MS. HENRY, "Good morning.  Congratulations.  Uh, Tony had indicated that, uh, the transa | Y | Y | 1 |
| | 1:20 PM | 1/18/00 Tue | "The January 18, 2000 conference call statements set forth above regarding demand were false or misleading..." (Connecticut's Second Amended & Fifth Supplemental Responses to Defendant Kevin Kalkhoven's First Set of Interrogatories, 2/2/07, Interrogatory No. 4, p. 24). | | | | | |
| 1/19/00 | | | | 1/19/00 | Shares of JDS Uniphase Corp. and its acquisition target, E-Tek Dynamics Inc., jumped sharply as the companies provided the first evidence that the $15B mega-deal will open new sales avenues.  Jozef Straus, JDS Uniphase's President and Chief Operating Officer, told analysts in Toronto that the company has already received word of at least 1 large contract from a key European customer that couldn't have been placed before the merger(The Globe and Mail 01.20.00);  CE Unterberg, Towbin is raising price target to $240 from $225 and increasing FY01 estimate to $1.02 from 98¢ and revenue estimate for FY01 to $2.2B from $1.8B to reflect approval of JDS's purchase of ETEK Dynamics(Analyst Report) | | Y | 1 |
| 1/20/00 | | | | 1/20/00 | JDS Uniphase Corp. announced that it has extended through December, 2001, a multi-year contract with Lucent Technologies for the supply of advanced optical amplifier modules for Lucent's WaveStar(TM) OLS 400G optical networking system(Business Wire 01.19.00);  Sutro & Co. reports that it believes that JDS and ETEK Dynamics will face Hart-Scott Rodino scrutiny due to the combined companies dominance in thin filter Wave Division Multiplexers.  They also believe that the usage of alternate solutions such as the Array Waveguide WDM solutions used by Lucent and the Fiber Bragg Grating WDM solution used by Ciena provide a strong counterpoint to the concern of domination of the multiplexer market by the combined entity.  Sutro is raising price target to $250 from $125 based on JDS Uniphase's opportunity to dominate a market experiencing explosive growth(Analyst Report) | | Y | 1 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 1/24/00 | | | | 1/24/00 | Gruntal & Co. raised its intermediate price target for JDS Uniphase Corp. to $265 from $210 in the immediate term ahead of the company's 2Q earnings report.  It also raised its long-term price target to $318 from $295 to reflect the passage of time and the company's ability to execute(Reuters News) | | Y | 0 |
| 1/25/00 | | | | 1/25/00 | JDS Uniphase Corporation announced the first shipment of 10 Gb/s transmitter and receiver modules to meet customers' growing demand for products with higher functionality(Business Wire 01.24.00) | | Y | 1 |
| 1/26/00 | | | | 1/26/00 | SG Cowen is raising FY00 and FY01 EPS estimates by 8¢ and 12¢ to 74¢ and $1.05 due to higher revenue growth and also raising target prices to $250-$275.  They continue to view JDS as not only benefiting from high growth in optical systems demand, but also potential market share shifting from captive to merchant suppliers augmented by its own aggressive acquisition strategy(Analyst Report) | | Y | 0 |
| 1/27/00 | 4:44 PM (1/26/00) | 1/27/00 Thu | "On January 26, 2000, JDS issued a press release announcing its results for the second quarter of fiscal 2000 ('2Q 00'), in which it disclosed that it achieved sales of $282 million during the quarter, a 22% increase over sales in the previous quarter" (Complaint ¶ 204). | 1/27/00 | JDSU said strong 2Q earnings were fuelled by growth in its sector.  They said that its pro forma net income, excluding 1-time items, rose 145% to $66M, or 18¢ a share, from $27M, or 8¢ a share, in the year-earlier period.  Analysts polled by First Call/Thomson Financial expected the firm to post a profit of 16¢ a share, though whisper numbers had pegged the profit at 18¢(Reuters News 01.26.00); Wachovia Securities raised rating on JDSU to strong buy from long-term buy and raised 12-month price target to $285 from $250.  They also raised FY00 revenue estimate to $1.3B from $1.1B, and raised earnings per share estimate to 74¢ from 64¢(Reuters News);  JDSU told analysts it expects 25% quarter-over-quarter revenue growth(Dow Jones News Service 01.26.00);  JDS Uniphase Canada Ltd. was raised to "market outperform" from "accumulate" by Dundee Securities.  The 12-month target price is $410 per share(Bloomberg);  JDSU was maintained "strong buy" by US Bancorp Piper Jaffray.  The price target was raised to $300 from $250 per share(Bloomberg);  Morgan Stanley is raising target price to $250 from $200 and 2000 and 2001 EPS estimates to 74¢ and $1.10 from 64¢ and 94¢ to reflect | Y | Y | 1 |
| 1/31/00 | | | | 1/31/00 | Edward Jones analyst David Powers said he initiated coverage of fiber-optic component supplier JDS Uniphase Corp. with a hold rating(Reuters News) | | Y | 0 |
| 2/1/00 | | | | 2/1/00 | JDS Uniphase Corp.'s largest shareholder, Furukawa Electric Co., plans to sell up to 7M shares, or 10%, of its holdings in the world's biggest maker of parts for fiber-optic communications networks, the Ottawa Citizen reported(Bloomberg) | | Y | 1 |
| 2/2/00 | | | | 2/2/00 | Wachovia is raising FY01 price target to $285 from $250 and FY00 EPS and revenue estimates to 74¢ and $1.3B from 64¢ and $1.1B, and upgraded JDSU to strong buy to reflect strong management team, a strong market and a strong product line(Analyst Report) | | Y | 0 |
| 2/7/00 | 5:28 PM (2/4/00) | 2/7/00 Mon | "On February 4, 2000, JDS completed the acquisition of OCLI for 54 million shares of JDS stock, valued at $2.7 billion" (Complaint ¶ 205). | 2/7/00 | Optical Coating Laboratory Inc. shareholders approved its merger with JDS Uniphase Corp., closing the merger(Dow Jones News Service) | | Y | 0 |
| 2/10/00 | 8:20 AM | 2/10/00 Thu | "On February 10, 2000, JDS filed its Form 10-Q for the second quarter ending December 31, 1999 ('2Q 00 10-Q')… The net sales … were intentionally due to the fraudulent shipments of products… JDS's reported net sales were also inflated due to JDS's practice of recognizing revenue on shipments to customers such as Lucent and Nortel… " (Complaint ¶¶ 206-207). | 2/10/00 | | | | |
| 2/11/00 | | | | 2/11/00 | JDS Uniphase Corp. will take an $84.1M charge in the quarter ending March 31 for in-process research and development in connection with the company's acquisition of Optical Coating Laboratory Inc., which was completed on Friday(Dow Jones News Service 02.10.00) | | Y | 0 |
| 2/14/00 | 5:12 PM (2/11/00) | 2/14/00 Mon | "On February 11, 2000, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with E-TEK (the 'E-TEK Registration Statement')... According to the OCLI Proxy-Prospectus, the primary reason for the proposed merger was the allegedly strong demand in the fiber optic industry..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 4). | 2/14/00 | | | | |
| | 5:12 PM (2/11/00) | 2/14/00 Mon | "On February 11, 2000, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with E-TEK (the 'E-TEK Registration Statement')... --- The foregoing statement in the E-TEK Proxy-Prospectus was false and misleading because it failed to disclose that at least part of the seemingly increasing demand was due to JDS's practice of recognizing revenue on shipments to its customers that were merely being held in inventory ... and JDS's practice of deferring sales into later quarters once sales quotas have been achieved. (Complaint ¶¶ 208-210). | | | | | |

