1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JAMES P. BENNETT (BAR NO. 65179)
JORDAN ETH (BAR NO. 121617)
TERRI GARLAND (BAR NO. 169563)
PHILIP T. BESIROF (BAR NO. 185053)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105
Telephone: 415.268.7000
Facsimile: 415.268.7522
Email: pbesirof@mofo.com

Attorneys for Defendants JDS Uniphase Corporation,
Charles Abbe, Jozef Straus, and Anthony Muller

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re JDS UNIPHASE CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:  All Actions | Master File No. C–02–1486 CW (EDL)<br><br>**DECLARATION OF STEPHANIE L. ZELLER IN SUPPORT OF THE JDSU DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>Date:       TBD<br>Time:       TBD<br>Ctrm:       2, 4th Floor<br>Before:     Hon. Claudia Wilken<br><br>Trial Date: October 22, 2007 |

I, STEPHANIE L. ZELLER, declare as follows:

1.      I am a member of the bar of the State of California and am admitted to practice in the Northern District of California.  I am an associate at the law firm of Morrison & Foerster LLP, attorneys of record for Defendants JDS Uniphase Corporation ("JDSU"), Jozef Straus, Anthony Muller, and Charles J. Abbe (collectively, the "JDSU Defendants").  I make this declaration in support of the JDSU Defendants' Motion For Sanctions Pursuant To Rule 11 Of The Federal Rules Of Civil Procedure.  I have personal knowledge of the matters set forth herein, except for any items stated on information and belief, which I am informed and believe are true. If called as a witness, I would testify to the following facts:

2.      Attached as Exhibit 1 is a true and correct copy of relevant excerpts from the Reporter's Transcript of Proceedings from the June 4, 2004 hearing on the JDSU Defendants' Motion to Dismiss the Second Amended Complaint.

3.      Attached as Exhibit 2 is a true and correct copy of relevant excerpts from the Reporter's Transcript of Proceedings from the July 15, 2005 hearing on plaintiffs' Motion to Strike the JDSU Defendants' Answer.

4.      Attached as Exhibit 3 is a true and correct copy of relevant excerpts from the November 19, 2007 Transcript of Proceedings in the trial in this matter.

5.      The Second Amended Complaint ("SAC") alleges the following about Confidential Witness No. 1 (later identified by plaintiffs as Matthew P. Voicheck):

Paragraph 11:

> From the beginning of the Class Period until at least June 2000, top JDS management at its Horsham, Pennsylvania facility engaged in blatant fraud in order to artificially inflate sales.  According to Confidential Witness No. 1, a production planner at the Horsham plant, during the last weekend of every quarter, JDS Horsham executives watched while employees packed inventory on trucks, which inventory would then be returned to JDS, unopened, a few weeks later.  This scheme was approved by Eitan Gertel ("Gertel"), the founder, vice president and general manager of JDS's Transmission Subsystem Division ("TSD") in Horsham, who reported to defendant Kalkhoven.

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

1

Paragraph 70:

> Beginning no later than the first quarter of fiscal 2000 (the quarter ending September 30, 1999) and lasting at least through the quarter ending June 30, 2000, top management at JDS's Horsham, Pennsylvania plant, one of the five largest JDS plants in the United States, engaged in a deceptive scheme to artificially inflate its sales. According to Confidential Witness No. 1, a production planner at the Horsham plant, during the last weekend of every quarter, JDS executives watched while employees packed $1 to $3 million of products onto trucks from Hatboro Delivery Service ("Hatboro") in order to meet the plant's sales target. Confidential Witness No. 1 added that the products were either delivered to a Hatboro warehouse or dropped off at a Federal Express or UPS facility for temporary storage. This inventory was then picked up by a JDS truck and returned, unopened, to the Horsham plant a few weeks later.

Paragraph 73 (in relevant part):

> Both Confidential Witness No. 1 and 7 confirmed that this practice[1] was approved by Eitan Gertel, the founder and general manager of JDS's TSD division in Horsham who reported to defendant Kalkhoven.

6. On November 30, 2006, Confidential Witness No. 1 (Matthew P. Voicheck) was deposed about the information attributed to him in the SAC. Attached as Exhibit 4 is a true and correct copy of relevant excerpts from the certified copy of the November 30, 2006 deposition of Matthew Voicheck ("Voicheck Dep.").

7. Mr. Voicheck testified as follows about the information attributed to him in Paragraph 11 of the SAC:

- Mr. Voicheck confirmed that he did not even work at JDSU between October 1999 and June 2000. Voicheck Dep. 76:24-77:11; *see also id.* 13:9-12 (Mr. Voicheck was hired in late 2000, "the winter of 2000 and 2001.").

- Mr. Voicheck confirmed that the allegation in Paragraph 11 of the SAC is inaccurate with respect to timing. *Id.* 77:19-23.

- Mr. Voicheck never witnessed inventory returning unopened, a few weeks after it was shipped. *Id.* 69:22-25; 70:2-4; 80:23-81:20.

---

[1] "Hatboro picked up fiber optic components at the end of a fiscal quarter and that those products were returned to JDS shortly after the beginning of the next quarter." SAC ¶ 72.

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

2

1   • Mr. Voicheck did not say what is attributed to him regarding Eitan
2       Gertel. *Id*. 81:21-82:16 ("I don't recall anything being approved by
        Eitan. I had no dealings with him.")

3       8.      Mr. Voicheck testified as follows about the information attributed to him in

4   Paragraph 70 of the SAC:

5   • The allegation is inaccurate with respect to timing. Voicheck Dep.
6       84:8-23 ("I wasn't employed at that time"); *id*. 13:9-12 (Mr. Voicheck
        was hired in late 2000).

7   • Mr. Voicheck is not familiar with Hatboro Delivery Service. *Id*. 85:13-
        15.
8
    • Mr. Voicheck does not know the value of the products packed onto
9       trucks. *Id*. 85:16- 86:10.

10  • Mr. Voicheck does not know where the product went after it was
        packed onto trucks. *Id*. 90:9-11.
11
    • Mr. Voicheck has no personal knowledge whether inventory was
12      "returned, unopened, to the Horsham plant a few weeks later." *Id*.
        90:19-91:2.

13      9.      Mr. Voicheck testified as follows about the information attributed to him in

14  Paragraph 73 of the SAC:

15  • "I don't recall anything being approved by Eitan [Gertel]. I had no
16      dealings with him." Voicheck Dep. 81:25-82:3.

17      10.     The SAC alleges the following about Confidential Witness No. 2 (later identified

18  by plaintiffs as Jeff Drothler):

19      Paragraph 57:

20          According to Confidential Witness No. 2, a JDS Account Manager
            at the Company's San Jose facility, because JDS's products were
21          manufactured to each customer's unique specifications, if JDS
            produced more product than any given customer actually needed,
22          those products could not be sold to others.

23      Paragraph 120 (in relevant part):

24          And Confidential Witness No. 2, an Account Manager in San Jose,
            confirmed that by late Spring 2000, there was widespread' "pushing
25          out" of orders for JDS products by both large and small customers.

26      Paragraph 151:

27          Indeed, Confidential Witness No. 2, a JDS account manager, noted
            that by mid-2000 "it became obvious that previous forecasts, based
28

on 1999 information, were fast becoming obsolete, that they were overly optimistic."

11.     On December 1, 2006, Confidential Witness No. 2 (Jeff Drothler) was deposed about the information attributed to him in the SAC.  Attached as Exhibit 5 is a true and correct copy of relevant excerpts from the certified copy of the December 1, 2006 deposition of Jeff Drothler ("Drothler Dep.").

12.     Mr. Drothler testified as follows:

- Plaintiffs paid Mr. Drothler $100 an hour to "consult" with them regarding JDSU.  Drothler Dep. 38:2-39:24 (Mr. Drothler "billed [plaintiffs] for 12 hours" and received $1,200); *see also id.* 45:11-17.

13.     Mr. Drothler testified as follows about the information attributed to him in Paragraph 57 of the SAC:

- Mr. Drothler would add the word "typically" before "those products could not be sold to others" and would change the language to read that JDSU's products were "generally or sometimes were manufactured to customer's specific [specifications]."  Drothler Dep. 99:10-25; 103:12-104:1.

- Mr. Drothler could not recall any instances in which JDSU produced more product than the customer had ordered.  "It's gray in my mind, but I would say I would lean to the answer no.  Generally speaking, no, you don't produce more than the customer's order, except there are natural excess materials at the subassembly level." *Id.* 120:12-121:14.

14.     Mr. Drothler testified as follows about the information attributed to him in Paragraph 120 of the SAC:

- The allegation is inaccurate with respect to timing.  This allegation would be reasonable if the date were changed from Spring 2000 to Spring 2001.  *Id.* 130:19-23.

- When asked whether in Spring 2000, there was a widespread pushing out of orders of JDSU product by large and small JDSU customers, Mr. Drothler testified that in Spring 2000, he "wasn't thinking about or aware of anything other than just ramping up demand — or ramping up capacity and trying to race to meet demand." *Id.* 132:3-13.

- In October 2000, the Company was still experiencing "significant demand" for its products.  *Id.* 75:5-14.

- After Mr. Drothler was hired in December 1999, he had a good year of solid business at JDSU.  "Best year of [Mr. Drothler's] sales ever in [his] career.  $15 million is a lot of widgets." *Id.* 77:24-78:3.

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

4

15.     Mr. Drothler testified as follows about the information attributed to him in Paragraph 151 of the SAC:

- Mr. Drother does not recall that at or around May of 2000 he believed that the Company forecasts he was using were overly optimistic. Instead, he recalls that at that time "everybody was scrambling to demonstrate the ability to ship more, more, more in that time frame." Drothler Dep. 135:10-16.

- The allegation is inaccurate with respect to timing. *Id.* 135:5-6.

16.     The SAC alleges the following about Confidential Witness No. 4 (later identified by plaintiffs as Maureen Gainey):

Paragraph 59 (in relevant part):

> Indeed, Confidential Witness No. 4, a JDS assembly line worker in Bloomfield, confirmed that JDS had a "no inventory" policy for finished product at its own plants, meaning that finished product produced by JDS was shipped immediately and often held in its customers' inventory until needed.

Paragraph 61:

> According to Confidential Witness No. 4, JDS kept close track of how much inventory was at customer locations so that when the customer pulled down the product, JDS would manufacture to replace that product.

Paragraph 91:

> In response to the reduced demand for its products, beginning no later than March or April of 2000, JDS engaged in practices that materially overstated its reported revenues (as set forth in its SEC filings for the quarters ending March 30 and June 30, 2000) by repeatedly shipping products to customers after the customers had cancelled the orders. According to Confidential Witness No, 4, an assembly line worker on JDS's wavelocker product in Bloomfield, Connecticut, JDS shipped products to cancelled orders once or twice a month.

17.     On May 25, 2006, Confidential Witness No. 4 (Maureen Gainey) supplied a declaration about allegations attributed to her in the SAC. Attached as Exhibit 6 is a true and correct copy of the May 25, 2006 declaration of Maureen H. Gainey ("Gainey Decl.").

18.     Ms. Gainey testified as follows about the information attributed to her in Paragraph 59 of the SAC:

> I did not provide this information to plaintiffs' lawyers. I agree that JDS Uniphase had a "no inventory policy," but I don't believe that I

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

5

1    spoke to plaintiffs about this.  I recall that we only built the amount
     that was needed; we never made more than was ordered.  If there
2    weren't enough orders to fill, we would go and help out in other
     departments.  We didn't store finished product.  The Company
3    didn't keep any surplus inventory of finished product.

4    Gainey Decl. ¶ 7.

5         19.    Ms. Gainey testified as follows about the information attributed to her in

6    Paragraph 61 of the SAC:

7         I did not provide the above information [Paragraph 61] to plaintiffs'
          lawyers.  I recall that we kept track of inventory that a customer had
8         so we wouldn't make more than the customer needed.  We changed
          how much we would make depending on how much the customer
9         had used from its own inventory.  The Company did so to avoid
          making more product than the customer needed.  However, I don't
10        believe that I spoke to plaintiffs about this.

11   Gainey Decl. ¶ 10.

12        20.    Ms. Gainey testified as follows about the information attributed to her in

13   Paragraph 91 of the SAC:

14        I did not provide the above information [Paragraph 91] to plaintiffs'
          lawyers.  This information does not describe conduct that I saw or
15        heard about at the Company.

