1  Joseph J. Tabacco, Jr. (75484)
   Christopher T. Heffelfinger (118058)
2  BERMAN DeVALERIO PEASE
     TABACCO BURT & PUCILLO
3  425 California Street, Suite 2100
   San Francisco, California 94104-2205
4  Telephone:    (415) 433-3200
   Facsimile:     (415) 433-6382
5
6  Liaison Counsel for Lead Plaintiff
   Connecticut Retirement Plans and Trust Funds
7
   Barbara J. Hart
8  Mark S. Arisohn
   Anthony J. Harwood
9  Michael W. Stocker (179083)
   Stefanie J. Sundel
10 LABATON SUCHAROW LLP
   140 Broadway
11 New York, New York 10005
   Telephone:    (212) 907-0700
12 Facsimile:     (212) 818-0477
13
   Lead Counsel for Lead Plaintiff Connecticut
14 Retirement Plans and Trust Funds

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

|  |  |
|---|---|
| IN RE JDS UNIPHASE CORPORATION SECURITIES LITIGATION | Master File No. C 02-1486 CW (EDL) |
|  | CLASS ACTION |
| This Document Relates To:<br>        All Actions | **DECLARATION OF MARK S. ARISOHN IN OPPOSITION TO JDSU DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11** |
|  | Date:     n/a<br>Time:     n/a<br>Ctrm:     2, 4th Floor<br>Before:   Hon. Claudia Wilken |

I, Mark S. Arisohn, declare as follows:

1.  I am a partner with the New York law firm of Labaton Sucharow LLP, counsel for Lead Plaintiff Connecticut Retirement Plans and Trust Funds ("Lead Plaintiff" or "Connecticut").  I respectfully submit this declaration in further support of Lead Plaintiff's Opposition to the JDSU Defendants' Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 ("Defendants' Motion").  I make this Declaration based on personal knowledge. If called as a witness, I would testify to the facts set forth below.

## Background

2.  The investigations underlying the allegations in the Second Amended Complaint ("SAC") took place more than four years ago, in 2002 and 2003.  Interviews of confidential witnesses were conducted by professional investigators and by attorneys with this firm, who spent hundreds of hours diligently investigating the facts of this case. Records of these interviews include notes from telephone calls, internal email, memoranda, and reports.

3.  In several instances witnesses came forward on their own volition to make statements to counsel for Plaintiffs.

4.  Counsel for Lead Plaintiff has made every effort to locate all materials relating to the investigations underlying the SAC. However, since the case was commenced more than five years ago, many of the investigating attorneys have left the firm, one of the investigating firms dissolved, and the law firm itself, including all of its records, moved offices.  Accordingly, the documentary record relating to the investigations may be incomplete.

## Allegations Relating to Confidential Witnesses

5.  Only 13 of the confidential witnesses referred to the Declaration of Stefanie L. Zeller in Support of the JDSU Defendants' Motion for Sanctions Pursuant to Rule 11 of the Federal Rule of Civil Procedure ("Zeller Declaration") were deposed.  The remainder of the Zeller Declaration challenges allegations in the SAC by citing to declarations obtained by defense counsel from confidential witnesses who were not deposed.  These declarations were obtained approximately four years after the confidential witnesses spoke to Plaintiffs' representatives.  The  testimony of Daneanne Leisinger, a confidential witness who was

1  deposed, exposes the methodology defense counsel used to obtain these declarations. Ms.

2  Leisinger met twice with Ms. Zeller (November 6, 2006 Deposition of Daneane Leisinger

3  (excerpts attached as Exhibit A to this Declaration) at 180:21-22) and during each meeting Ms.

4  Zeller took notes (183:23-184:2). Ms. Zeller prepared a declaration for Ms. Leisinger to sign,

5  but Ms. Leisinger refused to sign it because it contained many inaccuracies (186:8-19).

6  Subsequently, Ms. Zeller sent Ms. Leisinger a letter advising that if she did not sign a

7  declaration, she would have to be served with a subpoena and undergo the inconvenience of a

8  deposition. (Exhibit 540 to the Leisinger Dep., attached as Exhibit B to this Declaration).

9       6.       The SAC alleges the following about Confidential Witness No. 1 (later

10  identified as Matthew P. Voicheck):

11      Paragraph 11:

12          From the beginning of the Class Period until at least June 2000, top
            JDS management at its Horsham, Pennsylvania facility engaged in
13          blatant fraud in order to artificially inflate sales. According to
            Confidential Witness No. 1, a production planner at the Horsham
14          plant, during the last weekend of every quarter, JDS Horsham
            executives watched while employees packed inventory on trucks,
15          which inventory would then be returned to JDS, unopened, a few
            weeks later. This scheme was approved by Eitan Gertel ("Gertel"),
16          the founder, vice president and general manager of JDS's
            Transmission Subsystem Division ("TSD") in Horsham, who
17          reported to defendant Kalkhoven.

18      Paragraph 70 :

19          Beginning no later than the first quarter of fiscal 2000 (the quarter
            ending September 30, 1999) and lasting at least through the quarter
20          ending June 30, 2000, top management at JDS's Horsham,
            Pennsylvania plant, one of the five largest JDS plants in the United
21          States, engaged in a deceptive scheme to artificially inflate its
            sales. According to Confidential Witness No. 1, a production
22          planner at the Horsham plant, during the last weekend of every
            quarter, JDS executives watched while employees packed $1 to $3
23          million of products onto trucks from Hatboro Delivery Service
            ("Hatboro") in order to meet the plant's sales target. Confidential
24          Witness No. 1 added that the products were either delivered to a
            Hatboro warehouse or dropped off at a Federal Express or UPS
25          facility for temporary storage. This inventory was then picked up
            by a JDS truck and returned, unopened, to the Horsham plant a few
26          weeks later.

27      Paragraph 73 :

28          Both Confidential Witness No. 1 and 7 confirmed that this practice
            was approved by Eitan Gertel, the founder and general manager of

JDS's TSD division in Horsham who reported to defendant Kalkhoven.

7.      With respect to paragraphs 11 and 73 of the SAC, Voicheck confirmed at his deposition that the first sentence of paragraph 11 "looks familiar" to him (November 30, 2006 Deposition of Matthew Voichek (excerpts attached as Exhibit C to this Declaration) at 76:20-23), and that "we would fill up trucks at the end of the quarter; and it was strictly for financial reasons, they were not accurate orders, then the trucks would come back.  That was, like the talk of the group.  These orders were just to make that quarterly target….The units were eventually going to be returned to JDS.  The orders were processed to meet the financial targets for that end of the quarter." (Id. at 69:7-21.)   And although Voicheck admitted at his deposition that he had reported what amounted to a rumor, he also testified that the rumor was not limited to a single quarter, but extended to "the quarters that I can recall during the time that I was employed there, based on us having to hit a certain number to go home." (Id. at 78:13-20).  Further, Voicheck confirmed that the second sentence of paragraph 11 of the SAC "matches the rumor" he reported.  Regarding Eitan Gertel, Voicheck testified that "I don't remember saying verbatim, 'Eitan approved this scheme'" (Id. at 82:10-11), but he never specifically denied that he did say that.

8.      Attorney notes of an interview with this witness on  July 24, 2003 confirm his statements regarding a practice at Horsham of packing $1-3 million in products in trucks at the end of every quarter, and that the trucks then "found their way back" to JDSU.  The notes reflect that this witness stated that company executives looked on while this took place.  The notes show that this witness stated that this information was specifically known to Eitan Gertel, and that this practice was underway before he began work at JDSU in November of 2000.

9.      Paragraph 57 of the SAC alleges the following about Confidential Witness No. 2 (later identified as Jeff Drothler):

Paragraph 57:

> According to Confidential Witness No. 2, a JDS Account Manager at the Company's San Jose facility, because JDS's products were manufactured to each customer's unique specifications, if JDS produced more product than any given customer actually needed, those products could not be sold to others.