| | | | Plaintiffs | | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant | |
| 2/16/00 | | | | 2/16/00 | JDS Uniphase Corp. said it plans to introduce more than 30 new products at a fiber-optics show on March 6.  Shares of JDS Uniphase rose on the news(Dow Jones Business News) | | Y | 0 | |
| 2/23/00 | | | | 2/23/00 | JDS Uniphase Corp. shares rose 9.7% after Lehman Brothers Inc. said it's buying the stock of the world's biggest maker of parts for fiber-optic communications networks.  JDS Uniphase rose 20.75 to 235.5 in trading of 13.5M shares.  The stock of the company has climbed almost 10-fold in the past year.  Jeffrey Applegate, Lehman's Chief Investment Strategist, wrote that Lehman is buying JDS Uniphase shares as part of changes to its US strategy portfolio(Bloomberg) | | Y | 1 | |
| 2/24/00 | | | | 2/24/00 | PaineWebber's report cited 10 companies in the sector that it had begun covering and listed JDS Uniphase Corp. as its top pick.  In its report, PaineWebber initiated coverage with a buy rating and a 12-month price target of $330.  The company should be able to achieve revenue growth of 70% a year for several more years(Reuters News) | | Y | 1 | |
| 3/1/00 | | | | 3/1/00 | JDS Uniphase Corp., aiming to gain an edge in keeping track of the rapid changes in the photonics industry, recently formed a fund with VantagePoint Venture Partners, a big US venture-capital firm(Dow Jones News Service);  Muller interview on RadioWallStreet.com at Robertson Stephens conference(Business Wire);  Investment Research Morning Comments raised intermediate price target for JDSU to $300 from $271 and long-term price target to $400 from $380 to reflect the passage of time and continued execution of JDSU(Analyst Report) | | Y | 1 | |
| 3/2/00 | | | | 3/2/00 | SG Cowen said it raised its price target on shares of JDS Uniphase to $300 per share from an earlier range of $250 to $275(Reuters News 03.01.00) | | Y | 0 | |
| 3/3/00 | | | | 3/3/00 | RBC Dominion Securities raised JDS target price from $277 to $331(Analyst Report) | | Y | 0 | |
| 3/6/00 | | | | 3/6/00 | JDS Uniphase Corporation announced its plans to introduce several new products targeted for 10 Gb/s (OC-192) systems at OFC 2000, the premier fiber optics show taking place in Baltimore, Maryland(Dow Jones News Service);  JDS Uniphase Corporation announced a significant expansion to its line of amplification products for telecommunications and CATV applications(Dow Jones News Service) | | Y | 0 | |
| 3/7/00 | | | | 3/7/00 | Prudential Securities started coverage of JDS Uniphase with a strong buy rating(Reuters News) | | Y | 0 | |
| 3/8/00 | | | | 3/8/00 | JDS Uniphase Corporation and Alcatel have agreed to participate in an agreement that defines a consistent standard for the form, footprint and electrical specifications of an internally wavelength-locked WDM source laser(Dow Jones News Service);  Sutro & Co. is raising price target on JDSU from $250 to $325 based on JDSU's demonstrated ability to remain the largest end-to-end supplier of optical components and continued focus on meeting customer demand through capacity expansion, yield and productivity improvement, and increased manufacturing automation(Analyst Report) | | Y | 0 | |
| 3/9/00 | | | | 3/9/00 | Goldman Sachs International filed with the Securities and Exchange Commission to sell 816,819 common shares of JDS Uniphase Corp.(Bloomberg 03.08.00) | | Y | 1 | |
| 3/10/00 [4] | No Time | 3/10/00 Fri 3/13/00 Mon | "On March 10, 2000, JDS completed another two-for-one stock split" (Complaint ¶ 211). | 3/10/00 | | | | | |
| 3/13/00 | | | | 3/13/00 | JDS Uniphase Corp. Senior Vice President Dan Pettit and shareholder Koninklijke Philips Electronics N.V. (PHG) registered to sell a total of 850,000 shares of JDS common stock, according to Form 144s(Dow Jones News Service 03.10.00);  The Chicago Board Options Exchange said it listed Long-Term Equity Anticipation Securities on JDS Uniphase Corp.(Reuters News) | | Y | 0 | |
| 3/15/00 | | | | 3/15/00 | JDS Uniphase Corp. was downgraded to "buy on weakness" from "buy" by analyst Susan Streeter at Sprott Securities.  The 12-month target price is US $140 per share(Bloomberg) | | Y | 0 | |
| 3/21/00 | | | | 3/21/00 | JDS Uniphase Canada Ltd. was downgraded to "hold" from "buy" by analyst Michael Urlocker at Scotia Capital Markets(Bloomberg);  RBC Dominion is raising target price to $179 from $166(Analyst Report) | | Y | 0 | |
| 3/22/00 | | | | 3/22/00 | JDS Uniphase Corp. was rated new "buy" by analyst Jim Liang at WR Hambrecht & Co.  The 12-month price target is $180 per share(Bloomberg) | | Y | 0 | |
| 3/23/00 | | | | 3/23/00 | Alcatel plans to protest E-Tek merger on antitrust grounds(late 03.22.00) | | Y | 0 | |
| 3/27/00 | | | | 3/27/00 | Philips Electronics NV said it had sold 20% of its holding in JDS Uniphase(Reuters News) | | Y | 0 | |
| 3/28/00 | | | | 3/28/00 | JDS Uniphase Names Charles Abbe Senior Operating Officer(Dow Jones News Service);  JDS Uniphase Corp. was rated new "strong buy" in new coverage by analyst Stephen G. Koffler at First Union Securities Inc.  The 12-to-18-month target price is $225 per share(Bloomberg) | | Y | 1 | |
| 4/3/00 | | | | 4/3/00 | JDS Uniphase Corp. and E-Tek Dynamics Inc. said they received requests for more information from the Justice Department's antitrust division regarding JDS' proposed purchase of E-Tek(The Wall Street Journal) | | Y | 0 | |
| 4/4/00 | | | | 4/4/00 | JDS Uniphase Corp. announced it is buying Cronos Integrated Microsystems Inc. for $750M in stock(Reuters News);  JDS Uniphase Corp. was added to the "Analyst Action List" by analyst Stephen G. Koffler at First Union Securities Inc.(Bloomberg);  JDS Uniphase Corp. was added to the "top pick" by analyst David Wong at PaineWebber Inc.  The 12-month target price is $165 per share(Bloomberg) | | Y | 0 | |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 4/10/00 | | | | 4/10/00 | Furukawa Electric Co. said its Canadian subsidiary FEJ Holding Inc. has signed a forward contract to sell a small part of its stake in JDS Uniphase Corp. in October.  FEJ Holding has agreed to sell 1.385M of the 135.834M shares it holds in JDS Uniphase(Dow Jones International News) | | Y | 0 |
| 4/12/00 | | | | 4/12/00 | E-Tek earnings announcement(late 04.11.00);  E-TEK could accelerate JDSU growth(PaineWebber Report) | | Y | 0 |
| 4/25/00 | | | | 4/25/00 | JDS Uniphase Corp. shot up as investors expected to hear solid earnings news from the company after the market close(Reuters News) | | Y | 1 |
| 4/26/00 | 4:03 PM (4/25/00) | 4/26/00 Wed | "Subsequent to the release of its 3Q 00 results on April 25, 2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and its prospects. During the call, Kalkhoven, Muller, Abbe and Straus made presentations and answered questions. During the follow-up conversations with participants, Kalkhoven, Muller, Abbe and Straus directly disseminated important information to the market. Specifically, Kalkhoven stated that 'demand remains incredibly strong', that he believed that 'we will see demand accelerate,' and that 'whatever we make is going to be used'' (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 4). | 4/26/00 | JDSU posted 3Q earnings that beat analysts' consensus estimates by 1¢ as sales soared 155%.  JDS Uniphase reported net income, excluding 1-time items, of $85.8M, or 11¢ a share in the 3Q.  In the year-earlier period, pro forma combined profit from JDS Fitel and Uniphase Corp. - which merged in June 1999 - was $33.2M, or 5¢ a share, on revenues of $154.9M(Reuters News);   JDS Uniphase Confident E-TEK Merger Will Be Approved(Dow Jones News Service);   JDS raised its forecast for 4Q sales growth to 20% from 15%.  It also lifted projections for sales growth in 2000 to 75%(Reuters News); JDS Uniphase Canada Ltd. was raised to "buy" from "buy on weakness" by analyst Susan Streeter at Sprott Securities.  The 12-month target price is $205 per share(Bloomberg);   RBC Dominion Securities is raising the EPS estimates for JDSU for FY00 and FY01 from 35¢ to 38¢ and 58¢ to 66¢ respectively based on the belief that the combination of capacity expansion and continued strong demand will drive the revenue growth in future(Analyst Report);   Dain Rauscher Wessels is raising FY00 estimates to 39¢ from 37¢ and FY01 estimates to 60¢ from 55¢(Analyst Report);   Morgan Stanley is raising revenue and E | Y | Y | 1 |
| | 7:00 AM | 4/26/00 Wed | "Mr. Kalkhoven gave an interview to CNBC on April 26, 2000. During that interview, Mr. Kalkhoven stated, 'Well, at this moment in time the demand is so strong it is just a question of being able to get everything out of the door, so manufacturing issues'' (Connecticut's Second Amended & Fifth Supplemental Responses to Defendant Kevin Kalkhoven's First Set of Interrogatories, 2/2/07, Interrogatory No. 4, p. 26). | | | | |
| | No Time | 4/26/00 Wed 4/27/00 Thu | "On April 26, 2000, the day after the conference call, securities analysts issued reports on JDS, which were based on and repeated statements disseminated by Defendants…" (Complaint ¶ 215). | | | | | |
| 4/27/00 | | | | 4/27/00 | JDS Uniphase gained for a second day.  The company exceeded analysts' expectations with its 3Q fiscal results released Tuesday(The Globe and Mail 04.28.00);  JDS Uniphase Corp. was raised to "neutral" from "reduce" by analyst Dayle Hogg at Griffiths McBurney & Partners.  The 12-month target price raised to US $91 from US $73.50 per share(Bloomberg) | | Y | 0 |
| 5/1/00 | | | | 5/1/00 | Global Equity Research is raising FY00 and FY01 EPS estimates to 39¢ and 61¢ from 37¢ and 55¢ respectively.  Inventory turns were flat at 4.1 and A/R DSOs increased to 61 days from 60 days(Analyst Report) | | Y | 0 |
| 5/4/00 | | | | 5/4/00 | Prudential Securities is raising FY00 estimate from 37¢ to 39¢ and revenue from $1.3B to $1.4B and FY01 EPS estimates from 55¢ to 61¢ and revenues from $2.2B to $2.4B(Analyst Report) | | Y | 0 |
| 5/8/00 | | | | 5/8/00 | JDS Uniphase Corp. said it had bought Fujian Casix Laser Inc., its first venture into China(Reuters News);  Wachovia Securities is raising FY00 estimates of revenue from $1.3B to $1.39B and EPS estimates from 37¢ to 40¢ and FY01 revenue and EPS estimates from $2.26B and 55¢ to $2.47B and 61¢ respectively.  DSO increased only 1 day in the quarter from 59 to 60 days and inventory turns declined to 3.9x from 4.0x even though the company is greatly affected by purchase accounting that requires taking in the acquired company's receivables and inventories before taking in the first dollar sales(Analyst Report) | | Y | 0 |
| 5/11/00 | | | | 5/11/00 | JDS Uniphase Corp. is not worried by Nortel Networks Corp.'s plan to form a new fiber-optic equipment unit, a senior JDS executive told analysts(Reuters News);   JDS Uniphase Corp. was rated new "buy" in new coverage by analyst Hasan Imam at Donaldson Lufkin & Jenrette Securities.  The 12-month target price is $120 per share(Bloomberg) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 5/16/00 | 5:15 PM (5/15/00) | 5/16/00 Tue | "On May 15, 2000, the Company filed its 10Q for the quarter ending March 31, 2000 ('3Q 00 10-Q')… The 3Q 00 10Q also contained the following representations: (a) 'Strong demand for virtually all our optical components and modules products combined with the JDS merger contributed to the increases in gross profit...'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 5). | 5/16/00 | | | | |
| | 5:15 PM (5/15/00) | 5/16/00 Tue | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). | | | | | |
| 5/17/00 | | | | 5/17/00 | PNC Advisors is increasing 2001 EPS estimate from 60¢ to 65¢ and lowering the price target from $180 to $150, out of concern about what appears to be modified environment for technology stock valuation(Analyst Report) | | Y | 0 |
| 5/18/00 | 7:00 AM | 5/18/00 Thu | "Jozef Straus stated in this [CNBC/Dow Jones Business Video] public interview, 'Well, if you would recall the company JDS Uniphase came about by merger of JDS Fitel and Uniphase Corporation last July and since that time the company has really grown very, very fast. We have had several good quarters, the market is really exploding, and we think that we will be a strong force moving forward. In today's conference call our CFO has given a guidance of 75, 80 percent growth for the next fiscal year. We have our way cut out for us next year'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 6). | 5/18/00 | JDS Uniphase Corp. announced the retirement of Kevin Kalkhoven as Co-Chairman and CEO and from the Board of Directors of the Company and the appointment of Jozef Straus as CEO(PR Newswire); "Well, if you would recall the company JDS Uniphase came about by merger of JDS FITEL and Uniphase Corporation last July and since that time the company has really grown very, very fast. We have had several good quarters, the market is really exploding, and we think that we will be a strong force moving forward.  In today's conferences call our CFO has given a guidance of 75 - 80% growth for the next fiscal year.  We have our way cut out for us next year"(Straus in an Interview for CNBC/DJ Business Video) | | Y | 0 |
| | 7:03 AM | 5/18/00 Thu | "On May 18, 2000, JDS issued a press release announcing that defendant Kalkhoven was retiring as Co-Chairman and CEO and from the Board of Directors" (Complaint ¶ 220). | | | | | |
| 5/23/00 | | | | 5/23/00 | E-Tek files notice of vote date for merger(PR Newswire) | | Y | 0 |
| 5/24/00 | 5:21 PM (5/23/00) | 5/24/00 Wed | "JDS filed amendments to the E-TEK Registration Statement on May 23, 2000 and May 3 1, 2000 (the "Amended E-TEK Registration Statements"), which were signed by Defendants Straus and Muller. The Amended E-TEK Registration statements contained a Proxy Statement- Prospectus (the "Amended E-TEK Proxy-Prospectuses") which repeated the statements in the original E-TEK Registration Statement that the proposed merger was in response to 'unprecedented growth in the telecommunications industry and demand for the fiber optic networks that are enabling such growth'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 6). | 5/24/00 | | | | |
| | 5:21 PM (5/23/00) | 5/24/00 Wed | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). | | | | | |
| 5/25/00 | | | | 5/25/00 | Deutsche Banc Alex Brown said it initiated coverage on JDS Uniphase Corp. and SDL Inc. with "strong buy" ratings(Reuters News);  Furakawa disclosed earnings, attributed extraordinary gain to the sale of JDSU shares(Asia Pulse 05.26.00) | | Y | 0 |
| 5/30/00 | | | | 5/30/00 | JDS Uniphase Corp. extended a contract to 2001 for SDL Inc. to supply grating-stabilized 980 nm pump lasers to JDS's erbium doped fiber amplifiers(Dow Jones News Service) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 6/1/00 | 4:34 PM (5/31/00) | 6/1/00 Thu | "JDS filed amendments to the E-TEK Registration Statement on May 23, 2000 and May 3, 2000 (the "Amended E-TEK Registration Statements"), which were signed by Defendants Straus and Muller. The Amended E-TEK Registration statements contained a Proxy Statement- Prospectus (the "Amended E-TEK Proxy-Prospectuses") which repeated the statements in the original E-TEK Registration Statement that the proposed merger was in response to 'unprecedented growth in the telecommunications industry and demand for the fiber optic networks that are enabling such growth'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 6). | 6/1/00 | | | | |
| | 4:34 PM (5/31/00) | 6/1/00 Thu | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). | | | | | |
| 6/2/00 | | | | 6/2/00 | ABN AMRO analyst Dave Kang said in a research note he started coverage of JDS Uniphase Corp. with a "buy" rating, a 12-month price target of $144 and fiscal 2000 and 2001 earnings per share estimates of 39¢ and 59¢ respectively(Reuters News) | | Y | 0 |
| 6/5/00 | | | | 6/5/00 | The Globe and Mail reports that JDS Uniphase Corp. and E-Tek Dynamics will together spend an estimated $110-M(US) on the costs associated with their corporate marriage.  According to a registration statement filed this week by the 2 companies, the money will have to be paid even if the deal does not go through(Canada Stockwatch) | | Y | 0 |
| 6/6/00 | | | | 6/6/00 | JDS Uniphase Announces Small Form Factor 10 gb/s Transponder Modules(PR Newswire Europe); Fortune announced that 2 companies, JDS Uniphase Corp. and VeriSign, Inc. will be added to the Fortune e-50 Index (FEX) after the close of trading on Tuesday(Bloomberg 06.05.00) | | Y | 0 |
| 6/13/00 | | | | 6/13/00 | JDS Uniphase Corp. could complete its acquisition of E-Tek Dynamics Inc. by the end of the month, CFO Anthony Muller said(Dow Jones News Service);  JDS Uniphase Corp. was rated new "buy" in new coverage Sands Brothers.  The target price is $150 per share.  The recommendation takes the following factors into consideration: JDS holds market leader status in the optical components space, expects growth rate of 60-70% range in next 2 years, has strong management, and JDS's range of product is varied both horizontal(Analyst Report);   JDS Uniphase Corp. was rated new "strong buy" in new coverage by analyst Todd K. Koffman at Raymond James Financial Inc.  The 12-month target price is $150 per share(Bloomberg) | | Y | 0 |
| 6/14/00 | | | | 6/14/00 | JDS Uniphase to buy Motorola facility(Reuters News) | | Y | 0 |
| 6/15/00 [5] | 11:08 AM | 6/16/00 Fri | "Form 10-Q filed May 15, 2000, Which is Incorporated by Reference in Forms S 4 [sic] dated May 23, 2000 and May 31, 2000, any [sic] by Form S-3 filed June 15, 2000...JDS falsely stated that as of March 31, 2000, its total inventory was worth $197.1 million, and that its finished goods inventory was worth $25.6 million..." (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 54). | 6/15/00 | Muller interview in Wall Street Transcript published | | Y | 0 |
| | No Time | 6/15/00 Thu 6/16/00 Fri | "Muller stated in this public interview [reported in the Wall Street Transcript], '[w]ithout question, the most compelling trend is the overwhelming growth in demand. This demand is continually exceeding our forecasts and those of our customers....The biggest opportunities we have for improvement are to continue to add capacity. We are currently in a program where we are working to quadruple our capacity over the next 18 months....We have provided specific guidance for the current quarter and for our next fiscal year ending June 30, 2001. This guidance reflects the strong growth we anticipate.... The first reason I would give is that the fiberoptic industry is growing extremely rapidly, and I believe it will continue to grow rapidly for years to come.... I have never seen an industry where the growth prospects look to be as bright as they are in fiberoptics...." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 6-7). | | | | | |
| 6/20/00 | | | | 6/20/00 | Shares in JDS Uniphase Corp. led volume trade on NASDAQ as a block sale of 7.7M shares valued at $962.5M was executed by CIBC World Markets and Banc of America.  It is widely believed that JDS Uniphase's largest shareholder, Furukawa Electric Co. Ltd., sold the stock and that a handful of institutional buyers purchased the shares(Reuters News) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 6/22/00 | | | | 6/22/00 | Merrill Lynch unveiled a list of stocks that it called its best long-term investment picks and it listed JDS Uniphase(Reuters News) | | Y | 0 |
| 6/23/00 | 5:34 PM (6/22/00) | 6/23/00 Fri | "On June 22, 2000, the U.S. Department of Justice cleared JDS's merger with E-TEK" (Complaint ¶ 227). | 6/23/00 | US okays Uniphase, E-TEK merger with conditions(Reuters News);   DLJ Securities is raising price target to $140 to reflect JDS's strengthening position due to the close of E-Tek(Analyst Report); PaineWebber believes that the merger with E-Tek adds value to JDS and is raising price target to $220 from $200(Analyst Report);   SG Cowen reports that JDS held an analyst meeting to highlight its recent acquisition of Cronos and its outlook for MEMs technology.  The acquisition allows JDS to capture a leadership position in what could be the underlying technology for optical cross-connects but marries Cronos' component technology with JDS's packaging expertise, a key ingredient in turning the technology into a sellable product(Analyst Report) | | Y | 0 |
| 6/28/00 | 11:38 AM | 6/28/00 Wed | "E-TEK shareholders subsequently approved the merger on June 28, 2000" (Complaint ¶ 227). | 6/28/00 | E-Tek Holders Clear JDS Uniphase Merger(Dow Jones News Service);   Argus is raising 12-month price target to $160 from $140 and 2001 EPS to 58¢ from 55¢ to reflect that JDS has become a powerhouse in supplying components and modules to makers of optical networking systems; it has the broadest portfolio of components and modules which enables it to become a one stop shop; the merger with E-TEK which boosts its production capacity; it has an experienced management team; and delivers strong financial results(Analyst Report) | | Y | 0 |
| 6/30/00 | 10:43 AM | 6/30/00 Fri | "The merger was completed on June 30, 2000 for 150.1 million shares of JDS stock, for a total purchase price of $17.5 billion" (Complaint ¶ 227). | 6/30/00 | PaineWebber said it had added JDS Uniphase Corp. to its highlighted stocks list(Reuters News) | | Y | 0 |
| 7/3/00 | | | | 7/3/00 | Interest in JDSU following completion of merger, analysts rate stock a buy following merger(The Globe and Mail 07.04.00) | | Y | 0 |
| 7/5/00 | | | | 7/5/00 | JDS Uniphase Corp. shares could hit $175 before the end of the year as it benefits from its acquisition of E-Tek Dynamics Inc., Business Week reported in its "Inside Wall Street" column, citing Jay Nakahara of the Invesco GT Technology Fund(Bloomberg);   UBS Warburg raised price target to $160 from $130 and 2001 EPS estimate to 66¢ from 61¢ to reflect merger benefits with E-TEK(Analyst Report) | | Y | 0 |
| 7/6/00 | | | | 7/6/00 | CIBC World Markets is raising 2001 EPS estimates to 63¢ from 61¢ to reflect benefits from the merger with E-TEK(Analyst Report);   Ryan, Beck & Co. is initiating coverage on JDS Uniphase with a buy rating and a $155 target price(Analyst Report) | | Y | 0 |
| 7/7/00 | | | | 7/7/00 | JDS Uniphase Corp. was rated new "buy" in new coverage by analyst Jordan Estra at Ryan, Beck & Co.  The target price is $155 per share(Bloomberg);   OCLI announces increase in Flex Products manufacturing capacity(PR Newswire) | | Y | 0 |
| 7/10/00 | 12:03 AM | 7/10/00 Mon | "On July 10, 2000, JDS announced that it agreed to merge with SDL, a fiber optic communications company, in a transaction valued at approximately $41 billion" (Complaint ¶ 228). | 7/10/00 | JDSU is buying SDL Inc. for about $37B in stock, just weeks after it purchased competitor E-Tek Dynamics Inc.  Under the terms of the deal, each share of SDL will be exchanged for 3.8 shares of JDSU(Associated Press);   JDSU was named "buy" by Hornblower Fischer AG(Bloomberg);   JDSU said preliminary results indicate that sales and earnings for JDS, its recently acquired E-Tek unit, and SDL will all beat street estimates(Reuters News);   Heavy trading of JDSU shares ahead of news that the company will acquire SDL Inc. has sparked speculation that some investors may have known about the deal in advance.  Indeed, the stock's unusual activity has prompted an investigation by the Chicago Board Options Exchange.  JDSU also has been contacted by the NASDAQ regarding the trading.  However, the National Association of Securities Dealers Inc., the NASDAQ's parent company, declined to confirm whether an investigation is under way.  But JDSU CFO Tony Muller said the notion that the stock's heavy trading was rooted in insider activity is "farfetched"(Dow Jones News Service);   "Well, actually the market is moving very, very fast.  The customers are demanding new products.  Our products | | Y | 0 |
| | 9:30 AM | 7/10/00 Mon | "Straus stated [in another publicly broadcast interview on July 10 on Market Call, CNNFN], '[w]hat we have to look at is really that bandwidth explosion allows more people to reach higher opportunities with respect to the Internet...I really can't say whether we will cap the acquisition streak, but all we have to look at is whether we can produce whatever customers need....Both of us feel that we are capacity constrained, and we both believe that this in an incredible opportunity moving forward the next several years'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 7-8). | | | | | |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 7/11/00 | 5:00 PM (7/10/00) | 7/11/00 Tue | "In this publicly broadcast interview [on CNBC/Dow Jones Business Video], Straus stated, Straus stated [sic], '[w]ell, actually the market is moving very, very fast. The customers are demanding new products. Our products, we are bringing products forward in every six to nine months. There is really very little overlap. What we really need to bring is more capacity to our customers to therefore we feel that we, with our synergies, technological synergies, we will bring products closer to our customers...'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 7). | 7/11/00 | JDSU fell on continued investor concern that government regulators might scuttle the transaction because, combined, JDS Uniphase and SDL would control 65% to 75% of the market for specialized lasers used to transmit optical pulses across fiber optic lines.  Concerns that JDS Uniphase might have trouble digesting SDL after completing its $20.3B stock purchase of E-Tek Dynamics Inc. last week also weighed on the stock, analysts said(Reuters News);   JDS Uniphase Corp. was raised to "strong buy" from "buy" by Ryan, Beck & Co.  The price target was maintained at $155(Bloomberg) | | Y | 0 |
| 7/18/00 | | | | 7/18/00 | Rockwell unit sues JDS Uniphase over chip patent(Reuters News) | | Y | 0 |
| 7/20/00 | 5:40 PM (7/19/00) | 7/20/00 Thu | "On July 19, 2000, it was announced that JDS stock would be added to the S&P 500 index after the close of trading on July 26, 2000" (Complaint ¶ 229). | 7/20/00 | JDS Uniphase shares soared on news the company is being added to the benchmark S&P 500 Index(Associated Press);   JDS Uniphase Corp. was rated new "recommend list" in new coverage by analysts Natarajan Subrahmanyan and Mary Henry at Goldman, Sachs & Co.(Bloomberg) | | Y | 0 |
| | No Time | 7/20/00 Thu 7/21/00 Fri | "On July 20, 2000, an article in the M2 Presswire noted that 'the news [on JDS] keeps getting better and better and the recent stock price of both JDS Uniphase and SDL is a good indicator that things are going very well'" (Complaint ¶ 230). | | | | | |
| 7/21/00 | | | | 7/21/00 | Strong quarter for SDL makes merger look better(PaineWebber Analyst Report) | | Y | 0 |
| 7/26/00 | | | | 7/26/00 | JDS Uniphase replaced drugstore chain Rite Aid in the S&P 500 at Wednesday's close(Dow Jones Business News) | | Y | 0 |
| 7/27/00 | 4:56 PM (7/26/00) | 7/27/00 Thu | "On July 26, 2000, JDS announced its fourth quarter fiscal 2000 ('4Q 00') results in a release which stated that the Company's sales for the quarter were $524 million, or 33% above net sales of $395 million for the quarter ended March 31, 2000" (Complaint ¶ 231). | 7/27/00 | Furukawa Electric Co. of Japan may sell 50M shares of JDSU out of the 144M shares it holds within this week, CNBC television reported(Jiji Press English News Service 07.26.00);   JDSU said it beat 4Q profit projections by 2¢, reflecting a 173% sales increase over the same period last year.  JDSU reported net income excluding 1-time costs of $114M or 14¢ per share, on revenues of $524M.  In the year-earlier period ended June 30, pro forma combined profit from JDS Fitel and Uniphase Corp., which merged in June 1999, was $41M or 6¢ a share, on revenues of $192M.  The average estimate carried by First Call/Thomson Financial was a profit of 12¢ per share, before extraordinaries, from a group of 28 brokers(Reuters News 07.26.00);   Merrill Lynch lifted FY01 EPS estimate to 69¢ from 61¢ and raised 2002 forecast to 90¢ from 83¢.  It also raised revenue forecast for 2001 to $3.5B from $2.45B and for 2002 to $5B from $3.5B.  Deutsche Banc Alex Brown raised 2001 profit estimate to 68¢ per share from 61¢ and lifted 2002 forecast to $1.01 from 90¢ per share.  Deutsche Banc Alex Brown said JDS is positioned to enjoy strong markets that show no signs of abating and lifted 2001 sales forecast to $3.4B fr | Y | Y | 1 |
| | 7:39 PM (7/26/00) | 7/27/00 Thu | "On July 26, 2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's fourth quarter 2000 results, its business and prospects. During the call, Defendants Straus, Muller and Abbe made presentations and answered questions. As senior managers, each of them is responsible for all the false statements in this call, as is JDS. Specifically, Muller falsely stated that 'demand for our products remains very strong and our growth remains determined by the rate at which we can expand capacity' and Straus added that the 'demand for bandwidth' is 'grow[ing] exponentially'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 8). | | | | | |
| | No Time | 7/27/00 Thu 7/28/00 Fri | "Following the conference call, on July 27, 2000, securities analysts issued reports on JDS, which were based on, and repeated statements disseminated by Defendants, including on the quarterly conference call..." (Complaint ¶ 236). | | | | | |
| 7/28/00 | 5:00 PM (7/27/00) | 7/28/00 Fri | "Straus stated in this public interview [on CNBC/Dow Jones Business Video], 'This industry is really growing very, very fast and we have a multiple strategy. One of the strategies is to put increased capacity four times over an 18 month period. We have been doing this consistently and we believe our capacity expansion plan and all the activities will meet the demand... Well, we have been growing at an incredible pace over the five, six years. We see the growth of the Internet and the corresponding wideband continuing unabating and we fell [sic] that the growth rate is what we have educated in yesterday's conference call will unabated. We are very comfortable with what we are seeing here in the future.'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 8). | 7/28/00 | JDS Uniphase slid amid news that Royal Philips Electronics had sold 5M of its JDS shares(Associated Press Newswires);  Furukawa Electric Co. denied a news report that it sold about 50M of its 144M shares of JDS Uniphase Corp. yesterday.  Furukawa, the biggest shareholder of the US company, sold the shares to take advantage of recent gains in the stock, CNBC's David Faber said on the network's Faber report.  Furukawa Electric spokesman Nobuyuki Kishi said the company didn't sell any JDS shares yesterday.  "We plan to sell the shares a little at a time," Kishi said.  "But we won't sell such a large amount all at once"(Bloomberg 07.27.00) | Y | Y | 1 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 8/9/00 | | | | 8/9/00 | JDS Uniphase Chief Executive Registers To Sell 1.26M Shares(Federal Filings Newswires 08.08.00) | | Y | 0 |
| 8/10/00 | | | | 8/10/00 | JDS Uniphase Corp. President and Chief Operating Officer, Charles Abbe, filed to sell 100,000 common shares of the company, according to a Form 144 filed Wednesday with the Securities and Exchange Commission(Federal Filings Newswires 08.09.00) | | Y | 0 |
| 8/15/00 | | | | 8/15/00 | Anthony R. Muller, CFO, sold 115,000 shares from 08.01.00 - 08.08.00 and 35,000 shares on 07.31.00. Zita Cobb, VP, sold 392,788 shares on 07.31.00.  Kevin Kalkhoven, CEO, sold 500,000 shares on 07.31.00.  Michael Phillips, VP, sold 50,000 shares on 07.31.00.  Wilson Sibbett, Director, sold 40,000 shares on 07.31.00(Federal Filings Newswires) | | Y | 0 |
| 8/16/00 | | | | 8/16/00 | PNC Advisors is increasing 2001 EPS estimate to 75¢ and price target to $160 as well as rating to Advantage Portfolio from "outperform" to reflect finalized acquisition of E-Tek and raised revenue assumptions on a pre-merger basis(Analyst Report) | | Y | 0 |
| 8/17/00 | | | | 8/17/00 | Wachovia is raising FY01 EPS and revenue estimates to 68¢ and $3.4B from 61¢ and $2.47B and price target to $170 to reflect strong quarter results(Analyst Report) | | Y | 0 |
| 8/18/00 | | | | 8/18/00 | JDS Uniphase Corp. Senior VPs filed to sell a total of 457,208 shares of the company's common stock, according to Form 144s released Thursday by the Securities and Exchange Commission.  Joseph Ip filed to sell 257,208 shares.  He listed August 10 as the approximate date of sale for the shares.  Dan Pettit listed August 9 as the approximate sale date for his 200,000 shares(Federal Filings Newswires 08.17.00);  Nortel Negotiates With JDS Uniphase on Fiber Optics Supply(The New York Times) | | Y | 0 |
| 8/23/00 | | | | 8/23/00 | JDS Uniphase CEO Muller Files To Sell 100,000 Common Shares(Federal Filings Newswires 08.22.00) | | Y | 1 |
| 8/25/00 | | | | 8/25/00 | JDS Uniphase Corporation and SDL, Inc. announced that they have received requests for additional information and other documentary material from the US Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 , with respect to JDS Uniphase's previously announced merger with SDL(PR Newswire 08.24.00) | | Y | 0 |
| 8/29/00 | | | | 8/29/00 | JDS Uniphase Announces Products for Higher Power, Higher Capacity Fiber Optic Systems(PR Newswire 08.28.00) | | Y | 0 |
| 8/30/00 | | | | 8/30/00 | JDS Uniphase Corp. Senior VP, Joseph Ip, filed to sell 400,000 common shares of the company, according to a From 144 released by the Securities and Exchange Commission(Federal Filings Newswires 08.29.00) | | Y | 1 |
| 8/31/00 | 8:51 PM (8/30/00) | 8/31/00 Thu | "On August 30, 2000 [as reported in the DowJones NewsWires] Abbe reiterated guidance, provided in late July, of sequential revenue growth for the first fiscal quarter, ending in September.  He said the revenue growth will be in the "very high teens" from the $524 million posted in the fiscal fourth quarter ended June 30..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 8). | 8/31/00 | JDS Uniphase Corp.'s President and Chief Operating Officer, Charles Abbe, said that the company's integration of its June acquisition of E-Tek Dynamics Inc. is going well.  Abbe also reiterated previous guidance, provided in late July, of sequential revenue growth for the first fiscal quarter, ending in September(Dow Jones News Service 08.30.00) | Y | Y | 1 |
| 9/1/00 | No Time | 9/1/00 Fri 9/5/00 Tue | "Straus stated publicly in a Wall Street Transcript interview, '[t]he greatest single opportunity is really the growth of the Internet and the growth of bandwidth in telecommunications. What we are seeing is an increase in demand for more information that in the end will provide the further need for our components and modules...'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 9). | 9/1/00 | | | | |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 9/5/00 | 4:54 PM (9/1/00) | 9/5/00 Tue | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). | 9/5/00 | JDS Uniphase Corp. VP of Sales, Russell Johnson, registered to sell 205,000 shares, valued at $25.6M, of the company's common stock, according to a Form 144 released by the Securities and Exchange Commission(Federal Filings Newswires) | | Y | 0 |
| | 4:54 PM (9/1/00) | 9/5/00 Tue | "On September 1, 2000, JDS filed a Form 8-K with the SEC which ... [stated] "Strong demand for virtually all of our optical components and module products combined with the increased operations resulting from the JDS FITEL merger contributed to the increases in gross profit for 2000" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 9). | | | | | |
| | 4:54 PM (9/1/00) | 9/5/00 Tue | "...JDSU failed to account for the fact that a substantial part of the goodwill for ETEK was impaired at the time of the closing of the acquisition of the company.  Instead, goodwill should have been written down at the date each acquisition closed..." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, pp. 60-61). | | | | | |
| 9/7/00 | 6:30 PM (9/6/00) | 9/7/00 Thu | "Straus stated in this public interview [on CNN Moneyline News Hour], 'As you know, Internet is really just exploded the last three, four years, we are just barely seeing the beginning of it, e-commerce, download videos, real-time videos are not even there. We believe the expansion will continue unabated for long, long time, which creates a great demand for fiber-optic networks, create a great demand for fiber-optic systems, and consequently, create great demand for our products.'" "Muller stated in this public interview, 'Well, we have many challenges in our business, and the biggest challenge is keeping up with our customer demands.  And the business is growing very quickly, the technology is changing quickly, we're expanding all over the world, as Josef mentioned...'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 10). | 9/7/00 | JDS Uniphase Sees $410M In Merger-Related Costs For SDL(Federal Filings Newswires);   The SDL Proxy-Prospectus includes the balance sheet which represented that JDS's inventories balance at 06.30.00 was $375.4M and its intangible assets, including goodwill, was $22.3B(Form S-4);  SDL and JDS Uniphase are proposing to merge in response to unprecedented growth in the telecommunications industry and demand for the fiber optic networks that are enabling such growth(Form S-4) | Y | Y | 1 |
| | 8:16 AM | 9/7/00 Thu | "On September 7, 2000, JDS filed a Registration Statement on Form S-4 with the SEC with respect to the registration of shares of JDS common stock to be used in the Company's merger with SDL (the 'SDL Registration Statement')… As with the E-TEK merger, JDS once again cited strong demand as the impetus for its merger with SDL..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 11). | | | | | |
| | 8:16 AM | 9/7/00 Thu | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). | | | | | |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| | 8:16 AM | 9/7/00 Thu | "In its Form S-4 filed with the SEC on September 7, 2000, JDSU stated in the Unaudited Pro Forma Consolidated Balance Sheet of JDS Uniphase and SDL, that as of June 30, 2000 goodwill was worth $22.3 billion and that total assets were worth $26.4 billion..." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 60). | | | | | |
| 9/12/00 [6] | No Time | 9/12/00 Tue 9/13/00 Wed | "Maurice Tavares, President of the largest division at JDS (fiber products group) stated [in a meeting of 200 analysts], 'There is no slowdown or stopping of the growth. We will grow at tremendous rate in Ottawa to meet the demand.'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 11). | 9/12/00 | JDS Uniphase Corp. assured that its massive expansion push was comfortably on schedule, but despite the positive news the company's shares took a beating(Reuters News);  JDS Uniphase Corp. realigned the organization of its semiconductor products and fiber-optics products groups as part of a plan to integrate recently acquired operations and management teams(Dow Jones News Service); SDL Inc. CFO Michael Foster said US regulators likely will approve his company's $34B acquisition by rival fiber-optic components maker JDS Uniphase Corp. in December(Bloomberg);  There is no slowdown or stopping of the growth.  We will grow at tremendous rate in Ottawa to meet the demand(Tavares-Meeting of 200 analysts on 09.12.00 as reported by Canadian Press Newswire 09.12.00) | Y | Y | 1 |
| | No Time | 9/13/00 Wed 9/14/00 Thu | "The Globe and Mail reported that JDS set a goal of quadrupling its production capacity over 18 months in 2000. Straus stated that the company was 'on pace' to achieving that goal.  'The market is there, we've got to respond.'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 11-12). | | | | | |
| 9/13/00 | | | | 9/13/00 | Zita Cobb, Vice President, sold 260,000 shares on 08.03.00.  Bruce Day, Director, sold 40,000 shares on 08.09.00.  Harry Deffebach, Officer, sold 80,000 shares on 08.31.00.  Robert Enos, Director, sold 20,000 shares on 08.21.00.  Joseph Ip, Vice President, sold 657,108 shares on 08.10.00 - 08.24.00.  Fred Leonberger, Officer, sold 120,000 shares on 08.04.00 - 08.31.00.  Anthony R. Muller, Chief Financial Officer, sold 130,000 shares on 08.04.00 - 08.14.00.  Michael Phillips, Vice President, sold 100,000 shares on 08.04.00 - 08.07.00.  Casimir Skrzypczak, Director, sold 25,000 shares on 08.09.00.  Jozef Straus, Chief Executive Officer, sold 1,388,044 shares on 08.01.00 - 08.07.00(Federal Filings Newswires);  This year, JDS set a goal of quadrupling its production capacity over 18 months.  Jozef Straus, JDS's chief executive officer, said yesterday that the company is "on pace" to achieving that goal.  "The market is there, we've got to respond," said Straus(The Globe and Mail 09.13.00) | | Y | 0 |
| 9/14/00 | | | | 9/14/00 | Charles J. Abbe, President, sold 150,000 shares on 08.01.00 - 08.11.00.  John A. MacNaughton, Director, sold 31,272 shares on 08.09.00.  Danny E. Pettit, Vice President, sold 800,000 shares on 08.09.00 - 08.18.00(Federal Filings Newswires);  JDS Uniphase Corp. said it is trying to soothe customer concerns over its acquisition of SDL Inc.(Reuters News);  JDS Uniphase Canada Ltd. was raised to "buy" from "market perform" by analyst Susan Streeter at Sprott Securities.  The 12-month target price is $235 per share(Bloomberg) | | Y | 0 |
| 9/18/00 | No Time | 9/18/00 Mon 9/19/00 Tue | "Muller said [at an investor's conference in Boston] demand for optical-networking gear is doubling every six to nine months as telecommunication providers struggle to expand capacity. 'We are now in a major revolution.' Muller said. He continued, '[t]hat phenomenon is what's driving growth at JDS Uniphase.' And, '[t]he fact is JDS Uniphase needs the additional production capacity in order to meet customer demand.'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). | 9/18/00 | Anthony R. Muller, Chief Financial Officer, sold 25,000 shares on 08.14.00(Federal Filings Newswires); JDS Uniphase Corp., which has 10 major acquisitions under its belt since its creation a little more than a year ago, is seeking more, Anthony Muller, its CFO, said(Dow Jones News Service) | | Y | 0 |
| 9/19/00 | | | | 9/19/00 | Wall Street Transcript interview with Straus published from Banc of America Securities Conference; JDS plans more acquisitions and company stays on course in Muller comments at an investor conference on 09.18.00(Ottawa Citizen);  Shares of SDL Inc. and JDS Uniphase Corp. have gone lower since their proposed merger was announced in July, raising concerns about whether SDL got the best price, considering that there were other bidders(Dow Jones News Service 09.18.00);  Mr. Muller said demand for optical-networking gear is doubling every 6 to 9 months as telecommunication providers struggle to expand capacity. "Mr. Muller said.  "That phenomenon is what's driving growth at JDS Uniphase. The fact is JDS Uniphase needs the additional production capacity in order to meet customer demand"(Muller at an Investor's conference in Boston as reported by The Ottawa Citizen);  Banc of America Securities Investment Conference, San Francisco, 09.20.00.  "We feel the explosion of bandwidth is going to continue unabated"(Straus in CBS MarketWatch) | Y [†] | Y | 1 |
| 9/20/00 | No Time | 9/20/00 Wed 9/21/00 Thu | "At the Banc of America Securities Investment Conference in San Francisco on September 20, 2000 [as reported by CBS MarketWatch], Straus stated, 'We feel the explosion of bandwidth is going to continue unabated.'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). | 9/20/00 | | | | |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 9/21/00 | | | | 9/21/00 | Salomon Smith Barney started coverage of Canada's JDS Uniphase Corp. with buy rating and a $155 price target(Analyst Report 09.20.00);  SDL Inc. was rated new "outperform" in new coverage by analyst Timothy Anderson at Salomon Smith Barney.  The price target is $410(Bloomberg) | | Y | 0 |
| 9/22/00 | | | | 9/22/00 | Kintisheff Research is initiating coverage of JDS Uniphase with a short term market perform and a long term strong buy rating and a 6-12 month price target of $113.25(Analyst Report) | | Y | 0 |
| 9/26/00 | | | | 9/26/00 | JDS Uniphase CEO Straus Sold 1.3M Company Shares In August(Federal Filings Newswires);  Lehman Brothers started coverage of JDS Uniphase Corp. with a rating of "outperform" and set 12-month price target of $130(Reuters News) | | Y | 0 |
| 9/29/00 | 4:00 PM (9/28/00) | 9/29/00 Fri | "On September 28, 2000, JDS filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2000 ('Fiscal 2000 10-K'). The Fiscal 2000 10-K incorporated by reference the financial statements filed with the SEC in the September 1, 2000 8-K. The Fiscal 2000 10-K was signed by Defendants Straus and Muller and was false and misleading and contained the same false and misleading statements regarding revenue as that statement..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). | 9/29/00 | | | | |
| | 4:00 PM (9/28/00) | 9/29/00 Fri | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). | | | | | |
| | 4:00 PM (9/28/00) | 9/29/00 Fri | "…Because each of these statements [of goodwill and total assets in JDSU's Form S-4 filed on September 7, 2000] were false, both the September 28, 2000 Form 10-K and the September 7, 2000 Form S-4 contained false statements"  (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 60). | | | | | |
| 10/2/00 | | | | 10/2/00 | JDS Uniphase Corp. Co-Chairman and Chief Executive Jozef Straus' complete stake in the company is much greater than the 167 directly-owned shares listed in a Form 4 recently filed with the Securities and Exchange Commission, JDS Uniphase Manager of Investor Relations Alison Reynders told Federal Filings Business News.  According to the Form 4, Straus directly held 167 common shares of the company at the end of August.  The filing also showed that he directly held 1.22M derivative securities at the end of the month(Federal Filings Newswires) | | Y | 0 |
| 10/4/00 | | | | 10/4/00 | JDS Uniphase Director Files To Sell 51,200 Common Shares(Federal Filings Newswires) | | Y | 0 |
| 10/6/00 | | | | 10/6/00 | JDS Uniphase Seeks To Hike Authorized Shares To 6B From 3B(Federal Filings Newswires);  JDS Uniphase Corp. former Co-Chairman and Chief Executive Kevin Kalkhoven exercised options for 2.4M shares of common stock during the fiscal year ended June 30 for total proceeds of $106.2M, according to a preliminary proxy statement filed with the Securities and Exchange Commission(Federal Filings Newswires) | | Y | 0 |
| 10/11/00 | 4:30 PM (10/10/00) | 10/11/00 Wed | "On October 10, 2000, Lucent, one of JDS's two biggest customers, announced in a press release that it was experiencing a slow down in its optical networking business" (Complaint ¶ 249). | 10/11/00 | JDS Uniphase Corp. was rated new "strong buy" in new coverage by analyst John H. Butler at SG Cowen.  The price target is $135(Bloomberg) | | Y | 0 |
| 10/12/00 | | | | 10/12/00 | JDS Uniphase Corp. was rated new "buy" in new coverage by analyst Robert V. Tango, Jr. at William Blair & Co.(Bloomberg) | | Y | 0 |
| 10/19/00 | | | | 10/19/00 | Fears of a shortfall by SDL(TheStreet.com) | | Y | 0 |
| 10/20/00 | | | | 10/20/00 | JDS Uniphase gained following the release of better-than-expected quarterly earnings from SDL Inc., which JDS has agreed to acquire(Dow Jones News Service);  SDL Inc. was raised to "strong buy" from "buy" by analyst Kevin Slocum at Wit SoundView(Bloomberg) | | Y | 0 |
| 10/25/00 [7] | 5:15 PM (10/24/00) | 10/25/00 Wed | "On October 25, 2000, Nortel reported its results for the quarter ending September 30, 2000 and noted that it was experiencing a downturn in its optical networking equipment division -- the division which made Nortel one of JDS's two largest customers" (Complaint ¶ 250). | 10/25/00 | JDS Uniphase stock fell on Nortel's news, but the Company said not too concerned that it will miss its numbers when it reports, but that guidance could be weaker than in past quarters(Dow Jones News Service);  Lehman cut JDS Uniphase to "neutral" from "outperform"(Reuters News) | Y | Y | 1 |