16   Gainey Decl. ¶ 11.

17        21.    The SAC alleges the following about Confidential Witness No. 5 (later identified

18   by plaintiffs as Robert M. Gallagher):

19        Paragraph 62:

20        Confidential Witness Nos. 5 (a Logistics Analyst in West Trenton,
          New Jersey), 6 (an accountant in Windsor, Connecticut), and 7 (a
21        controller in Horsham, Pennsylvania) confirmed that throughout the
          Class Period, JDS's internal inventory of finished and unfinished
22        product was tracked very closely through the use of a computerized
          system designed by Oracle.  The Oracle system provided current
23        information on inventory levels, customer orders and shipments.
          As admitted by Defendant Muller during a July 26, 2000
24        conference call, this information was available to "all parts of the
          Company" and was accessible to each of the Individual Defendants.

25        Paragraph 90:

26
          Finally, according to Confidential Witness No. 5, a former
27        Logistics Analyst at a JDS plant in West Trenton, New Jersey (one
          of JDS's top five plants in the United States), in or around April
28        2000, Lucent and Nortel – the Company's two biggest customers –

1     declined to take delivery on orders, leaving that facility with
approximately $40 million in excess inventory.

2

Paragraph 119:

3

     Confidential Witness No. 5, the West Trenton Logistics Analyst,
4     stated that by mid-2000, "no firm orders were coming in" even
from the Company's most established customers like Lucent, Cisco
5     and Nortel. According to Confidential Witness No. 5, "visibility"
was not high, meaning that by mid-2000, JDS officials could not
6     say with a high degree of confidence that firm orders would be
coming in with regularity. Confidential Witness No. 5 added that at
7     or around that same time, two of the biggest users of JDS's OC-192
product, Lucent and Nortel, were canceling orders and refusing
8     deliveries on orders.

9

Paragraph 169:

10

     So, too, Confidential Witness No, 5, the Logistics Analyst at JDS's
West Trenton facility, stated that by the Fall of 2000, orders were
11     only "trickling in."

12    22.  On August 7, 2006, Confidential Witness No. 5 (Robert M. Gallagher) was

13 deposed about the information attributed to him in the SAC. Attached as Exhibit 7 is a true and

14 correct copy of relevant excerpts from the certified copy of the August 7, 2006 deposition of

15 Robert M. Gallagher ("Gallagher Dep.").

16    23.  Mr. Gallagher testified as follows about the information attributed to him in

17 Paragraph 62:

18   • Mr. Gallagher would not have tied the use of the Oracle system to "any
specific period of time." The allegation contradicts what Mr. Gallagher
19    knows about the Oracle system. The Oracle system did not come "on
line" in West Trenton until November 2000. Gallagher Dep. 108:6-25.
20

21    24.  Mr. Gallagher testified as follows about the information attributed to him in

22 Paragraphs 90 and 119:

23   • The allegations are inaccurate with respect to timing. The issues
regarding customers declining to take orders occurred just a few
24    months before Mr. Gallagher left the Company in 2001, not in April
2000. Gallagher Dep. 109:9-110:10.

25    25.  Mr. Gallagher testified as follows about the information attributed to him in

26 Paragraph 169:

27   • This allegation is inaccurate with respect to timing. Rather than "Fall
of 2000," the situation alleged in paragraph 169 did not occur until the
28    year 2001. Gallagher Dep. 110:11-25.

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

7

26.     The SAC alleges the following about Confidential Witness No. 6 (later identified by plaintiffs as Herbert Marone):

Paragraph 62:

> Confidential Witness Nos. 5 (a Logistics Analyst in West Trenton, New Jersey), 6 (an accountant in Windsor, Connecticut), and 7 (a controller in Horsham, Pennsylvania) confirmed that throughout the Class Period, JDS's internal inventory of finished and unfinished product was tracked very closely through the use of a computerized system designed by Oracle.  The Oracle system provided current information on inventory levels, customer orders and shipments.  As admitted by Defendant Muller during a July 26, 2000 conference call, this information was available to "all parts of the Company" and was accessible to each of the Individual Defendants.

27.     On November 8, 2006, Confidential Witness No. 6 (Herbert Marone) was deposed about the information attributed to him in the SAC.  Attached as Exhibit 8 is a true and correct copy of relevant excerpts from the certified copy of the November 8, 2006 deposition of Herbert Marone ("Marone Dep.").

28.     Mr. Marone testified as follows about the information attributed to him in Paragraph 62 of the SAC:

- This allegation is inaccurate for two reasons.  First, Mr. Marone has no knowledge as to whether the Oracle system was being used at the JDSU before the time he joined the Company in September 2000.  Second, even after he joined the Company, Mr. Marone did not know the extent to which Oracle tracked finished and unfinished product.  Marone Dep. 64:3-66:15.

- Mr. Marone has no knowledge of nor has he ever heard of a July 26, 2000 conference call.  *Id*. 71:20-72:7.

- Mr. Marone was surprised to find out that certain statements in the SAC have been attributed to him since he does not remember talking to anyone about the information attributed to him in the SAC.  *Id*. 62:3-16.

29.     The SAC alleges the following about Confidential Witness No. 7 (later identified by plaintiffs as Bryan F. Guckavan):

Paragraph 62:

> Confidential Witness Nos. 5 (a Logistics Analyst in West Trenton, New Jersey), 6 (an accountant in Windsor, Connecticut), and 7 (a controller in Horsham, Pennsylvania) confirmed that throughout the Class Period, JDS's internal inventory of finished and unfinished product was tracked very closely through the use of a computerized

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

8

system designed by Oracle.  The Oracle system provided current information on inventory levels, customer orders and shipments. As admitted by Defendant Muller during a July 26, 2000 conference call, this information was available to "all parts of the Company" and was accessible to each of the Individual Defendants.

Paragraph 72:

In addition, Confidential Witness No. 7, a former controller of the Horsham plant, confirmed that Hatboro picked up fiber optic components at the end of a fiscal quarter and that those products were returned to JDS shortly after the beginning of the next quarter.

Paragraph 73 (in relevant part):

Both Confidential Witness No. 1 and 7 confirmed that this practice was approved by Eitan Gertel, the founder and general manager of JDS's TSD division in Horsham who reported to defendant Kalkhoven.

Paragraph 118:

JDS's problems were by no means confined to Bloomfield. Confidential Witness No. 7, the former Horsham Controller (one of JDS's five largest plants in the U.S.), stated that business took a "nose-dive" in the fourth quarter of fiscal year 2000 (i.e., quarter ending June 30, 2000), with revenue declining by approximately 70% during that quarter.

Paragraph 175:

Similarly, Confidential Witness No. 7, the controller in Horsham, recounted that JDS's inventory of raw material and finished goods was building in the first quarter of 2001 (i.e., quarter ending September 30, 2000) as a result of customer cancellations.

30.     On November 17, 2006, Confidential Witness No. 7 (Bryan F. Guckavan) supplied a declaration about the information attributed to him in the SAC.  Attached as Exhibit 9 is a true and correct copy of the November 17, 2006 declaration of Bryan F. Guckavan ("Guckavan Decl.").

31.     Mr. Guckavan testified as follows about the information attributed to him in Paragraph 62 of the SAC:

I did not provide the above information [Paragraph 62] to plaintiffs' lawyers.  I never said what has been attributed to me in paragraph 62 of the Complaint to anybody.

Guckavan Decl. ¶ 5.

32.     Mr. Guckavan testified as follows about the information attributed to him in Paragraph 72 of the SAC:

> I did not provide the above information [Paragraph 72] to plaintiffs' lawyers.  This information does not describe conduct that I saw or heard about at the Company.  I was not in a position to know this kind of information.  I never said what has been attributed to me in paragraph 72 of the Complaint to anybody.

Guckavan Decl. ¶ 6.

33.     Mr. Guckavan testified as follows about the information attributed to him in Paragraph 73 of the SAC:

> I did not provide the above information [Paragraph 73] to plaintiffs' lawyers.  This information does not describe conduct that I saw or heard about at the Company.  Mr. Gertel was several levels me.  I was not in a position to know this kind of information.  I never said what has been attributed to me in paragraph 73 of the Complaint to anybody.

Guckavan Decl. ¶ 7.

34.     Mr. Guckavan testified as follows about the information attributed to him in Paragraph 118 of the SAC:

> I did not provide the above information [Paragraph 118] to plaintiffs' lawyers.  This information is not consistent with my recollection of events at the Company.  This information does not describe conduct that I saw or heard about at the Company.  I never said what has been attributed to me in paragraph 118 of the Complaint to anybody.  Further, I would never have cited a percentage nor would I have provided a date.

Guckavan Decl. ¶ 8.

35.     Mr. Guckavan testified as follows about the information attributed to him in Paragraph 175 of the SAC:

> I did not provide the above information [Paragraph 175] to plaintiffs' lawyers.  This information does not describe conduct that I saw or heard about at the Company.  I never said what has been attributed to me in paragraph 175 of the Complaint to anybody.

Guckavan Decl. ¶ 9.

36.     The SAC alleges the following about Confidential Witness No. 8 (later identified by plaintiffs as Sandra M. Thompson):

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

10

Paragraph 63:

> Moreover, Confidential Witness No. 8, an Executive Assistant to a high level officer in JDS's corporate headquarters in San Jose, whose desk was located outside the offices of defendants Kalkhoven and Muller, stated that weekly sales and inventory reports from the Oracle system were generated into hard copy. Those reports were distributed to JDS senior executives, including defendant Muller, who shared the information with defendant Kalkhoven. Moreover, Confidential Witness No. 8 added that anyone with access to the Oracle system (including all senior management) was able to get daily updates, which included orders placed at every division throughout the company.

Paragraph 224:

> Significantly, Kalkhoven's September 29, 1999 Employment Agreement provided that he did not have to return the Company's property including all "books, manuals, records, reports, notes, contracts, lists, blueprints, and other documents, or materials, or copies thereof, and equipment furnished to or prepared by Employee" until termination of employment. The Amended Employment Agreement did not alter that provision. Because Kalkhoven remained an employee of JDS through July 31, 2001, he was permitted to retain JDS property until that time. In fact, according to Confidential Witness No. 8, an Executive Assistant in JDS's executive suite in San Jose whose desk was located outside of Kalkhoven's office, Kalkhoven retained his office and computer and came to the office even after his announced retirement. Thus, his massive sales of JDS stock in August 2000 and February 2001 were made as an insider, and after he was provided access to the Oracle System's non-public information regarding demand, sales and inventory.

Paragraph 399(b):

> According to Confidential Witness No, 8, Muller and Kalkhoven received weekly hard copy sales and inventory reports from the Oracle system. Muller came into IT and would "request reports all the time." Muller's office was next to Kalkhoven's and the two of them constantly discussed developments including sales and inventory. Moreover, Kalkhoven was "very hands on and aware of everything going on in the company," Kalkhoven often flew to Ottawa to meet with Straus and was constantly walking "up and down the hall" to see what was going on.

37.     On September 12, 2006, Confidential Witness No. 8 (Sandra M. Thompson) supplied a declaration about the information attributed to her in the SAC. Attached as Exhibit 10 is a true and correct copy of the September 12, 2006 declaration of Sandra M. Thompson ("Thompson Decl.").

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

11

38.     Ms. Thompson testified as follows about the information attributed to her in Paragraph 63 of the SAC:

> I did not provide the above information [Paragraph 63] to plaintiffs' lawyers.  Again, I do not recall what the Oracle system was.  I had no way of knowing whether anybody could get daily updates from the Oracle system, or what those updates might have included.  I do not know whether the Oracle system included information about orders placed at every division throughout the Company.  I do not know, and was not in a position to know, whether any particular member of senior management had access to the Oracle system, or what sort of access they may or may not have had.  I recall nothing to suggest that "all senior management" had access to the Oracle system.  I do not know who plaintiffs mean when they refer to "all senior management."  I have no knowledge about what access to the Oracle system Mr. Kalkhoven may have had; nor do I know that he had any such access.

Thompson Decl. ¶ 5.