Paragraph 120 (in relevant part):

> And Confidential Witness No. 2, an Account Manager in San Jose, confirmed that by late Spring 2000, there was widespread' "pushing out" of orders for JDS products by both large and small customers.

Paragraph 151:

> Indeed, Confidential Witness No. 2, a JDS account manager, noted that by mid-2000 "it became obvious that previous forecasts, based on 1999 information, were fast becoming obsolete, that they were overly optimistic."

10.     With respect to paragraph 57 of the SAC, Drothler testified at his deposition that the "information [in the paragraph] is consistent with my view of things" (December 1, 2006 Deposition of Jeffrey Drothler (excerpts attached as Exhibit D to this Declaration) at 99:12-13), although he did not recall if he had made the exact statement attributed to him in the SAC (Id. at 100:5-6).  Regarding paragraph 151 of the SAC, Drothler testified that with respect to the words in quotes attributed to him, "I can't be certain, but I may have" told that to plaintiffs. (Id. at 133:1-4)

11.     A June 12, 2002 investigator report confirms that this witness stated in an interview that, inter alia,  customers were pushing out demand as early as mid-2000, and that forecasts were overly optimistic by September of 2000.

12.     The SAC alleges the following about Confidential Witness No. 4 (later identified as Maureen Gainey):

Paragraph 59 (in relevant part):

> Indeed, Confidential Witness No. 4, a JDS assembly line worker in Bloomfield, confirmed that JDS had a "no inventory" policy for finished product at its own plants, meaning that finished product produced by JDS was shipped immediately and often held in its customers' inventory until needed.

Paragraph 61:

> According to Confidential Witness No. 4, JDS kept close track of how much inventory was at customer locations so that when the customer pulled down the product, JDS would manufacture to replace that product.

Paragraph 91:

1    In response to the reduced demand for its products, beginning no
     later than March or April of 2000, JDS engaged in practices that
2    materially overstated its reported revenues (as set forth in its SEC
     filings for the quarters ending March 30 and June 30, 2000) by
3    repeatedly shipping products to customers after the customers had
     cancelled the orders. According to Confidential Witness No, 4, an
4    assembly line worker on JDS's wavelocker product in Bloomfield,
     Connecticut, JDS shipped products to cancelled orders once or
5    twice a month.

6        13.    All of the statements attributed in the SAC to this witness are consistent with a

7    June 2, 2003 investigator memorandum.

8        14.    The SAC alleges the following about Confidential Witness No. 5 (later identified

9    as Robert M. Gallagher):

10       Paragraph 62:

11           Confidential Witness Nos. 5 (a Logistics Analyst in West Trenton,
             New Jersey), 6 (an accountant in Windsor, Connecticut), and 7 (a
12           controller in Horsham, Pennsylvania) confirmed that throughout
             the Class Period, JDS's internal inventory of finished and
13           unfinished product was tracked very closely through the use of a
             computerized system designed by Oracle. The Oracle system
14           provided current information on inventory levels, customer orders
             and shipments.  As admitted by Defendant Muller during a July 26,
15           2000 conference call, this information was available to "all parts of
             the Company" and was accessible to each of the Individual
16           Defendants.

17       Paragraph 90:

18           Finally, according to Confidential Witness No. 5, a former
             Logistics Analyst at a JDS plant in West Trenton, New Jersey (one
19           of JDS's top five plants in the United States), in or around April
             2000, Lucent and Nortel – the Company's two biggest customers –
20           declined to take delivery on orders, leaving that facility with
             approximately $40 million in excess inventory.

21
         Paragraph 119:
22
             Confidential Witness No. 5, the West Trenton Logistics Analyst,
23           stated that by mid-2000, "no firm orders were coming in" even
             from the Company's most established customers like Lucent,
24           Cisco and Nortel. According to Confidential Witness No. 5,
             "visibility" was not high, meaning that by mid-2000, JDS officials
25           could not say with a high degree of confidence that firm orders
             would be coming in with regularity. Confidential Witness No. 5
26           added that at or around that same time, two of the biggest users of
             JDS's OC-192 product, Lucent and Nortel, were canceling orders
27           and refusing deliveries on orders.

28       Paragraph 169:

---

So, too, Confidential Witness No, 5, the Logistics Analyst at JDS's West Trenton facility, stated that by the Fall of 2000, orders were only "trickling in."

15.     With respect to paragraph 62 of the SAC, Gallagher confirmed at his deposition that in speaking with plaintiffs, he would have "indicated the use of Oracle" but did not know "that I would have tied it to any specific period of time it was used." (August 7, 2006 Deposition of Robert Gallagher (Excerpts attached as Exhibit E to this Declaration) at 108:17-21).  Only when shown documentation establishing the time frame for use of Oracle did Gallagher agree he would not have reported the time frame reflected in paragraph 62 of the SAC "because that would have been incorrect."  (Id. at 109:6-8).   Regarding paragraphs 90 and 169 of the SAC, Gallagher acknowledged at his deposition that the dates referred to were "inaccurate" but there is no testimony that he did not provide the "inaccurate" dates to the plaintiffs. (Id. at 110:6-23).  Gallagher was never questioned about paragraph 119 of the SAC.

16.     A May 31, 2002 investigator's memorandum reflects that this witness stated in an interview that inventory was routinely tracked via a JDS intranet website. He also stated that he used Oracle to track inventory.  He further stated that he worked at the company for the bulk of the class period--from Feb 2000 to October 2001. A June 11, 2002 investigative memorandum notes further reflect that Gallagher said that by the summer of 2000 "no firm orders were coming in".

17.     The SAC alleges the following about Confidential Witness No. 6 (later identified by plaintiffs as Herbert Marone):

Paragraph 62:

Confidential Witness Nos. 5 (a Logistics Analyst in West Trenton, New Jersey), 6 (an accountant in Windsor, Connecticut), and 7 (a controller in Horsham, Pennsylvania) confirmed that throughout the Class Period, JDS's internal inventory of finished and unfinished product was tracked very closely through the use of a computerized system designed by Oracle. The Oracle system provided current information on inventory levels, customer orders and shipments.  As admitted by Defendant Muller during a July 26, 2000 conference call, this information was available to "all parts of the Company" and was accessible to each of the Individual Defendants.

1        18.     With respect to paragraph 62 of the SAC,  Marone did not recall speaking with

2   plaintiffs' representatives at all about anything. (November 8, 2006 Deposition of Herbert

3   Marone (Excerpts attached Exhibit F to this Declaration) at 62:8-10).  However, I have

4   reviewed an interview report prepared on May 29, 2002 reflecting that Marone did speak about

5   JDSU from his residence by telephone to an investigator employed by counsel.  And whether or

6   not Oracle was used throughout the class period, Marone testified at his deposition that he

7   "could not say for sure." (Id. 65:8-13).  According to the same notes, Marone started work at

8   JDSU in September of 2000. Marone also stated that inventory "was well tracked on Oracle".

9        19.     The SAC alleges the following about Confidential Witness No. 7 (later identified

10  by plaintiffs as Bryan F. Guckavan):

11      Paragraph 62:

12          Confidential Witness Nos. 5 (a Logistics Analyst in West Trenton,
            New Jersey), 6 (an accountant in Windsor, Connecticut), and 7 (a
13          controller in Horsham, Pennsylvania) confirmed that throughout
            the Class Period, JDS's internal inventory of finished and
14          unfinished product was tracked very closely through the use of a
            computerized system designed by Oracle. The Oracle system
15          provided current information on inventory levels, customer orders
            and shipments.  As admitted by Defendant Muller during a July 26,
16          2000 conference call, this information was available to "all parts of
            the Company" and was accessible to each of the Individual
17          Defendants.