| | | | Plantiffs | | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 10/26/00 | No Time | 10/26/00 Thu 10/27/00 Fri | "Straus stated in this public interview [on CNBC], 'We still feel that the industry is very robust, and we providing right solution to our customers. And we look very comfortable for next quarter and the whole fiscal year beyond.'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 12). | 10/26/00 | Earnings expectations(TheStreet.com);  The cloud hanging over JDS and other fiber telecom stock lifted somewhat(Marketplace);  "We still feel that the industry is very robust, and we providing right solution to our customers.  And we look very comfortable for next quarter and the whole fiscal year beyond," said Straus(Interview on CNBC) | Y | Y | 1 |
| 10/27/00 | 6:40 PM (10/26/00) | 10/27/00 Fri | "Subsequent to the release of its 1Q 01 results, on October 26, 2000, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and its prospects" (Complaint ¶ 253). | 10/27/00 | JDSU reported 1Q net earnings that came in 2¢ above analysts' expectations and lifted growth forecasts, a performance that could help ease market worries about a slowdown in the fiber-optics sector(Reuters News 10.26.00);  JDSU was raised to "strong buy" from "market perform" by Sprott Securities(Bloomberg);  JDSU was raised to "outperform" from "market perform" by BMO Nesbitt Burns(Bloomberg);  GMP raised the 12-month target price raised to $202 from $182(Bloomberg); JDSU surged after it raised estimates for its 2Q and FY01, on strong sales.  The company increased its 2Q earnings per share estimate, and said revenue should grow in the high teen percentage range from the 1Q to the 2Q.  JDS also said 2001 revenues will be 115% to 120% over the $1.77B pro forma revenues of 2000(Reuters News 10.26.00);  Bruce D. Day, Director, sold 40,000 shares on 08.09.00. Anthony Muller, CFO, sold 150,000 on 08.11.00 - 08.15.00.  William Sinclair, Director, sold 51,200 shares on 08.28.00(Federal Filings Newswires);  Deutsche Banc Alex Brown raised revenue targets on JDS to $3.9B in 2001 from an earlier $3.4B and in 2002 from $6.2B from a prior $5.5B and expected JDS | Y | Y | 1 |
| | 6:40 PM (10/26/00) | 10/27/00 Fri | "...JDSU misrepresented inventory trends in its October 26, 2000 conference call with investors and analysts .... During this conference call, defendant Abbe, president and COO of the Company, stated that '[w]e do not see indications of systematic across the board component or module inventory builds either at our customers or in our own shops;' and that '[c]ustomer orders for our products are keeping up with our output'" (Plaintiffs' Amended and Supplemental Responses and Objections to Defendant Anthony Muller's First of Interrogatories, 2/2/07, Interrogatory No. 10, pp. 7-8). | | | | | |
| | No Time | 10/27/00 Fri 10/30/00 Mon | "Following the conference call, on October 27, 2000, securities analysts issued reports on JDS, which were based on, and repeated statements disseminated by Defendants, including on the quarterly conference call..." (Complaint ¶ 258). | | | | | |
| | No Time | 10/27/00 Fri 10/30/00 Mon | "An October 27, 2000 Wall Street Journal article about JDS's first quarter 2001 results repeated similar positive sentiments about demand for JDS's products..." (Complaint ¶ 259). | | | | | |
| | No Time | 10/27/00 Fri 10/30/00 Mon | "Straus misrepresented demand for JDSU products in an October 27, 2000 appearance on CTV-TV with interviewer Linda Sims. When Sims questioned Straus about declining demand for JDSU products, Straus responded that 'On the contrary, we are finding that there's a great demand from a variety of our customers. We have a very wide and diverse customer base, and each of the customers from different backgrounds are continually requesting our product'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 15). | | | | | |
| 10/30/00 | | | | 10/30/00 | JDS Uniphase Corp. was raised to "buy" from "neutral" by Sands Brothers & Co.(Bloomberg 10.27.00); PNC Advisors is raising FY01 EPS estimate to 85¢ from 75¢(Analyst Report);  UBS Warburg is raising revenue forecasts for 2001 and 2002 to $3.91B and $6.23B and $3.39B and $5.10B and raised EPS estimate for FY01 and 02 to 81¢ and $1.15 from 68¢ and 94¢(Analyst Report) | | Y | 0 |