39.     Ms. Thompson testified as follows about the information attributed to her in Paragraph 224 of the SAC:

> I did not provide this information to plaintiffs' counsel.  As stated above, my desk was not near Mr. Kalkhoven's office, and I had no line of sight into his office.  I recall that Mr. Kalkhoven retired at some point while I was still working at JDS Uniphase, but I do not recall when this was.  I have no idea whether Mr. Kalkhoven retained his office after his retirement.  Nor do I know if he kept his computer after his retirement.  Finally, I have no recollection of having provided any of this information to plaintiffs' counsel.

Thompson Decl. ¶ 6.

40.     Ms. Thompson testified as follows about the information attributed to her in Paragraph 399(b) of the SAC:

> I did not provide the above information [Paragraph 399(b)] to plaintiffs' lawyers.  As noted above, I do not know what information was contained in the Oracle system or what reports (if any) were generated from Oracle or how often they were generated.  I do not know whether Mr. Kalkhoven or Mr. Muller received weekly, or any other, copies of sales and inventory reports, or any other particular reports from the Oracle system or otherwise.  I do not recall that Mr. Muller requested such reports, let alone "all the time," and I have not recollection of ever saying such a thing to plaintiffs' lawyers.

Thompson Decl. ¶ 7.

> Paragraph 339(b) also states "Muller's office was next to Kalkhoven's and the two of them constantly discussed

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

12

developments including sales and inventory." While I do remember that Mr. Muller's office was close to Mr. Kalkhoven's office, as noted above my desk was nowhere near their offices, so I was not in a position to know how frequently they talked. Nor would I have known what Mr. Kalkhoven and Mr. Muller discussed, even if I had seen them in conversation. I do not recall ever participating in or overhearing any conversation between Mr. Kalkhoven or Mr. Muller regarding sales or inventory, or any other subject, for that matter. I do not recall saying to plaintiffs' counsel that Mr. Muller and Mr. Kalkhoven had frequent discussions.

Thompson Decl. ¶ 8.

I do not know what plaintiffs mean by the term "hands on." Under my own understanding of that term, I have no idea—and had no idea during the time I worked at JDS Uniphase—whether Mr. Kalkhoven was "hands on" or not, and I have no idea what he was or was not aware of concerning JDS Uniphase.

Thompson Decl. ¶ 9.

I do not recall telling plaintiffs' counsel anything about Mr. Kalkhoven's travel or meetings outside the office, and I do not believe I would have been in a position to know whether or where Mr. Kalkhoven was traveling during the time that he and I both worked at JDS Uniphase. I do not recall Mr. Kalkhoven walking up and down the hall frequently, and I have no recollection of ever saying that to plaintiffs' counsel.

Thompson Decl. ¶ 10.

41.     The SAC alleges the following about Confidential Witness No. 9 (later identified by plaintiffs as Manjeet Ner):

Paragraph 64:

Throughout the Class Period, JDS's revenues were materially overstated in violation of GAAP due to the improper recognition of revenue on products that it shipped to its customers with full rights of return and the understanding that the customer would hold the product in its inventory until needed and would not take ownership of the products nor become obligated to pay for them until such later time.[2]

---

[2] The allegation in Paragraph 64 is attributed to Confidential Witnesses Nos. 9, 10, and 11 by virtue of the fact that Paragraph 64 is directly preceded by the subheading, "Three Former JDS Employees Confirm that Throughout the Class Period, JDS Improperly Recognized Revenues on Shipments of Products It Still Owned," and Paragraphs 65-67 identify these "Three Former JDS Employees" as Confidential Witnesses Nos. 9, 10, and 11.

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

13

1     Paragraph 65:

2           According to Confidential Witness No. 9, a JDS Senior Product
            Line Manager in Ottawa, Nortel, one of JDS's largest customers,
3           had a consignment arrangement with JDS whereby Nortel would
            keep JDS products on its shelf until they were "pulled in" as
4           needed.

5     Paragraph 127:

6           Confidential Witness No. 9, a Senior Product Line Manager in
            Ottawa, stated that in the Summer of 2000, senior people in Ottawa,
7           including Senior Vice President Joe Ip (who sold $80.6 million of
            JDS stock in August 2000), stated on various occasions that JDS
8           had over-capacity, was building too much inventory, and that they
            didn't know what they were going to do with the products they
9           were building.  This slowdown related to WDM filters – JDS's top
            revenue producing product in Ottawa.
10
      Paragraph 172:
11
            As noted above, Nortel, JDS's largest customer of WDM filters,
12          had a consignment arrangement with JDS whereby Nortel would
            keep JDS products on its shelf until they were "pulled in" as
13          needed.  According to Confidential Witness No. 9, a Senior Product
            Line Manager in Ottawa, Nortel cancelled orders in the Summer of
14          2000 and JDS's inventory started to build up.  In response, JDS
            desperately tried to get Nortel to agree to pay for the inventory on
15          their shelves, even though Nortel did not currently need the
            product.
16
      Paragraph 399(d):
17
            According to Confidential Witness No. 9, a Senior Product Line
18          Manager in Ottawa, Senior Vice President Joe Ip knew about and
            verbally acknowledged the Company's overcapacity and excess
19          inventory in the Summer of 2000.  Confidential Witness No. 9
            added that Ip was very close to defendant Straus and that Straus
20          knew about the slowdown as well.

21          42.     On November 9, 2006, Confidential Witness No. 9 (Manjeet Ner) supplied a

22    declaration about the information attributed to him in the SAC.  Attached as Exhibit 11 is a true

23    and correct copy of the November 9, 2006 declaration of Manjeet Singh Ner ("Ner Decl.").

24          43.     Mr. Ner testified as follows about the information attributed to him in

25    Paragraph 64 of the SAC:

26          Though I spoke to the plaintiffs' lawyers about consignment
            arrangements at the Company, I did not draw these conclusions.  I
27          do recall that the Company had consignment arrangements with
            some of its customers, where "the customer would hold the product
28          in its inventory until needed."  I do not have any specific

1    knowledge about any of these arrangements. I recall hearing that
     we sent product to customers before they had an immediate need
2    because customers wanted to ensure they had adequate supply of
     Company product. I don't recall which customers had these
3    arrangements. I was not a part of the sales department and have no
     firsthand knowledge of consignment arrangements. I did not have
4    accounting responsibilities or know when the Company recognized
     revenue on consignment arrangements, but I do not have any reason
5    to think that the Company improperly recognized revenue.

6    Ner Decl. ¶ 4.

7          44.    Mr. Ner testified as follows about the information attributed to him in

8    Paragraph 65 of the SAC:

9    Senior Product Line Manager was my job title. The above
     information [Paragraph 65] sounds generally correct. I may have
10   told the plaintiffs' lawyer this information. It was generally known
     that Nortel had a procedure in place to pull product, but I did not
11   have any personal knowledge about how it worked. I also had no
     personal knowledge about what product Nortel kept on its shelves.
12   I would not have had personal knowledge as to whether something
     was on "consignment," because that would be something that the
13   sales department would handle and did not involve a product line
     that I was responsible for.

14   Ner Decl. ¶ 5.

15         45.    Mr. Ner testified as follows about the information attributed to him in

16   Paragraph 127 of the SAC:

17
     The plaintiffs' lawyers asked me about over-capacity and Mr. Ip
18   selling shares, but I did not tell them what is set out in
     paragraph 127. This information does not describe conduct that I
19   saw or heard about at the Company. I would not have been privy to
     the information included in this paragraph. I never talked to Joe Ip
20   but I know that he sold a large amount of stock around that time
     period. I do not know how much was sold. Joe Ip was not my
21   immediate supervisor. I was promoted to a Senior Product Line
     Manager in 2000, but I had no knowledge of a slowdown in 2000.
22   In fact, throughout 2000, customers were vying for capacity. WDM
     filters was not a product line that I worked on. I recall overhearing
23   discussions among product line managers in the Fall of *2001* that
     product was not being pulled, but I did not participate in these
24   conversations. I specifically recall overhearing discussions about a
     slowdown in the Fall of *2001*, because that is when my daughter
25   was born.

26   Ner Decl. ¶ 6 (emphasis added).

27         46.    Mr. Ner testified as follows about the information attributed to him in

28   Paragraph 172 of the SAC:

1

> I spoke to plaintiffs' lawyers about Nortel orders, but paragraph 172 is not the response I gave them. This information does not describe conduct that I saw or heard about at the Company. Again, I recall that Nortel pulled product, but I do not know where the product was kept. I had no insight into what product Nortel had on its own shelves and what it did with that product. I do recall Nortel canceling orders at some point, but do not recall when. Moreover, during my time at JDSU, I had no conversations with other product line managers about payments from Nortel.

2

3

4

5

6  Ner Decl. ¶ 7.

7      47.    Mr. Ner testified as follows about the information attributed to him in

8  Paragraph 399(d) of the SAC:

9

> I did not tell the plaintiffs' attorneys what they attribute to me as set out in paragraph 399(d). This information does not describe conduct that I saw or heard about at the Company. As mentioned above, I never talked to Mr. Ip and I am not aware of any slowdown in the Summer of 2000. I recall that when I started at the Company, Mr. Straus and Mr. Ip worked closely together. I have no reason to believe that this relationship changed but I do not know what the relationship was like in the summer of 2000.

10

11

12

13

14  Ner Decl. ¶ 8.

15      48.    The SAC alleges the following about Confidential Witness No. 10 (later identified

16  by plaintiffs as Ronald Blachman):

17      Paragraph 64:

18

> Throughout the Class Period, JDS's revenues were materially overstated in violation of GAAP due to the improper recognition of revenue on products that it shipped to its customers with full rights of return and the understanding that the customer would hold the product in its inventory until needed and would not take ownership of the products nor become obligated to pay for them until such later time.

19

20

21

22      Paragraph 66:

23

> Similarly, according Confidential Witness No. 10, a JDS engineering manager in Bloomfield, Connecticut, JDS had the same arrangement [consignment] with Lucent, another of JDS's major customers.

24

25      Paragraph 89:

26

> Likewise, Confidential Witness No, 10, an Engineering Manager in Bloomfield, stated that in or around the Spring of 2000, customers began to reduce their monthly requirements of JDS products and, in some months, asked that no product be shipped at all.

27

28

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

16

Paragraph 101:

> Further, according to Confidential Witness No. 10, an Engineering
> Manager in Bloomfield, Connecticut, by the Spring of 2000,
> Lucent's inventory of JDS products had built up to the point that
> they had no room to store additional products, prompting Lucent to
> ask JDS to hold its inventory rather than ship it to Lucent as had
> been done in the past.

Paragraph 111:

> According to Confidential Witness No. 10, in response to
> customers pushing out delivery dates in the Spring of 2000, JDS
> negotiated an agreement with Lucent in the Summer of 2000,
> whereby Lucent agreed to take wavelocker products (priced at $350
> to $1,000 each) it did not currently need with the right to return if a
> need did not develop.

49.     On May 25, 2006, Confidential Witness No. 10 (Ronald Blachman) supplied a

declaration about allegations in the SAC.[3]  Attached as Exhibit 12 is a true and correct copy of the

May 25, 2006 declaration of Mr. Blachman ("Blachman Decl.").

50.     Mr. Blachman testified as follows:

> I received a call a couple of years ago from the plaintiffs.  The
> person that I spoke with asked me if I was aware that the Company
> was lying, and if I knew about any improper shipping tactics or
> inventory treatment at the Company.  I said that I had no knowledge
> of anything of the sort occurring at the Company.

Blachman Decl. ¶ 4 (in part).

> I have read only a little about this litigation and have some
> familiarity with the issues and claims in the case.  I believe that the
> allegations that have been made by the plaintiffs against the
> Company are not correct.  In my experience, JDSU was an ethical
> company that did things by the book.  I am not aware of things
> being done improperly, either intentionally or by accident.  The
> Company's business culture was one of honesty.  I never saw
> anyone do anything that seemed to be illegal or improper, and I did
> not think that anything illegal or improper would be tolerated.

Blachman Decl. ¶ 5.

> I knew people in the wavelocker group, but I was not in it.  I heard
> that Lucent wanted the Company to hold some wavelocker
> shipments, but I don't know why.  Also, there may have been a

---

[3] Mr. Blachman's declaration does not directly address the allegations attributed to him
because, at the time, plaintiffs had not yet identified Mr. Blachman as Confidential Witness
No. 10.

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

17

1

> specification dispute.  Outside of that, I was not aware of order
> cancellations and returns in the summer of 2000.  My job was in

2

> engineering and product development, not sales.  I didn't have
> firsthand knowledge about sales or orders, so I cannot say whether

3

> the number of cancellations and returns was unusual.