18      Paragraph 72:

19          In addition, Confidential Witness No. 7, a former controller of the
            Horsham plant, confirmed that Hatboro picked up fiber optic
20          components at the end of a fiscal quarter and that those products
            were returned to JDS shortly after the beginning of the next
21          quarter.

22      Paragraph 73 (in relevant part):

23          Both Confidential Witness No. 1 and 7 confirmed that this practice
            was approved by Eitan Gertel, the founder and general manager of
24          JDS's TSD division in Horsham who reported to defendant
            Kalkhoven.
25
        Paragraph 118:
26
            JDS's problems were by no means confined to Bloomfield.
27          Confidential Witness No. 7, the former Horsham Controller (one
            of JDS's five largest plants in the U.S.), stated that business took a
28          "nose-dive" in the fourth quarter of fiscal year 2000 (i.e., quarter

---

ending June 30, 2000), with revenue declining by approximately
70% during that quarter.

Paragraph 175:

Similarly, Confidential Witness No. 7, the controller in Horsham,
recounted that JDS's inventory of raw material and finished goods
was building in the first quarter of 2001 (i.e., quarter ending
September 30, 2000) as a result of customer cancellations.

20.     With respect to paragraphs 62, 72, 73, 118 and 175 of the SAC, Bryan

Guckavan,  signed a declaration (attached as Exhibit 9 to the Zeller Decl.) in 2006 stating that

he "did not recall ever speaking to anybody about this case" and claims that he did not provide

any of the information attributed to him in these paragraphs of the SAC.

21.     In fact, July 24, 2002 notes by a professional investigator reflect that Guckavan

spoke at length about the Company to Counsel for Lead Plaintiff.  These July 24, 2002

investigator notes reflect that Guckavan worked at JDSU from April of 2000 to June of 2001.

The notes reflect, inter alia, that Guckavan stated that an Oracle system was used to track

inventory while he was at JDSU, that the Hatboro delivery service picked up fiber optic

components at the end of a fiscal quarter and that those products were returned to JDS shortly

after the beginning of the next quarter and that this practice was known to Eitan Gertel, founder

and General Manager of the Horsham division.

22.     The SAC alleges the following about Confidential Witness No. 8 (later identified

by plaintiffs as Sandra M. Thompson):

Paragraph 63:

Moreover, Confidential Witness No. 8, an Executive Assistant to a
high level officer in JDS's corporate headquarters in San Jose,
whose desk was located outside the offices of defendants
Kalkhoven and Muller, stated that weekly sales and inventory
reports from the Oracle system were generated into hard copy.
Those reports were distributed to JDS senior executives, including
defendant Muller, who shared the information with defendant
Kalkhoven. Moreover, Confidential Witness No. 8 added that
anyone with access to the Oracle system (including all senior
management) was able to get daily updates, which included orders
placed at every division throughout the company.

Paragraph 224:

Significantly, Kalkhoven's September 29, 1999 Employment
Agreement provided that he did not have to return the Company's

1         property including all "books, manuals, records, reports, notes,
contracts, lists, blueprints, and other documents, or materials, or
2         copies thereof, and equipment furnished to or prepared by
Employee" until termination of employment. The Amended
3         Employment Agreement did not alter that provision. Because
Kalkhoven remained an employee of JDS through July 31, 2001,
4         he was permitted to retain JDS property until that time. In fact,
according to Confidential Witness No. 8, an Executive Assistant in
5         JDS's executive suite in San Jose whose desk was located outside
of Kalkhoven's office, Kalkhoven retained his office and computer
6         and came to the office even after his announced retirement. Thus,
his massive sales of JDS stock in August 2000 and February 2001
7         were made as an insider, and after he was provided access to the
Oracle System's non-public information regarding demand, sales
8         and inventory.

9      Paragraph 399(b):

10         According to Confidential Witness No, 8, Muller and Kalkhoven
received weekly hard copy sales and inventory reports from the
11         Oracle system. Muller came into IT and would "request reports all
the time." Muller's office was next to Kalkhoven's and the two of
12         them constantly discussed developments including sales and
inventory. Moreover, Kalkhoven was "very hands on and aware of
13         everything going on in the company," Kalkhoven often flew to
Ottawa to meet with Straus and was constantly walking "up and
14         down the hall" to see what was going on.

15     23.     With respect to paragraphs 63, 224 and 399(b) of the SAC, Sandra M.

16 Thompson, signed a declaration (Zeller Exhibit 10) in 2006 stating that "I do not remember

17 [the] conversation exactly" she had with an attorney or investigator for plaintiffs "several years

18 ago." Although Ms. Thompson states that the information attributed to her in the first sentence

19 of paragraph 63 of the SAC "is not accurate" she does not claim that she did not provide the

20 information. She does make that claim with respect to the information contained in the

21 remaining paragraphs of the SAC referenced above, but her declaration speaks about her lack of

22 recollection, not that the allegations are incorrect.

23     24.     According to attorney notes of a May 14, 2003 interview with this witness, Ms.

24 Thompson stated, inter alia, that she was very familiar with the Oracle system and understood

25 that senior management, in particular Muller and Kalkhoven, had access to it. She knew that the

26 information on the system was from every division in the company. She also stated that

27 Kalkhoven and Muller spoke frequently about sales and inventory, received hard copies of

28 weekly sales and inventory reports, and that Kalkhoven often flew to Ottawa to speak to Straus.

25.     The SAC alleges the following about Confidential Witness 9, later identified as Manjeet Ner:

Paragraph 65:

> According to Confidential Witness No. 9, a JDS Senior Product Line Manager in Ottawa, Nortel, one of JDS's largest customers, had a consignment arrangement with JDS whereby Nortel would keep JDS products on its shelf until they were "pulled in" as needed.

Paragraph 127:

> Confidential Witness No. 9, a Senior Product Line Manager in Ottawa, stated that in the Summer of 2000, senior people in Ottawa, including Senior Vice President Joe Ip (who sold $80.6 million of JDS stock in August 2000), stated on various occasions that JDS had over-capacity, was building too much inventory, and that they didn't know what they were going to do with the products they were building. This slowdown related to WDM filters – JDS's top revenue producing product in Ottawa.

Paragraph 172:

> As noted above, Nortel, JDS's largest customer of WDM filters, had a consignment arrangement with JDS whereby Nortel would keep JDS products on its shelf until they were "pulled in" as needed. According to Confidential Witness No. 9, a Senior Product Line Manager in Ottawa, Nortel cancelled orders in the Summer of 2000 and JDS's inventory started to build up. In response, JDS desperately tried to get Nortel to agree to pay for the inventory on their shelves, even though Nortel did not currently need the product.

Paragraph 399(d):

> According to Confidential Witness No. 9, a Senior Product Line Manager in Ottawa, Senior Vice President Joe Ip knew about and verbally acknowledged the Company's overcapacity and excess inventory in the Summer of 2000. Confidential Witness No. 9 added that Ip was very close to defendant Straus and that Straus knew about the slowdown as well.

26.     With respect to paragraph 64, 65, 127, 172 and 399(d) of the SAC, Manjeet Ner, identified as Confidential Witness No. 9, signed a declaration (Zeller Exhibit 11) in 2006 stating that she spoke to a representative of the Plaintiffs "about three years ago" and "I do not remember what exactly we discussed."  Nonetheless, Ms. Ner confirms that she spoke to Plaintiffs' representative about the matters referred to in paragraph 64 of the SAC (although none of the information in that paragraph is attributed to her).  Regarding paragraphs 65, Ms.