| | | | Plantiffs | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Hakala | | | |
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 10/31/00 | 4:46 PM (10/30/00) | 10/31/00 Tue | "In its form 8-K filed with the SEC on September 1, 2000, JDS reported gross profits for fiscal year 2000 of $678.8 million. It also reported total inventory value of $375.4 million, of which $39.2 million represented finished goods. Because each of these statements was false, both the September 1, 2000 form 8-K, the September 7, 2000 Form S-4, the October 30, 2000 Form S-3, and the September 28, 2000 Form 10-K, contained false statements. Moreover, had JDSU properly taken an inventory write down, the Company's cost of sales would have been increased and its gross profits and earnings per share would have been decreased. By not taking the write down, JDSU presented artificially inflated profits and earnings to the public.." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 55). | 10/31/00 | JDS Uniphase Corp. registered 424,699 common shares on behalf of shareholders under a shelf registration statement filed with the Securities and Exchange Commission.  According to the filing, the 424,699 shares will be held by certain of the company's shareholders in exchange for exchangeable shares of JDS Uniphase Canada Ltd., a subsidiary of the company(Federal Filings Newswires 10.30.00) | | Y | 0 |
| | 4:46 PM (10/30/00) | 10/31/00 Tue | "In its Form S-3 filed with the SEC on October 30, 2000, the Company incorporated by reference the Form 8-K filed September 1, 2000, and the misrepresentations regarding goodwill contained therein  (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 60). | | | | | |
| 11/1/00 | No Time | 11/1/00 Wed 11/2/00 Thu | "As described in a November 1, 2000 Motley Fool article recounting the conference call '[i]t's rare that I've listened to any conference call in which I've heard so many comments from management about how good things went in the past quarter and how good they expect business to be in the future'" (Complaint ¶ 257). | 11/1/00 | | | | |
| 11/8/00 | | | | 11/8/00 | Wachovia Securities is raising 2001 EPS and revenue estimate to 80¢ and $3.95B from 68¢ and $3.4B(Analyst Report) | | Y | 0 |
| 11/9/00 | | | | 11/9/00 | OCLI to spend $20M to accommodate demand(Press Democrat);   JDS sees no slowdown in spending despite comments from Worldcom.  JDS doesn't see customers spending less on fiber optic gear(Investor's Business Daily) | | Y | 1 |
| 11/13/00 [8] | 8:09 AM | 11/14/00 Tue | "On or about November 13, 2000, JDS filed a Form 10-Q with the SEC which contained its financial statements for the fiscal 2001 first quarter ('1Q 01 10-Q') and was signed by Defendant Muller. The 1Q 01 10-Q also stated that "[s]trong demand for virtually all our optical components and modules products combined with the increased operations resulting from our acquisitions completed in fiscal 2000 contributed to the increases in gross profit" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 15). | 11/13/00 | | | | |
| | 8:09 AM | 11/14/00 Tue | "...JDSU stated that the total value of its inventory as of September 30, 2000 was $394.5, of which $68.2 million was finished goods. Both of these statements were false" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 56). | | | | | |
| 11/14/00 | 8:09 AM | 11/14/00 Tue | "The November 14, 2000 Form 10-Q for the quarter ended September 30, 2000 is incorporated by reference within the Forms S-4 filed November 17, 2000 and February 12, 2001.  In its Form 10-Q filed with the SEC on November 14, 2000, JDSU stated in its Consolidated Balance Sheets that as of September 30, 2000, intangible assets including goodwill were worth $21.1 billion and that total assets were worth $25.7 billion..." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 65). | 11/14/00 | JDS Uniphase Corp. was rated new "outperform" by analyst John N. G. Wilson at RBC Dominion Securities.  The 12-month target price is $90 per share(Bloomberg) | | Y | 0 |
| 11/15/00 | 2:56 PM | 11/15/00 Wed 11/16/00 Thu | "In this public conference [UBS Warburg Global Telecom Conference], Straus stated, '[JDSU] will see sequential revenue growth in the high teens during the current second fiscal quarter.' And, '[J]DS Uniphase continues to increase capacity worldwide while adding automation to its manufacturing process.' Straus and Muller reiterated previous guidance, saying the company expects year-over-year sales growth of 75% in the January quarter, 80% in the April quarter, 90% in the July quarter, and 110% in the October quarter'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 15). | 11/15/00 | JDS Uniphase Chief Executive Jozef Straus said the company will see sequential revenue growth in the high teens during the current second fiscal quarter.  During a presentation at the UBS Warburg Global Telecom Conference November 15, JDS Uniphase Corp. Chief Financial Officer Tony Muller said the company stated on October 26 that year-over-year sales growth in fiscal year 2001 would be between 115-120%.  Muller noted that in April, the company had projected sales growth for fiscal 2001 would be 75%, then bumped that number up to 80% in May and 90% in July.  Straus and Chief Financial Officer Tony Muller reiterated previous guidance, saying the company expects year-over-year sales growth of 75% in the January quarter, 80% in the April quarter, 90% in the July, and 110% in the October quarter(Dow Jones News Service);   RBC Dominion Securities is initiating coverage with an "outperform" rating(Analyst Report) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 11/17/00 | 3:20 PM | 11/17/00 Fri 11/20/00 Mon | "On November 17, 2000, JDS filed an amendment to the SDL Registration Statement with the SEC.... The Amended SDL Registration Statement included Proxy-Prospectuses ... which contained the same rationale for the merger as the original SDL Registration Statement and incorporated by reference the same documents that were incorporated into the original SDL Proxy-Prospectus as well as JDSU's 1Q 01 10-Q" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). | 11/17/00 | JDS and SDL announce December 27 date for shareholders meeting(PR Newswire) | | Y | 0 |
| | 3:20 PM | 11/17/00 Fri 11/20/00 Mon | "The November 14, 2000 Form 10-Q for the quarter ended September 30, 2000 is incorporated by reference within the Forms S-4 filed November 17, 2000 and February 12, 2001. In its Form 10-Q filed with the SEC on November 14, 2000, JDSU stated in its Consolidated Balance Sheets that as of September 30, 2000, intangible assets including goodwill were worth $21.1 billion and that total assets were worth $25.7 billion. Because each of these statements were false, both the November 14, 2000 Form 10-Q and the November 17, 2000 Form S-4 contained false statements" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 65). | | | | | |
| 11/20/00 | 1:03 AM | 11/20/00 Mon | "On November 20, 2000, JDS and SDL set December 27, 2000 as the date for their shareholders to vote on the proposed merger at special meetings of their shareholders" (Complaint ¶ 265). | 11/20/00 | UBS says JDS Uniphase is the stock to own in optical components sector, but also that it does not expect multiple expansion in the short run given issues related to its merger with SDL and cautious sentiment on the optical sector in general(Dow Jones News Service) | | Y | 0 |
| 11/29/00 | | | | 11/29/00 | JDS Uniphase Corp. is close to winning US antitrust clearance of its $21.1B purchase of rival SDL Inc. by offering to sell a factory in Switzerland, people familiar with the matter said(Bloomberg 11.28.00) | | Y | 0 |
| 11/30/00 | | | | 11/30/00 | JDS Uniphase Corp. was rated new "buy" in new coverage by analysts Rashad Barajakly and Shayna Malnak at Williams Capital Group.  The price target is US $86(Bloomberg) | | Y | 0 |
| 12/8/00 | | | | 12/8/00 | JDS Uniphase Corp. was rated new "strong buy" in new coverage by analyst James C. Kedersha at Adams, Harkness & Hill(Bloomberg);  Corning Inc. President John Loose said the biggest maker of glass used in telecommunications networks doesn't oppose the planned $23.1B purchase of rival SDL Inc. by rival JDS Uniphase Corp.  Corning is a competitor and a customer to both JDS and SDL in the market for lasers, filters and other parts used in fiber-optic equipment.  JDS, the biggest maker of optical components, is close to winning US antitrust clearance for its SDL purchase, people familiar with the matter said recently(Bloomberg 12.07.00) | | Y | 0 |
| 12/12/00 | | | | 12/12/00 | JDS Uniphase Corp. Director John MacNaughton liquidated his stake in the company's common stock in November, according to a Form 4 released by the Securities and Exchange Commission(Federal Filings Newswire);  US antitrust authorities are expected to give the green light soon to JDS Uniphase Corp.'s $25.4B acquisition of SDL Inc., but approval is expected to come with conditions, analysts said(Reuters News 12.11.00) | | Y | 1 |
| 12/13/00 | | | | 12/13/00 | Casimir Skrzypczak, Director, sold 30,000 shares on 11.29.00(Federal Filings Newswire) | | Y | 0 |
| 12/18/00 | 5:00 AM | 12/18/00 Mon | "On December 18, 2000, JDS and SDL were forced to adjourn the December 27 meetings because of delays in the regulatory approval process" (Complaint ¶ 265). | 12/18/00 | JDS Uniphase Corp. and SDL Inc. expect to complete their merger in January, rather than by the end of December as had been expected.  In a press release, the companies said they need more time to gain regulatory approvals for the transaction(Dow Jones News Service) | | Y | 0 |
| 12/19/00 | 1:00 PM | 12/19/00 Tue | "Straus stated [in a JDSU press release], 'JDS Uniphase is continually striving to increase manufacturing output to meet customer demand. The securing and opening of new and expanded facilities, such as those in West Trenton, New Jersey, is a vital step towards achieving that goal'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). | 12/19/00 | JDS opens manufacturing facility in New Jersey(PR Newswire) | | Y | 0 |
| 12/21/00 | No Time | 12/21/00 Thu 12/22/00 Fri | "Muller stated [in the Los Angeles Times, Business Section], 'I think capital-spending growth in the telecom space will be slowing but... as a percentage of... the telecommunications mix, fiber optics will be increasing'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). | 12/21/00 | | | | |
| 12/22/00 | | | | 12/22/00 | JDS Uniphase Corp. was downgraded to "buy" from "strong buy" by analyst George G. Hunt at Wachovia Securities.  The 12-month target price is $85 per share(Bloomberg);  JDS shares dropped after Deutsche Banc warned clients on a call that JDS may face problems in its upcoming quarter and miss earnings(AFX News Limited) | Y [†] | Y | 1 |
| 12/26/00 | | | | 12/26/00 | Deutsche Banc Alex Brown said it cut the rating of fiber optic-components maker JDS Uniphase to "buy" from "strong buy"(Reuters News);  Positive mention by Barrons over the weekend(The Globe and Mail 12.28.00) | | Y | 1 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 12/27/00 | | | | 12/27/00 | Shares in JDS Uniphase Corp. surged as investors turned to it in a year-end hunt for market bargains(Reuters News);  JDS Uniphase Corp. and SDL Inc. rescheduled their shareholder meetings to January 26 to approve their pending $25B merger(Reuters News);  JDS shares may have received a boost from comments by analyst with Ryan Beck & Co. reiterating JDS as "strong buy" after 2 analyst downgrades(Ottawa Citizen 12.28.00) | Y [‡] | Y | 1 |
| 12/28/00 [9] | 1:26 PM | 12/27/00 Wed | "On December 28, 2000, JDS and SDL set January 26, 2001 as the new date for the shareholders' meetings" (Complaint ¶ 265). | 12/28/00 | | | | |
| 1/1/01 | No Time | 1/2/01 Tue | "In this publication [Lightwave, No. 1, Vol. 18], Abbe is reported stating, 'From the industry point of view, the demand is like a bow wave pushed out in front of a boat; our goal will be a capacity expansion of four times over 18 months... We've seen shortages up and down the supply line... We are aware of a lot of recent concern. Many service providers' capital budgets aren't growing, and there has to be money generated to pay for all of this....'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 16). | 1/1/01 | | | | |
| 1/2/01 | | | | 1/2/01 | PaineWebber recommends fiber-optics player JDS(Deseret News 12.31.00);  Q: Will capacity expansion shorten the wait for components?  A: Technology Information(Lightwave 01.01.01);  "We've made a commitment to expand our capacity to 4 times the current level....We're expanding our physical manufacturing space from 1.2M square feet to 3.6M square feet in 30 facilities in 11 countries around the world," said Jeff Wild(Lightwave 01.01.01);  "From the industry point of view, the demand is like a bow wave pushed out in front of a boat; our goal will be a capacity expansion of 4 times over 18 months....We've seen shortages up and down the supply line.... We are aware of a lot of recent concern.  Many service providers' capital budgets aren't growing, and there has to be money generated to pay for all of this.  Within the optical space of DWDM, for example, we're not seeing fundamental shifts in industry growth," said Abbe(Lightwave 01.01.01) | Y [‡] | Y | 1 |
| 1/3/01 | | | | 1/3/01 | Merrill Lynch analyst sees technology rebound; fiber optics makers that could see growth include JDS(The Gazette) | | Y | 1 |
| 1/9/01 | | | | 1/9/01 | JDS Uniphase Corp. bought a minority equity stake in privately owned Avantas Networks Corp. "We have made this investment because we believe that Avantas' technology can help our customers more effectively deploy and manage their increasingly complex networks," said Joe Ip, JDS Uniphase's Senior Vice President of product strategy(Reuters News 01.08.01);  JDSU opened 320,000 sq ft. manufacturing facility in Shenzhen, China(Bloomberg) | | Y | 0 |
| 1/11/01 | | | | 1/11/01 | JDSU rated buy in new coverage by Global Capital Markets(Bloomberg);  WR Hambrecht report indicating future quarters murky and predicting coming good news on SDL merger(Analyst Report) | | Y | 0 |
| 1/12/01 | No Time | 1/12/01 Fri 1/16/01 Tue | "In this publication [Hamilton Spectator, Friday Final Edition], Abbe stated that additional manufacturing space will help JDS Uniphase 'meet the ongoing demand for optical components in the global telecommunications market'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 17). | 1/12/01 | | | | |
| | No Time | 1/12/01 Fri 1/16/01 Tue | "Muller stated [in The Business Journal, Vol. 18, No. 37], in Responses to rumors that a large customer might be puling [sic] back on orders sending the price of JDS stock reeling: 'At times like this, rumors are rampant - rumors about our company and other companies in the optical space.' He continued, '[s]uch rumors have certainly contributed to the decline in the optical space.' And, '[m]any of these are purposely started by those who might have short positions in the stock'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 17). | | | | | |
| 1/17/01 | | | | 1/17/01 | A wire service report that JDS Uniphase is in talks to sell a Zurich plant to Nortel Networks makes sense, but is unconfirmed analysts said on Wednesday(Reuters and TheStreet.com) | | Y | 0 |
| 1/18/01 | | | | 1/18/01 | A person familiar with the situation confirmed plant sale rumors(The Morning Call and The Gazette); Analysts say rumors make sense(various reports);  Nortel and JDS decline comment on rumors(The Globe and Mail);  JDS is likely to report strong earnings for quarter but may trim their March quarter outlook(AFX News Limited) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 1/19/01 | | | | 1/19/01 | Salomon Smith Barney reports that Nortel's inventory levels jumped and the use of internally manufactured optical components accelerated.  They believe that Nortel accepted $35-50M in optical inventories late last quarter under supply contracts established earlier in the year and the company built inventory levels that exceeded its 4Q needs.  SSB is concerned about the possibility of a material dip in demand for optical components that could negatively impact the outlook for JDS(Analyst Report) | | Y | 0 |
| 1/22/01 | | | | 1/22/01 | JDS Uniphase Corp. and other makers of fiber-optic parts may lower sales and earnings forecasts for this quarter as their customers look to reduce inventories of components, investors said(Bloomberg); JDS Uniphase Corp. was downgraded to "buy" from "strong buy" by analyst Kevin Slocum at Wit SoundView(Bloomberg) | | Y | 0 |
| 1/23/01 | | | | 1/23/01 | Merrill Lynch poses this question: What are the chances of a typical JDS Uniphase quarter - where the company beats numbers and raises forecasts for the next few quarters?  Brokerage firm says that may be difficult this time around, but says good news for longer-term investors is that it sees weak current market conditions as temporary in nature.  Says keys in near term are forward looking statements in earnings report and inventory levels at OEMs(Dow Jones News Service) | | Y | 0 |
| 1/24/01 | 3:09 PM | 1/24/01 Wed 1/25/01 Thu | "On January 24, 2001, the meetings were adjourned to February 12, 2001" (Complaint ¶ 265). | 1/24/01 | SDL announces earnings(PR Newswire);   Additional delay in closing SDL merger announced(PR Newswire) | | Y | 0 |
| 1/25/01 | No Time | 1/25/01 Thu 1/26/01 Fri | "In its January 25, 2001 Conference Call... Had the Company correctly reserved for its inventory, its pro forma statement of gross margin would have been reduced" (Plaintiffs' Amended and Supplemental Responses to Defendant Anthony Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, pp. 6-7). | 1/25/01 | JDS Uniphase and SDL Inc. expect to complete their merger in February, due to delays related to the regulatory approval process(Reuters News 01.24.01);   Salomon Smith Barney cut JDSU to "outperform" from "buy" to reflect concerns about demand for optical components(Analyst Report); JDS Uniphase Corp. said that it logged sales of $925M(US dollars) and a pro forma net income of $208M in its most-recent quarter.  But the announcement of a 161% increase in sales and earnings that exceeded many analyst expectations came after the close of trading today on the NASDAQ, where investors knocked nearly $8 off the price of JDS stock.  Investors were reacting to reports Wednesday that Nortel Networks and Lucent Technologies, which combine for about a third of JDS revenue, would likely be warehousing fewer components(Newsbytes News Network) | | Y | 0 |
| | No Time | 1/26/01 Fri 1/29/01 Mon | "Subsequent to the release of its 2Q 01 results, JDS held a conference call on January 25, 2001 for securities analysts, money and portfolio managers, institutional investors, brokers and stock traders to discuss the Company's business and prospects. During the call, Straus, Muller and Abbe made presentations and answered questions. Specifically, Straus represented that JDS had "another record quarter" and that JDS was looking forward to the next quarter 'with optimism.' Abbe stated that despite the inventory adjustments at JDS's customers, 'demand is so strong,' 'backlog is enormous,' 'we do not see oversupply,' and the 'underlying growth in telecommunications bandwidth we believe continues unabated'" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 17). | | | | | |
| 1/26/01 | 4:05 PM (1/25/01) | 1/26/01 Fri | "In its press release [January 25, 2001 Press Release], JDSU notes gross profit of $475.3 million... Had the Company correctly reserved for its inventory, its pro forma statements of gross profits and earnings per share would have been reduced" (Plaintiffs' Amended and Supplemental Responses to Defendant Anthony Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 7). | 1/26/01 | JDSU beat 2Q earnings expectations but warned future sales will be dampened by a slowdown in equipment spending by its customers.  JDS reported quarterly earnings of 21¢ compared to 19¢ expected by analysts surveyed by Thomson/First Call(AP Newswires 01.25.01);   JDSU gave investors reassuring news on Thursday, reporting market-beating 2Q results and shaving only a fraction from its critically watched growth forecasts.  "I think we provided the level of comfort that was perhaps appropriate," Chief Executive Jozef Straus told Reuters.  JDSU expects 3Q pro forma earnings equal to or slightly better than the 2Q, with revenues 7-10% above the 2Q(Reuters News 01.25.01);   JDS Uniphase jumped in early trade on Friday as analysts trimmed back estimates in line with reduced forecasts but kept buy recommendations intact on improved long-term growth prospects(Reuters News); JDSU cut to "buy" from "strong buy" at CE Unterberg, Towbin(Bloomberg);   JDSU price target cut to $85 from $120 at BMO Nesbitt Burns(Bloomberg);   JDSU CN price target cut to C$130 from C$239 by Sprott Securities(Bloomberg);   JDSU cut to buy from strong buy at Adams, Harkness & Hill(Bloomberg); | Y | Y | 1 |
| | No Time | 1/26/01 Fri 1/29/01 Mon | "Following the conference call, on January 26, 2001, securities analysts issued reports on JDS, which were based on and repeated information provided by JDS management on the conference call and in follow-up conversations..." (Complaint ¶ 270). | | | | | |