4

Blachman Decl. ¶ 8 (in part).

5

> I never saw any activity at the Company that I thought was
> improper or fraudulent.  I never felt pressured to do anything

6

> improper or fraudulent.  I believe that JDS Uniphase was an ethical,
> well-run company.

7

Blachman Decl. ¶ 11.

8

      51.     The SAC alleges the following about Confidential Witness No. 11 (later identified

9

by plaintiffs as Sopheap Khieu):

10

Paragraph 64:

11

12

> Throughout the Class Period, JDS's revenues were materially
> overstated in violation of GAAP due to the improper recognition of

13

> revenue on products that it shipped to its customers with full rights
> of return and the understanding that the customer would hold the
> product in its inventory until needed and would not take ownership

14

> of the products nor become obligated to pay for them until such
> later time.

15

Paragraph 67:

16

17

> Confidential Witness No. 11, a Senior Manufacturing Engineer in
> JDS's San Jose facility, confirmed that JDS would ship a large

18

> amount of product to its customers and the customers, in turn,
> would store the product in their own stockrooms, Confidential
> Witness No. 11 stated that under JDS's agreements with its many

19

> customers, even though the customers had taken possession of the
> product, they were not liable for payment until the product was

20

> actually used.

21

Paragraph 85:

22

> Likewise, Confidential Witness No. 11, a Senior Manufacturing
> Engineer in San Jose, stated that during that same time period,

23

> employees at JDS became aware that "demand had come to a halt."

24

      52.     On October 6, 2006, Confidential Witness No. 11 (Sopheap Khieu) supplied a

25

declaration about the information attributed to him in the SAC.  Attached as Exhibit 13 is a true

26

and correct copy of the October 6, 2006 declaration of Sopheap Khieu ("Khieu Decl.").

27

      53.     Mr. Khieu testified as follows about the information attributed to him in

28

Paragraph 64 of the SAC:

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

18

1

I did not provide the above information [Paragraph 64] to plaintiffs'
lawyers.  This information is not consistent with my recollection of
events at the Company.  This information does not describe conduct
that I saw or heard about the Company.  I do recall that the
Company had consignment arrangements with some of its
customers, where "the customer would hold the product in its
inventory until needed."  I don't recall which customers had these
arrangements.  I do not have any reason to think that the Company
improperly recognized revenue on consignment arrangements.

2

3

4

5

6    Khieu Decl. ¶ 4 (in part).

7        54.    Mr. Khieu testified as follows about the information attributed to him in

8    Paragraph 67 of the SAC:

9

The first part of this statement describes what people referred to as
consignment arrangements.  The information in the first part of this
statement is consistent with what I told the plaintiffs' attorneys.
However, the second part of the statement is not consistent with
what I remember or with what I told the plaintiffs' attorneys.  I
thought customers were liable for payment, and that revenue was
recognized, when they pulled the products from the shelves, but I
have no personal knowledge of when the Company recognized
revenue.

10

11

12

13

14   Khieu Decl. ¶ 5 (in part).

15       55.    Mr. Khieu testified as follows about the information attributed to him in

16   Paragraph 85 of the SAC:

17

I did not provide the above information [Paragraph 85] to plaintiffs'
lawyers.  This information is not consistent with my recollection of
events at the Company.  Sales were still high in March and April
2000.  Customers were buying left and right.  It wasn't until *2001*
that orders slowed.  The slowdown in sales happened so quickly
that it took people by surprise.

18

19

20

21   Khieu Decl. ¶ 6 (in part) (emphasis added).

22       56.    The SAC alleges the following about Confidential Witness No. 12 (later identified
by plaintiffs as John Wetherill):

23

Paragraph 71:

24

25

Confidential Witness No. 12, the former CEO of Hatboro, located
in Warrington, Pennsylvania, confirmed this fraudulent practice;
stating that his company would pick up approximately 40 or 50
cartons of product from the JDS Horsham facility at the end of a
quarter.  The product was delivered to a storage facility where it
would be picked up by JDS a few weeks later — intact and
unopened — and returned to the Horsham plant.

26

27

28

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

19

57.     On October 17, 2005, Confidential Witness No. 12 (John Wetherill) was deposed about the information attributed to him in the SAC.  Attached as Exhibit 14 is a true and correct copy of relevant excerpts from the certified copy of the October 17, 2005 deposition of John Wetherill ("Wetherill Dep.").

58.     Mr. Wetherill testified as follows about the information attributed to him in Paragraph 71 of the SAC:

- Mr. Wetherill's companies did business with JDSU's Chalfont, Pennsylvania location.  Mr. Wetherill was not aware of a JDSU plant in Horsham.  Wetherill Dep. 8:7-9:25.

- JDSU took inventory back five or six times and the amount picked up was anywhere from one carton to ten cartons.  *Id*. 88:6-91:14.

- Mr. Wetherill does not recall that JDSU would pick up 40 or 50 boxes after the end of a quarter.  *Id*. 93:18 – 102:1.

59.     The SAC alleges the following about Confidential Witness No. 13 (later identified by plaintiffs as John P. Libby):

Paragraph 74:

> The illegal practice described above was ***not*** confined to JDS's Horsham facility.  Confidential Witness No. 13, who tested OC-48 modulators at the Bloomfield facility before they were shipped out, reports that in the Summer of 2000 he heard that trucks were leaving the Bloomfield plant full of products near the end of the quarter and then returning with the same product at the start of the next quarter, "jury-rigging the books" and "shipping to make the books look good."

60.     On August 8, 2006, Confidential Witness No. 13 (John P. Libby) was deposed about the information attributed to him in the SAC.  Attached as Exhibit 15 is a true and correct copy of relevant excerpts from the certified copy of the August 8, 2006 deposition of John P. Libby ("Libby Dep.").

61.     Mr. Libby testified as follows about the information attributed to him in Paragraph 74 of the SAC:

- Mr. Libby did not personally witness the activity described in Paragraph 74.  Libby Dep. 66:15-20.

- Mr. Libby does not recall when he heard about the information discussed in Paragraph 74:  "I remember it was warm because we were

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

20

outside without a coat on, but I don't remember if it was summer, fall, or the spring. I don't know." *Id.* 66:3-7.

- Paragraph 74 does not accurately reflect what Mr. Libby remembers hearing: "It may be stretching a bit. I don't know if it was more than one truck. I can't be sure and I don't know if it was full of product. It may have been a couple of cases. I don't know." *Id.* 66:10-14.

- Mr. Libby did not believe the reports when he heard them because he did not perceive that "there was any basis" to them. *Id.* 69:25-70:8.

62.     The SAC alleges the following about Confidential Witness No. 14 (later identified by plaintiffs as David G. Marcellus):

Paragraph 77:

> Confidential Witness No. 14, a former manufacturing engineer at JDS's Trenton, New Jersey plant, stated that there appears to have been a deliberate delay of delivery on components or modules to a subsequent quarter in order to make the numbers for the later quarter look better.

63.     On October 7, 2006, Confidential Witness No. 14 (David G. Marcellus) supplied a declaration about the information attributed to him in the SAC. Attached as Exhibit 16 is a true and correct copy of the October 7, 2006 declaration of David G. Marcellus ("Marcellus Decl.").

64.     Mr. Marcellus testified as follows about the information attributed to him in Paragraph 77 of the SAC:

> I did not provide the above information [Paragraph 77] to plaintiffs' lawyers. This information does not describe conduct that I saw or heard about at the Company. I worked on machinery. I did not know about product delivery or whether deliveries were delayed. I had no knowledge about making numbers for any quarter. I wouldn't have made such statements.

Marcellus Decl. ¶ 4.

65.     The SAC alleges the following about Confidential Witness No. 15 (later identified by plaintiffs as Anthony C. Boncore, Jr.):

Paragraph 78:

> Similarly, Confidential Witness No. 15, a JDS Research Engineer at the Company's Bloomfield facility, stated that JDS commonly pushed shipments to later quarters once the Company satisfied its internal goals for that quarter. Specifically, Confidential Witness No. 15 recalled that, early in the Class Period, JDS delayed shipping into the next quarter Wavelockers to Lucent and OC-48s

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

21

to Ciena into the next quarter once it had already made its numbers
for the current quarter.

66.     On September 27, 2006, Confidential Witness No. 15 (Anthony C. Boncore, Jr.)
was deposed about the information attributed to him in the SAC.  Attached as Exhibit 17 is a true
and correct copy of relevant excerpts from the certified copy of the September 27, 2006
deposition of Anthony C. Boncore, Jr. ("Boncore Dep.").

- Though Mr. Boncore confirmed that he made the statements
  attributed to him (Boncore Dep. 107:10-21; 116:25-117:10), he
  testified that though there was a lack of urgency once quarterly
  goals were met, the Company did not delay orders once quarterly
  goals were met. *Id.* 109:16-112:24 ("The customer would get what
  they asked for when the product was ready."); *id.* 96:6-7 ("when the
  goals were met, the urgency stopped").

- Also, Mr. Boncore's knowledge was limited to JDSU's Bloomfield
  facility.  He had no knowledge about the internal goals of divisions
  outside of Bloomfield or company-wide goals. *Id.* 112:25-113:15.

- Mr. Boncore had no role in determining whether Bloomfield met its
  internal goals or pushing shipments to later quarters. *Id.* 109:8-24.

67.     The SAC alleges the following about Confidential Witness No. 18 (later identified
by plaintiffs as Diana C. Burns):

Paragraph 84 (in relevant part):

According to Confidential Witness No. 18, an Information
Technology Engineer at JDS's San Jose facility in or around March
2000, JDS employees began to talk about declining demand for the
Company's products.

68.     On November 2, 2006, Confidential Witness No. 18 (Diana C. Burns) was
deposed about the information attributed to her in the SAC.  Attached as Exhibit 18 is a true and
correct copy of relevant excerpts from the certified copy of the November 2, 2006 deposition of
Diana Burns ("Burns Dep.").

69.     Ms. Burns testified as follows about the information attributed to her in
Paragraph 84 of the SAC:

- Ms. Burns testified that the only employee she purportedly heard these
  rumors from was her supervisor, Mr. Jim Flood.  Burns Dep. 64:19-
  65:1; 65:20-66:1; 107:17-108:1.  She testified that she had no first-hand
  knowledge regarding any products that may have suffered a decline in
  demand and she did not attend any meetings where a decline in demand
  for products was discussed. *Id.* 109:6-22.

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

22

1

- Ms. Burns also testified that the Company was doing really well when Mr. Kalkhoven left the company. *Id.* 110:16-111:3. Ms. Burns also testified that she did not talk to Jim Flood about any decline in demand until after Mr. Kalkhoven left and his departure was in May 2000. *Id.* 111:4-15.

2

3

4        70.     On February 12, 2007, Mr. Jim Flood supplied a declaration which contradicted

5    Ms. Burns's testimony. Attached as Exhibit 19 is a true and correct copy the February 12, 2007

6    declaration of James A. Flood ("Flood Decl.").

7        71.     Mr. Flood declared that:

8            In my position as the Company's internet manager, I do not have access to information regarding the demand for JDSU's product. Consequently, I never had conversations with Ms. Burns regarding demand for JDSU's products. I do recall, however, that during the spring and summer of 2001, the Company's stock was dropping, and as a result, I had general discussions with Ms. Burns, as well as others within the Company, regarding the overall health of the Company and the telecommunications sector.

9

10

11

12   Flood Decl. ¶ 6.

13       72.     The SAC alleges the following about Confidential Witness No. 19 (later identified

14   by plaintiffs as Jeff Nguyen):

15       Paragraph 84 (in relevant part):

16

17           Moreover, Confidential Witness No. 19, a Senior Financial Analyst in San Jose confirmed that order cancellations in the San Jose plant – the Company's largest plant in the United States – began in earnest in March or April 2000.

18

19       Paragraph 122:

20

21           Confidential Witness No. 19, a Senior Financial Analyst at the San Jose Facility, stated that by mid-2000, orders from major customers such as Nortel, Ciena, Alcatel and ONI Systems began to dry up.

22       73.     On November 9, 2006, Confidential Witness No. 19 (Jeff Nguyen) supplied a

23   declaration about the information attributed to him in the SAC. Attached as Exhibit 20 is a true

24   and correct copy of the November 9, 2006 declaration of Huan H. "Jeff" Nguyen.