1  Ner confirms that the "information sounds generally correct" and that she "may have told the

2  plaintiffs' lawyer this information."  Despite her lack of recollection about what was discussed,

3  Ms. Ner states that she did not provide the information in paragraph 127, 172 and 399(d) to

4  Plaintiffs' attorney.

5        27.    The statements attributed to Ms. Ner in the SAC are well supported by notes of

6  an interview with her conducted by an attorney on September 12, 2003.

7        28.    The SAC alleges the following about Confidential Witness No. 10 (later

8  identified as Ronald Blachman):

9        Paragraph 66:

10             Similarly, according Confidential Witness No. 10, a JDS
               engineering manager in Bloomfield, Connecticut, JDS had the
11             same arrangement [consignment] with Lucent, another of JDS's
               major customers.
12
       Paragraph 89:
13
               Likewise, Confidential Witness No, 10, an Engineering Manager
14             in Bloomfield, stated that in or around the Spring of 2000,
               customers began to reduce their monthly requirements of JDS
15             products and, in some months, asked that no product be shipped at
               all.
16
       Paragraph 101:
17
               Further, according to Confidential Witness No. 10, an Engineering
18             Manager in Bloomfield, Connecticut, by the Spring of 2000,
               Lucent's inventory of JDS products had built up to the point that
19             they had no room to store additional products, prompting Lucent to
               ask JDS to hold its inventory rather than ship it to Lucent as had
20             been done in the past.

21     Paragraph 111:

22             According to Confidential Witness No. 10, in response to
               customers pushing out delivery dates in the Spring of 2000, JDS
23             negotiated an agreement with Lucent in the Summer of 2000,
               whereby Lucent agreed to take wavelocker products (priced at
24             $350 to $1,000 each) it did not currently need with the right to
               return if a need did not develop.
25
         29.    With respect to paragraph 64, 66, 89, 101 and 111 of the SAC Blachman signed
26
   a declaration (Zeller Exhibit 12) in 2006 stating that he spoke to plaintiffs "a couple of years
27
   ago."  Paragraph 64 of the SAC does not attribute anything to Confidential Witness No. 10
28

1   (Blachman).  Aside from the broad and conclusory claim that he had no knowledge of

2   "improper shipping tactics or inventory treatment," Blachman does not deny providing the

3   specific information attributed to him.  He does deny providing information that the SAC

4   specifically attributes to other confidential witnesses: paragraph 92 (Confidential Witness No.

5   21), paragraph 117 (Confidential Witness No. 34), paragraph 133 (Confidential Witness No.

6   41).

7         30.   The statements attributed to Blachman in the SAC are well supported by attorney

8   notes of an interview with this witness dated May 6, 2003.  In particular, Blachman stated

9   during his interview that if there was fraud at JDSU, it was because management was afraid of

10   reporting bad results.

11         31.   The SAC alleges the following about Confidential Witness No. 11 (later

12   identified by plaintiffs as Sopheap Khieu):

13       Paragraph 64:

14           Throughout the Class Period, JDS's revenues were materially
        overstated in violation of GAAP due to the improper recognition of
15           revenue on products that it shipped to its customers with full rights
        of return and the understanding that the customer would hold the
16           product in its inventory until needed and would not take ownership
        of the products nor become obligated to pay for them until such
17           later time.

18       Paragraph 67:

19           Confidential Witness No. 11, a Senior Manufacturing Engineer in
        JDS's San Jose facility, confirmed that JDS would ship a large
20           amount of product to its customers and the customers, in turn,
        would store the product in their own stockrooms, Confidential
21           Witness No. 11 stated that under JDS's agreements with its many
        customers, even though the customers had taken possession of the
22           product, they were not liable for payment until the product was
        actually used.

23       Paragraph 85:
24
25           Likewise, Confidential Witness No. 11, a Senior Manufacturing
        Engineer in San Jose, stated that during that same time period,
26           employees at JDS became aware that "demand had come to a halt."

27         32.   With respect to paragraphs 64, 67 and 85 of the SAC, Khieu signed a declaration

28   (Zeller Exhibit 13) in 2006 stating that he spoke to someone about the case "more than a year

1  ago."  He claims that he did not provide the information contained in paragraph 64 of the SAC,

2  but that paragraph does not attribute any information to Mr. Khieu.  He confirms that the first

3  part of paragraph 67 "is consistent with what I told the plaintiffs' attorneys."  However, he says

4  that the second part "is not consistent with what I remember or with what I told the plaintiff's

5  attorneys."

6       33.     The statements attributed in the SAC to this witness, in particular his statements

7  about consignment arrangements and demand, accurately reflect the content of attorney notes of

8  an interview dated May 31, 2002.

9       34.     The SAC alleges the following about Confidential Witness No. 12 (later

10  identified by plaintiffs as John Wetherill):

11       Paragraph 71:

12            Confidential Witness No. 12, the former CEO of Hatboro, located
in Warrington, Pennsylvania, confirmed this fraudulent practice;

13            stating that his company would pick up approximately 40 or 50
cartons of product from the JDS Horsham facility at the end of a

14            quarter. The product was delivered to a storage facility where it
would be picked up by JDS a few weeks later — intact and

15            unopened — and returned to the Horsham plant.

16       35.     With respect to paragraph 71 of the SAC, Wetherill was never asked at his

17  deposition specifically about the allegations in this paragraph attributed to him.  However,

18  Wetherill's testimony about picking up 40 to 50 cartons of product from JDSU and then

19  returning that product to JDSU is not as definitive as represented in the Zeller Declaration, at

20  ¶ 58.  Although (as cited by Zeller) Wetherill did testify at one point in his deposition that he

21  did not have an "independent recollection" about this matter  (October 17, 2005 Deposition of

22  John Wetherill (attached as Exhibit G to this Declaration) at 94:11-19), Wetherill also testified

23  at his deposition (not cited by Zeller) that there was "a time before the end of the quarter

24  [meaning June 30] when 40 or 50 cartons of product were picked up and returned.  (Id. at 93:18-

25  25).

26       36.     In any event, May 19, 2003 investigator notes of an interview with this witness

27  support all of the statements attributed to him in the SAC.

28

37.     The SAC alleges the following about Confidential Witness No. 13 (later identified by plaintiffs as John P. Libby):

Paragraph 74:

> The illegal practice described above was **not** confined to JDS's Horsham facility. Confidential Witness No. 13, who tested OC-48 modulators at the Bloomfield facility before they were shipped out, reports that in the Summer of 2000 he heard that trucks were leaving the Bloomfield plant full of products near the end of the quarter and then returning with the same product at the start of the next quarter, "jury-rigging the books" and "shipping to make the books look good."

38.     With respect to paragraph 74 of the SAC, Libby testified at his deposition that he did not personally witness the activities described in this paragraph.  That testimony is completely consistent with what is alleged in paragraph 74 of the SAC, namely that he "<u>heard</u> that trucks were leaving the … plant full of products near the end of the quarter and then returning with the same product at the start of the next quarter…."  (Emphasis supplied.)  Moreover, when asked directly about paragraph 74 of the SAC, Libby testified that the material attributed to him "sounds like something I would have said." (August 8, 2006 Deposition of John Libby, attached as Exhibit H to this Declaration, at 65:4-9).  Specifically, Libby confirmed at his deposition that while he did not specifically recall using the phrases  "jury rigging the books" or "shipping to make the books look good" during his interview, it is "quite possible" that he did say these things. (Id. at 66:21 – 67:21)  And although Libby was unsure of the "summer of 2000" time reference, he did recall "it was warm out." (Id. at 65:18 – 66:7).

39.     The statements attributed to Libby in the SAC, including the use of specific phrases like "jury-rigging the books" are accurately reflected in attorney notes of an interview dated May 9, 2003.