| | | | Plantiffs | | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| | No Time | 1/26/01 Fri 1/29/01 Mon | "Furthermore, notwithstanding that the Company finally alluded, in the January 25, 2001 press release, to the fact that demand was not quite as good as Defendants had primed the market to believe, Defendants continued to downplay the effect that this would have on JDS's future results and suggested instead that the downturn in demand would have only a minor and temporary effect on JDS. This is illustrated by an article in The Wall Street Journal on January 26, 2001..." (Complaint ¶ 268). | | | | | |
| 1/29/01 | | | | 1/29/01 | Lay offs announced at JDS(CTV News, CTV Television, and The Canadian Press) | Y [†] | Y | 1 |
| 1/30/01 | No Time | 1/30/01 Tue 1/31/01 Wed | "Katherine Payne, vice-president of human resources for JDS's fiberoptic group, stated in this publication [National Post], 'We have several sites in mainland China, and we can and must use them to greater opportunity for the company. So we will be expanding our capacity in Asia and certainly that will have some impact on the production that is currently in some of our other sites. That would include, but not be exclusive to, Ottawa'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 17-18). | 1/30/01 | | | | |
| | No Time | 1/30/01 Tue 1/31/01 Wed | "Katherine Payne, vice-president of human resources for JDS's fiberoptic group, stated in this publication [The Globe and Mail], 'I don't believe we're seeing a general slowdown in the industry'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 18). | | | | | |
| | No Time | 1/30/01 Tue 1/31/01 Wed | "Abbe stated in this publication [The Globe and Mail], 'We may experience a temporary slowing of order flow for certain products until this adjustment is completed'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 18). | | | | | |
| 1/31/01 | | | | 1/31/01 | Wachovia is raising 2001 revenues and EPS estimate to $3.83B and 82¢ from $3.75B and 76¢ and 2002 EPS estimate by 4¢ to $1.10 due to lower expenses assumptions(Analyst Report);  Stockholders' Update held in Ottawa(PR Newswire, China Telecom and The Globe and Mail 02.01.01) | Y [†] | Y | 1 |
| 2/1/01 | No Time | 2/1/01 Thu 2/2/01 Fri | "Abbe stated in this publication [China Telecom, No. 2, Vol. 8], 'Over the next year we will expect a greater percentage of our output to be manufactured in Asia. We find our competitors increasingly doing this and taking advantage of those economics, and we too must move directionally westward...'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 18). | 2/1/01 | JDSU is less certain than past periods that it will hit its sales forecasts(Bloomberg);  JDS Uniphase Corp. will manufacture more of its fiber-optic telecoms components in Asia to cash in on dramatic cost savings and keep pace with its competitors(Reuters News 01.31.01);  The company expects to increase its workforce by at least 60 pct over the next year, to facilitate its expectation to double revenue said Abbe(AFX European Focus);   "Over the next year we will expect a greater percentage of our output to be manufactured in Asia. We find our competitors increasingly doing this and taking advantage of those economics, and we too must move directionally westward....The target for staff expansion is a rate of about 60% of revenue growth.  Based on recent forecasts, another 3,700 in staff will be added to the current employee base of 23,000 employees," said Abbe(China Telecom);  Jay Abbe said JDS has little choice because Asian workers are "substantially" cheaper than their North American counterparts.  "Over the next year, we will expect a greater percentage of our output to be manufactured in Asia....That's a very attractive area for us...." But he said the shift to more Asian manufa | Y | Y | 1 |
| | No Time | 2/1/01 Thu 2/2/01 Fri | "Abbe stated in this publication [The Globe and Mail] that JDS had little choice because Asian workers were 'substantially' cheaper than their North American counterparts..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 18-19). | | | | | |
| | No Time | 2/1/01 Thu 2/2/01 Fri | "After the layoff by JDS Uniphase of 700 contract workers in Ottawa, Abbe told reporters [of AFX European Focus and The Globe and Mail] in Ottawa following a meeting with shareholders that JDS expected to increase its workforce by at least 60 percent over the next year, to facilitate its expectation to double revenue...There's more uncertainty in the telecommunications sector than a few months ago but demand from JDS customers will continue to grow in the coming years..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 19). | | | | | |
| 2/5/01 | | | | 2/5/01 | Deutsche Banc reiterated Buy rating but cut revenue growth because of "continued inventory issues"(TheStreet.com);  JDS up on DB report that Justice Department approval of SDL merger is imminent(TheStreet.com) | | Y | 0 |