25       74.     Mr. Nguyen testified as follows about the information attributed to him in

26   Paragraph 84 of the SAC:

27           I did not provide the above information [Paragraph 84] to plaintiffs' lawyers. This information is not consistent with my recollection of events at the Company. This information does not describe conduct

28

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

23

that I saw or heard about at the Company. In fact, in March and
April of 2000, demand for the Company's products was at an all-
time high and growing. Cancellations were no higher than usual.
Customers cancel all of the time; that's the nature of the business.
Our customers won and lost contracts constantly.

Nguyen Decl. ¶4.

75.     Mr. Nguyen testified as follows about the information attributed to him in

Paragraph 122 of the SAC:

I did not provide the above information [Paragraph 122] to
plaintiffs' lawyers. This information is not consistent with my
recollection of events at the Company. This information does not
describe conduct that I saw or heard about at the Company.

Nguyen Decl. ¶ 5.

76.     The SAC alleges the following about Confidential Witness No. 20 (later identified

by plaintiffs as Mark Tybor):

Paragraph 86:

So, too, Confidential Witness No, 20, a Clean Room Technician at
the Bloomfield plant, stated that the downturn in JDS's business
started "right after winter" 2000. Cisco, Lucent, Ciena and Alcatel
cancelled orders once or twice every 1 1/2 or two weeks beginning
in March and April 2000. Indeed, rooms of inventory were stacked
up in the Bloomfield plant, requiring JDS to move people to
another building to make room for all of the product and equipment
lying around.

Paragraph 93:

Likewise, Confidential Witness No. 20, a Clean Room Technician
in Bloomfield, was told by his supervisor, Brett Shanaman, in
March or April 2000 that an order was cancelled but was to be
filled anyway. The order was for between 36 and 48 modulators.

77.     On November 16, 2006, Confidential Witness No. 20 (Mr. Tybor) was deposed

about the information attributed to him in the SAC. Attached as Exhibit 21 is a true and correct

copy of relevant excerpts from the certified copy of the November 16, 2006 deposition of Marek

"Marc" Tybor ("Tybor Dep.").

78.     Mr. Tybor testified as follows about the information attributed to him in

Paragraphs 86 and 93 of the SAC:

- The allegations are inaccurate with respect to timing. The date must be
  wrong because Mr. Tybor did not start working at JDSU until

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

24

1    November 2000.  Tybor Dep. 45:16-46:5; 50:15-51:23.  The allegations
     should read "2001," not 2000.  *Id.* 45:25-46:5; 48:18-19; 51:21-23.

2
     •   When Mr. Tybor spoke to plaintiffs, he told them he was uncertain
3        about the dates of his employment.  *Id.* 44:9-47:6; 57:1-16.

4        79.    The SAC alleges the following about Confidential Witness No. 22 (later identified

5    by plaintiffs as John L. Lattimer):

6        Paragraph 88:

7            Further, Confidential Witness No. 22, a Materials Planner at that
             plant, reported that work orders "decreased drastically in or around
8            April 2000 and into 2001." Confidential Witness No. 22 added that
             "it got to the point where there was so much down time" that the
9            planner began "concocting training topics for work cell members,
             simply to keep them appropriately busy."

10       Paragraph 146:

11
             The employees in charge of the Redbook met weekly on Thursdays
12           during 2000 to discuss current demand levels and any changes
             thereto.  However, pursuant to the corporate culture at JDS, which
13           strongly encouraged aggressive forecasts, the Redbook team did not
             want to officially acknowledge the bad news with respect to
14           demand or sales, and delayed downward revisions of its forecasts as
             long as possible.  Indeed, Confidential Witness No. 22, a materials
15           planner at the Bloomfield facility whose responsibilities included
             planning a product line that generated approximately $80 million
16           annually, stated that he couldn't understand why the Company
             forecasters set targets that clearly were not realistically attainable in
17           2000 and 2001.

18       80.    On August 9, 2006, Confidential Witness No. 22 (John L. Lattimer) was deposed

19   about the information attributed to him in the SAC.  Attached as Exhibit 22 is a true and correct

20   copy of relevant excerpts from the certified copy of the August 9, 2006 deposition of John

21   Lattimer ("Lattimer Dep.").

22       81.    Mr. Lattimer testified as follows about the information attributed to him in

23   Paragraph 88 of the SAC:

24       •   The downturn was in 2001 not 2000.  Lattimer Dep. 88:14-22.  At
             Bloomfield in Fall 2000, "business was growing" — "I would call it
25           explosive."  *Id.* 70:8-71:2.

26       •   The period of explosive growth unexpectedly ended at the end of
             March/beginning of April 2001 — "But not before then."  *Id.* 71:16-
27           73:6.

28

1

- "I came on board [joined JDSU] in December of 2000 so I would have no knowledge prior to December of 2000."  *Id*. 88:8-10.

2

82.     Mr. Lattimer testified as follows about the information attributed to him in

3

Paragraph 146 of the SAC:

4

5

- Mr. Lattimer knows nothing about the Redbook.  Lattimer Dep. 89:22-24 ("I'm not familiar with that term [Redbook].")

6

- "I came on board in December of 2000, so I can't answer prior to that." *Id*. 90:3-5.

7

8

- Mr. Lattimer was only familiar with Bloomfield, not other JDSU facilities.  *Id*. 82:25-83:5.

9

- Forecasts were unrealistic because demand was strong and it was difficult to meet the demand.  *Id*. 91:3-92:20.

10

83.     The SAC alleges the following about Confidential Witness No. 23 (later identified

11

by plaintiffs as Daniel P. Welch):

12

Paragraph 94:

13

14

> This illegal practice continued through at least the Summer of 2000. Confidential Witness No. 23, a Manufacturing Supervisor in JDS's Bloomfield facility, stated that Ciena cancelled an order for approximately 300 of JDS's OC-48 modulators (which sold for $3,000 to $4,500 each) in the Summer of 2000, but the modulators were shipped anyway.

15

16

17

Paragraph 105:

18

19

> For example, Confidential Witness No. 23, a Manufacturing Supervisor in Bloomfield, stated that by early Spring of 2000, Lucent returned 3,000 OC-192 modulators (which cost approximately $5,000 each) to Bloomfield due to corrosion. However, when JDS offered to replace the modulators, Lucent refused to take a replacement of the $15,000,000 order, indicating that the return was primarily due to demand issues rather than to quality issues.  These returned products were excess inventory as of the time they were returned.

20

21

22

23

Paragraph 116:

24

25

> Confidential Witness No. 23, a Manufacturing Supervisor in Bloomfield confirmed that by the Summer of 2000, demand had fallen greatly.  Where the plant had been producing 400 OC-48 modulators per day, they began producing less than 100.

26

27

28

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

26

Paragraph 132:

> Moreover, Confidential Witness No. 23, a Manufacturing Supervisor in Bloomfield, stated that overtime in Bloomfield was cut from ten hours a week to zero in May 2000.

84.     On November 10, 2006, Confidential Witness No. 23 (Daniel P. Welch) was deposed about the information attributed to him in the SAC.  Attached as Exhibit 23 is a true and correct copy of relevant excerpts from the certified copy of the November 10, 2006 deposition of Daniel P. Welch ("Welch Dep.").

85.     Mr. Welch testified as follows about the information attributed to him in Paragraph 94 of the SAC:

- Mr. Welch didn't work at JDSU in Summer 2000.  Welch Dep. 53:24-55:2; *see also id.* 28:18-20 (Mr. Welch started at JDSU in January 2001).

- Mr. Welch was aware of no evidence that the modulators were shipped back to Ciena or shipped back against Ciena's wishes.  *Id.* 56:18-58:13.

86.     Mr. Welch testified as follows about the information attributed to him in Paragraph 105 of the SAC:

- Mr. Welch did not work at JDSU in Spring 2000.  Welch Dep. 63:14-16; *see also id.* 28:18-20.

- Lucent's demand issues were speculation.  *Id.* 70:15-21.

87.     Mr. Welch testified as follows about the information attributed to him in Paragraph 116 of the SAC:

- Mr. Welch didn't work at JDSU in Summer 2000 and did not have information about JDSU from that time period.  Welch Dep. 51:16-23; *see also id.* 28:18-20.

88.     Mr. Welch testified as follows about the information attributed to him in Paragraph 132 of the SAC:

- Mr. Welch didn't work at JDSU in May 2000.  Welch Dep. 60:6-7; *see also id.* 28:18-20 (Mr. Welch started at JDSU in January 2001).

89.     The SAC alleges the following about Confidential Witness No. 24 (later identified by plaintiffs as Janice Pablo Namauleg):

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

27

1    Paragraph 95:

2        Moreover, Confidential Witness No. 24, a Logistics Supervisor in
         JDS's San Jose plant, confirmed that the practice of shipping
3        cancelled orders took place at Company headquarters in California
         as well.  During the Summer of 2000, customers were returning
4        orders that were shipped after the customer had cancelled the order.
         When Confidential Witness No. 24 questioned why orders were
5        sent out after a customer cancelled the order, she was told that the
         cancellations were not put in the books in time to prevent shipping
6        and that the shipment was in error.  She noticed that this "error"
         occurred quite often beginning in the Summer of 2000.

7    Paragraph 124:

8
         Similarly, Confidential Witness No. 24, a former Logistics
9        Supervisor at the former E-TEK facility, commented that
         immediately after JDS's acquisition of E-TEK in June 2000, people
10       in the shipping department were putting in "massive" overtime to
         get orders out the door, but there was also a need for "massive"
11       overtime in receiving since many of the shipped goods came back.
         Nortel and Alcatel returned large amounts of products during this
12       period.  Some customers said that the products were defective, but
         when they were sent to the Final Analysis department, it was
13       discovered the products were not defective, leading to the obvious
         conclusion that the customers did not need them.

14
     90.    On October 1, 2006, Confidential Witness No. 24 (Janice Pablo Namauleg)
15
     supplied a declaration about allegations attributed to her in the SAC.  Attached as Exhibit 24 is a
16
     true and correct copy of the October 1, 2006 declaration of Janice P. Namauleg ("Namauleg
17
     Decl.").
18
     91.    Ms. Namauleg testified as follows:
19
20       I had no responsibility for accounting, and no knowledge of the
         company's accounting practices.  I also had no responsibility for
21       sales, and no knowledge of this area.  Furthermore, I had no
         knowledge of why customers might have returned products, or what
         testing might have been done on returned products.
22
     Namauleg Decl. ¶ 4.
23
     92.    Ms. Namauleg testified as follows about the information attributed to her in
24
     Paragraph 95 of the SAC:
25
26       The job description in Paragraph 95 sounds like my job, but I did
         not provide the above information [Paragraph 95] to plaintiffs'
27       lawyers.  This information is not consistent with my recollection of
         events at the Company.  This information does not describe conduct
28       that I saw or heard about at the Company.  I never heard of products
         being shipped after the orders for them were cancelled.  As far as I

1   know, I never shipped cancelled orders. I am not aware of anyone
    else shipping cancelled orders, either. Also, I do not recall shipping
2   cancelled orders in error because the cancellation was not entered
    into the system in time.

3   Namauleg Decl. ¶ 7 (in part).

4       93.     Ms. Namauleg testified as follows about the information attributed to her in

5   Paragraph 124 of the SAC:

6
        This job title also sounds like my job, but I did not provide the
7       above information [Paragraph 124] to plaintiffs' lawyers. This
        information is not consistent with my recollection of events at the
8       Company. This information does not describe conduct that I saw or
        heard about at the Company. I do not recall that people in the
9       shipping department put in a lot of overtime after E-TEK and JDS
        Uniphase merged, either for shipping product or receiving returned
10      product. I recall that there was some overtime, but I do not ever
        remember people working "massive" overtime. Also, I do not
11      recall Nortel or Alcatel returning large amounts of product in
        June 2000.

12  Namauleg Decl. ¶ 8 (in part).

13      94.     The SAC alleges the following about Confidential Witness No. 25 (later identified

14  by plaintiffs as Eric Kelly):

15      Paragraph 97:

16
        The growth in inventory was confirmed by Confidential Witness
17      No. 25, a JDS Production Team Leader in Windsor, Connecticut,
        who stated that by April 2000, JDS was overproducing product
18      despite the fact that orders from virtually all JDS clients had
        dwindled.