40.     The SAC alleges the following about Confidential Witness No. 14 (later identified by plaintiffs as David G. Marcellus):

Paragraph 77:

> Confidential Witness No. 14, a former manufacturing engineer at JDS's Trenton, New Jersey plant, stated that there appears to have been a deliberate delay of delivery on components or modules to a subsequent quarter in order to make the numbers for the later quarter look better.

41.     With respect to paragraph 77 of the SAC, Marcellus signed a declaration (Zeller Exhibit 16) in 2006 stating that JDSU laid him off on July 6, 2000 and that some time after he was laid off he spoke to someone about a civil suit against the company, but claims he said he "didn't know anything."  He claims that he did not provide the information attributed to him in paragraph 77 of the SAC.

42.     In fact, according to July 24, 2002 notes of an interview with this witness, he indeed  said during his interview that there "might have been" an attempt to delay deliveries to a subsequent quarter.

43.     The SAC alleges the following about Confidential Witness No. 15 (later identified by plaintiffs as Anthony C. Boncore, Jr.):

Paragraph 78:

> Similarly, Confidential Witness No. 15, a JDS Research Engineer at the Company's Bloomfield facility, stated that JDS commonly pushed shipments to later quarters once the Company satisfied its internal goals for that quarter. Specifically, Confidential Witness No. 15 recalled that, early in the Class Period, JDS delayed shipping into the next quarter Wavelockers to Lucent and OC-48s to Ciena into the next quarter once it had already made its numbers for the current quarter.

44.     With respect to paragraph 78 of the SAC,  the Zeller Declaration concedes that Boncore confirmed at his deposition that he made the statements attributed to him in this paragraph of the SAC.  Zeller Decl. ¶ 66.   Indeed, Boncore testified that he told Plaintiffs' representative that "JDS commonly pushed shipments to later quarters once the Company satisfied its internal goals for that quarter."  (September 27, 2006 Deposition of Anthony Boncore (excerpts attached as Exhibit I to this Declaration) at 107:10-21)  According to Boncore, this practice began in 1996 and continued throughout Mr. Boncore's tenure.  (Id. at 108:14-25)  Boncore also specifically confirmed that he told Plaintiffs' representative that "early in the class period, JDS delayed shipping into the next quarter, Wave Lockers to Lucent and OC48s to Sienna [sic] into the next quarter once it already made its numbers for the current quarter."  (Id. at 116:25 – 117:10).

45.     The SAC alleges the following about Confidential Witness No. 18 (later

identified as Diana C. Burns):

Paragraph 84 (in relevant part):

> According to Confidential Witness No. 18, an Information
> Technology Engineer at JDS's San Jose facility in or around
> March 2000, JDS employees began to talk about declining demand
> for the Company's products.

46.     With respect to paragraph 84 of the SAC, Diana C. Burns, testified at her

deposition that the SAC paragraph was "accurate," that it "captures what [she] told the

investigators," and that she "stand[s] behind it." (November 2, 2006 Deposition of Diana Burns

(excerpts attached as Exhibit J to this Declaration) at 106:4 – 107:5).

47.     The SAC alleges the following about Confidential Witness No. 19 (later

identified by plaintiffs as Jeff Nguyen):

Paragraph 84 (in relevant part):

> Moreover, Confidential Witness No. 19, a Senior Financial
> Analyst in San Jose confirmed that order cancellations in the San
> Jose plant – the Company's largest plant in the United States –
> began in earnest in March or April 2000.

Paragraph 122:

> Confidential Witness No. 19, a Senior Financial Analyst at the San
> Jose Facility, stated that by mid-2000, orders from major
> customers such as Nortel, Ciena, Alcatel and ONI Systems began
> to dry up.

48.     With respect to paragraphs 84 and 122 of the SAC, Jeff Nguyen, signed a

declaration (Zeller Exhibit 20) in 2006 stating that he spoke to an investigator "around 2002."

He recalls telling the investigator that he did not "have any information that would be helpful to

plaintiffs" and denies providing the information attributed to him in these paragraphs.

49.     The statements attributed to Nguyen  in these paragraphs are accurately reflected

in a May 29, 2002 investigator memorandum regarding his interview.

50.     The SAC alleges the following about Confidential Witness No. 20 (later

identified by plaintiffs as Mark Tybor):

Paragraph 86:

So, too, Confidential Witness No. 20, a Clean Room Technician at the Bloomfield plant, stated that the downturn in JDS's business started "right after winter" 2000. Cisco, Lucent, Ciena and Alcatel cancelled orders once or twice every 1 ½ or two weeks beginning in March and April 2000. Indeed, rooms of inventory were stacked up in the Bloomfield plant, requiring JDS to move people to another building to make room for all of the product and equipment lying around.

Paragraph 93:

Likewise, Confidential Witness No. 20, a Clean Room Technician in Bloomfield, was told by his supervisor, Brett Shanaman, in March or April 2000 that an order was cancelled but was to be filled anyway. The order was for between 36 and 48 modulators.

51.     With respect to paragraph 86 of the SAC, Mark Tybor,  testified that he did not recall the dates he mentioned to the investigator. (November 16, 2006 Deposition of Mark Tybor (excerpts attached as Exhibit K to this Declaration) at 58:10-11)  However, Tybor confirmed at his deposition that although he "might have mixed up the dates," he in fact told Plaintiffs that "the downturn in JDS' business started right after winter, 2000," exactly as alleged in paragraph 86 of the SAC. (Id. at 45:12-25)  With respect to paragraph 93 of the SAC, Tybor also confirmed that he provided the information contained in that paragraph to the Plaintiffs.  (Id. at 52:12-15).

52.     All of the statements attributed to Tybor in the SAC are accurately reflected in attorney notes of a May 8, 2003 interview with this witness.

53.     The SAC alleges the following about Confidential Witness No. 22 (later identified as John L. Lattimer):

Paragraph 88:

Further, Confidential Witness No. 22, a Materials Planner at that plant, reported that work orders "decreased drastically in or around April 2000 and into 2001." Confidential Witness No. 22 added that "it got to the point where there was so much down time" that the planner began "concocting training topics for work cell members, simply to keep them appropriately busy."

Paragraph 146:

Indeed, Confidential Witness No. 22, a materials planner at the Bloomfield facility whose responsibilities included planning a product line that generated approximately $80 million annually, stated that he couldn't understand why the Company forecasters

set targets that clearly were not realistically attainable in 2000 and 2001.

54.     Statements attributed to Lattimer in the SAC are confirmed by a May 29, 2002 investigator memorandum detailing an interview with this witness.  Among other things, this memorandum confirms the timing and degree of the downturn in JDSU's business in 2000.

55.     The SAC alleges the following about Confidential Witness No. 23 (later identified  as Daniel P. Welch):

Paragraph 94:

> This illegal practice continued through at least the Summer of 2000.  Confidential Witness No. 23, a Manufacturing Supervisor in JDS's Bloomfield facility, stated that Ciena cancelled an order for approximately 300 of JDS's OC-48 modulators (which sold for $3,000 to $4,500 each) in the Summer of 2000, but the modulators were shipped anyway.

Paragraph 105:

> For example, Confidential Witness No. 23, a Manufacturing Supervisor in Bloomfield, stated that by early Spring of 2000, Lucent returned 3,000 OC-192 modulators (which cost approximately $5,000 each) to Bloomfield due to corrosion. However, when JDS offered to replace the modulators, Lucent refused to take a replacement of the $15,000,000 order, indicating that the return was primarily due to demand issues rather than to quality issues. These returned products were excess inventory as of the time they were returned.

Paragraph 116:

> Confidential Witness No. 23, a Manufacturing Supervisor in Bloomfield confirmed that by the Summer of 2000, demand had fallen greatly. Where the plant had been producing 400 OC-48 modulators per day, they began producing less than 100.

Paragraph 132:

> Moreover, Confidential Witness No. 23, a Manufacturing Supervisor in Bloomfield, stated that overtime in Bloomfield was cut from ten hours a week to zero in May 2000.