| | | | Plantiffs | | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 2/6/01 | | | | 2/6/01 | JDS Uniphase Corp. will sell a Swiss subsidiary to Nortel Networks Corp., satisfying Justice Department concerns over its $18B acquisition of rival SDL Inc.(AP Newswires);   JDS Uniphase Co-Chairman and Chief Executive Jozef Straus filed to sell 100,000 shares of the company's common stock.   JDS Uniphase Executive Vice President Mary Zita Cobb registered 100,000 common shares of the company in a separate Form 144 filed Monday with the SEC(Dow Jones News Service 02.05.01) | | Y | 0 |
| 2/7/01 | | | | 2/7/01 | JDSU fell more than 6% after an analyst trimmed his earnings estimates for the company due to near-term growth challenges.  WR Hambrecht & Co. analyst Jim Liang maintained a buy recommendation, but scaled back his revenue growth forecast for the 3Q over the 2Q to 5.5% from 7%.  He also cut his forecast for 4Q revenue growth to 7.5% from 9% and said JDS might revise its own forecasts lower too.  Liang shaved back revenue estimates for 2001 to $3.74B from $3.78B and earnings to 81¢ per share from 82¢ per share.  He cut 2002 revenue estimates to $5.44B from $5.54B and earnings to $1.05 from $1.07.  The analyst cited a recent warning of order cancellations by semiconductor company Applied Micro Circuits Corp., whose products JDS buys and incorporates into its optical transmission and receiving technology.  UBS Warburg analyst Joseph Wolf wrote that he expects JDS to leave earnings guidance "relatively" unchanged.  He estimates that JDS in combination with SDL will report FY01 sales of $3.97B and calendar 2001 sales of $5.23B.  "We expect a positive impact to gross margin due to SDL's high corporate gross margin," he wrote, citing SDL's margin of 56.8% in the 4Q(Reuters News 02.0 | | Y | 0 |
| 2/12/01 | No Time | 2/12/2001 Mon 2/13/2001 Tue | "The November 14, 2000 Form 10-Q for the quarter ended September 30, 2000 is incorporated by reference withing the Forms S-4 filed November 17, 2000 and February 12, 2001.  In its Form 10-Q filed with the SEC on November 14, 2000, JDSU stated in its Consolidated Balance Sheets that as of September 30, 2000, intangible assets including goodwill were worth $21.1 billion and that total assets were worth $25.7 billion" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 65). | 2/12/01 | JDS Uniphase reported the completion of a major milestone in its global systems integration program.  This accomplishment was capped with the launch of standardized business processes running on Oracle applications for its Ottawa operations -- its single largest business and manufacturing site(PR Newswire) | Y | Y | 1 |
| 2/13/01 | 10:32 PM (2/12/01) | 2/13/01 Tue | "On February 12, 2001, JDS and SDL announced that their respective stockholders approved the merger at special meetings" (Complaint ¶ 272). | 2/13/01 | JDS Uniphase and SDL rise after shareholders OK merger(Reuters);   JDS Uniphase shares were down over 5% on the NASDAQ to close Tuesday at $38.5.  The slide in the share accelerated after the company said it would announce revised guidance for the quarter today(Reuters News);   "While our near term business levels are being affected by carrier capital spending uncertainties and inventory adjustments by some of our customers, demand, specifically the growth in telecommunication services in the internet, is projected to continue growing rapidly.  This will lead most likely during a second half of this calendar year to compelling needs to add to carrier capacity.  With this increase in car-in carrier capacity additions will come increased demand for optical components in modules and the new technologies, provide increased performance and added customer value.  We believe that such a return to healthy demand growth will be reflected by the financial performance of our company, which has been strengthened so much by our merger with SDL," said Muller(Conference Call following the close of SDL Merger) | Y | Y | 1 |
| | No Time | 2/13/01 Tue 2/14/01 Wed 4/9/01 Mon [10] | "JDS filed its Form 10-Q for 2Q 01 with the SEC on February 13, 2001 ('2Q 01 10-Q'), which was signed by Defendant Muller. The 2Q 01 10-Q stated that "Strong demand for virtually all our optical components and modules products combined with the increased operations resulting from our acquisitions completed subsequent to December 31, 1999 contributed to the increases in gross profit" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 19-20). | | | | | |
| | No Time | 2/13/01 Tue 2/14/01 Wed 4/9/01 Mon [10] | "In [the company's] 10-K filed February 13, 2001, JDSU stated that the value of the company's total inventory for the year ended June 30, 2000 was $375.4 million, of which $39.2 million consisted of finished goods.  The Company's [sic] further misstated that its gross profits for the fiscal year ending June 30, 2000 was $678.8 million..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, p. 57). | | | | | |
| | No Time | 2/13/01 Tue 2/14/01 Wed 4/9/01 Mon [10] | "In [JDSU's 10-Q filed February 13, 2001], the Company reported that the total value of its inventory was $493.9 million, of which $35.7 million was finished goods.  JDSU also falsely reported gross profits of $475.3 million for the three months ending December 30, 2000..." (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 6, pp. 57-58). | | | | | |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| | No Time | 2/13/01 Tue 2/14/01 Wed 4/9/01 Mon [10] | "...JDSU amended its Form 10-K for the year ending June 30, 2000. The amended 10-K lists in the Consolidated Balance Sheets that as of June 30, 2000 goodwill was worth $22.3 billion and that total assets were worth $26.4 billion" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 66). | | | | | |
| | No Time | 2/13/01 Tue 2/14/01 Wed 4/9/01 Mon [10] | "In this [Form 10-Q] filed with the SEC, JDSU reported in its Consolidated Balance Sheets that net intangible assets including goodwill were $20.0 billion with $24.9 billion in total assets.  Note 5 also lists the value of goodwill at $21.2 billions of December 30, 2000" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 67). | | | | | |
| 2/14/01 | 4:52 PM (2/13/01) | 2/14/01 Wed | "Also on February 13, 2001 - the day after JDS and SDL shareholders approved the merger - JDS issued a press release informing investors that JDS had unexpectedly lowered its guidance for the third quarter of Fiscal 2001 from $0.21 to $0.17 and reduced its EPS estimates for the full year from $0.82 to $0.74.  ...  Shortly after the press release was issued on February 13, 2001, JDS held a conference call for securities analysts, money and portfolio managers, institutional investors, brokers, and stock traders...." (Complaint ¶¶ 274-275). | 2/14/01 | JDSU expects sales of $3.9B and earnings of 74¢ a share for the fiscal year ending in June, which includes about a quarter and a half of results from SDL.  JDS expects sales for the 3Q ending in March to be at or slightly above $1B, with earnings per share at 17¢.  The FY01 guidance also reflects "continued uncertainty in carrier capital spending prospects and customer inventory adjustments as well as a lower level of near-term sales visibility than the company has experienced in recent periods," the company said.  JDS and SDL expect lower sales on a stand alone basis for 3Q(Dow Jones News Service 02.13.01);  UBS Warburg cut the price target on JDSU to $60 from $75(Reuters News);  JDSU added about 5% in late trade on Wednesday in advance of a increased weighting on the S&P 500 Index after the market's close.  The shift is expected to boost buying of JDS stock among fund managers whose funds reflect share weighting on the S&P 500.  SG Cowen downgraded JDS to a "buy" from a "strong buy", and Adams Harkness & Hill cut the stock to a "market perform" rating from a "buy" citing ongoing growth concerns.  WR Hambrecht & Co. dropped its stock target to $60 from $85(Re | Y | Y | 1 |
| 2/15/01 | | | | 2/15/01 | Merrill Lynch lowered its earnings estimate for the company's fiscal 3Q to 17¢ per share from 21¢ per share, but increased its revenue expectation to $1B from $989M.  For the FY01headed in June, Merrill Lynch cut its earnings estimate to 73¢ per share from 81¢ per share.  The brokerage dropped its estimate for the FY02 to 88¢ per share from $1.02 per share.  Merrill cited a general reduced outlook and the sale of the company's Zurich facility as reasons for the new estimates(Reuters News);  GMP cut JDSU price target to $100 from $189(Bloomberg 02.14.01) | | Y | 1 |
| 2/16/01 | | | | 2/16/01 | Lehman Brothers cut its price target for JDSU to $65 from $100 after Nortel Networks forecast a 1Q loss and cut revenue forecasts.  Lehman is decreasing its revenues forecast at JDS Uniphase to $3.6B from $3.9B and earnings per share expectations to 68¢ from 73¢ for 2001.  Lehman is also lowering 2002 forecasts at JDSU to $5.4B in revenues from $6B and earnings per share to 80¢ from 88¢(Reuters News);  JDS "understands" analysts cutting forecasts(Reuters);  First Union reduced its rating on JDSU's stock to "market perform" from "strong buy"(AP Newswires);  Salomon Smith Barney Trims Views On Corning, JDS(Dow Jones News Service);  CSFB cut its price target for JDSU shares to $65 from $100 and 2001 and 2002 revenue estimates to $3.6B and $5.4B from $3.9B and $6B as well as FY01 and 02 EPS estimates to 68¢ and 80¢ from 73¢ and 88¢ after Nortel Networks forecast a 1Q loss and cut revenue forecasts(Analyst Report);  JDSU told Reuters it "can certainly understand" why analysts are cutting JDS forecasts below company guidance amid a dramatic warning by key customer Nortel Networks Corp. and a spending slowdown(Reuters News);  PNC Advisors is reducing 2001 EPS e | | Y | 1 |
| 2/20/01 | | | | 2/20/01 | "We're not considering a lawsuit against Nortel," JDS CFO Anthony Muller said. "Of course we're talking to lawyers, but it's not easy to sue your largest customer."  2 days before Nortel chopped its profit and revenue forecasts, it closed a $2.5B all-stock deal for a JDS manufacturing plant in Zurich.  JDS said that Nortel's warning came as a "shock" and it is talking to lawyers to assess the situation.  "It did not come out in the due diligence nor in any of the representations that were made in the contracts," Muller said of the plant sale discussions. "Nortel is saying they just learned about it"(Reuters News);  US Bancorp Piper Jaffray cut JDSU to "neutral" from "strong buy." The price target was lowered to $43 from $69 and 2001 and 2002 EPS estimates were reduced(Bloomberg);  JDSU rated "buy" with a $50 price target in new coverage at Yorkton Securities(Bloomberg);  GMP cut the price target on JDSU to $50 from $100(Bloomberg);  Yorkton is initiating coverage on JDS with a buy recommendation and a $50 price target(Analyst Report);  Dain Rauscher Wessels is lowering 2001 revenue and EPS estimate to $3.7B and 70¢ from $3.9B and 73¢ and 2002 estimates of $5.4B and 79¢ from $5.8B and 82¢(Analyst | | Y | 1 |
| 2/21/01 | | | | 2/21/01 | JDS Uniphase to discuss remedies regarding sale of plant to Nortel in all stock deal(The Globe and Mail);  JDS acquires Optical Process Automation(TheStreet.com, The Daily Deal, Canada NewsWire);  After a conference call with JDS Uniphase Corp. management last week, Griffiths McBurney & Partners cut its target price for JDS stock to US$100 from US$189.  Yesterday, it cut the target again -- to US$50(National Post) | | Y | 1 |
| 2/22/01 | | | | 2/22/01 | JDS Uniphase acquired Optical Process Automation Inc. "The acquisition of OPA represents an important move in our global manufacturing strategy," said JDS chief executive Jozef Straus in a statement(Reuters News 02.21.01);  JDS chief says considering options over Nortel sale(Reuters News);  Wachovia Securities is lowering price target to $60 from $85 to reflect dilution and weaker near-term market(Analyst Report) | | Y | 1 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 2/23/01 | No Time | 2/23/01 Fri 2/26/01 Mon | "Straus stated [as reported by The Ottawa Citizen] optical gear is grabbing a bigger slice of telecommunication spending because it provides the answers to the financial squeeze hitting the industry. 'I firmly believe that there will be strong growth'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 20). | 2/23/01 | Morgan Stanley cut its price target on JDSU to $50 from $95(Reuters News);  Merrill Lynch decides to "pro-actively" reduce estimates on JDS. Cites Nortel news and other indications of weaker-than-expected end-market for optical systems in next few quarters.  March quarter review goes to $950M from $1B and EPS to 16¢ from 17¢.  FY01 revenue falls to $3.75B from $3.9B, EPS to 70¢ from 72¢(Dow Jones News Service);  Statements by Straus at Corel Centre on February 22 reported(Ottawa Citizen);  Mr. Straus said optical gear is grabbing a bigger slice of telecommunication spending because it provides the answers to the financial squeeze hitting the industry.  "I firmly believe that there will be strong growth," he said.  Straus said that carrier spending has slowed dramatically because the revenue from the wave of Internet traffic has fallen behind the cost of providing the new equipment.  He said the new optical gear will sell because it provides a path out of the industry's dilemma.  It will increase capacity, provide new revenue-generating services and reduce operating costs.  He predicted | Y | Y | 1 |
| 2/27/01 | 9:01 AM | 2/27/01 Tue | "On February 27, 2001, JDS issued a press release announcing that it would be reducing its global workforce by approximately 3,000 people.  Despite that news, JDS stated in the press release that 'it remains confident about its long-term position in the industry and believes that its ongoing prospects remain very positive'" (Complaint ¶ 279). | 2/27/01 | JDS Uniphase will cut more than 3,000 jobs, or more than 10% of its work force, in an effort to improve efficiency(AP Newswire);  JDS Uniphase Corp. was busy buying companies even as it sought antitrust regulators' approval for its $13.5B purchase of rival SDL Inc.  JDSU acquired 3 companies between September and January for as much as $665.8M in cash and stock, according to recent US Securities and Exchange Commission filings(The Globe and Mail) | Y | Y | 1 |
| 2/28/01 | | | | 2/28/01 | A new co-chairman of Canada's JDS Uniphase Corp. plans to sell shares valued at about $14M, a US regulatory filing on Wednesday showed.  It was not immediately known if the shares have been sold.  A spokesman was not immediately available for comment.  Scifres is a former chief executive at SDL Inc.(Reuters News);  JDS Uniphase Corp. was downgraded to "buy" from "strong buy" by analyst Susan Streeter at Sprott Securities.  The 12-month target price was reduced to $46 from $58 per share(Bloomberg) | | Y | 1 |
| 3/1/01 | | | | 3/1/01 | JDS Uniphase Corp. shares have been hammered in recent months, but they may still have further to fall, analysts suggest.  Arnab Chanda, an analyst who follows JDS for Lehman Brothers, raised that possibility in several recent notes on the firm and related companies.  "We . . . believe that downside risk remains given the possibility of pricing pressure and margin deterioration."  Brian Piccioni, an analyst with BMO Nesbitt Burns Inc., also says the shares could fall further.  He feels there is still more bad news to come out of the sector.  "There are more companies that will be preannouncing or adjusting their outlook downward," he said(The Globe and Mail);  JDS Uniphase Corp. President and COO Jay Abbe filed to sell 150,000 shares of the company's common stock, according to a Form 144 released Thursday by the SEC(Dow Jones News Service) | | Y | 0 |
| 3/2/01 | | | | 3/2/01 | WR Hambrecht cut its FY01 EPS from 73¢ to 65¢ and for FY02 from 89¢ to 67¢ due to business fundamentals deteriorating since last update and lowered its price target from $60 to $45(Analyst Report);  BMO Nesbitt cut JDSU price target to $45 from $66(Bloomberg) | | Y | 1 |
| 3/5/01 | No Time | 3/5/01 Mon 3/6/01 Tue | "An unnamed Spokesman for JDS Uniphase stated [quoted in Telephony, 2001 WLNR], 'We see it as a short-term downturn.'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 20). | 3/5/01 | | | | |
| 3/6/01 | | | | 3/6/01 | Deutsche Banc Alex Brown cut its earnings and revenue forecasts for JDS Uniphase, citing continued weakness in the sector.  DB Alex Brown cut 2001 EPS forecast to 70¢ from 74¢ and reduced revenue estimate to $3.7B from $3.9B.  For 2002, EPS forecast cut to 74¢ per share from 88¢ and revenue estimate cut to $5.5B from $6B(Reuters News 03.05.01) | Y [†] | Y | 1 |
| 3/7/01 | 5:14 PM (3/6/01) | 3/7/01 Wed | "On March 6, 2001, the Company filed a Form 8-K with the SEC in which it revised its guidance for future periods downward for the third time in little over a month" (Complaint ¶ 280). | 3/7/01 | Amid a weakening US economy and waning customer demand, JDSU lowered its guidance or the 3Q and 4Q.  The company expects 3Q pro forma earnings per share of 14¢ and revenues of $925M, below the firm's previous forecast of earnings of 17¢ per share(Reuters News 03.06.01);  Goldman Sachs lowered 2001 and 2002 EPS estimates for JDSU to 64¢ and 65¢ from 74¢ and 88¢, respectively(Reuters News);  SSB cut 3Q earnings estimate on JDSU to 14¢ per share from 16¢ per share and its revenue target to $925M from $942M.  SSB cut 4Q earnings estimate to 14¢ from 17¢ and its revenues to $925M from $1.1B(Reuters News);  Merrill Lynch cut 2002 EPS estimate on JDSU to 62¢ from 74¢ and cut the revenue estimate to $4.3B from $5.3B(Reuters);  WR Hambrecht cut 3Q EPS estimate to 14¢ from 15¢.  The company maintained EPS revenue and EPS estimate for the June quarter and subsequent quarters(Analyst Report);  Lehman Brothers cut 2001 and 2002 EPS estimates for JDSU to 65¢ and 55¢ from 72¢ and 74¢(Bloomberg);  JDSU cut to "add" from "buy" at ABN AMRO.  The price target was cut to $45 from $78.  EPS estimates were reduced for 2001 and 2002 to 63¢ and 62 | Y | Y | 1 |
| 3/8/01 | | | | 3/8/01 | JDS Uniphase Canada was maintained "buy" by analyst Benoit Chotard at National Bank Financial.  The 12-month target price was reduced to C$61 from C$90 per share(Bloomberg);  PNC Advisors reduced its fiscal 2001 EPS from 73¢ to 64¢ and lowered its price target from $75 to $50(Analyst Report);  CIBC World Markets reduced its FY01 EPS from 70¢ to 64¢ and FY02 EPS from 91¢ to 59¢ after JDS lowered guidance(Analyst Report) | | Y | 1 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 3/9/01 | | | | 3/9/01 | JDS Uniphase to purchase 5.1% share of Okmetic, valued at $8.4M.  JDS also entered into a long-term agreement to purchase silicon wafers from Okmetic(Reuters News);   JDS Uniphase Executive Cobb Files To Sell 100,000 More Shares(Federal Filings Newswire);   JDSU will not reprice employee stock options after the stock dropped 80% in the past year(Bloomberg) | | Y | 0 |
| 3/12/01 | | | | 3/12/01 | SSB cut JDSU price target to $45 from $55.  SSB cut 2002 EPS estimate to 63¢ from 70¢(Bloomberg); Undaunted by slumping sales and a crumbling share price, JDS Uniphase Corp. said yesterday it will buy a 5.1% stake in Finland's Okmetic for about US $8.4M in cash.  JDS has also struck a long-term contract to buy Okmetic silicon wafers(National Post) | | Y | 0 |
| 3/14/01 | | | | 3/14/01 | New Focus (NUFO) had a big day on the up side, rising $3.94.  That's takeover speculation.  There's a rumor that JDS Uniphase is eyeing the stock.  Just a rumor(Nightly Business Report);   JDS Uniphase extended a supply deal with Alcatel Optronics to 2003(Reuters News) | | Y | 0 |
| 3/19/01 | | | | 3/19/01 | JDS Uniphase will introduce 70 new products, presented in a new network solutions approach, at the optical fiber communications conference(Canada Stockwatch) | | Y | 0 |
| 3/20/01 | No Time | 3/20/01 Tue 3/21/01 Wed | "On March 20, 2001, [in a presentation to investors at the OFC Conference] an unidentified speaker from JDS management states, 'The longer-term outlook for the optical component space is strong, driven by continued solid bandwidth demand growth and carriers' needs to minimize the cost per bit invested in equipment'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, p. 20). | 3/20/01 | | | | |
| 3/21/01 | | | | 3/21/01 | JDS Uniphase CEO, Joseph Straus, interviewed on CNNfn.  CEO Straus discusses outlook for fiber optics, company positioning, and the merger with SDL(CNNfn: Capital Ideas 03.20.01);   "The longer-term outlook for the optical component space is strong, driven by continued solid bandwidth demand growth and carriers' needs to minimize the cost per bit invested in equipment(Unidentified JDSU Management-OFC Conference) | Y [†] | Y | 1 |
| 3/22/01 | | | | 3/22/01 | Robertson Stephens cut its rating on JDS Uniphase to long-term attractive from buy due to weak demand and excess inventory(Reuters News) | | Y | 1 |
| 3/23/01 | 1:14 PM | 3/23/01 Fri | "In this document [Form 8-K] filed with the SEC, JDSU reported in the Consolidated Balance Sheets of JDS Uniphase and SDL that intangible assets including goodwill were $60.2 billion with $65.5 billion in total assets..." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 70). | 3/23/01 | | | | |
| 3/28/01 | | | | 3/28/01 | CSFB lowered its FY01 EPS From 62¢ to 57¢ and FY02 EPS from 73¢ to 49¢ as well as lowering the price target from $50 to $35 to reflect NT pre-announcement and continued lack of visibility(Analyst Report);  Merrill Lynch lowered its rating on JDS Uniphase Corp. to mid-term "neutral" from "accumulate", citing a "lack of visibility in the next few quarters" and the recent earnings warning from a major customer, Nortel Networks Corp.  Merrill remained concerned about growing margin pressure, especially in so-called "passive components" to which JDS is exposed.  Merrill said inventory levels at customers continue to have a negative impact.  Cut FY01 revenue estimate to $3.5B from $3.6B and cut its earnings view to 61¢ per share from 64¢ for this year.  For 2002, Merrill lowered its revenue estimate to $3.95B from $4.25B and earnings to 55¢ per share from 62¢(Reuters News);   CE Unterberg, Towbin cut FY01 EPS estimates to 57¢ from 67¢ and FY02 to 50¢ from 75¢(Analyst Report);   UBS Warburg reduced FY01 sales and EPS from $3.56B to $3.46B and 66¢ to 63¢ as well as FY02 sales and EPS from $4.71B to $3.61B and from 67¢ to 47¢, respectively(Analyst Report);   US B | | Y | 1 |
| 3/29/01 | | | | 3/29/01 | JDS Uniphase Corp. shares fell $2.42 (US) or 12% to $17.50.  Analysts Shayna Malnak and Rashad Barajakly at Williams Capital Group forecast that shares of the fiber-optic gear maker will reach $30 on the NASDAQ Stock Market within 12 months. That's down from an earlier forecast of $58(The Globe and Mail 03.30.01);   JDS lays off 700 in Ottawa(Ottawa Citizen 03.30.01) | | Y | 1 |
| 3/30/01 | | | | 3/30/01 | Jefferies initiated coverage of JDS with a hold rating(Analyst Report) | | Y | 0 |
| 4/2/01 | | | | 4/2/01 | Dain Rauscher Wessels reduced FY01 from 64¢ to 62¢ and FY02 from 70¢ to 58¢ and reduced its price target to $25 as environment continues to deteriorate(Analyst Report) | | Y | 0 |
| 4/5/01 | | | | 4/5/01 | MSDW cut its price target on JDSU to $30 from $50.  MSDW cut JDSU EPS estimates for 2001 and 2002 to 62¢ and 60¢ from 65¢ and 64¢(Bloomberg) but indicated that the fair value (DCF) was $30 and indicated a buy for the shares(AFX News Limited) | | Y | 0 |
| 4/17/01 | | | | 4/17/01 | JDS Uniphase Corp. was rated new "buy" in new coverage by analyst Abdul Saleh at Corinthian Partners(Bloomberg) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 4/20/01 | | | | 4/20/01 | Salomon Smith Barney upgraded JDS to "buy" from "outperform" as they believe the fundamentals should bottom in the next 6 months.  It also lowered FY01 EPS from 66¢ to 63¢ and for FY02 from 63¢ to 50¢(Analyst Report);  WR Hambrecht upgraded JDS to "strong buy" from "buy" based on belief that the inventory correction in the optical component space is likely to be completed within the next quarter and the end-market demand for optical components is likely to pick up toward the second half of this year(Analyst Report);  JDS Uniphase is understood to be one of at least 4 potential buyers still in the running for Lucent's optical-fiber division, which is expected to be sold for $5-$8B(National Post); Robertson Stephens upgrades JDS to buy from long-term attractive and lowered its FY01 EPS from 64¢ to 58¢ and FY02 from 56¢ to 37¢(Analyst Report);  Dain Rauscher Wessels reduced its FY01 EPS from 62¢ to 59¢ and FY02 EPS from 58¢ to 51¢ due to Nortel issues(Analyst Report) | | Y | 1 |
| 4/23/01 | | | | 4/23/01 | Yorkton Securities cut its price target to $35 from $40 and lowered FY01 sales and EPS to $3.48B and 64¢ from $3.6B and 65¢ as well as FY02 sales and EPS to $4B and 61¢ from $4.6B and 70¢(Analyst Report) | | Y | 1 |
| 4/24/01 | 6:00 AM | 4/24/01 Tue | "In its condensed consolidated statement of operations table attached to this press release [April 24, 2001 Press Release 'JDS Uniphase Announces Third Quarter Results and Global Realignment Program'], JDSU notes gross profit of $425.9 million for the quarter ended March 31, 2001.… Had the Company correctly reserved for its inventory, its statement of gross profits would have been reduced" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 7). | 4/24/01 | JDSU fell after the company said it would announce key developments early Tuesday, which analysts speculated would involve the purchase of Lucent Technologies Inc.'s fiber-optic cable unit(Reuters News 04.23.01);  JDSU lost nearly $1.3B in its latest quarter and plans to eliminate 5,000 jobs, or 20% of its worldwide work force.  The realignment will cost $375M to $425M, and will cut annual expenses by more than $250M(AP Newswires);  The company is evaluating the carrying value of certain long-lived assets, consisting primarily of $56.2B of goodwill recorded on its balance sheet at 03.31.01.  The majority of the goodwill was recorded based on stock prices at the time merger agreements were executed and announced.  The company's policy is to assess enterprise level goodwill if the market capitalization of the company is less than its net assets.  Goodwill will be reduced to the extent that net assets are greater than market capitalization.  At 03.31.01, the value of the company's net assets, including unamortized goodwill exceeded the company's market capitalization by approximately $40B(PR Newswire);  JDSU rated hold in new coverage to McDonald Investments(Bloomberg);  JDSU | Y | Y | 1 |
| | 6:00 AM | 4/24/01 Tue | "In the same press release, the Company also announced a "new" Global Realignment program being implemented by the Company to deal with the declining demand, i.e., the restructuring program that JDS had been planning since June 2000) and also announced that the Company's goodwill was impaired" (Complaint ¶ 284). | | | | | |
| | 8:15 AM | 4/24/01 Tue | "JDSU attached to this document [Form 8-K filed April 24, 2001] as an exhibit the script of a conference call in which the company announced pro forma earnings of $.14 per share. … Had the company correctly stated its inventory reserves, its cost of sales would have increased, and its gross profits and earnings per share would have decreased" (Plaintiffs' Amended and Supplemental Responses and Objections to Anthony Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 6). | | | | | |
| | 8:15 AM | 4/24/01 Tue | "Despite this assertion, JDSU's press release dated April 24, 2001 announcing its results for the quarter ending 3/31/01 said nothing about ADVA being an impaired asset, and included ADVA on its balance sheet at a grossly exaggerated value…" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 10, p. 91). | | | | | |
| 4/25/01 | | | | 4/25/01 | High level of goodwill assets could be bad news for JDS Uniphase(The Canadian Press);  Robertson Stephens lowered its 2001 EPS estimate to 57¢ from 58¢ and 2002 EPS estimate to 23¢ from 37¢(Analyst Report);  First Union cut 2001 and 2002 EPS estimates for JDSU to 50¢ and 26¢ from 64¢ and 59¢(Bloomberg);  UBS Warburg cut its EPS estimates for 2001 and 2002 to 57¢ and 29¢ from 63¢ and 47¢, respectively(Analyst Report);  Dain Rauscher Wessels lowered its rating to buy-aggressive and price target to $30. It also reduced FY01 EPS from 59¢ to 54¢ and FY02 from 51¢ to 34¢.  The company made no announcement regarding Lucent's fiber unit(Analyst Report 04.24.01);  Goldman Sachs cut 2002 EPS estimate for JDSU to 31¢ from 65¢(Bloomberg);  JP Morgan cut 2001 and 2002 EPS estimates for JDSU to 53¢ and 32¢ from 64¢ and 66¢(Bloomberg);  JDSU cut to "market perform" from "buy" and its price target was cut to $25 from $38 by Sprott Securities(Bloomberg);  GMP cut JDSU to "neutral" from "buy"(Bloomberg);  Yorkton reduced rating to "accumulate" from "buy" and its price target to $25 from $35.  For FY02, it lowered estimates from $4B and 61¢ to $3.4B and 32¢(Analyst | | Y | 1 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 4/30/01 | No Time | 4/30/01 Mon 5/1/01 Tue | "Muller reiterated [in a teleconference call sponsored by WR Hambrecht] the company's guidance for the June quarter with revenues of $700 million and EPS of $0.05. The tone of Muller's commentary was decidedly more positive during this conference call than at the previous week's earnings conference call. Muller stated he believed that the annual growth rate for JDS Uniphase could be in the range of 40-50%, once the inventory correction is completed and the carrier capital spending picture becomes more certain" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 1, pp. 20-21). | 4/30/01 | | | | |
| | No Time | 4/30/01 Mon 5/1/01 Tue | "Muller says he believes that the inventory correction in the optical component space will be completed by September quarter, possibly sooner" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 5, pp. 53). | | | | | |
| 5/1/01 | No Time | 5/1/01 Tue 5/2/01 Wed | "During the call [a May 1, 2001 conference call], Muller stated that 't] [ sic] industry's inventory glut is likely to be over no later than the end of September…." (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, p. 8). | 5/1/01 | WR Hambrecht sponsored a teleconference with Tony Muller, Executive VP and CFO.  Mr. Muller said its annual growth rate could be 40-50% once a customer inventory correction is completed and carrier capital spending picture becomes more certain.  Mr. Muller believes that the inventory correction in the optical component space will be completed by the September quarter, possibly sooner.  WR Hambrecht stated that the conference call reinforced its thesis that the inventory correction in the optical component space could be largely completed by the end of the June quarter(Analyst Report);   UBS Warburg reduced its FY01 estimates to sales of $3.32B and EPS of 57¢, down from $3.46B and 63¢, respectively.  It also lowered its FY02 revenue estimate to $3.05B and EPS to 29¢ from $3.61B and 47¢, respectively.  It also stated that inventory turns at 3.6 was flat versus the prior quarter. UBS Warburg also said that the guidance for $700M is achievable and should allow a lot of excess inventory to be flushed out by the end of June(Analyst Report) | Y | Y | 1 |
| 5/2/01 | No Time | 5/2/01 Wed 5/3/01 Thu | "According to CBS Marketwatch, Muller stated [at the JP Morgan H&Q Technology Conference], 'We think the inventory correction among our customers will have run its course by September…'" (Plaintiffs' Supplemental Responses to Abbe's First Set of Interrogatories, 1/12/07, p. 53). | 5/2/01 | | | | |
| | No Time | 5/2/01 Wed 5/3/01 Thu | "In a May 2, 2001 statement printed in The Canadian Press, defendant Muller asserted that '[t]he industry's inventory glut is likely to be over no later than the end of September…'" (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 11, p. 38). | | | | | |
| 5/3/01 | | | | 5/3/01 | JDS Uniphase plans to go fiber-optic shopping again. The company says low prices for smaller firms are attractive in wake of market meltdowns(The Globe and Mail);   According to the "In The Money" section written by Steven Jones, "Write-downs and reorganization will wipe significant problems off the balance sheet at JDS, but won't address 2 other basic problems.  JDS customers hold large inventories of finished goods that will depress sales well into the fall.  More importantly, a shift is developing in the optical components business toward more integrated devices and away from separate amplifiers, switches and filters"(Dow Jones News Service);   Investors pushed the shares 7.3% lower after analyst Shima Nakao at HSBC Securities Inc. said JDS does not have the means to bid for Lucent Technologies Inc.'s fiber and cable unit(The Globe and Mail 05.04.01) | | Y | 0 |
| 5/4/01 | | | | 5/4/01 | Wachovia lowered FY01 estimates to 54¢ from 65¢ and reducing price target to $33 from $45(Analyst Report) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 5/14/01 | 5:24 PM (5/11/01) | 5/14/01 Mon | "...JDSU misrepresented the value of its inventory in the following statements:<br><br>…<br><br>The statements of inventory set out in the Condensed Consolidated Balance Sheet at Part 1 Item 1 of the Company's Form 10-Q filed May 11, 2001 (stating inventory of $672.9 million, including $141 million in finished goods)... " (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 10, pp. 5-6). | 5/14/01 | | | | |
| | 5:24 PM (5/11/01) | 5/14/01 Mon | In this document [Form 10-Q filed May 11, 2001] filed with the SEC, JDSU reported in its Consolidated Balance Sheets, that net intangible assets including goodwill was $58.4 billion with $65.0 billion in total assets... (Plaintiffs' Amended and Supplemental Responses to Muller's First Set of Interrogatories, 2/2/07, Interrogatory No. 16, p. 68). | | | | | |
| | 5:24 PM (5/11/01) | 5/14/01 Mon | "...Moreover, the company continued to use this exaggerated value for ADVA in its May 11, 2001 Form 10-Q even after advising the SEC of the need to record an impairment charge" (Plaintiffs' Supplemental and Amended Responses to Abbe's First Set of Interrogatories, 1/12/07, Interrogatory No. 10, p. 91). | | | | | |
| 5/30/01 | | | | 5/30/01 | A downgrade of the fiber optic sector with Nortel, JDS Uniphase and Tellabs all lowered by Morgan Stanley on concerns that weak demand for networking equipment will delay the sector's rebound(Agence France-Presse);  JDS and Oplink settle patent litigation(Reuters News);  Shares of JDS Uniphase Corp. tumbled following a profit warning from a major customer.  France's Alcatel SA said Tuesday its telecommunications operating profit would slip this year, and charges and write downs would lead to a second-quarter net loss of about $2.57B(US).  It also called off merger talks with Lucent Technologies Inc.(The Toronto Star 05.31.01) | Y | 1 | |
| 5/31/01 | | | | 5/31/01 | CIBC cut its rating and estimates for JDS Uniphase Corp. citing deteriorating conditions in the sector.  CIBC downgraded JDS to a hold from a strong buy and cut estimates for 2001 and 2002.  Revenue targets for the June fourth quarter were cut to $660M from $700M and earnings per share were trimmed to 4¢ from 5¢.  Revenue estimates for the September quarter were cut to $600M from $660M.  Revenue forecasts for 2002 were reduced to $2.7B from $3.7B and earnings estimates were cut to 14¢ per share from 37¢ per share. "Our downgrade from strong buy to hold is based on our belief that fundamentals in the WDM (wavelength division multiplexing) sector are deteriorating beyond our once 'conservative' assumptions," CIBC wrote in a research report(Reuters News);  WR Hambrecht continued to believe that the inventory correction in the optical component space could largely be completed by the end of the June quarter(Analyst Report);  Jefferies reduced its FY02 EPS from 30¢ to 25¢ based on recent developments at Alcatel(Analyst Report) | Y | 0 | |
| 6/7/01 | | | | 6/7/01 | 6 executives and 2 directors of JDS Uniphase Corp. have adopted plans for sales of the company's stock under Securities and Exchange Commission Rule 10b5-1, according to a Form 8-K filed Wednesday with the Securities and Exchange Commission.  Co-Chairman and Chief Executive Jozef Straus and executives Donald R. Scifres, Charles J. Abbe, Anthony R. Muller, Michael C. Phillips, Frederick L. Leonberger and directors Robert E. Enos and Peter A. Guglielmi have adopted the plans, the filing said(Dow Jones Corporate Filings Alert);  Deutsche Banc Alex Brown reduced its FY02 revenue estimates to $2.804M from $3.538M and EPS estimate to 28¢ from 34¢ based on the continued weakness in the sector(Analyst Report) | Y | 0 | |
| 6/8/01 | | | | 6/8/01 | Credit Lyonnais Securities Europe initiated coverage of JDS with a hold rating and a price target of $17(Analyst Report) | Y | 0 | |
| 6/12/01 | 4:00 AM | 6/12/01 Tue | "On June 12, 2001, JDS announced the retirement of Charles Abbe as President and Chief Operating Officer and the appointment of Gregory Dougherty as Executive Vice President and Chief Operating Officer." (Complaint ¶ 289). | 6/12/01 | Credit Lyonnais Securities USA initiated coverage of JDS with a hold rating and a $19 price target(Analyst Report);  JDS Uniphase President and COO, Charles J. Abbe, announced his retirement.  Greg Dougherty was appointed to Executive VP and COO(Bloomberg) | Y | 0 | |
| 6/13/01 | | | | 6/13/01 | Wit SoundView cut JDSU 2002 revenue estimate to $2.73B from $3.53B. The company also lowered its 2002 EPS estimate on JDSU to 18¢ from 38¢(Bloomberg);  Jefferies stated that management recently commented that inventory levels at JDS will return to normal levels by the end of September 2001(Analyst Report);  Yorkton upgraded JDS from "accumulate" to "buy" but lowered its price target from $25 to $20(Analyst Report) | Y | 0 | |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 6/15/01 | 4:05 PM (6/14/01) | 6/15/01 Fri | "On June 14, 2001, JDS issued a press release, downwardly revising for the fourth time its outlook and acknowledging for the first time the fact that its inventories balance was overstated due to declining demand" (Complaint ¶ 290). | 6/15/01 | JDSU cut sales estimates for the 4Q, citing continued weakness in telecommunication carrier spending. JDS cut its forecast of revenues to $600M from earlier projections of $700M, it also expects 1Q revenues to reach only $450M. The company, which said it is reviewing its expenses, said the lowered forecast means it will take an increased excess inventory write-down of $225M to $250M(Reuters News 06.14.01); Goldman Sachs cut 2002 EPS estimate on JDSU to 3¢ from 31¢ per share. Goldman also cut its 2002 revenue estimate for JDSU to $2.1B from $3.2B(Reuters News); Lehman Brothers cut EPS estimates on JDSU to 55¢ from 58¢ for 2001 and to 1¢ from 28¢ for 2002(Bloomberg); ABN Amro cut JDSU to "hold" from "add" and lowered 2001 and 2002 EPS estimates to 44¢ and 11¢ from 54¢ and 28¢, respectively(Bloomberg); JDSU 2002 EPS estimate reduced to 15¢ from 26¢ at First Union Securities(Bloomberg); CSFB cut its rating to "hold" from "buy" and lowered FY02 sales estimate from $3B to $2B and EPS from 31¢ to 7¢(Analyst Report); Merrill Lynch reduced JDSU 2002 EPS estimate to 7¢ from 29¢(Bloomberg); MSDW cut JDSU June and September revenue estimates to $ | Y | Y | 1 |
| 6/18/01 | | | | 6/18/01 | PNC Advisors lowered its FY01 EPS from 54¢ to 49¢ and FY02 EPS from 38¢ to 5¢(Analyst Report) | | Y | 1 |
| 6/20/01 | | | | 6/20/01 | Yorkton Securities cut its rating to "accumulate" from "buy" and reduced the price target to $13 from $20(Analyst Report) | | Y | 1 |
| 6/21/01 | | | | 6/21/01 | Street gets better vibe about JDS(The Globe and Mail) | | Y | 1 |
| 6/22/01 | | | | 6/22/01 | Wit SoundView raised JDSU to "strong buy" from "buy"(Bloomberg) | | Y | 1 |
| 6/27/01 | | | | 6/27/01 | JDS Uniphase Corp. is considering more job reductions on top of the 8,000 cuts announced earlier this year, a spokeswoman said(Associated Press Newswires) | | Y | 0 |
| 7/10/01 | | | | 7/10/01 | GMP cut the price target on JDSU to $9 from $13(Bloomberg) | | Y | 0 |
| 7/12/01 | | | | 7/12/01 | CSFB reinstated coverage of JDSU with a hold rating(Bloomberg) | | Y | 0 |
| 7/23/01 | | | | 7/23/01 | CSFB stated that the goodwill write-down did not worry them as it will have no effect on cash earnings or the cash balance sheet(Analyst Report) | | Y | 0 |
| 7/26/01 | 3:58 PM | 7/26/01 Thu 7/27/01 Fri | "Finally, on July 26, 2001, JDS issued a press release in which it announced its fourth quarter Fiscal 2001 ('4Q 01') results and revealed that its 4Q 01 sales were 35% below its 3Q 01 sales. In addition to the dismal 4Q 01 results, the Company also announced large write-downs of inventory and goodwill" (Complaint ¶ 292).<br><br>Trading halted at approximately 3:38 PM on 7/26/01. | 7/26/01 | | | | |
| 7/27/01 | | | | 7/27/01 | JDSU reported a 4Q loss of 36¢ per share compared to the prior year 4Q profit of 14¢. After all charges, the company lost $7.9B or $5.99 per share. JDSU expects to eliminate an additional 7,000 jobs bringing the total job cuts related to the Global Realignment Program to 16,000. The cost of the program is now estimated at $900 to $950M, up from a previous estimate of $425M. JDS also revised its forecast to $600M from a previous estimate of $700M(Reuters News 07.26.01); JDSU sales for the 4Q ended 06.30.01 were 35% below sales of $920M for the quarter ended 03.31.01. JDSU has incurred roughly $500M in charges related to the Global Realignment Program through Q4. JDSU also took a $270M write down of excess inventory. JDSU has had communications with the Staff of the SEC, and will amend its Quarterly Report on Form 10-Q for the quarter ended 03.31.01 to reduce the carrying value of goodwill by $38.7B for that quarter. In addition, the company has recorded a $6.1B reduction of goodwill for the quarter ended 06.30.01 following further declines in its market capitalization. Finally, approximately $300M in certain amounts paid to SDL executives in connection with | Y [†] | Y | 1 |
| 7/31/01 | | | | 7/31/01 | JDS Uniphase Corp. was downgraded to "market perform" from "buy" by analyst Abdul Saleh at Corinthian Partners(Bloomberg) | | Y | 1 |
| 8/8/01 | | | | 8/8/01 | The chief financial officer of JDS Uniphase Corp. said he could not give a financial forecast for the current fiscal year until customers tell them what they want(Reuters News) | | Y | 0 |
| 8/10/01 | | | | 8/10/01 | Wachovia lowered its estimates for 2002 to revenues of $1.8B and EPS of 1¢ down from $2.6B and EPS of 19¢(Analyst Report) | | Y | 0 |
| 8/20/01 | | | | 8/20/01 | Furukawa Electric Co will sell part of its holdings in JDS Uniphase to net 23.8B yen ($198M) in capital gains(Reuters News) | | Y | 0 |
| 8/21/01 | | | | 8/21/01 | PNC Advisors lowered its fiscal 2002 EPS projection from 5¢ to a loss of 5¢ and its long term growth estimate from 25% to 23%(Analyst Report) | | Y | 0 |
| 8/28/01 | | | | 8/28/01 | Jefferies reduced its estimated revenues for FY02 from $1.5B to $1.3B and its estimated loss per share from 3¢ to 7¢ based on current business trends(Analyst Report) | | Y | 0 |
| 9/4/01 | | | | 9/4/01 | The Globe and Mail reports that the only thing not shrinking at JDS Uniphase is its shares outstanding. The Wall Street Journal reports inside The Globe that the number of common shares at JDS stood at 1.32B in the 2Q, almost double the level at the start of 2000. The Wall Street Journal says the increased number of shares outstanding threatens to be a painful experience for investors, outweighing the impact of stock-option programs that long have been a complaint of many institutional shareholders(Canada Stockwatch) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 9/18/01 | | | | 9/18/01 | Deutsche Banc Alex Brown lowered its 2002 EPS estimate from 1¢ to a loss of 6¢ and 2003 EPS estimate from 20¢ to 12¢ due to increased economic uncertainty, likelihood of further declines in carrier capex and its view that investors may have to look to 2003 earnings for recovery(Analyst Report) | | Y | 0 |
| 9/19/01 | | | | 9/19/01 | JDS Uniphase completed a review of the carrying value of its long-term assets and will record another $4.2B in goodwill write downs for its fiscal 4Q, which ended June 30, and another $1.1B for the 3Q, which ended March 31.  Additionally, JDS has determined it must record another $76M in charges for increased inventory reserves and other costs(Reuters News);   JDS Uniphase paid $16M cash and $2.3M in stock to settle certain claims stemming from its $17B acquisition in February of SDL Inc.  The company may pay an additional $4.5M next year as part of the settlement(Dow Jones News Service) | | Y | 0 |
| 9/20/01 | | | | 9/20/01 | CSFB upgraded JDS to "buy" based on risk-reward.  CSFB also reduced its September quarter estimates to $310M sales and (4¢) EPS from $380M sales and (3¢) EPS.  For FY02, its estimates were reduced to $1.3B sales and (8¢) EPS from $1.6B and 4¢ EPS due to lower capital spending and an increase in inventory reserves suggests a decline in demand(Analyst Report);  Yorkton revised its estimates and target price downward based on recent field checks in the industry.  Revenue estimates were lowered to $330M for 1QFY02 and $1.48B for FY02 from $375M and $1.6B, respectively.  EPS was lowered to (2¢) for 1QFY02 and 2¢ for FY02 from (2¢) and 3¢, respectively.  Yorkton lowered its price target to $6 from $10 and cut its recommendation to Hold from Accumulate(Analyst Report) | | Y | 0 |
| 9/21/01 | | | | 9/21/01 | Salomon Smith Barney trimmed its earnings estimates for JDS based on a number of recent data points suggesting the outlook for optical continues to weaken and that the recovery timing is no more certain, and likely sliding.  Revenues were trimmed to $330M from $360M for September and cut to $1.3B from $1.5B for FY02.  FY02 EPS was lowered to a loss of 3¢ from breakeven(Analyst Report) | | Y | 0 |
| 9/24/01 | | | | 9/24/01 | JDSU expects sales of about $325M for the 1Q ending September 29, which is less than Wall Street consensus expectations of about $357.4M.  "And while the downturn in our markets has not yet reversed, we believe we are beginning to see the early signs of stabilization at levels from which our industry can grow in the future," said Jozef Straus, Co-Chairman, President and Chief Executive(Dow Jones News Service);   "We're close to a level of stability from which can grow," CFO Anthony Muller told Dow Jones. "I don't think the bottom will be in September.  There's a possibility it will be in December"(Dow Jones News Service);  UBS Warburg reduced its price target to $10 from $16 given a lower near term sales outlook and a reduction in valuations across the sector.  UBS lowered its FY02 EPS from (15¢) to (18¢)(Analyst Report);  CSFB increased its 1QFY02 estimates from $310M and (4¢) to $320M and (3¢) and its FY02 estimates to $1.32B and (6¢) from $1.3B and (8¢)(Analyst Report);  Robertson Stephens lowered its EPS estimates in 2002 to (7¢) from (5¢) and in 2003 to 3¢ from 4¢(Analyst Report);   CIBC World Markets raised its rating to buy from hold with a price target of $9 basec | | Y | 0 |
| 9/25/01 | | | | 9/25/01 | Merrill Lynch raised near-term rating on JDSU to "accumulate" from "neutral"(Bloomberg) | | Y | 0 |
| 9/26/01 | | | | 9/26/01 | Jefferies reduces its September quarter estimated revenue from $350M to $325M, but maintains the estimated loss per share of 4¢ and a loss per share of 7¢ for FY02(Analyst Report) | | Y | 0 |
| 10/1/01 | | | | 10/1/01 | JDS Uniphase unveiled its Semiconductor Optical Amplifier modules (SOA) and Passive Optical Network (PON) products that are designed and priced for developing metro and access fiber optic communications applications.  It also introduced high performance 10 Gb/s modulators and modulator drivers that require less power than current offerings and a range of components that are manufactured using new methods that reduce costs and increase reliability(Canada Newswire);  Agere Systems, Agilent Technologies, Alcatel Optronics, Ericsson Microelectronics, ExceLight Communications, JDS Uniphase, Mitsubishi Electric, NEC and OpNext today announced the formation of a multisource agreement (MSA) for 40-gigabit-per-second (Gb/s) transponder modules used in fiber optic telecommunications networks(Canada Stockwatch) | | Y | 0 |
| 10/5/01 | | | | 10/5/01 | JDS Uniphase Corp. Chief Executive Jozef Straus exercised options on nearly 1.6M shares, representing a realized value of more than $150M, the company said(Reuters News) | | Y | 0 |
| 10/15/01 | | | | 10/15/01 | Flex Products, Inc., a JDS Uniphase company, announces the launch of its SecureShift(TM) pigment technology(PR Newswire);  Yorkton cut its rating on JDS from "hold" to "reduce" because the stock has become expensive so investors should take profits into this rally(Analyst Report) | | Y | 0 |
| 10/22/01 | | | | 10/22/01 | Piper Jaffray increased its December quarter loss per share from (1¢) to (2¢) and lowered its FY02 from breakeven to (2¢) because 2002 capex outlook continues to slip(Analyst Report) | | Y | 0 |
| 10/23/01 | | | | 10/23/01 | JDS Uniphase and Adept Technology have signed definitive agreements to enter into an automation development alliance for optical component and module manufacturing.  JDS will invest $25M in Adept convertible preferred stock(Dow Jones News Service) | | Y | 0 |
| 10/24/01 | | | | 10/24/01 | JDS Uniphase Corp. was downgraded to "market perform" from "buy" by analyst Jeffrey Lipton at JP Morgan(Bloomberg) | | Y | 0 |