19      Paragraph 135:

20
        In addition, according to Confidential Witness No. 25, a Production
21      Team Leader, by mid to late-2000, no overtime was authorized and
        temporary staff was fired at the Company's plant in Windsor,
22      Connecticut.

23      95.     On October 6, 2006, Confidential Witness No. 25 (Eric Kelly) was deposed about

24  the information attributed to him in the SAC. Attached as Exhibit 25 is a true and correct copy of

25  relevant excerpts from the certified copy of the October 6, 2006 deposition of Eric Kelly ("Kelly

26  Dep.").

27      96.     Mr. Kelly testified as follows about the information attributed to him in

28  Paragraph 97 of the SAC:

- The allegation is inaccurate with respect to timing.  The date should read "April 2001."  Kelly Dep. 81:19-82:16.

- Mr. Kelly was not a Production Team Leader.  *Id.* 82:14-17.

- Mr. Kelly's knowledge is limited to one particular product — SN switches.  He has no basis to know about other products that JDSU manufactured.  *Id.* 82:23-83:5.

- The rumors about a slowdown began shortly after February 2001.  *Id.* 98:12-99:9.

97.     Mr. Kelly testified as follows about the information attributed to him in Paragraph 135 of the SAC:

- Mr. Kelly states that there was overtime in late fall and maybe December 2000.  Kelly Dep. 50:22-51:4.

- The allegation is inaccurate with respect to timing.  Mr. Kelly corrects the timing of the allegation in paragraph 135 to reflect that temporary workers were let go in late 2000 or early 2001.  *Id.* 89:5-23.

- Mr. Kelly's knowledge regarding allegations in paragraph 135 is limited to the SN switches product line.  *Id.* 91:4-15.

98.     The SAC alleges the following about Confidential Witness No. 26 (later identified by plaintiffs as Patricia Richard-Revette):

Paragraph 100:

> Confidential Witness No. 26, a member of JDS's Erbium Department in Ottawa, added that inventory of erbium (spooled rolls of fiber) began to build up in June 2000.

Paragraph 125:

> Confidential Witness No. 26, an employee in JDS's Erbium Department in Ottawa, stated that Nortel returned "a lot" of products to JDS in Ottawa in June and July 2000.  Nortel had previously ordered the materials, but began sending them back without penalty when its own production and demand had dropped.

Paragraph 126:

> Confidential Witness No. 26 further noted that in response to the downturn in business in May or June 2000, JDS started cutting staff.  Employees were told that because Nortel was scaling back, JDS had to also.

Paragraph 134:

> Moreover, as noted above, Confidential Witness No. 26 stated that JDS started cutting staff in Ottawa in May or June 2000.

99.  On November 13, 2006, Confidential Witness No. 26 (Patricia Richard-Revette) supplied a declaration about the information attributed to her in the SAC.  Attached as Exhibit 26 is a true and correct copy of the November 13, 2006 declaration of Patricia Richard-Revette ("Richard-Revette Decl.").

100.  Ms. Richard-Revette testifies as follows about the information attributed to her in Paragraph 100 of the SAC:

> This is not true.  There was always some erbium inventory on hand; however, the serious backlog of erbium inventory did not begin to build up until the spring of *2001*, not 2000.

Richard-Revette Decl. ¶ 5 (in part) (emphasis added).

101.  Ms. Richard-Revette testifies as follows about the information attributed to her in Paragraph 125 of the SAC:

> This is not true.  First of all, Nortel did not begin returning any significant amount of products to JDSU until the spring of *2001*. Second, I do not know why Nortel began [returning] large amounts of product, in the spring of 2001.  Finally, I do not know if there was a penalty for Nortel returns.

Richard-Revette Decl. ¶ 6 (in part) (emphasis added).

102.  Ms. Richard-Revette testifies as follows about the information attributed to her in Paragraph 126 of the SAC:

> This is not true.  First of all, JDSU did not start cutting staff until the spring of *2001*.  I specifically remember that all three of my co-workers from our four-person department were let go in the late spring of 2001.  Second, I am not aware of any JDSU employees being "told" that JDSU was cutting staff because Nortel was cutting staff.  This was a [sic] assumption that I and some other JDSU employees shared, but no one from the Company ever announced or explained why.  We used to talk amongst ourselves about why JDSU was scaling back, but we were never told why.

Richard-Revette Decl. ¶ 7 (in part) (emphasis added).

103.  Ms. Richard-Revette testifies as follows about the information attributed to her in Paragraph 134 of the SAC:

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

31

1
> As I stated above [Richard-Revette Decl. ¶ 7], this is not true.
> JDSU did not start cutting staff until the spring of *2001*.

2

Richard-Revette Decl. ¶ 8 (in part) (emphasis added).

3
      104.   The SAC alleges the following about Confidential Witness No. 27 (later identified

4

by plaintiffs as Jodi L. Blanco):

5
      Paragraph 103:

6

7
> According to Confidential Witness No. 27, a production worker at
> the Bloomfield facility, there were serious problems with
> modulators manufactured at that plant, caused by a faulty design.

8
> The undercarriage of the modulators were nickel-plated.  The nickel
> plating was reacting to the oxidation of other chemicals inside the
> modulators, causing corrosion.  An entire warehouse full of these

9
> corroded modulators were returned to JDS in the Spring of 2000.
> The witness said that this problem continued through at least

10
> August 2000, and caused severe customer relation problems with
> major customers, including Lucent, Alcatel and Nortel.

11

12
      Paragraph 133:

13
> Confidential Witness No, 27, a production worker in Bloomfield,
> confirmed that overtime was brought to a halt in that time period

14
> [May 2000], and Confidential Witness No. 41, an Engineering
> Technician in that same plant, stated that a two-shift operation at

15
> the plant was reduced to one shift in mid to late 2000.

16
      105.   On October 24, 2006, Confidential Witness No. 27 (Jodi L. Blanco) was deposed

17
about the information attributed to her in the SAC.  Attached as Exhibit 27 is a true and correct

18
copy of relevant excerpts from the certified copy of the October 24, 2006 deposition of Jodi L.

19
Blanco ("Blanco Dep.").

20
      106.   Ms. Blanco testified as follows about the information attributed to her in

21
Paragraph 103 of the SAC:

22
- The allegation is inaccurate with respect to timing.  Ms. Blanco was not
  employed by JDSU until August 2000.  During her employment at

23
  JDSU, Ms. Blanco remembers that the problem discussed in Paragraph
  103 occurred in Spring *2001*, not Spring 2000.  Blanco Dep. 52:25-

24
  53:25.

25
- Specifically, Ms. Blanco saw the problem "at the end of [her]
  employment or near the end of [it]," which was around April of *2001*.

26
  *Id.* 54:2-23.

27
      107.   Ms. Blanco testified as follows about the information attributed to her in

28
Paragraph 133 of the SAC:

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

32

1
2
3

- The allegation is inaccurate with respect to timing. Ms. Blanco did not join the Company until August 2000, months after May 2000, which is the time period referenced in Paragraph 133. Blanco Dep. 61:24-62:11 ("[Paragraph 133] has to be incorrect because that's an incorrect date.").

4

- The halt in overtime occurred between January and April of *2001*. *Id.* 63:2-6.

5

6

108.    The SAC alleges the following about Confidential Witness No. 28 (later identified by plaintiffs as Manuel A. Reyes[4]):

7

Paragraph 107:

8
9
10
11
12
13

Confidential Witness No, 28, a Team Leader in JDS's Bloomfield plant, noticed many instances of unfinished product being shipped out in early 2000. Specifically, in March 2000, JDS sent unfinished "Gen 1" Modulators to Ciena, who returned the products in April 2000. In addition, there were also a lot of returns from Ciena (modulators) and Alcatel (Dual Mach/Zenders) that were attributed to unfinished goods and/or goods that did not meet specifications. Each time Confidential Witness No. 28 questioned his superiors as to why they would ship such goods, JDS management sent an engineer to tell him that it was okay to ship the products even if they were unfinished or did not meet specifications. Once again, JDS management showed that they were willing to take any steps available in order to meet their sales quotas.

14

109.    On May 26, 2006, Confidential Witness No. 28 (Manuel A. Reyes) supplied a

15
16

declaration about the information attributed to him in the SAC. Attached as Exhibit 28 is a true and correct copy of the May 26, 2006 declaration of Manuel A. Reyes ("Reyes Decl.").

17

110.    Mr. Reyes testified as follows about the information attributed to him in

18

Paragraph 107 of the SAC:

19
20
21
22
23
24
25
26

I did not provide the above information [Paragraph 107] to plaintiffs' lawyers. This information does not describe conduct that I saw or heard about at the Company. Although parts of the above statement sound similar to what I discussed with plaintiffs' lawyers, it is mostly inaccurate and inconsistent with my recollection of events at the Company. I did work on the Gen 1 OC-48 product that the Company built for Ciena and other customers. There were times when I questioned an item, but if the engineers said it functioned correctly, then I let the item go out. I don't recall the Company sending out unfinished product. I don't recall Ciena returning Gen 1 modulators because they were unfinished. I only recall that in *Spring 2001* we worked on a large order for Gen 1 modulators for Ciena, that Ciena never took. I don't recall a lot of returns from Ciena and Alcatel because of "unfinished goods and/or

27

_____

[4] Plaintiffs actually incorrectly identified this individual as "Manuel Erea."

28

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

33

goods that did not meet specification."  I didn't tell the plaintiffs' lawyer that.

Reyes Decl. ¶ 14 (emphasis added).

111.    The SAC alleges the following about Confidential Witness No. 29 (later identified by plaintiffs as Tim Bakes):

Paragraph 108:

Confidential Witness No. 29, a Team Leader in JDS's Bloomfield plant, confirmed that JDS rushed delivery of products a quarter earlier than customers wanted, in order to allow JDS to pick up the revenue early.

Paragraph 114:

Confidential Witness No. 29 confirmed that in the Summer of 2000 there was "no work" to be had.  Many orders were cancelled, including an order from Cisco for OC-192 modulators.

112.    On May 24, 2006, Confidential Witness No. 29 (Tim Bakes) supplied a declaration about allegations in the SAC.  Attached as Exhibit 29 is a true and correct copy of the May 24, 2006 declaration of Timothy P. Bakes ("Bakes Decl.").

113.    Mr. Bakes testified as follows:

After I was laid off, a man I understood to be an attorney for the plaintiffs phoned me.  We spoke for about five minutes.  He asked me questions about the Company, such as:  Did I ever see anyone driving product around in a van and calling it a delivery?  Did the Company ever ship unfinished product or ship product that it knew a customer didn't want?  I told him no.  I just worked on the floor. I wouldn't have seen anything like that.

Bakes Decl. ¶ 4.

114.    Mr. Bakes testified as follows about the information attributed to him in Paragraph 108 of the SAC:

I did not provide the above information [Paragraph 108] to plaintiffs' lawyers.  This information does not describe conduct that I saw or heard about the Company.  I recall that when the plaintiffs' attorney phoned me, he asked me if I had seen this conduct and I told him no.

Bakes Decl. ¶ 15 (in part).

115.    Mr. Bakes testified as follows about the information attributed to him in Paragraph 114 of the SAC:

1

> I did not provide the above information [Paragraph 114] to
> plaintiffs' lawyers.  This information is not consistent with my
> recollection of events at the Company.  Even though OC-192
> production, where I worked, was slow in Summer 2000, groups like
> OC-48 were busy.  I heard the rumor about a cancelled order from
> Cisco, but I never heard a manager say that.

2

3

4

Bakes Decl. ¶ 17 (in part).

5

     116.    The SAC alleges the following about Confidential Witness No. 30 (later identified

6

by plaintiffs as Kelli Hawkins):

7

Paragraph 109:

8

9

> Similarly, Confidential Witness No. 30, a Production Control
> Manager in JDS's San Jose facility, stated that JDS engaged in a
> pattern of earnings management in that near the end of the quarter
> the Company would ship products to customers early (e.g., ship at
> end of June 2000 even though the customer did not want the
> product until July) but JDS would ship the product on the "slow
> boat" so that JDS could recognize revenue in June, but the customer
> would not receive it until July.

10

11

12

13

     117.    On June 22, 2006, Confidential Witness No. 26 (Kelli Hawkins) supplied a

14

declaration about allegations in the SAC.  Attached as Exhibit 30 is a true and correct copy of the

15

June 22, 2006 declaration of Kelli A. Hawkins ("Hawkins Decl.").