56.     With respect to paragraphs 94, 105 and 116 of the SAC, Daniel P. Welch, identified as Confidential Witness No. 23, testified at his deposition that he did not remember if he told Plaintiffs' investigators 2000 or 2001.  (November 10, 2006 Deposition of Daniel Welch (excerpts attached as Exhibit L to this Declaration) at 51:24 – 52:4)   However, Welch

1    confirmed that he "probably stated" Ciena cancelled an order for approximately 300 OC-48's

2    (Id. at 53:24-54:13); that Lucent returned 3,000 OC-92's for corrosion (Id. at 63:4-13) and that

3    "demand had fallen off" (Id. at 51:2-6).

4         57.    The statements attributed to this witness in the SAC are consistent with May 9,

5    2004 attorney notes of an interview with this witness.  Among other things, Welch stated that he

6    began work in January of 1999.

7         58.    The SAC alleges the following about Confidential Witness No. 24 (later

8    identified  as Janice Pablo Namauleg):

9        Paragraph 95:

10           Moreover, Confidential Witness No. 24, a Logistics Supervisor in
             JDS's San Jose plant, confirmed that the practice of shipping
11           cancelled orders took place at Company headquarters in California
             as well. During the Summer of 2000, customers were returning
12           orders that were shipped after the customer had cancelled the
             order.  When Confidential Witness No. 24 questioned why orders
13           were sent out after a customer cancelled the order, she was told
             that the cancellations were not put in the books in time to prevent
14           shipping and that the shipment was in error. She noticed that this
             "error" occurred quite often beginning in the Summer of 2000.
15
         Paragraph 124:
16
             Similarly, Confidential Witness No. 24, a former Logistics
17           Supervisor at the former E-TEK facility, commented that
             immediately after JDS's acquisition of E-TEK in June 2000,
18           people in the shipping department were putting in "massive"
             overtime to get orders out the door, but there was also a need for
19           "massive" overtime in receiving since many of the shipped goods
             came back.  Nortel and Alcatel returned large amounts of products
20           during this period. Some customers said that the products were
             defective, but when they were sent to the Final Analysis
21           department, it was discovered the products were not defective,
             leading to the obvious conclusion that the customers did not need
22           them.

23        59.    With respect to paragraphs 95 and 124 of the SAC, Janice Namauleg,  signed a

24   declaration (Zeller Exhibit 24) in 2006 stating that she spoke to someone she understood was

25   one of plaintiffs' attorneys but that she does "not remember our conversation exactly."  Despite

26   her recollection issue, Ms. Namauleg claims that she did not provide the information in

27   paragraphs 95 and 124 to plaintiffs' lawyers.

28

60.     The statements attributed to this witness are accurately reflected in attorney notes of an interview dated May 14, 2003.

61.     The SAC alleges the following about Confidential Witness No. 25 (later identified by plaintiffs as Eric Kelly):

Paragraph 97:

> The growth in inventory was confirmed by Confidential Witness No. 25, a JDS Production Team Leader in Windsor, Connecticut, who stated that by April 2000, JDS was overproducing product despite the fact that orders from virtually all JDS clients had dwindled.

Paragraph 135:

> In addition, according to Confidential Witness No. 25, a Production Team Leader, by mid to late-2000, no overtime was authorized and temporary staff was fired at the Company's plant in Windsor, Connecticut.

62.     With respect to paragraphs 97 and 135 of the SAC, Kelly testified that he could not remember "that specifically" what he said to Plaintiffs four years earlier (October 6, 2006 Deposition of Eric Kelly (excerpts attached as Exhibit M to this Declaration) at 80:5-15).  With respect to the dates, Kelly asserted at his deposition that "they must have just mixed that up," that he "would not have said 2000" and that he "must have said … 2001." (Id. at 82:2-12) Aside from this speculation, Kelly did not testify definitively that he in fact did not say "2000" four years earlier when he was interviewed.

63.     The statements attributed to Kelly in the SAC are consistent with a May 29, 2002 investigator report detailing an interview with this witness.

64.     The SAC alleges the following about Confidential Witness No. 26 (later identified by plaintiffs as Patricia Richard-Revette):

Paragraph 100:

> Confidential Witness No. 26, a member of JDS's Erbium Department in Ottawa, added that inventory of erbium (spooled rolls of fiber) began to build up in June 2000.

Paragraph 125:

> Confidential Witness No. 26, an employee in JDS's Erbium Department in Ottawa, stated that Nortel returned "a lot" of products to JDS in Ottawa in June and July 2000. Nortel had

previously ordered the materials, but began sending them back without penalty when its own production and demand had dropped.

Paragraph 126:

Confidential Witness No. 26 further noted that in response to the downturn in business in May or June 2000, JDS started cutting staff. Employees were told that because Nortel was scaling back, JDS had to also.

Paragraph 134:

Moreover, as noted above, Confidential Witness No. 26 stated that JDS started cutting staff in Ottawa in May or June 2000.

65.     With respect to paragraphs 100, 125, 126 and 134 of the SAC, Richard-Revette signed a declaration (Zeller Exhibit 26) in 2006 stating that she spoke to an attorney "several years ago" and does "not remember any details of our conversation."  Ms. Revette claims that the information contained in the referenced paragraphs "is not true" but there is no contention by her that she did not tell plaintiffs' representatives everything in those paragraphs attributed to her.

66.     The statements attributed to Richard-Revette in the SAC are consistent with a September 23, 2003  investigator report detailing an interview with this witness.

67.     The SAC alleges the following about Confidential Witness No. 27 (later identified  as Jodi L. Blanco):

Paragraph 103:

According to Confidential Witness No. 27, a production worker at the Bloomfield facility, there were serious problems with modulators manufactured at that plant, caused by a faulty design. The undercarriage of the modulators were nickel-plated. The nickel plating was reacting to the oxidation of other chemicals inside the modulators, causing corrosion. An entire warehouse full of these corroded modulators were returned to JDS in the Spring of 2000.  The witness said that this problem continued through at least August 2000, and caused severe customer relation problems with major customers, including Lucent, Alcatel and Nortel.

Paragraph 133:

Confidential Witness No, 27, a production worker in Bloomfield, confirmed that overtime was brought to a halt in that time period [May 2000], and Confidential Witness No. 41, an Engineering Technician in that same plant, stated that a two-shift operation at the plant was reduced to one shift in mid to late 2000.

68.     With respect to paragraphs 103 and 133 of the SAC, Jodi L. Blanco,  testified that reference to 2000 "may have been an error on their part when they wrote it down" (October 24, 2006 Deposition of Jodi Blanco (excerpts attached as Exhibit N to this Declaration) at 53:8-12), but did not affirmatively testify that she in fact did not use dates in 2000 when she made her statements to the Plaintiffs.

69.     In fact, a May 29, 2002 investigator report confirms the accuracy of the statements attributed to this witness in the SAC.

70.     The SAC alleges the following about Confidential Witness No. 28 (later identified by plaintiffs as Manuel A. Reyes[1]):

Paragraph 107:

> Confidential Witness No, 28, a Team Leader in JDS's Bloomfield plant, noticed many instances of unfinished product being shipped out in early 2000.  Specifically, in March 2000, JDS sent unfinished "Gen 1" Modulators to Ciena, who returned the products in April 2000. In addition, there were also a lot of returns from Ciena (modulators) and Alcatel (Dual Mach/Zenders) that were attributed to unfinished goods and/or goods that did not meet specifications. Each time Confidential Witness No. 28 questioned his superiors as to why they would ship such goods, JDS management sent an engineer to tell him that it was okay to ship the products even if they were unfinished or did not meet specifications.  Once again, JDS management showed that they were willing to take any steps available in order to meet their sales quotas.