| | | | Plantiffs | | Hakala | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Time (Date) [1] | Impact Date(s) [2] | Complaint/Plaintiffs' Responses to Interrogatories | Date | Description | Match [*] | Event | Relevant |
| 10/26/01 | | | | 10/26/01 | JDSU lost $260M in its 1Q while a downturn in its industry will see sales levels drop a further 10-15%. Revenue in the period declined to $329M from $786M, and below the $350M in sales required on a quarterly basis for JDS to break-even(Reuters News 10.25.01);  "We believe the steep declines in revenues are largely behind us," CFO Tony Muller said in a conference call with analysts(Dow Jones News Service 10.25.01);  Robertson Stephens gave a price target of $9 and cut JDS Uniphase to market perform from buy because they believe that JDS stock is trading above fair valuation.  EPS estimates were lowered to (24¢) from (7¢) for FY02 and raised to 14¢ from 3¢(Analyst Report);  CSFB analyst Max Schuetz also adjusted his revenue outlook for the company, cutting his 2Q estimate to $285M from $310M.  "We continue to expect a downward revenue trend for the next 1 to 2 quarters and no significant up-tick for the next 3 to 4 quarters," he wrote in a note to clients.  "With neither positive nor negative catalysts likely near term, we expect JDSU to trade in line with the larger tech | | Y | 0 |