16

     118.    Ms. Hawkins testifies as follows about the information attributed to her in

17

Paragraph 109 of the SAC:

18

> I did not provide the above information [Paragraph 109] to
> plaintiffs' lawyers.  The job description in Paragraph 109 of
> Confidential Witness No. 30 sounds like my job.  But I have never
> heard of the term "pattern of earnings management." I did not use
> that term.  I did hear the term "slow boat." At some point after I
> became Production Control Manager in October 2000, I recall
> having meetings where we used the term "slow boat." To us "slow
> boat" meant shipping product using a slow regular shipping
> method.  For example, we would ship by regular ground shipment
> rather than shipping by an overnight or delivery service.  I do not
> recall hiding this practice, or anyone saying that this method of
> shipping was improper.  I do not recall ever shipping any product
> that would arrive before the customer was ready to receive it.  I also
> do not recall any customer complaining about this practice, or about
> receiving products too early.  I do not know when the Company
> recognized revenue on product sales.  I was not involved with
> revenue recognition or accounting matters.

19

20

21

22

23

24

25

26

Hawkins Decl. ¶ 8 (in part).

27

28

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

35

119.   The SAC alleges the following about Confidential Witness No. 31 (later identified by plaintiffs as Brent Cunningham):

Paragraph 110:

> The Company frequently used this tactic ["slow-boat"] in the quarter ending June 30, 2000.  According to Confidential Witness No. 31, a JDS product engineer in Ottawa, JDS did a lot of "pull-ins" in that quarter, meaning that the Company produced more product than had been ordered so that it could ship ahead of schedule in order to get the numbers up for the quarter.

Paragraph 164:

> Confidential Witness No. 31, a Product Engineer in Ottawa, reported that in August 2000, Lucent cancelled a "huge order" of post filters that was at least in the "tens of millions of dollars."

Paragraph 170:

> Finally, Confidential Witness No. 31, stated that prior to Christmas 2000, Nortel canceled a $100 million order known as the "Mosaic Project."

120.   On March 9, 2007, Confidential Witness No. 26 (Brent Cunningham) supplied a declaration about the information attributed to him in the SAC.  Attached as Exhibit 31 is a true and correct copy of the March 9, 2007, declaration of Brent H. Cunningham ("Cunningham Decl.").

121.   Mr. Cunningham testifies as follows about the information attributed to him in Paragraph 110 of the SAC:

> This job title sounds like my job title.  I did not tell plaintiffs' representative that there were pull-ins for the quarter ended June 30, 2000.  I also did not tell plaintiffs' representative that during the quarter ended June 2000, the Company produced more product than had been ordered.

Cunningham Decl. ¶ 5 (in part).

> It is my recollection that in the quarter ended September 2000, I saw a sheet from a CWDM production planner showing that some products that were originally scheduled to ship in the next quarter had been rescheduled to ship in the current quarter.  I do not know why this product was rescheduled for the September quarter.  I am not aware of any products shipping to customers that did not want the products.  In fact, although I did not personally have contact with customers, I heard all the time that customers were beating down the door for faster shipment of more products.  The CWDM

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

36

1        group was busy like crazy from the start to the end of the quarter
              ended September 2000.

2   Cunningham Decl. ¶ 6.

3        122.    Mr. Cunningham testifies as follows about the information attributed to him in

4   Paragraph 164 of the SAC:

5

6        I do not recall providing plaintiffs' counsel with the information in
              paragraph 164.  I do know that Lucent purchased postfilters from
7        the Company and that those orders stopped at some point, but I do
              not know when that occurred.  I also do not know if Lucent's orders
              for postfilters were in the magnitude of "tens of millions of
8        dollars."  I was not the product engineer responsible for the post
              filter products.

9   Cunningham Decl. ¶ 8 (in part).

10        123.    Mr. Cunningham testifies as follows about the information attributed to him in

11   Paragraph 170 of the SAC:

12

13        I do not recall providing plaintiffs' representative with the
              information in paragraph 170.  I do recall that "Mosaic" was a name
              used to describe a system developed by Nortel.  I also recall that
14        Nortel awarded the Company an opportunity to build optical
              amplifiers for Nortel's Mosaic system in 2000, but I was not privy
15        to the value of this or any other order.  I also recall that the
              Company was trying to solve some technical issues with Mosaic as
16        of Christmas 2000, so it is not correct that Nortel had canceled the
              Mosaic Project by the end of 2000. Instead, I believe the Mosaic
17        Project was canceled in 2001.

18   Cunningham Decl. ¶ 9 (in part).

19        124.    The SAC alleges the following about Confidential Witness No. 32 (later identified

20   by plaintiffs as Patricia Arle):

21        Paragraph 113:

22        Confidential Witness No. 32, a Team Leader in JDS's Bloomfield
              and Windsor plants, noticed a severe downturn in demand in May
23        2000.  People were laid off at that time.  Unsold inventory was
              building up in the Cable and Specialty Group.  For one type of
24        modulator priced at $5,000 each, the plant was "a good thousand
              ahead."

25        125.    On May 26, 2006, Confidential Witness No. 32 (Patricia Arle) supplied a

26   declaration about allegations in the SAC.  Attached as Exhibit 32 is a true and correct copy of the

27   May 26, 2006 declaration of Patricia A. Arle ("Arle Decl.").

28

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

37

126.   Ms. Arle testifies as follows about the information attributed to her in

Paragraph 113 of the SAC:

> I did not provide the above information [Paragraph 113] to
> plaintiffs' lawyers.  This information is not consistent with my
> recollection of events at the Company.  This information does not
> describe events that I saw or heard about at the Company.  In fact,
> in my experience working with the Cable and Specialty Group, we
> always built to order. We would never build a thousand extra units.
> You would never find excess inventory building up in the Cable
> and Specialty Group.

Arle Decl. ¶ 17 (in part).

> When I spoke to plaintiffs' attorneys, I told them that I did not
> recall if Bloomfield's first round of layoffs occurred in spring 2000
> or spring 2001.  Since that time, I have reviewed an April 25, 2001
> article from The Hartford Courant (attached as Exhibit A), the April
> 24, 2001 memo from Don Bossi, entitled "JDSU Global
> Realignment Program" (attached as Exhibit B), and the April 24,
> 2001 "Message from Jozef Straus" (attached as Exhibit C).  They
> helped me recall that Bloomfield's first round of layoffs occurred in
> April 2001.

Arle Decl. ¶ 18 (in part).

> Up until the first round of layoffs, things were so gung-ho. We were
> pumping out thousands of reels of prepared fiber. We were going,
> going, going, and then all of a sudden, there were layoffs.  To me,
> the layoffs were a total shock. I recall that we had just moved into
> the new building a few weeks before the first layoffs were
> announced.  After the layoffs, things slowed down.

Arle Decl. ¶ 19.

127.   The SAC alleges the following about Confidential Witness No. 33 (later identified

by plaintiffs as Scott Thomas):

Paragraph 115:

> According to Confidential Witness No. 33, a Production Supervisor
> in Bloomfield, it was "widely known" by mid-2000, that there was
> a "glut" of components building up on the shelves of JDS's
> customers that the customers could not sell.

128.   On May 26, 2006, Confidential Witness No. 33 (Scott Thomas) supplied a

declaration about allegations in the SAC.  Attached as Exhibit 33 is a true and correct copy of the

May 26, 2006 declaration of Scott M. Thomas ("Thomas Decl.").

129.   Mr. Thomas testified as follows:

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

38

1

> Some years ago, I responded to a newspaper ad placed by plaintiffs'
> lawyers asking about improprieties at the Company. I called and

2

> spoke to a man and explained to him that Bloomfield was on the
> up-and-up and that Bloomfield management was top-notch and

3

> ethical. I told plaintiffs' lawyers that we didn't ship empty boxes
> that supposedly contained Company product and that we didn't

4

> intentionally ship product when we knew it would be returned. I
> was not told that I would be a confidential witness in this case. I

5

> first learned that I had been identified by plaintiffs as a confidential
> witness when I was contacted by the Company's lawyers.

6

Thomas Decl. ¶ 5.

7

      130.    Mr. Thomas testified as follows regarding the information attributed to him in

8

Paragraph 115 of the SAC:

9

> I recall that at some point in 2000, there was a concern about

10

> customer inventory levels. I may have spoken to plaintiffs about
> that. I did not have any discussions with Jay Abbe, Kevin

11

> Kalkhoven, Tony Muller, Jozef Straus, or any other executive about
> this issue. I don't know if they had any concerns about customer

12

> inventory levels. I did not tell plaintiffs that there was a glut of
> components building up on the shelves of the Company's

13

> customers that the customers could not sell.

14

Thomas Decl. ¶ 12 (in part).

15

      131.    The SAC alleges the following about Confidential Witness No. 34 (later identified

16

by plaintiffs as Roy N. Lawrence):

17

Paragraph 117:

18

> Moreover, Confidential Witness No. 34, a JDS Engineer in

19

> Bloomfield, noted that top management at the plant began to leave
> in the Summer of 2000, during which time there were an unusual

20

> number of order cancellations and returns. Many of the products
> that were rejected were tested by JDS and found not to be defective
> (i.e., they were simply not wanted).

21

      132.    On September 11, 2006, Confidential Witness No. 34 (Roy Lawrence) was

22

deposed about the information attributed to him in the SAC. Attached as Exhibit 34 is a true and

23

correct copy of relevant excerpts from the certified copy of the September 11, 2006 deposition of

24

Roy Lawrence ("Lawrence Dep.").

25

      133.    Mr. Lawrence testified as follows about the information attributed to him in

26

Paragraph 117 of the SAC:

27

28

    •   Regarding the allegations in Paragraph 117, Mr. Lawrence answered
      "no" to the following question: "And my question is based on your

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

39

1   observation was there more return product in that stockroom during the
2   summer of 2000 than what you had observed prior to the summer of
    2000 in the same stockroom?" Lawrence Dep. 122:21-123:16.

3   • Mr. Lawrence also testified that the company remained busy during the
      Summer of 2000. *Id*. 42:4-16.

4

5   • Mr. Lawrence also testified he had no facts on which to base the
      conclusion that JDSU's customers rejected product simply because
      they did not want them. *Id*. 87:14-88:9.

6

7   134.   The SAC alleges the following about Confidential Witness No. 35 (later identified
    by plaintiffs as Tai Ton):

8   Paragraph 120:

9

10     So, too, Confidential Witness No. 35, an Opto-Mechanical
       Engineer at JDS's San Jose plant, reported that demand decreased
       beginning in April 2000. And Confidential Witness No. 2, an
11     Account Manager in San Jose, confirmed that by late Spring 2000,
       there was widespread "pushing out" of orders for JDS products by
12     both large and small customers.

13  135.   On October 3, 2006, Confidential Witness No. 35 (Tai Ton) supplied a declaration

14  about the information attributed to him in the SAC. Attached as Exhibit 35 is a true and correct

15  copy of the October 3, 2006 declaration of Tai V. Ton ("Ton Decl.").

16  136.   Mr. Ton testified as follows about the information attributed to him in

17  Paragraph 120 of the SAC:

18     The job description of Confidential Witness No. 35 sounds similar
       to my position, but I did not provide the above information
19     [Paragraph 120] to plaintiffs' lawyers. I understand that "demand"
       means demand for JDSU product. But I didn't know anything
20     about customer demand for JDSU product. I wouldn't have said
       anything about it. I did not have any information about customer
21     orders, cancellations, or inventory. I believe that I spoke to the
       person that I thought was a job recruiter about the Company's stock
22     price dropping.

23  Ton Decl. ¶ 5 (in part).

24  137.   The SAC alleges the following about Confidential Witness No. 37 (later identified

25  by plaintiffs as Sandra J. Macika):

26  Paragraph 121:

27     In or around July 2000, according to Confidential Witness No. 37, a
       Senior Quality Engineer in San Jose, customers were canceling

28

orders and sending back inventory that they could not sell to their own clients.

138. On November 3, 2006, Confidential Witness No. 37 (Sandra Macika) was deposed about the information attributed to her in the SAC. Attached as Exhibit 36 is a true and correct of relevant excerpts from the certified copy of the November 3, 2006 deposition of Sandra Macika ("Macika Dep.").