71.     With respect to paragraph 107 of the SAC, Reyes signed a declaration (Zeller Exhibit 28) in 2006 stating that he did not provide the information contained in this paragraph which he says is "mostly inaccurate" and "inconsistent with my recollection of events," although he heard rumors confirming some of the information asserted and agreed that "parts of the … statement sound similar to what I discussed with plaintiff's lawyers…."   Moreover, Mr. Reyes also denies that he provided information in other paragraphs of the SAC that are attributed to other confidential witnesses: paragraph 108 (Confidential Witness No. 29),

---

[1]     Plaintiffs actually incorrectly identified this individual as "Manuel Erea."

paragraph 113 (Confidential Witness No. 32), paragraph 114 (Confidential Witness No. 29), and paragraph 135 (Confidential Witness No. 25).

72.     In fact, the allegations in the SAC attributed to Reyes are consistent with attorney notes of a May 8, 2003 interview with the witness.

73.     The SAC alleges the following about Confidential Witness No. 29 (later identified  as Tim Bakes):

Paragraph 108:

> Confidential Witness No. 29, a Team Leader in JDS's Bloomfield plant, confirmed that JDS rushed delivery of products a quarter earlier than customers wanted, in order to allow JDS to pick up the revenue early.

Paragraph 114:

> Confidential Witness No. 29 confirmed that in the Summer of 2000 there was "no work" to be had. Many orders were cancelled, including an order from Cisco for OC-192 modulators.

74.     With respect to paragraphs 108 and 114 of the SAC, Bakes signed a declaration (Zeller Exhibit 29) in 2006 stating that he spoke to an attorney for the plaintiffs for about five minutes after he was laid off in November 2001.  Mr. Bakes denies having provided information in other paragraphs of the SAC that are attributed to other confidential witnesses: paragraph 59 (Confidential Witness No. 3), paragraph 86 (Confidential Witness No. 20), paragraph 87 (Confidential Witness No. 21), paragraph 92 (Confidential Witness No. 21), paragraph 93 (Confidential Witness No. 20), paragraph 97 (Confidential Witness No. 25), paragraph 107 (Confidential Witness No. 28), paragraph 113 (Confidential Witness No. 32), paragraph 114 (Confidential Witness No. 29), paragraph 133 (Confidential Witness No. 41) and paragraph 167 (Confidential Witness No. 41).  He also denies having provided the information attributed to him in paragraph 108.

75.     The statements attributed to this witness in the SAC are consistent with attorney notes of a May 8, 2003 interview with this witness.

76.     The SAC alleges the following about Confidential Witness No. 30 (later identified as Kelli Hawkins):

Paragraph 109:

> Similarly, Confidential Witness No. 30, a Production Control Manager in JDS's San Jose facility, stated that JDS engaged in a pattern of earnings management in that near the end of the quarter the Company would ship products to customers early (e.g., ship at end of June 2000 even though the customer did not want the product until July) but JDS would ship the product on the "slow boat" so that JDS could recognize revenue in June, but the customer would not receive it until July.

77.    With respect to paragraph 109 of the SAC, Hawkins signed a declaration (Zeller Exhibit 30) in 2006 stating that she spoke to an attorney for the plaintiffs in 2003.  She denies having provided the information in paragraph 95 of the SAC although that information is attributed to Confidential Witness No. 24.  She denies having provided the information in paragraph 124 (Confidential Witness No. 24) and paragraph 136 (Confidential Witness No. 42), and paragraph 173 (Confidential Witness No. 49).   She also denies having provided the information in paragraph 109 of the SAC.

78.    The statements attributed to this witness in the SAC are accurately reflected in attorney notes of a 7/21/03 interview.

79.    The SAC alleges the following about Confidential Witness No. 31 (later identified  as Brent Cunningham):

Paragraph 110:

> The Company frequently used this tactic ["slow-boat"] in the quarter ending June 30, 2000. According to Confidential Witness No. 31, a JDS product engineer in Ottawa, JDS did a lot of "pull-ins" in that quarter, meaning that the Company produced more product than had been ordered so that it could ship ahead of schedule in order to get the numbers up for the quarter.

Paragraph 164:

> Confidential Witness No. 31, a Product Engineer in Ottawa, reported that in August 2000, Lucent cancelled a "huge order" of post filters that was at least in the "tens of millions of dollars."

Paragraph 170:

> Finally, Confidential Witness No. 31, stated that prior to Christmas 2000, Nortel canceled a $100 million order known as the "Mosaic Project."

80.      With respect to paragraphs 110, 164 and 170 of the SAC, Brent Cunningham, signed a declaration (Zeller Exhibit 31) in 2007 stating that he spoke to plaintiffs' counsel in 2003.  He claims that he did not provide the information attributed to him in paragraph 110 and does not recall providing the information attributed to him in paragraphs 164 and 170.

81.      In fact, the statements attributed to this witness in the SAC are accurately reflect attorney notes of a July 24, 2003 interview.

82.      The SAC alleges the following about Confidential Witness No. 32 (later identified by plaintiffs as Patricia Arle):

Paragraph 113:

> Confidential Witness No. 32, a Team Leader in JDS's Bloomfield and Windsor plants, noticed a severe downturn in demand in May 2000. People were laid off at that time. Unsold inventory was building up in the Cable and Specialty Group. For one type of modulator priced at $5,000 each, the plant was "a good thousand ahead."

83.      With respect to paragraph 113 of the SAC, Patricia Arle, signed a declaration (Zeller Exhibit 32) in 2006 stating that she spoke to an attorney for the plaintiffs in 2003.  She denies having provided information attributed in the SAC to other confidential witnesses: paragraph 59 (Confidential Witness Nos. 3 and 4), paragraph 61 (Confidential Witness No. 4), paragraph 97 (Confidential Witness No. 25), paragraph 103 (Confidential Witness No. 27), paragraph 107 (Confidential Witness No. 28), paragraph 108 (Confidential Witness No. 29), paragraph 114 (Confidential Witness No. 29), paragraph 133 (Confidential Witness Nos. 27 and 41), paragraph 135 (Confidential Witness 25), snf paragraph 168 (Confidential Witness No. 48). She also denies having provided the information in paragraph 113 that is attributed to her. However, Ms. Arle admits that when she spoke to plaintiffs' attorneys, she did not recall if the events she related occurred in 2000 or 2001 and only recalled that it was 2001 later.

84.      In fact, the statements in the SAC attributed to this witness accurately reflect attorney notes of a May 6, 2003 interview.

85.      The SAC alleges the following about Confidential Witness No. 33 (later identified as Scott Thomas):

1    Paragraph 115:

2        According to Confidential Witness No. 33, a Production
         Supervisor in Bloomfield, it was "widely known" by mid-2000,
3        that there was a "glut" of components building up on the shelves of
         JDS's customers that the customers could not sell.
4

5    86.    With respect to paragraph 115 of the SAC, Scott Thomas, signed a declaration

6    (Zeller Exhibit 33) in 2006 stating that he responded to a newspaper ad seeking witnesses.  He

7    denies having provided information attributed in the SAC to other confidential witnesses:

8    paragraph 66 (Confidential Witness No. 10), paragraph 89 (Confidential Witness No. 10),

9    paragraph 94 (Confidential Witness No. 23), paragraph 101 (Confidential Witness No. 10),

10   paragraph 105 (Confidential Witness No. 23), paragraph 111 (Confidential Witness No. 10),

11   paragraph 116 (Confidential Witness No. 23), and paragraph 132 (Confidential Witness No.

12   23).  With respect to the information attributed to him in paragraph 115, he admits he "may

13   have spoke to plaintiffs about that."

14   87.    In fact, the statements in the SAC attributed to this witness accurately reflect

15   attorney notes of a May 12, 2003 interview.