Note:

[*] A Hakala event day is categorized as a match if Hakala deems the day to have "relevant events" and if the corresponding date he uses matches with an impact date of an event alleged by Plaintiffs in the Complaint and/or Plaintiffs' Responses to Interrogatories.
Thus, of Hakala's 74 relevant events during the Class Period, 32 match with impact dates of events alleged by the Plaintiffs for which no timestamp was available.

[1]  These "relevant events" overlap with the impact date of an event alleged by the Plaintiffs for which no timestamp was available.

[1]  The match is for the event alleged by the Plaintiffs on December 28, 2000 but that was actually reported in the public press during the trading day on December 27, 2000.

[1]  Events occurring after market hours are listed under the trading day in which the information would first affect the market with the actual release date in parentheses.

[2]  The impact date is the date of the event for which plaintiffs cite a public statement in the Complaint and/or Plaintiffs' Responses to Interrogatories and the following trading day if the information was disclosed late in the trading day (i.e. between 2:00 p.m. ET and the close of the market), or at an unknown time.
If the information was disclosed after market close, the impact date is only the trading day following the date of the event cited by plaintiffs.

[3]  The stock split was completed on 12/30/99, but 12/29/99 was listed on Bloomberg as the Pay Date.

[4]  The stock split was completed on 3/13/00, but 3/10/00 was listed on Bloomberg as the Pay Date and is the date listed in the Complaint.

[5]  The Abbe interrogatories from 1/12/07 allege this event on 6/15/00.  However, Thomson Research only has a record of this filing on 6/16/00.

[6]  The Abbe interrogatories from 1/12/07 allege this event on 9/12/00.  However, according to Hakala's Report dated 2/5/00, this event occurred on 9/13/00 with no time stamp.  Due to this new information, 9/14/00 was included as an indicator variable.

[7]  The Complaint places this event on 10/25/00, but the public press reports this event on 10/24/00.

[8]  The Abbe interrogatories from 1/12/07 allege this event on 11/13/00.  However, Thomson Research only has a record of this filing on 11/14/00.

[9]  The Complaint places this event on 12/28/00, but the public press reports this event on 12/27/00.

[10]  According to 10-K Wizard, the 10-Q for the period ending 12/30/00 was filed on 2/13/01.  However, according to Thomson Research, the 10-Q for the period ending 12/30/00 was filed on 4/6/01 at 8:33 PM.
According to 10-K Wizard, the 10-K for the period ending 6/30/00 was filed on 2/13/01.  However, according to Thomson Research, the 10-K for the period ending 6/30/00 was filed on 4/6/01 at 8:35 PM.