139. Ms. Macika testified as follows about the information attributed to her in Paragraph 121 of the SAC:

- Ms. Macika testified that she was aware of one order being cancelled by one customer in or around July 2000. *Id*. 183:14-20.

- Ms. Macika testified that she only recalled telling plaintiffs that Lucent was the only customer she was aware of that canceled an order. *Id*. 183:14-184:23.

- In response to a question about whether she was busy at JDSU until the time she left, she stated that, "there may have [been] different levels, but I – I always felt like I was busy and had a lot of work to do and there was more work to do than I could – Yes." *Id*. 142:1-7.

140. The SAC alleges the following about Confidential Witness No. 38 (later identified by plaintiffs as Henry Fan):

Paragraph 123:

Confidential Witness No. 38, a Product Line Manager at the former E-TEK plant in San Jose, noted that at or around the time that E-TEK was acquired by JDS in June 2000, there was a decrease in orders at that plant.

141. On October 18, 2006, Confidential Witness No. 38 (Mr. Fan) supplied a declaration about the information attributed to him in the SAC. Attached as Exhibit 37 is a true and correct copy of the October 18, 2006 declaration of Haining "Henry" Fan ("Fan Decl.").

142. Mr. Fan testified as follows about the information attributed to him in Paragraph 123 of the SAC:

First of all, I never held a position as Product Line Manager at the former E-TEK plant in San Jose. So I am not sure whether or not the said Confidential Witness No. 38 refers to me. Secondly, I do not remember there being a decrease in orders at the E-TEK plant at the time when E-TEK was acquired by JDSU.

Fan Decl. ¶ 8 (in part).

143.    The SAC alleges the following about Confidential Witness No. 39 (later identified by plaintiffs as Bert Ramos):

Paragraph 128:

> Finally, Confidential Witness No. 39, a Senior Programmer Analyst in Santa Clara, California, recalled that by late Spring or early Summer of 2000, the Santa Clara plant was running only five days a week (down from seven), almost everyone had their hours reduced, and overtime was no longer available.

144.    On October 14, 2006, Confidential Witness No. 39 (Bert Ramos) supplied a declaration about the information attributed to him in the SAC.  Attached as Exhibit 38 is a true and correct copy of the October 14, 2006 declaration of Alberto "Bert" Ramos ("Ramos Decl.").

145.    Mr. Ramos testified as follows about the information attributed to him in Paragraph 128 of the SAC:

> The above information [Paragraph 128] is incorrect.

Ramos Decl. ¶ 4 (in part).

> I recall speaking to somebody who I thought was a recruiter, and that person asked me about hours at the JDSU Santa Clara plant.  I told him that I had heard from my wife's friend, who worked in the Santa Clara plant, that in the *Summer of 2001* the plant had slowed down.  I have no personal knowledge of how busy the plant was.  I did not tell them that the hours at the plant changed in 2000.  Further, in the Summer of 2000, the Santa Clara plant was an SDL, Inc. plant, not a JDS Uniphase plant.

Ramos Decl. ¶ 5 (emphasis added).

146.    The SAC alleges the following about Confidential Witness No. 47 (later identified by plaintiffs as Bruce Coleman):

Paragraph 165:

> Confidential Witness No. 47, an Order Management Specialist in Ottawa confirmed that demand for JDS products "tailed off" in August 2000.

147.    On February 15, 2007, Confidential Witness No. 47 (Bruce Coleman) supplied a declaration about the information attributed to him in the SAC.  Attached as Exhibit 39 is a true and correct copy of the February 15, 2007 declaration of Bruce Coleman ("Coleman Decl.").

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

42

148.    Mr. Coleman testified as follows about the information attributed to him in

Paragraph 165 of the SAC:

> I do not remember making this statement.  I do not believe that I
> would have said that demand "tailed off" in August 2000.  In
> August 2000, I had only been working for JSDU [sic] for two
> months.  I may have known about demand, but I did not know
> enough to see any patterns or demand changes.  At no time during
> my employment with JDSU did I review or have access to
> information about JDSU demand on a company-wide or even on a
> facility-wide basis.

Coleman Decl. ¶ 5 (in part).

149.    The SAC alleges the following about Confidential Witness No. 49 (later identified

by plaintiffs as Daneanne Leisinger):

Paragraph 173:

> Confidential Witness No. 49, a former materials supervisor at JDS
> in San Jose, whose job responsibilities included supervising six
> stockrooms and an offsite storage facility, also confirmed that there
> was a buildup of a "huge amount" of excess material throughout
> 2000.  The massive buildup of inventory, which far exceeded
> demand, consisted of finished product as well as raw material,
> mostly raw fiber used in fiber optics.  For example, the list of solid,
> firm orders for products at the San Jose plant on the Oracle
> database system was 50-60% below the quantity of material ordered
> from JDS's raw material products suppliers.  All six stockrooms
> were full of inventory by June 2000, and offsite storage areas were
> used for storing additional inventory.  The stockrooms and storage
> area combined amounted to approximately 11,000 square feet of
> storage, and by May or June 2000, there was enough raw material
> and finished fiber optic components to keep the facility running at
> capacity for an entire year.  Moreover, Confidential Witness No. 49
> stated in the offsite storage facility alone, there were fifty pallets of
> finished products that no customer had ordered.

150.    On November 6, 2006, Confidential Witness No. 49 (Daneanne Leisinger) was

deposed about the information attributed to her in the SAC.  Attached as Exhibit 40 is a true and

correct copy of relevant excerpts from the certified copy of the November 6, 2006 deposition of

Daneanne Leisinger ("Leisinger Dep.").

151.    Ms. Leisinger testified as follows:

- Ms. Leisinger has no knowledge about JDSU before the E-TEK merger
  (June 30, 2000).  *Id.* 73:19-74:13.

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

43

1

- Ms. Leisinger recalled that business was good when JDSU and T-TEK merged (June 30, 2000). *Id*. 128 ("I felt it was good. We were shipping and growing as far as employees.")

2

3

- Ms. Leisinger responsibilities were limited to the E-TEK business unit. She has no knowledge about inventory outside of E-TEK. *Id*. 77:13-18; 87:24-90:1; 97:17-21; 110:7-12.

4

5

- Ms. Leisinger is unable to identify when in 2000 the build-up of inventory started. *Id*. 159:12-18.

6

- Ms. Leisinger cannot recall when the slowdown started, though she thinks it was "maybe six months" prior to April 2001. *Id*. 129:22-130:22; 131:3-13. Or maybe the slowdown started six months before she left in Summer 2001. *Id*. 127:9-18.

7

8

9

- Ms. Leisinger is not familiar with accounting for inventory. *Id*. 109:10-16; 89:21-90:1. She did not know what E-Tek's method for calculating excess and obsolete inventory was. *Id*. 110:7-23.

10

11

- Ms. Leisinger clarified that, with respect to the fifty pallets of product that allegedly "no customer had ordered," she doesn't know if there had originally been an order to build. *Id*. 170:14-25 ("It is possible that they did build it to an order.").

12

13

152.    The SAC alleges the following about Confidential Witness No. 50 (later identified

14

by plaintiffs as Denise Chau):

15

Paragraph 174:

16

17

This information was confirmed by Confidential Witness No. 50, a San Jose cost accountant in charge of inventory, who stated that the large build-up of inventory at JDS in 2000 was a result of mass cancellations by Nortel and other companies. According to the accountant, the inventory buildup was out of proportion with the demand for product, and there was a much higher accumulation of both raw material and finished product than there were confirmed orders. Ultimately, in or about March 2001, millions of dollars of the finished product was destroyed as obsolete.

18

19

20

21

153.    On November 10, 2006, Confidential Witness No. 50 (Denise Chau) supplied a

22

declaration about the information attributed to her in the SAC. Attached as Exhibit 41 is a true

23

and correct copy of the November 10, 2006 declaration of Denise N. Chau ("Chau Decl.").

24

154.    Ms. Chau testified as follows about the information attributed to her in

25

Paragraph 174 of the SAC:

26

I did not provide the above information [Paragraph 174] to plaintiffs' lawyers.

27

28

Chau Decl. ¶ 5 (in part).

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

44

1          The job description of Confidential Witness No. 50 sounds like my
     job — however, my work related only to E-TEK and cost
2    accounting responsibilities for E-TEK's inventory.  I did not track
     customer orders or order cancellations.

3    Chau Decl. ¶ 6.

4
           I recall that E-TEK and JDSU merged around June 2000.  There
5    was no build-up of inventory at E-TEK prior to the merger.  There
     were no mass cancellations of orders prior to the merger.
6    Moreover, as I played no role in due diligence for the merger, I had
     no visibility into JDSU inventory prior to June 2000.  After the
7    merger, my responsibilities remained limited to accounting for E-
     TEK inventory and related reserves with no visibility into
8    Company-wide inventory accounting.

9    Chau Decl. ¶ 7.

10
           I specifically remember the late summer and fall of 2000, because I
11   took maternity leave during this time.  I took a leave from work
     from late July 2000 until late October 2000, and I have no personal
12   knowledge of inventory or operations during that time.  Before I
     took my leave of absence, there was no large build-up of inventory
13   at E-TEK and there were no mass cancellations by Nortel or any
     other customer.

14   Chau Decl. ¶ 8.

15         After I returned from leave in late October 2000, my
     responsibilities remained limited to E-TEK inventory accounting
16   and monthly profit in inventory calculations.  By that time, the
     books for the quarter ending September 30, 2000, (*i.e.*, Q1 2001)
17   had already been closed and my work was focused on inventory
     calculations for the next quarter ending December 31, 2000 (*i.e.*,
18   Q2 2001).

19   Chau Decl. ¶ 9.

20         I do not recall Nortel cancellations in 2000.  I do recall an increase
     in inventory at the Company as well as order cancellations at some
21   point in time, but I believe that may have happened in calendar year
     2001.  Indeed, when I returned from my leave in late October 2000,
22   I recall that business was good.

23   Chau Decl. ¶ 10.

24         I was in a position to know if "the inventory buildup was out of
     proportion with the demand for product," because the inventory
25   reserves on which I worked would have included consideration of
     such information.  However, I only would have known this as it
26   related to E-TEK inventory reserve calculations.  In my experience,
     E-TEK had a conservative approach to accounting for its reserves
27   based on customer demand and the aging of inventory.  I worked
     with excess and obsolete inventory reports and I believe that E-
28   TEK properly reserved for inventory.  I also provided inventory

DECL. OF S. ZELLER I/S/O JDSU DEFS.' MOT. RE SANCTIONS PURSUANT TO RULE 11
MASTER FILE NO. C–02–1486 CW (EDL)
pa-1213737

45

1

> schedufles [sic] to the external auditors and my understanding was that they audited and approved the reserves taken.

2

Chau Decl. ¶ 11.

3

4

5

6

> I was not in the position to know about "confirmed orders." I do recall that the Company made product that was customer specific that later some customers didn't want. I do not recall whether millions of dollars worth of finished product was destroyed in or around March 2001. However, this is inconsistent with my recollection as material was scrapped from time to time as necessary and in the ordinary course of business.

7

Chau Decl. ¶ 12.

8

      155.    Attached as Exhibit 42 is a true and correct copy of an advertisement that I am

9

informed and believe plaintiffs ran in newspapers in areas where JDSU operated plants.

10

11

    I declare under penalty of perjury under the laws of the United States of America that the

12

foregoing information is true and correct and that this declaration was executed in Palo Alto,

13

California, on this 14th day of December 2007.

14

15

                                        _____/s/ Stephanie L. Zeller_____
                                             Stephanie L. Zeller

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

46

1         I, Jordan Eth, am the ECF User whose ID and password are being used to file the

2    Declaration Of Stephanie L. Zeller In Support Of The JDSU Defendants' Motion For Sanctions

3    Pursuant To Rule 11 Of The Federal Rules of Civil Procedure.  In compliance with General

4    Order 45, X.B., I hereby attest that Stephanie L. Zeller has concurred in this filing.

5    Dated:  December 14, 2007                MORRISON & FOERSTER LLP

6

7    By:         /s/ Jordan Eth         
                        Jordan Eth

8    Attorneys for the JDSU Defendants

Decl. of S. Zeller I/S/O JDSU Defs.' Mot. Re Sanctions Pursuant To Rule 11
Master File No. C–02–1486 CW (EDL)
pa-1213737

47