16   88.    The SAC alleges the following about Confidential Witness No. 34 (later

17   identified  as Roy N. Lawrence):

18   Paragraph 117:

19        Moreover, Confidential Witness No. 34, a JDS Engineer in
         Bloomfield, noted that top management at the plant began to leave
20       in the Summer of 2000, during which time there were an unusual
         number of order cancellations and returns. Many of the products
21       that were rejected were tested by JDS and found not to be defective
         (i.e., they were simply not wanted).

22   89.    With respect to paragraph 117 of the SAC, Roy N. Lawrence, confirmed at his

23   deposition that he told Plaintiffs all of the information attributed to him in this paragraph.

24   (September 11, 2006 Deposition of Roy Lawrence (excerpts attached as Exhibit O to this

25   Declaration) at 66:6-8; 66:16-20; 71:12-18; 82:16-22).

26   90.    The SAC alleges the following about Confidential Witness No. 35 (later

27   identified as Tai Ton):

28   Paragraph 120:

---

So, too, Confidential Witness No. 35, an Opto-Mechanical Engineer at JDS's San Jose plant, reported that demand decreased beginning in April 2000. And Confidential Witness No. 2, an Account Manager in San Jose, confirmed that by late Spring 2000, there was widespread "pushing out" of orders for JDS products by both large and small customers.

91.     This allegation attributed to this witness accurately reflects the contents of an investigator's report dated June 11, 2002.

92.     The SAC alleges the following about Confidential Witness No. 37 (later identified as Sandra J. Macika):

Paragraph 121:

In or around July 2000, according to Confidential Witness No. 37, a Senior Quality Engineer in San Jose, customers were canceling orders and sending back inventory that they could not sell to their own clients.

93.     With respect to paragraph 121 of the SAC, Macika testified at her deposition that the paragraph reflects "the basis of … what I said" although it is "paraphrased" in that "a couple of the words are not exactly correct."  (November 3, 2006 Deposition of Sandra Macika (excerpts attached as Exhibit P to this Declaration) at 182:24-183:4)  Macika testified about one customer's [Lucent's] cancellation of orders in or around July 2000 (Id. at 184:4-16), and "it could have been that [she] just used the wrong word [i.e., the plural "customers"] (Id. at 183:25 – 184:1).  And although at her deposition she testified it would not have been logical for her to say "customers" during her interview, the interview was "so long ago" that she could not "remember exactly." (Id. at 207:2-6).

94.     The statements attributed to this witness in the SAC correspond with a June 23, 2002 investigator's report.

95.     The SAC alleges the following about Confidential Witness No. 38 (later identified as Henry Fan):

Paragraph 123:

Confidential Witness No. 38, a Product Line Manager at the former E-TEK plant in San Jose, noted that at or around the time that ETEK was acquired by JDS in June 2000, there was a decrease in orders at that plant.

1    96.    With respect to paragraph 123 of the SAC, Fan signed a declaration (Zeller

2    Exhibit 37) in 2006 stating that he "faintly remember[s] being contacted about the case several

3    years ago."  He does not deny that he provided the information attributed to him in paragraph

4    123.  He claims that the SAC paragraph got his position wrong and that he does not remember

5    whether the allegation is true or not.

6    97.    The statements attributed to this witness in the SAC are accurately reflected in

7    May 6, 2003 attorney notes of an interview with Mr. Fan.

8    98.    The SAC alleges the following about Confidential Witness No. 39 (later

9    identified as Bert Ramos):

10    Paragraph 128:

11    > Finally, Confidential Witness No. 39, a Senior Programmer
   > Analyst in Santa Clara, California, recalled that by late Spring or
12    > early Summer of 2000, the Santa Clara plant was running only five
   > days a week (down from seven), almost everyone had their hours
13    > reduced, and overtime was no longer available.

14    99.    The statements attributed to this witness in the SAC are accurately reflected in a

15    May 29, 2002 investigator's report.

16    100.    The SAC alleges the following about Confidential Witness No. 47 (later

17    identified by plaintiffs as Bruce Coleman):

18    Paragraph 165:

19    > Confidential Witness No. 47, an Order Management Specialist in
   > Ottawa confirmed that demand for JDS products "tailed off" in
20    > August 2000.

21    101.    With respect to paragraph 165 of the SAC, Bruce Coleman, signed a declaration

22    (Zeller Exhibit 39) in 2006 stating that he was contacted by an attorney "several years ago" and

23    that he "remember[s] some details of our conversation."  He does not deny that he provided the

24    information attributed to him in paragraph 165, but only that he does "not remember making the

25    statement."

26    102.    The statements attributed in the SAC to this witness correspond with a June 11,

27    2002  investigator's report.

28

103.    The SAC alleges the following about Confidential Witness No. 49 (later

identified  as Daneanne Leisinger):

Paragraph 173:

> Confidential Witness No. 49, a former materials supervisor at JDS
> in San Jose, whose job responsibilities included supervising six
> stockrooms and an offsite storage facility, also confirmed that there
> was a buildup of a "huge amount" of excess material throughout
> 2000. The massive buildup of inventory, which far exceeded
> demand, consisted of finished product as well as raw material,
> mostly raw fiber used in fiber optics. For example, the list of solid,
> firm orders for products at the San Jose plant on the Oracle
> database system was 50-60% below the quantity of material
> ordered from JDS's raw material products suppliers. All six
> stockrooms were full of inventory by June 2000, and offsite
> storage areas were used for storing additional inventory. The
> stockrooms and storage area combined amounted to approximately
> 11,000 square feet of storage, and by May or June 2000, there was
> enough raw material and finished fiber optic components to keep
> the facility running at capacity for an entire year. Moreover,
> Confidential Witness No. 49 stated in the offsite storage facility
> alone, there were fifty pallets of finished products that no customer
> had ordered.

104.    With respect to paragraph 173 of the SAC, Leisinger confirmed at her deposition

that she told or may have told Plaintiffs' representative the information attributed to her in this

paragraph.  (November 6, 2006 Deposition of Daneane Leisinger (excerpts attached as Exhibit

Q to this Declaration) at 145:12-22; 158:16-20; 162:25-163:9;  165:21-166:4; 166:25-167:6;

168:20-169:5; 170:14-25).

105.    The SAC alleges the following about Confidential Witness No. 50 (later

identified by plaintiffs as Denise Chau):

Paragraph 174:

> This information was confirmed by Confidential Witness No. 50, a
> San Jose cost accountant in charge of inventory, who stated that
> the large build-up of inventory at JDS in 2000 was a result of mass
> cancellations by Nortel and other companies. According to the
> accountant, the inventory buildup was out of proportion with the
> demand for product, and there was a much higher accumulation of
> both raw material and finished product than there were confirmed
> orders. Ultimately, in or about March 2001, millions of dollars of
> the finished product was destroyed as obsolete.

106.    With respect to paragraph 174 of the SAC, Denise Chau, signed a declaration

(Zeller Exhibit 41) in 2006 stating that she does "not recall ever speaking with plaintiffs'

---

ARISOHN DECL. IN OPPOSITION TO JDSU DEFENDANTS' MOTION FOR SANCTIONS
MASTER CASE NO.  C 02-1486 CW (EDL)                                                    29

1    counsel or anyone acting on plaintiffs' behalf" about JDSU.   She denies that she provided the

2    information attributed to her in paragraph 174.

3          107.    However, all of the statements attributed to this witness that are set out in the

4    SAC are accurately reflected in a June 27, 2002 investigator's report.

5          I declare under penalty of perjury that the foregoing is true and correct.  Executed at New

6    York, New York on this 14th day of January, 2008.

7

8

9

10                              /s/  Mark S. Arisohn_____
                                      Mark S. Arisohn

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28